# No. 24-1284

## IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**MATTHEW CHRISTENSEN, KATHERINE KAESS CHRISTENSEN,**

**Plaintiffs-Appellees**

v.

**UNITED STATES,**

**Defendant-Appellant**

---

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES COURT OF FEDERAL CLAIMS NO. 20-935; SENIOR JUDGE MARIAN BLANK HORN

---

## BRIEF FOR APPELLANT UNITED STATES

---

DAVID A. HUBBERT
*Deputy Assistant Attorney General*

JACOB EARL CHRISTENSEN     **(202) 307-0878**
KATHLEEN E. LYON     **(202) 307-6370**
*Attorneys*
*Tax Division*
*Department of Justice*
*Post Office Box 502*
*Washington, D.C. 20044*

April 22, 2024

# TABLE OF CONTENTS

**Page**

Table of contents ................................................................. i

Table of authorities .......................................................... iii

Statement of related cases ............................................viii

Glossary .............................................................................ix

Jurisdictional statement ................................................... 1

Statement of the issue...................................................... 3

Statement of the case ....................................................... 3

    A.    Background ........................................................ 4

            1.    The foreign tax credit in the Internal Revenue Code ........................................................ 4

            2.    The 1994 Treaty ........................................ 8

            3.    The net investment income tax ................... 12

            4.    The Christensens' original and amended joint federal income tax returns for 2015 ........... 13

    B.    Proceedings in the CFC ................................... 15

Summary of argument ................................................... 16

Argument:

    The tax credit referenced in Article 24(2)(b) of the Treaty is subject to the Internal Revenue Code's limitations on foreign tax credits ................................................................... 20

    Standard of review ..................................................... 20

    A.    The text and context of Article 24(2) demonstrate that the provisions and limitations of the Internal Revenue Code apply to the foreign tax credit referenced in Article 24(2)(b).................................................... 20

**Page**

      1.    The CFC erroneously read subparagraph (b)(i) in isolation and rendered the special re-sourcing rule in subparagraph (b)(ii) superfluous ............................ 21

           a.    The origin of Article 24(2)(b) .............................. 23

           b.    Subparagraph (b)(i)'s ordering rule ................... 25

           c.    Subparagraph (b)(ii)'s re-sourcing rule ............. 27

      2.    The CFC's interpretation produces anomalous results .......................................................................... 34

  B.    The U.S. Treasury Department's Technical Explanation of the Treaty supports the Government's interpretation ..... 37

  C.    The Government's interpretation of Article 24(2)(b) is consistent with the Treaty's purposes ................................. 47

Conclusion ................................................................................ 53

Addendum ................................................................................ 54

Certificate of compliance ...................................................... 55

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abbott v. Abbott,*
    560 U.S. 1 (2010) ........................................................41-42

*Adams Challenge (UK) Ltd. v. Commissioner,*
    154 T.C. 37 (2020) ..................................................... 44

*Air France v. Saks,*
    470 U.S. 392 (1985) ....................................................21

*Attorney General of Canada v. R.J. Reynolds Tobacco*
    *Holdings, Inc.,*
    268 F.3d 103 (2d Cir. 2001)..................................... 43

*Garcia v. Commissioner,*
    140 T.C. 141 (2013) .................................................. 44

*GE Energy Power Conversion France SAS, Corp. v.*
    *Outokumpu Stainless USA, LLC,*
    140 S. Ct. 1637 (2020) ..............................................37

*Great-West Life Asur. Co. v. United States,*
    678 F.2d 180 (Ct. Cl 1982) ...................................... 43

*GSS Holdings (Liberty) Inc. v. United States,*
    81 F.4th 1378 (Fed. Cir. 2023) ...............................20

*Kolovrat v. Oregon,*
    366 U.S. 187 (1961) ...........................................41-42

*Maximov v. United States,*
    373 U.S. 49 (1963) ........................................... 36, 45

*Mazurek v. United States,*
    271 F.3d 226 (5th Cir. 2001) ................................. 43

*Medellin v. Texas,*
    552 U.S. 491 (2008) ...........................................41-42

*Nat'l Westminster Bank, PLC v. United States,*
    512 F.3d 1347 (Fed. Cir. 2008).................... 41, 43, 46

*O'Connor v. United States,*
    479 U.S. 27 (1986) ..............................................30-33

*Rabassa v. United States,*
    No. 23-12445, 2024 WL 1435103
    (11th Cir. Apr. 3, 2024) ........................................ 44

**Cases (cont'd):** **Page(s)**

*Sanders v. Commissioner*,
  161 T.C. No. 8, 2023 WL 7220014 (Nov. 2, 2023)..................22

*Shnier v. Commissioner*,
  151 Fed. Cl. 1 (2020) ...........................................................22

*Smith v. Commissioner of Internal Revenue*,
  No. 5191-20, 2022 WL 3654871
  (T.C. Aug. 25, 2022)..............................................................44

*Sumitomo Shoji Am., Inc. v. Avagliano*,
  457 U.S. 176 (1982) ....................................................40-42, 45

*Toulouse v. Commissioner*,
  157 T.C. 49 (2021) ..........................................5, 22, 43, 47, 48

*United States v. Stuart*,
  489 U.S. 353 (1989) .........................................................41-42

*Vento v. Commissioner*,
  147 T.C. 198 (2016) ...............................................................6

*Water Splash, Inc. v. Menon*,
  581 U.S. 271 (2017) .............................................21, 23, 33

*Xilinx, Inc. v. Commissioner*,
  598 F.3d 1191 (9th Cir. 2010) ............................................41

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 1        .........................................................................4, 14, 32
§ 27       .....................................................................4-5, 14, 37
§ 55       ...........................................................................................14
§ 61       .............................................................................................4
§§ 861–865.....................................................................................5
§ 871      .............................................................................................4
§§ 901–909......................................................................................5
§ 901      ...........................................................................................14
§ 901(a) .................................................................................5, 37
§ 904 ...................................................................6, 8, 33, 39
§ 904(a) ..............................5, 7, 17, 27-28, 33, 35, 39, 45, 48
§ 904(c)..................................................................................7, 49

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 904(d) .............................................................. 7, 35
§ 911 ........................................................................ 51
§ 911(a) ............................................................ 18, 34
§ 911(d)(6) ..................................................... 18, 34-35
§ 986 ................................................................... 5, 36
§ 1411 ......................... 3, 5, 12-16, 22, 37, 48-50, 52
§ 7422(f)(1) ............................................................... 2

28 U.S.C.:

§ 1295(a)(3) .............................................................. 2
§ 1491(a) ................................................................... 2
§ 1502 ....................................................................... 2
§ 2107(b) ................................................................... 2

Health Care and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, § 1402(a)(1), 124 Stat 1029 ................. 12

**Regulations:**

Treasury Regulations (26 C.F.R.):

§ 1.1411-1(e) ........................................................... 5

**Miscellaneous:**

1994 Treaty (Convention between the Government
of the United States of America and the Government
of the French Republic for the Avoidance of Double
Taxation and the Prevention of Fiscal Evasion with
Respect to Taxes on Income and Capital, signed on
August 31, 1994), 1963 U.N.T.S. 67 .............................. 8, 11, 29, 42

**Miscellaneous (cont'd):** **Page(s)**

1994 Treaty (cont'd)

    Article 24 ............................................................ 10, 11, 15, 47

    Article 24(2) ...................................... 17, 20, 21, 29, 37, 39, 51

    Article 24(2)(a) .............. 15-19, 21-22, 28-29, 32, 35, 40, 47-49

    Article 24(2)(b) ............................... 3, 15-20, 22-23, 25, 32-35, 37, 39, 46-49, 51-52

    Article 24(2)(b)(i) ............................... 12, 17-18, 21-23, 25-29, 33, 37, 39, 44, 51

    Article 24(2)(b)(ii) ......................... 12, 17-18, 21-23, 27-28, 30, 32-34, 39, 40, 44

    Article 24(2)(c) ................................................................ 29-30

    Article 24(2)(d) ............................................................... 29-30

    Article 24(2)(e) .................................................................... 30

8 *Mertens Law of Federal Income Taxation* § 32:59 (2024) ............. 8

12 *Mertens Law of Federal Income Taxation* § 45D:62 (2024) ........ 6

Andersen: Foreign Tax Credits (WG&L) ¶ 1.03[1],
    *Section 904 Limitation* (2023) ................................................ 8

Dirk Suringa, *The Foreign Tax Credit Limitation Under
    Section 904*, 6060 T.M. (BNA 2016) ........................................ 8

Federal Rule of Appellate Procedure 4(a)(1)(B) .............................. 2

H.R. Conf. Rep. No. 108-755 (2004) ................................................ 6

**Miscellaneous (cont'd):**                                              **Page(s)**

Kellar and Browne Jr., 6875-2nd T.M., *U.S. Income Tax
      Treaties—Benefits Provided by a Country to Its Own
      Residents and Citizens*, (2019) ............................................ 40

Lori Hellkamp & Alden Dilanni-Morton, *Demystifying the
      Saving Clause and Re-Sourcing Rules in Treaties*,
      Tax Notes Federal, vol. 172, August 16, 2021 ...................... 40

Michael J. Graetz & Michael M. O'Hear, *The "Original
      Intent" of U.S. International Taxation*,
      46 Duke L.J. 1021, 1054–56 (1997) ....................................... 7

New York State Bar Association Tax Section, *Report on
      Treaty Re-Sourcing Rules*, Rep. No. 1313
      (November 24, 2014) ..................................................... 40, 48

S. Budget Comm., *Tax Expenditures: Compendium
      of Background Material on Individual Provisions*,
      S. Prt. 111-58 (Comm. Print 2010) ................................. 23, 24

S. Exec. Rep. No. 96-4 (June 15, 1979) ................................... 23, 24

S. Exec. Rep. No. 104-7 (Aug. 10, 1995) ........................ 9, 38, 42, 45

Stephanie H. Simonard, *Newly Revised Income Tax
      Treaty with France: A Breakthrough in U.S. Tax
      Treaty Law*, 2 Nw. J. Int'l L. & Bus. 455, 457–59
      (1980) ..................................................................................... 25

Treasury Department Technical Explanation of The
Convention Between the Government of the United States
of America and the Government of the French Republic
for the Avoidance of Double Taxation and the Prevention
of Fiscal Evasion with Respect to Taxes on Income and
Capital Signed at Paris on August 31, 1994 ................ 19, 37-46, 52

# STATEMENT OF RELATED CASES

This case has not previously been before this or any other appellate court, and counsel for the United States are aware of no other case that will directly affect or be directly affected by this Court's decision in this case.

# GLOSSARY

| | |
|---|---|
| CFC | U.S. Court of Federal Claims |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| Treaty | Convention between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, signed on August 31, 1994 |

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

### No. 24-1284

### MATTHEW CHRISTENSEN, KATHERINE KAESS CHRISTENSEN,

**Plaintiffs-Appellees**

v.

### UNITED STATES,

**Defendant-Appellant**

_____

### ON APPEAL FROM THE JUDGMENT OF THE
### UNITED STATES COURT OF FEDERAL CLAIMS
### NO. 20-935; SENIOR JUDGE MARIAN BLANK HORN

_____

### BRIEF FOR APPELLANT UNITED STATES

_____

## JURISDICTIONAL STATEMENT

On January 8, 2020, Matthew and Katherine Christensen filed a

federal income tax refund claim for $3,851 for the 2015 tax year, which

the IRS disallowed on February 20, 2020.  (Appx920, Appx922,

Appx991-993.)[1]  On July 31, 2020, the Christensens filed a timely

_____

[1] "Appx" references are to the separately bound record appendix
filed with this brief.  "Add" cites are to the addendum attached to this
brief.

refund suit in the U.S. Court of Federal Claims (CFC) seeking that refund. (Appx920-921.) The CFC had jurisdiction under 28 U.S.C. § 1491(a). Although the suit involves a treaty-based claim, and such claims are generally beyond the jurisdiction of the CFC, 28 U.S.C. § 1502, a provision of the Internal Revenue Code (I.R.C.) (26 U.S.C.) provides an exception for treaty-based tax refund claims. *See* I.R.C. § 7422(f)(1) (providing that a tax-refund suit may be brought against the United States "notwithstanding the provisions of section 1502 of such title 28 (relating to certain treaty cases)").

On September 13, 2023, on the parties' cross-motions for partial summary judgment, the CFC issued an opinion holding that the Christensens were entitled to their 2015 refund claim. (Appx1-92.) On October 20, 2023, the court entered a stipulated judgment for the Christensens. (Appx93.) That judgment was a final order resolving all claims of all parties. On December 18, 2023, within 60 days after entry of the judgment, the United States filed a notice of appeal (Appx919), which was timely under 28 U.S.C. § 2107(b) and Federal Rule of Appellate Procedure 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUE

Whether the CFC erred in ruling that Article 24(2)(b) of the income tax treaty between the United States and France allows U.S. citizens residing in France to claim a foreign tax credit against the net investment income tax imposed by § 1411 of the Internal Revenue Code, even though the Code itself would not allow such a credit.

## STATEMENT OF THE CASE

The Christensens, U.S. citizens living in France, filed an amended joint federal income tax return for 2015 claiming a foreign tax credit against taxes they had previously paid to the United States on their net investment income.  Although the Internal Revenue Code does not permit a foreign tax credit against the net investment income tax, the Christensens claimed that a 1994 income tax treaty between the United States and France permitted the claimed credit, independent of any provisions or limitations in the Internal Revenue Code.  The IRS denied the refund claim, and the Christensens filed this refund suit in the CFC.  The parties filed cross-motions for partial summary judgment.

In a decision reported at 168 Fed. Cl. 263 (2023), the CFC determined that the Christensens were entitled to the claimed refund

on the ground that the treaty provided an independent foreign tax credit not subject to the provisions or limitations of the Internal Revenue Code.

## A.    Background

### 1.    The foreign tax credit in the Internal Revenue Code

The United States taxes its residents and its citizens, wherever they reside, on their worldwide income, and it taxes non-residents on their income from U.S. sources.  I.R.C. §§ 1, 61, 871.  This scheme results in situations where both the United States and another country may seek to tax the same income—a phenomenon known as double taxation.  To relieve U.S. taxpayers of some of the burden of double taxation, the Internal Revenue Code generally allows U.S. taxpayers a credit against their federal income tax for the amount of income tax paid to a foreign country.  I.R.C. § 27.  For example, suppose a U.S. citizen earns $100 from a foreign source, which the foreign country taxes at a rate of 10% and which the United States taxes at a rate of 12%.  The Code would allow a $10 foreign tax credit for the tax paid to the foreign country against the U.S. tax liability of $12, resulting in

U.S. tax due of $2.  Section 986 provides rules for converting the foreign tax payment into U.S. dollars to determine the amount of the credit.

But there are various limitations on the foreign tax credit, *see* I.R.C. §§ 901–909, two of which are relevant here.  First, the credit is available only against taxes imposed by Chapter 1 of the Internal Revenue Code, which imposes various kinds of income tax.  *See* I.R.C. § 27 (providing that the foreign tax credit applies "against the tax imposed by this chapter," *i.e.*, Chapter 1); I.R.C. § 901(a) (similar); *see also* 26 C.F.R. § 1.1411-1(e).  This means the foreign tax credit cannot be taken against taxes imposed elsewhere in the Code, including the tax on net investment income imposed by I.R.C. § 1411 in Chapter 2A.  *Toulouse v. Commissioner*, 157 T.C. 49, 55–56 (2021).

Second, the foreign tax credit is subject to a source-based limitation that distinguishes between income from sources outside the United States (foreign-source income) and income from sources inside the United States (U.S.-source income).  *See* I.R.C. § 904(a); *see also id.* §§ 861–865 (rules for determining the source of income).  Section 904(a) provides that the foreign tax credit cannot exceed the same proportion of U.S. tax which the taxpayer's income from foreign sources bears to

his entire taxable income for the year.  That is, the credit cannot be
more than the total U.S. tax liability multiplied by a fraction, where the
numerator of the fraction is taxable income from foreign sources and
the denominator is total taxable income from both U.S. and foreign
sources.  *See* 12 *Mertens Law of Federal Income Taxation* § 45D:62
(2024).  This limitation places a cap on the foreign tax credit equal to
the U.S. tax that would otherwise be due on the taxpayer's income from
foreign sources, thereby protecting the United States' ability to collect
its full tax on income from domestic sources.  *Vento v. Commissioner*,
147 T.C. 198, 204–05 (2016) ("A taxpayer's overall section 904 limitation
for a given year equals the portion of the taxpayer's precredit U.S. tax
liability attributable to foreign source income.  The limitation prevents
taxpayers from using foreign tax credits to reduce their U.S. tax on U.S.
source income."); H.R. Conf. Rep. No. 108-755, at 381 (2004) ("The
foreign tax credit generally is limited to the U.S. tax liability on a
taxpayer's foreign-source income, in order to ensure that the credit
serves its purpose of mitigating double taxation of cross-border income
without offsetting the U.S. tax on U.S.-source income."); *see also* 8
*Mertens Law of Federal Income Taxation* § 32:59 (2024).  *See generally*

Michael J. Graetz & Michael M. O'Hear, *The "Original Intent" of U.S. International Taxation*, 46 Duke L.J. 1021, 1054–56 (1997) (discussing the history of the foreign tax credit limitation).

To illustrate § 904(a)'s source-based limitation, assume the same facts as in the example above in which a U.S. citizen earns $100 from a foreign source, except that the tax rate of the foreign country on the foreign-source income is 15% (instead of 10%) and, in addition to the $100 in foreign-source income, the U.S. citizen also has $100 in income from U.S. sources. Although the U.S. citizen must pay $15 in tax on the foreign income to the foreign country, his foreign tax credit is limited to $12, which is derived from multiplying the total U.S. tax liability of $24 ($200 taxed at a U.S. rate of 12%) by 0.5 ($100 foreign income (the numerator) divided by $200 total taxable income (the denominator)). Section 904(c) would permit the excess $3 of unused foreign tax to be carried back as a credit in the prior year and then carried forward for the succeeding 10 years until absorbed.[2]

---

[2] The application of § 904(a)'s limitation on foreign tax credits is somewhat more complicated than illustrated by this simplified example because § 904(d) requires that § 904(a)'s limitation formula be applied separately for different categories, or "baskets," of income (*e.g.*, passive

(continued…)

-7-

## 2.    The 1994 Treaty

The Internal Revenue Code provisions governing foreign tax credits were substantially the same in 1994 when the United States and France signed a tax treaty titled the "Convention between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital," signed on August 31, 1994 (hereinafter "the Treaty") (reproduced at Add1-42).[3]  1963 U.N.T.S. 67.  At that time, France, like

_____

income and general income) to prevent cross-crediting.  "Cross-crediting refers to the practice of averaging high and low rates of foreign taxes together to bring the overall rate of foreign tax below the U.S. effective tax rate.  This practice erodes the impact of the foreign tax credit limitation, which otherwise might deny a portion of the credit for the highly taxed income."  Dirk Suringa, *The Foreign Tax Credit Limitation Under Section 904*, 6060 T.M., at A-2 (BNA 2016) (reproduced at Appx771-774); *see also* Andersen: Foreign Tax Credits (WG&L) ¶ 1.03[1], *Section 904 Limitation* (2023) ("Because of the general Section 904 limitation, taxpayers may be tempted to arrange the sources of their foreign income in such a way that the blended rate of foreign tax on that income is equal to or less than the effective U.S. tax rate on that income.  This cross-crediting technique is particularly powerful in the case of investment income, which can usually be located in any number of jurisdictions (high-tax or low-tax) without materially impairing the investment's pre-tax return.")

[3] The Treaty was amplified by diplomatic notes signed the same day on August 31, 1994, and by additional notes signed on December

(continued…)

the United States, taxed its residents on their worldwide income, and both countries taxed non-residents on income from sources within its own territory, creating the potential for double taxation. Relief from double taxation under the Treaty was principally achieved by each country agreeing to limit its right to tax income derived from sources within its territory by residents of the other country, thus yielding primary taxing rights to the country of residence. (*See* Articles 6–23). But the country of source retained a limited right to tax income derived by residents of the other country in some situations, such as where a permanent establishment or fixed base was maintained in the source country. (*See, e.g.*, Articles 7 and 10.) In those situations, the Treaty generally provided relief from double taxation by requiring the country of residence either to grant a credit against its tax for the taxes paid to the source country or to exempt that income from its tax altogether. (Article 24.) *See generally* S. Exec. Rep. No. 104-7, at 1–2 (Aug. 10, 1995) (reproduced at Appx287-322).

---

19, 1994, and December 20, 1994, all of which addressed matters of no relevance to this case. *See* S. Exec. Rep. No. 104-7, at 1, 9 n.5 (Aug 10, 1995). The Treaty replaced an earlier tax treaty between the United States and France signed in 1967 and amended by protocols in 1970, 1978, 1984, and 1988. *See* T.I.A.S. Nos. 6518, 7270, 9500, 11096, 11967.

The Treaty was amended by protocols in 2004 and 2009, *see* T.I.A.S. Nos. 06-1221.1 and 09-1223, but the substantive amendments made by those protocols are not relevant here.[4]

Article 24 (Relief from Double Taxation) sets forth the specific manner in which each country has undertaken to relieve double taxation.  Paragraph 1 of Article 24, as renumbered by the 2009 Protocol (*see* footnote 4), addresses France's obligations and provides in pertinent part:

> [1] In the case of France, double taxation shall be avoided in the following manner.
>
> > (a) Income arising in the United States that may be taxed or shall be taxable only in the United States in accordance with the provision of this Convention shall be taken into account for the computation of the French tax where the beneficiary of such income is a resident of France and where such income is not exempted from company tax according to

---

[4]  The 2009 Protocol amended Article 24 by reversing the original numbering of paragraphs 1 and 2 to correct an inconsistency between the French and English versions of the Treaty, which had originally set forth the United States' obligations to relieve double taxation in paragraph 1 and France's obligations in paragraph 2.  *See* 2009 Protocol, T.I.A.S. No. 09-1223, art. VIII ¶ 1.  No updated current version of the Treaty, as amended, appears to be included in any official reporting service.  The Treaty (with the original numbering in Article 24) is reproduced in the Addendum and is available on the IRS's website here, along with the amending protocols and other related documents.  We refer to the text of the Treaty using the renumbering adopted in the 2009 Protocol, with renumbering indicated by brackets.

French domestic law.  In that case, the United States tax shall not be deductible from such income, but the beneficiary shall be entitled to a tax credit against the French tax.  Such credit shall be equal:

\* \* \*

(iii) in the case of income referred to in Article 10 (Dividends), Article 11 (Interest), paragraph 1 of Article 13 (Capital Gains), Article 16 (Directors' Fees), and Article 17 (Artistes and Sportsmen), to the amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income.[5]

\* \* \*

_____

Paragraph 2 of Article 24 addresses the United States' obligations and provides in pertinent part (emphases added):

[2](a) *In accordance with the provisions and subject to the limitations of the law of the United States* (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States as a credit against the United States income tax:

(i) the French income tax paid by or on behalf of such citizen or resident; and

(ii) in the case of a United States company owning at least 10 percent of the voting power of a company that is a resident of

_____

[5] The original 1994 Treaty also included a reference in this paragraph to "Article 12 (Royalties)," which was deleted by the 2009 Protocol.

France and from which the United States company receives dividends, the French income tax paid by or on behalf of the distributing corporation with respect to the profits out of which the dividends are paid.

(b) In the case of an individual who is both a resident of France and a citizen of the United States:

(i) *the United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph (a)(iii) of paragraph [1].* However, the credit so allowed against United States income tax shall not reduce that portion of the United States income tax that is creditable against French income tax in accordance with subparagraph (a)(iii) of paragraph [1];

(ii) income referred to in paragraph [1] and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, *shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i).* The provisions of this subparagraph (b)(ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. No provision of this subparagraph (b) relating to source of income shall apply in determining credits against United States income tax for foreign taxes other than French income tax as defined in subparagraph (e)[.]

\*  \*  \*

---

### 3.    The net investment income tax

In 2010, Congress enacted I.R.C. § 1411 and placed it in a new

Chapter 2A of the Internal Revenue Code.  Health Care and Education

Reconciliation Act of 2010, Pub. L. No. 111-152, § 1402(a)(1), 124 Stat

1029, 1061.  Section 1411 in general imposes a 3.8% tax on the net

investment income of individuals, trusts, and estates.  The net

investment income tax "was enacted . . . in order to raise revenue that is

intended to offset increased expenditures for expanded health insurance

coverage" under the Affordable Care Act.  S. Budget Comm., *Tax

Expenditures: Compendium of Background Material on Individual

Provisions*, S. Prt. 111-58, at 414 (Comm. Print 2010).  The Government

acknowledged in its briefing below that this new § 1411 tax is a

"covered tax" under Article 2 of the Treaty.

### 4.    The Christensens' original and amended joint federal income tax returns for 2015

Matthew and Katherine Christensen, a married couple, are U.S.

citizens who resided in France throughout the year 2015.  (Appx32-33,

Appx920.)  As U.S. citizens, they were subject to U.S. federal income

taxes.  They filed a joint U.S. federal income tax return (Form 1040) for

2015 on which they reported having received wage income from foreign

sources and investment income (*i.e.*, dividends, interest, royalties, rents,

or annuities) from both foreign and U.S. sources.  (Appx33-34.)[6]  They

reported income tax of $76,287 (*see* I.R.C. § 1), alternative minimum tax

of $89 (*see* I.R.C. § 55), and a foreign tax credit of $75,859 under I.R.C.

§§ 27 and 901, resulting in total income tax due of $517 under Chapter

1 of the Internal Revenue Code.  (Appx34.)

In addition to the tax imposed by Chapter 1, the Christensens also

reported tax of $4,155 imposed by I.R.C. § 1411 in Chapter 2A.

(Appx34.)  They did not seek to apply any foreign tax credit against the

§ 1411 tax on their original return.  But they later filed an amended

return (Form 1040X) claiming they were entitled to a foreign tax credit

of $3,851 against their § 1411 tax for foreign tax paid to France on their

investment income.  (Appx922-923, Appx952.)  In asserting this claim,

the Christensens did not rely on the Code provision authorizing foreign

tax credits, I.R.C. § 27, which authorizes foreign tax credits only against

the tax imposed by Chapter 1 of the Code.  Rather, they maintained

---

[6]  The CFC's opinion accurately states items reported in the Christensen's original return for 2015, which they attached to the complaint and filed under seal.  Although the complaint and certain attachments were later unsealed (*see* Appx97 (Dkt. No. 31), Appx100 (Dkt. Nos. 69, 70)), the original return remains sealed.  The original return is available for review as Docket entry 1-1 (pages 71-144 of PDF).

that Article 24 of the Treaty between the United States and France allowed a foreign tax credit against their § 1411 tax that was not subject to the provisions and limitations of the Internal Revenue Code. (Appx923, Appx926, Appx954-955.)

## B.    Proceedings in the CFC

The IRS denied the Christensens' refund claim, after which they filed this suit in the U.S. Court of Federal Claims.  (Appx991-993, Appx920-921.)  The CFC ruled for the Christensens on the parties' cross-motions for partial summary judgment.  (Appx1-92.)  The court agreed with the Government that Article 24(2)(a) of the Treaty did not authorize a foreign tax credit against the § 1411 tax because the credit described in subparagraph (a) is expressly made subject to the provisions and limitations of the Internal Revenue Code, which do not permit foreign tax credits against taxes imposed outside of Chapter 1 of the Code.  (Appx84-86.)  But the court went on to construe Article 24(2)(b) of the Treaty as allowing a foreign tax credit against the § 1411 tax because the language in subparagraph (a) restricting any credit according to the provisions and limitations of the Code was not repeated in the reference to a credit in subparagraph (b).  (Appx86-92.)  The court

declined to give any deference to the U.S. Treasury Department's contemporaneous explanation of the Treaty's provisions and instead applied a rule of liberal construction to achieve the Treaty's purported purpose of avoiding double taxation, including under the circumstances of this case.  (Appx54-58, Appx75-77, Appx82-83.)  The court thus held that Article 24(2)(b) of the Treaty allowed a treaty-based foreign tax credit that was not subject to the limitations of the Internal Revenue Code and that could, therefore, be applied against the Christensens' § 1411 tax.  (Appx86-92.)

On October 20, 2023, the CFC granted the Christensens' refund claim of $3,851, plus interest, in a stipulated judgment that reserved the Government's right to appeal.  (Appx93, Appx995.)  The Government timely filed a notice of appeal on December 18, 2023. (Appx919.)

## SUMMARY OF ARGUMENT

Article 24(2)(a) of the Treaty provides that a U.S. citizen or resident may claim a foreign tax credit against U.S. income tax "[i]n accordance with the provisions and subject to the limitations of the law of the United States."  The CFC erred in holding that, because that

language is not expressly repeated in subparagraph (b) addressing the case of an individual who is both a resident of France and a U.S. citizen, the credit referenced in subparagraph (b) that is available to such individuals is *not* subject to the Internal Revenue Code's limitations on foreign tax credits.

1.     Both the text and context of Article 24(2) demonstrate that subparagraph (a)'s introductory language restricting the foreign tax credit "[i]n accordance with the provisions and subject to the limitations of the law of the United States" applies equally to the credit against U.S. tax that is referenced in subparagraph (b).  In holding otherwise, the CFC improperly read subparagraph (b)(i) in isolation, while ignoring subparagraph (b)(ii).  Subparagraph (b)(ii) is a re-sourcing rule that treats U.S.-source income as French-source income in order to "give effect" to the credit referenced in subparagraph (b)(i), on which the CFC relied.  The drafters' inclusion of this re-sourcing rule in (b)(ii) makes sense only if they understood that the credit referenced in (b)(i) was subject to the Internal Revenue Code's source-based limitation on foreign tax credits in I.R.C. § 904(a), such that a special re-sourcing rule was required in the Treaty to treat U.S.-source income as foreign-source

-17-

income in order to give effect to the intended credit referenced in (b)(i). The CFC's conclusion that Article 24(2)(b) provides a foreign tax credit that is unmoored from the Internal Revenue Code renders the re-sourcing provision in subparagraph (b)(ii) entirely superfluous.

The CFC's interpretation also leads to other anomalous results making its interpretation implausible. Under the CFC's interpretation, U.S. citizens residing in France can claim a double tax benefit by excluding their "foreign earned income" from U.S. tax under I.R.C. § 911(a), while also claiming a foreign tax credit under Article 24(2)(b) for the tax paid to France on that excluded income—a significant windfall for the taxpayer that is normally precluded by I.R.C. § 911(d)(6). The CFC's interpretation also provides U.S. citizens residing in France with a far more generous foreign tax credit under Article 24(2)(b) than is available to U.S. citizens residing in the United States, whose foreign tax credit is subject to the Code's limitations under Article 24(2)(a). An interpretation that assumes the signatories intended these and other anomalies, or failed to account for them, is implausible and should be rejected.

2.    The Technical Explanation of the Treaty prepared by the U.S. Treasury Department supports the Government's interpretation. It confirms that the Government's interpretation is in fact how the United States understood Article 24(2)(b) contemporaneously when the Treaty was executed.  The CFC erred by failing to give any deference to the Technical Explanation, as required by precedent of both this Court and the Supreme Court.

3.    Finally, the Government's interpretation is also consistent with the purposes of the Treaty to avoid double taxation and to prevent fiscal evasion of tax.  While the Treaty aims to relieve double taxation, its text demonstrates that it does not, and was never intended to, eliminate double taxation in all circumstances.  U.S. citizens residing in the United States may claim a foreign tax under Article 24(2)(a) that is nevertheless subject to the Internal Revenue Code's limitations, and Article 24(2)(b) should be interpreted consistently as it applies to U.S. citizens residing in France.  Such a consistent interpretation cannot offend the general purpose of the Treaty to relieve double taxation even though it would not eliminate double taxation in every instance.

The CFC's interpretation of Article 24(2)(b), on the other hand, is inconsistent with the Treaty's additional purpose of preventing fiscal evasion of tax because it allows U.S. citizens residing in France to claim double tax benefits against their U.S. tax, resulting in a windfall for the taxpayer at the expense of the U.S. Treasury.

The CFC's judgment was erroneous and should be reversed.

## ARGUMENT

**The tax credit referenced in Article 24(2)(b) of the Treaty is subject to the Internal Revenue Code's limitations on foreign tax credits**

### Standard of review

This Court "review[s] de novo a grant and denial of summary judgment by the [Court of Federal Claims]." *GSS Holdings (Liberty) Inc. v. United States*, 81 F.4th 1378, 1381 (Fed. Cir. 2023) (citation omitted).

**A.    The text and context of Article 24(2) demonstrate that the provisions and limitations of the Internal Revenue Code apply to the foreign tax credit referenced in Article 24(2)(b)**

The text and context of Article 24(2) of the Treaty demonstrate that the provisions and limitations of the Internal Revenue Code apply to the foreign tax credit that is referenced in Article 24(2)(b), on which

the CFC relied.  The CFC improperly read subparagraph (b)(i) in isolation while ignoring subparagraph (b)(ii), and its erroneous interpretation renders subparagraph (b)(ii) superfluous and produces other anomalous results that the drafters did not intend.

> **1.    The CFC erroneously read subparagraph (b)(i) in isolation and rendered the special re-sourcing rule in subparagraph (b)(ii) superfluous**

The interpretation of a treaty "must begin . . . with the text of the treaty and the context in which the written words are used." *Air France v. Saks*, 470 U.S. 392, 396–97 (1985); *see also Water Splash, Inc. v. Menon*, 581 U.S. 271, 276 (2017) (same) (quotation and citation omitted).  The text and context of Article 24(2) demonstrate that there is no foreign tax credit independent of the provisions and limitations of the Internal Revenue Code.

In Article 24(2)(a), the United States agreed to allow a U.S. citizen or resident a credit against U.S. income tax for the French income tax paid to France.  Article 24(2)(a) is explicit, however, that such credit is allowed only "[i]n accordance with the provisions and subject to the limitations of the law of the United States," which means it cannot be applied against taxes imposed outside of Chapter 1 of Internal Revenue

Code, including the I.R.C. § 1411 tax at issue here. The Tax Court so held in, *Toulouse v. Commissioner*, 157 T.C. 49 (2021), and the CFC agreed (Appx83-86).[7] But the CFC went on to hold in this case that the absence of such restricting language in Article 24(2)(b) means that the separate reference to a credit in subparagraph (b)(i) supports the allowance of an independent, treaty-based credit that is not subject to the limitations of the Internal Revenue Code.

The fundamental flaw in the CFC's interpretation of Article 24(2)(b) is that it reads subparagraph (b)(i) in isolation and completely ignores subparagraph (b)(ii). As we will explain, the drafters' inclusion of a special re-sourcing provision in (b)(ii) shows they understood that subparagraph (a)'s introductory language restricting the foreign tax credit ("In accordance with the provisions and subject to the limitations of the law of the United States") applied to the credit referenced in subparagraph (b)(i) as well. Under this interpretation, Article 24(2)(a)'s

---

[7] The CFC's characterization of the Tax Court's decision in *Toulouse* as "non-precedential" (Appx77) is incorrect. Although not binding in the Court of Federal Claims, reviewed opinions of the Tax Court such as *Toulouse* are binding precedent in the Tax Court, *see Sanders v. Commissioner*, 161 T.C. No. 8, 2023 WL 7220014, at *4 (Nov. 2, 2023), and are persuasive authority elsewhere, *Shnier v. Commissioner*, 151 Fed. Cl. 1, 11 (2020).

introductory language establishes the context for what follows in the
rest of paragraph 2, including for the credit referenced in Article
24(2)(b)(i), on which the CFC relied.  In contrast, the CFC's
interpretation renders the re-sourcing provision in Article 24(2)(b)(ii)
superfluous, violating the rule that treaties should not be interpreted in
a manner that makes terms meaningless.  *See Water Splash*, 581 U.S.
at 277–78 (rejecting an interpretation of the Hague Service Convention
that would render a provision superfluous).

### a.    The origin of Article 24(2)(b)

Article 24(2)(b) addresses the specific situation of "an individual
who is both a resident of France and a citizen of the United States."
This provision has its origin in the 1978 Protocol amending the previous
treaty between the United States and France in response to a change in
French domestic law that, for the first time, subjected U.S. citizens
resident in France to French tax on their worldwide income, including
income from U.S. sources.  (Prior to that time, such individuals were
taxed by France on only their French-source income.)  *See* 1978
Protocol, T.I.A.S. No. 9500, § 10, art. 23(3) (reproduced at Add43-51); S.
Exec. Rep. No. 96-4, at 1, 11–12 (June 15, 1979) (reproduced at Add52-

75).  As recognized at the time, France's new law created considerable

potential for taxation by both the United States and France of the U.S.-

source income of U.S. citizens residing in France because the U.S.

statutory foreign tax credit "does not apply to foreign taxes on U.S.-

source income."  S. Exec. Rep. No. 96-4, at 11.  To alleviate the impact of

France's new law, the 1978 Protocol divided the tax revenue from these

individuals' U.S.-source income between the U.S. and French

Treasuries, which was accomplished "by French agreement to exempt

part of the income from, or to give a partial credit against, its tax and

U.S. agreement to treat part of the income as if from French sources,

making French taxes on it eligible for the U.S. foreign tax credit."  *Id.* at

1, 11; *see also id.* at 17 ("the U.S. foreign tax credit limitation would

ordinarily prevent a credit against U.S. tax" in the absence of a re-

sourcing rule, added by the protocol, "to treat part of the income as from

French sources, increasing the recipient's foreign tax credit limitation,

and thereby, as a practical matter, allowing French tax on the income to

be credited against the individual's U.S. tax liability"); 1978 Protocol,

T.I.A.S. No. 9500, § 10, art. 23(3)(b) (providing that certain U.S.-source

income "shall be considered as from sources within France").

The re-sourcing rule introduced by the 1978 Protocol to treat U.S.-source income as foreign source so that it would fit within the U.S. statutory foreign tax credit limitation was heralded as a breakthrough in U.S. tax treaty law.  Stephanie H. Simonard, *Newly Revised Income Tax Treaty with France: A Breakthrough in U.S. Tax Treaty Law*, 2 Nw. J. Int'l L. & Bus. 455, 457–59, 468 (1980) (reproduced at Add135-156).

### b.    Subparagraph (b)(i)'s ordering rule

Article 24(2)(b) today reflects the same approach in addressing the situation of an individual who is both a resident of France and a U.S. citizen.  In that situation, the United States has limited rights under the Treaty to tax certain items of the individual's U.S.-source income,[8] France may tax the individual's worldwide income based on his residence in France, and the United States may likewise tax the individual's worldwide income based on his U.S. citizenship.[9]  Given the

---

[8] *See* Articles 10 (dividends), 11 (interest), 13 (capital gains), 16 (directors' fees), and 17 (artistes and sportsmen).

[9] A saving clause in the Treaty preserves the United States' ability to tax the worldwide income of its citizens residing in France.  (*See* Article 29(2), providing, with specified exceptions, that "the United States may tax its . . . citizens as if the Convention had not come into effect.")

countries' competing rights of taxation, subparagraph (b)(i) (colloquially called the "three-bite rule") lays out the order and priority of the foreign tax credits that must be allowed by both countries in this situation:

> (i) the United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph (a)(iii) of paragraph [1]. . . .

As set forth in the yellow highlighted text, this ordering provision gives first priority to the United States' right under the Treaty to tax certain U.S.-source income, *i.e.*, that described in subparagraph (a)(iii) of paragraph 1 (the "first bite"); and France must allow a credit for such tax against the French income tax that it imposes on the individual's worldwide income based on his residence in France (the "second bite"). As set forth in the green highlighted text, the United States must then allow a credit for the French income tax paid when it computes the residual U.S. tax imposed on worldwide income based on the individual's U.S. citizenship (the "third bite").  It is this latter credit against U.S. tax that the CFC erroneously held in this case is unrestricted by the limitations of the Internal Revenue Code.

### c.    Subparagraph (b)(ii)'s re-sourcing rule

Subparagraph (b)(ii) goes on to provide the re-sourcing rule that is critical to the proper interpretation of the credit referenced in subparagraph (b)(i).  Subparagraph (b)(ii) says that the individual's *U.S.-source income*—both the portion that the United States may tax and the portion that France may tax under the Treaty—"*shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i).*"  This language reflects the signatory parties' shared understanding that, in order to "*give effect* to the provisions of subparagraph (b)(i)," which provide for the credit here in dispute, the individual's U.S.-source income must be "considered income from sources within France"—that is, foreign-source income.

Crucially, the only reason this re-sourcing rule would be necessary is if the drafters believed that the credit against U.S. income tax referenced in subparagraph (b)(i), on which the CFC relied, was in the first place subject to the Internal Revenue Code's source-based limitation in § 904(a).  Under § 904(a), taxes paid to a foreign country on U.S.-source income *cannot* give rise to a foreign tax credit against

U.S. tax.  That is because § 904(a) limits the foreign tax credit to the proportion of U.S. tax equal to the ratio of the taxpayer's foreign-source income to total income.  *See* discussion *supra* pp. 5–7.  Consequently, the contracting parties had to include a special re-sourcing rule in subparagraph (b)(ii) to treat the individual's U.S.-source income as foreign-source income "to the extent necessary to give effect to" the foreign tax credit against U.S. income tax that is described in subparagraph (b)(i).  Had the drafters instead believed, as the CFC held, that Article 24(2)(b)(i) provided an independent credit unrestricted by the provisions and limitations of the Internal Revenue Code, then there would have been no reason for them to include subparagraph (b)(ii) in the Treaty because the source of the income would not have mattered for purposes of the credit.

The drafters' inclusion of the re-sourcing rule in subparagraph (b)(ii) shows—unmistakably—that the contracting parties understood that Article 24(2)(a)'s introductory language restricting the foreign tax credit "[i]n accordance with the provisions and subject to the limitations of the law of the United States" applied to the credit against U.S. income tax referenced in subparagraph (b)(i).  Under this

interpretation, Article 24(2)(a)'s introductory language—inserted at the very outset of paragraph 2—establishes the context for what follows in the rest of paragraph 2, including for the credit referenced in subparagraph (b)(i).  This conclusion is further reinforced by subparagraphs (c) and (d) of the original 1994 Treaty, which similarly provided re-sourcing rules that were necessary only if the drafters believed that subparagraph (a)'s introductory language applied to the specific situations addressed in those subparagraphs.[10]

In a nutshell, Article 24(2) sets forth the United States' obligation to relieve double taxation in the following manner.  Subparagraph (a) sets forth the central rule for doing so by allowing a foreign tax credit subject to "the provisions and limitations of" U.S. law for certain income taxes paid to France.  Subparagraphs (b)–(d) describe special rules for each of three unique situations in which subparagraph (a)'s overarching rule continues to apply:  the case of an individual who is both a resident of France and a U.S. citizen (subparagraph (b)); the case of an individual who is both a resident and citizen of the United States and a national of France (subparagraph (c), now deleted); and the case of a

---

[10]  Subparagraph (c) was later deleted by the 2009 Protocol.

partnership of which an individual member is a resident of France (subparagraph (d)).[11]  Subparagraphs (b)(ii), (c), and (d) all re-source income by treating U.S.-source income as if it were French-source income for purposes of determining relief *via* the foreign tax credit. These re-sourcing provisions make sense only if the drafters understood that subparagraph (a)'s introductory language applied throughout paragraph 2.  None of these provisions can be read independently.

In a closely analogous case arising under the Panama Canal Treaty between the United States and Panama, the Supreme Court held that express limiting language in the first paragraph of a treaty article addressing taxation applied to the entire article.  In *O'Connor v. United States*, 479 U.S. 27 (1986), U.S. citizen employees of the Panama Canal Commission and their spouses sought a refund of U.S. income taxes collected on salaries paid by the Commission.  *Id.* at 28.  Article III of the treaty provided that the rights and legal status of U.S. government employees operating in Panama were governed by an "Agreement in Implementation" of Article III.  *Id.* at 29.  Article XV(1)

---

[11]  Paragraph 2(e) defines "French income tax" for purposes of Article 24.

of the Agreement provided an exemption "from payment *in the Republic of Panama* of all taxes . . . on their activities or property." *Id.* at 29 (emphasis added). Article XV(2) provided that "United States citizen employees . . . shall be exempt" from any taxes on income from their work for the Commission, and Article XV(3) provided that "United States citizen employees . . . shall be exempt" from certain other taxes under certain conditions. *Id.* The CFC agreed with the petitioners in that case that Article XV(2) constituted an express exemption of their Commission salaries from both Panamanian and U.S. taxation. *Id.* at 30.

This Court reversed, and the Supreme Court affirmed this Court's decision. The Supreme Court held that Article XV(1), "which confers . . . an exemption 'from payment *in the Republic of Panama* of all taxes' . . . , establishes the context for the discussion of tax exemptions in the entire Article" such that the exemption language in Articles XV(2) and (3) "are understood to be dealing only with taxes payable in Panama." 479 U.S. at 30. Although the Court found some "subtle" textual evidence in Article XV(3) limiting taxation to Panamanian taxes, it held that "the contextual case for limiting Article

XV to Panamanian taxes" was "[m]ore persuasive than the textual evidence, and in our view overwhelmingly convincing." *Id.* at 31.  In reference to the language in paragraphs (2) and (3) that "United States citizen employees . . . shall be exempt" from taxes, the Court explained that "[u]nless one posits the ellipsis of failing to repeat, in each section, § 1's limitation to taxes 'in the Republic of Panama,' the Article takes on a meaning that is utterly implausible and has no foundation in the negotiations leading to the Agreement." *Id.* at 31.  The Supreme Court held that petitioners' reading of Article XV(2) was "unnatural" and would render other language in that article "superfluous," and it rejected the "verbal distortions necessary to give plausible content" to petitioners' interpretation.  *Id.* at 32–33.

Here, it is equally "implausible" to interpret Article 24(2)(b) of the Treaty to provide a foreign tax credit that is not "[i]n accordance with the provisions and subject to the limitations of the law of the United States" as set out in Article 24(2)(a).  Again, there would be no reason for the drafters to re-source U.S.-source income as French-source income in subparagraph (b)(ii) unless they understood that the limitations of the Internal Revenue Code applied to the credit

referenced in subparagraph (b)(i) and that § 904(a) of the Code would defeat the intended credit in the absence of a special re-sourcing rule in the Treaty.  The CFC's conclusion that Article 24(2)(b) provides a foreign tax credit that is unmoored from and unrestricted by the Internal Revenue Code improperly renders the re-sourcing provision in subparagraph (b)(ii) entirely "superfluous."  *See O'Connor*, 479 U.S. at 32; *Water Splash*, 581 U.S. at 277–78.

The CFC acknowledged, but never addressed, the Government's argument that interpreting Article 24(2)(b) to allow an unrestricted foreign tax credit "would render meaningless the resourcing rule in subsection (2)(b)(ii), which is premised on the application of the foreign-tax-credit limitation in I.R.C. § 904."  (Appx69.)  The CFC instead said repeatedly that § 904's limitation on foreign tax credits was not even relevant to the issues in this case.  (Appx69–70, Appx25, Appx50 n.23.)  As we have demonstrated, the CFC's failure to recognize and consider the clear implications of Article 24(2)(b)(ii)'s re-sourcing rule and its relation to § 904's source-based limitation on foreign tax credits resulted in the CFC's erroneous interpretation.

### 2.   The CFC's interpretation produces other anomalous results

In addition to rendering Article 24(2)(b)(ii) superfluous, the CFC's interpretation produces other anomalous results that are unprecedented in any other U.S. income tax treaty and that were not intended by the contracting parties.

As one egregious example, under the CFC's interpretation, a U.S. citizen residing in France can claim a double tax benefit by electing to exclude his "foreign earned income" from U.S. tax under I.R.C. § 911(a), while at the same time claiming a foreign tax credit under Article 24(2)(b) of the Treaty for the amount of tax paid to France on that excluded income.  In other words, not only does the taxpayer avoid paying any U.S. tax on his foreign earned income, as a result of the exclusion allowed under § 911(a), but the taxpayer also gets a treaty-based credit for taxes paid to France on that excluded income—a credit the taxpayer can then use to offset U.S. tax imposed on his other income, including unrelated U.S.-source income.  Such a windfall for the taxpayer at the expense of the U.S. Treasury is normally precluded by § 911(d)(6), entitled "denial of double benefits," which disallows a foreign tax credit that is "allocable to or chargeable against amounts

excluded from gross income under subsection (a)."  If, however, as the CFC held, the foreign tax credit in Article 24(2)(b) were not subject to the Code's limitations, then § 911(d)(6)'s denial of double tax benefits would not apply, and taxpayers who are U.S. citizens residing in France would reap a windfall.

Another anomaly in the CFC's interpretation is that it would provide U.S. citizens residing in France with a far more generous foreign tax credit than would be available to U.S. citizens residing in the United States.  U.S. citizens residing in the United States are subject to the Code's limitations in claiming a foreign tax credit under Article 24(2)(a), but U.S. citizens residing in France would not be subject to such limitations under Article 24(2)(b) if the CFC's ruling prevails.  Thus, § 904(a)'s source-based limitation, § 904(d)'s rules preventing cross-crediting (*see supra* p. 7, footnote 2), and § 911(d)(6)'s denial of double tax benefits, as just a few examples, would not apply to them.  No evidence in the record suggests that the parties to the Treaty meant to give such preferential treatment to a subset of U.S. citizens.

Still, other, perhaps less consequential, issues that are dealt with by the Code would remain unanswered if the credit allowed by the

Treaty were unmoored from the Code's provisions, such as the proper method for translating foreign taxes into U.S. dollars in determining the amount of the foreign tax credit that is normally governed by § 986.

The CFC dismissed these concerns by noting simply that "[n]one of the scenarios . . . appear to be before this court based on the facts presented" in this case. (Appx69-70, Appx246.) But an interpretation of the Treaty that assumes the signatory parties intended all of these anomalies, or simply failed to account for them, is utterly implausible. And such an interpretation should be avoided regardless of whether the taxpayers in this case have chosen to take advantage of the windfall anomalies created by the CFC's decision. *See Maximov v. United States*, 373 U.S. 49, 55 (1963) (declining to read the United States' tax treaty with the United Kingdom "to accord unintended benefits inconsistent with its words and not compellingly indicated by its implications" and explaining that "[o]ur interpretation [of the treaty] affords every benefit negotiated for by the parties to the Convention on behalf of their respective residents and prevents an unintended tax windfall to a private party.") Nothing in the Treaty suggests that the United States or France intended to undermine the highly articulated statutory

framework in the Code on which the foreign tax credit is based, and no such intent should be inferred or imputed.

———————————————

In sum, the text and context of Article 24(2) demonstrate that subparagraph (a)'s introductory language restricting the foreign tax credit "[i]n accordance with the provisions and subject to the limitations of the law of the United States" applies to the credit referenced in Article 24(2)(b)(i), on which the CFC relied. Consequently, the foreign tax credit referenced in Article 24(2)(b) cannot be applied against taxes imposed outside of Chapter 1 of the Internal Revenue Code, including the tax on net investment income imposed by I.R.C. § 1411 in Chapter 2A, because the Code limits foreign tax credits to the taxes imposed in Chapter 1. *See* I.R.C. §§ 27, 901(a). The CFC's contrary decision was in error.

## B. The U.S. Treasury Department's Technical Explanation of the Treaty supports the Government's interpretation

Other aids to treaty interpretation confirm the Government's textual interpretation of Article 24(2) set forth above. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,*

*LLC*, 140 S. Ct. 1637, 1645–46 (2020) ("Because a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation the negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations.") (internal quotations omitted).  In particular, as the agency charged with negotiating and drafting the Treaty, the U.S. Treasury Department prepared a Technical Explanation for the Senate prior to the Treaty's ratification.[12]  (Appx323-381); *see* S. Exec. Rep. No. 104-7, at 35 (referring Senate members to the Technical Explanation for a detailed explanation of the proposed treaty).  The Technical Explanation serves as "an official guide to the Convention" that "reflects the policies behind the particular Convention provisions, as well as understandings reached with respect to the application and interpretation of the Convention."  (Appx323.)

---

[12] The official name of the Technical Explanation is "Treasury Department Technical Explanation of The Convention Between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Signed at Paris on August 31, 1994."

In discussing Article 24, the Technical Explanation says explicitly that the foreign tax credit authorized under Article 24(2) is determined by the provisions of the U.S. Code and that a special re-sourcing rule was included in subparagraph (b) so that the credit would fit within I.R.C. § 904(a)'s source-based limitation:

> The credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law . . . . *Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given.* The limitations of U.S. law generally limit the credit against U.S. tax to the amount of U.S. tax due with respect to net foreign-source income within the relevant foreign tax credit limitation category (see Code section 904(a)). . . .

> \*   \*   \*

> Subparagraph 1(b) [now 2(b)] also provides that certain *U.S.-source income will be treated as French source income to permit the additional credit to fit within the foreign tax credit limitation of Code Section 904.*

(Appx361) (emphases added).  Again, the re-sourcing rule in Article 24(2)(b)(ii) would not have been necessary had the drafters believed that the credit referenced in subparagraph (b)(i) was free from the restrictions of the Internal Revenue Code, as the CFC held.  Treasury's explanation confirms that the Government's textual interpretation of Article 24(2)(b) set forth above, including the applicability of Article

24(2)(a)'s introductory language, is in fact how the United States

understood the agreement when the Treaty was executed.

Notably, the Government is not alone in this understanding of the

re-sourcing provision's purpose, which is shared by legal commentators

and practicing tax lawyers alike.[13]

The Supreme Court has repeatedly held that "the meaning

attributed to treaty provisions by the Government agencies charged

with their negotiation and enforcement is entitled to great weight."

*Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)

---

[13] Tax practitioners and legal commentators consistently share
the government's view that income re-sourcing provisions, such as that
in Article 24(2)(b)(ii), are necessary because the foreign tax credit
permitted by U.S. tax treaties (including the treaty with France)
remain subject to U.S. domestic law requirements that limit the credit
to foreign-source income. *See* Lori Hellkamp & Alden Dilanni-Morton,
*Demystifying the Saving Clause and Re-Sourcing Rules in Treaties*, Tax
Notes Federal, vol. 172, August 16, 2021, at 1105, 1107–08 & n.20
(citing the France-U.S. Treaty, art. 24(2)(b)) (reproduced at Add76-81);
Kellar and Browne Jr., 6875-2nd T.M., *U.S. Income Tax Treaties—
Benefits Provided by a Country to Its Own Residents and Citizens*, A-15
to A-16 & n. 105 (2019) (citing the U.S.-France Treaty, art. 24)
(reproduced at Add82-97); New York State Bar Association Tax Section,
*Report on Treaty Re-Sourcing Rules*, Rep. No. 1313, at 2–3, 13–14, 26–
27 (November 24, 2014) (reproduced at Add98-134; *see* Add99-100,
Add110-111, Add123-124); *see also id.* at 14–20 (discussing the
evolution of re-sourcing provisions in the U.S. model income tax
conventions) (*see* Add111-117).

(citing *Kolovrat v. Oregon*, 366 U.S. 187 (1961)); *accord Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (noting the "well-established canon of deference" that "the Executive Branch's interpretation of a treaty 'is entitled to great weight'") (internal quotation and citation omitted); *Medellin v. Texas*, 552 U.S. 491, 513 (2008) (same); *United States v. Stuart*, 489 U.S. 353, 369 (1989); *see also Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1358 (Fed. Cir. 2008); *Xilinx, Inc. v. Commissioner*, 598 F.3d 1191, 1196–97 (9th Cir. 2010) ("A tax treaty is negotiated by the United States with the active participation of the Treasury. The Treasury's reading of the treaty is 'entitled to great weight.'") (quoting *Stuart*, 489 U.S. at 369).

In contravention of these authorities, the CFC declined to accord any deference to Treasury's Technical Explanation because the record did not include evidence that France agreed with, or did not object to, Treasury's interpretation. (Appx57-58.) But that is not the rule. The Supreme Court has not conditioned deference to the Executive branch's interpretation of a treaty on proof of the other contracting party's acquiescence or agreement. *See Sumitomo*, 457 U.S. at 184–85; *Kolovrat*, 366 U.S. at 194; *Abbott*, 560 U.S. at 15; *Stuart*, 489 U.S. at

369.  Executive branch interpretations of a treaty are legitimate "aids to treaty interpretation" in themselves.  *Stuart*, 489 U.S. at 369.  The Supreme Court has given "great weight" to the Executive's views of a treaty even when presented in an amicus brief requested by the Court, long after a treaty was entered.  *See Sumitomo*, 457 U.S. at 184–85 n.10; *Kolovrat*, 366 U.S. at 194; *Abbott*, 560 U.S. at 15; *Medellin*, 552 U.S. at 508, 513.

Further, a Technical Explanation is not merely an expression of the views of the Executive branch.  Senate ratification documents, including the Technical Explanation at issue here, are presented to the Senate in connection with ratification and, as such, are legitimate aids to treaty interpretation.  *Medellin*, 552 U.S. at 507, 509-10, 514; *Stuart*, 489 U.S. at 366-68.  Here, the Senate Committee on Foreign Relations expressly relied on the Technical Explanation of the 1994 treaty throughout its Executive Report in which it recommended ratification of the treaty.  *See* S. Exec. Rep. 104-7, at 35 (endorsing the "detailed article-by-article explanation of the proposed tax treaty" in the Technical Explanation); *id.* at 6, 9, 13, 19, 20 n.9, 34.

This Court has explained that interpretation of a tax treaty requires "'examin[ing] not only the language, but the entire context of [the] agreement'"—including Treasury's Technical Explanation submitted to the Senate as part of the ratification process. *Nat'l Westminster*, 512 F.3d at 1353 (quoting *Great-West Life Asur. Co. v. United States*, 678 F.2d 180, 183 (Ct. Cl 1982)).  Indeed, other courts have properly looked to Treasury's Technical Explanations to aid in interpreting a tax treaty's (or related protocol's) provisions, the parties' understandings, and the negotiating or drafting history.  *See, e.g.*, *Toulouse*, 157 T.C. at 61; *Mazurek v. United States*, 271 F.3d 226, 233 (5th Cir. 2001) (holding that U.S. Competent Authority has broad discretion under U.S.-France tax treaty when considering an information request by France where "specific commentary and advice" in the Technical Explanation indicated that Treasury intended that approach and where Technical Explanation "does not restrict the plain meaning of the Treaty language in any way"); *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 121 (2d Cir. 2001) (concluding, based on its review of negotiators' understanding as reflected in Technical Explanation of 1995 Protocol to U.S.-Canada

tax treaty, that the U.S. "carefully considered whether and to what extent extraterritorial tax enforcement was advisable" before entering the protocol); *Rabassa v. United States*, No. 23-12445, 2024 WL 1435103, at *3 (11th Cir. Apr. 3, 2024) (finding that the court's interpretation of U.S.-Spain tax treaty's exchange-of-information agreement to apply to taxpayers who are not residents of either the United States or Spain was "consistent with" Treasury's understanding set forth in Technical Explanation); *Smith v. Commissioner of Internal Revenue*, No. 5191-20, 2022 WL 3654871, at *5 n.11 (T.C. Aug. 25, 2022) ("We have found the Treasury Department's technical explanations of income tax treaties helpful in interpreting treaty provisions.") (citing *Adams Challenge (UK) Ltd. v. Commissioner*, 154 T.C. 37, 66 (2020), and *Garcia v. Commissioner*, 140 T.C. 141, 160 (2013)).  The CFC erred by failing to give any deference to the Technical Explanation.

As explained above, the drafters' inclusion of the re-sourcing rule in Article 24(2)(b)(ii) is itself clear evidence of the United States' *and France's <u>mutual</u>* understanding at the time that the credit described in subparagraph (b)(i) was subject to subparagraph (a)'s introductory language restricting the foreign tax credit allowed under the Treaty "in

accordance with and subject to the provisions of" U.S. law, which includes I.R.C. § 904(a)'s source-based limitation and the foreign tax credit's inapplicability to taxes imposed outside of Chapter 1 of the Internal Revenue Code.  Treasury's Technical Explanation—upon which the Senate relied when ratifying the Treaty, *see* S. Exec. Rep. No. 104-7, at 35—confirms that understanding.  (Appx361.)

Indeed, the fact that Treasury's contemporaneous explanation aligns with a plain-language reading of the Treaty's text is compelling.  In such situations, "it is particularly inappropriate for a court to sanction a deviation from the clear import of a solemn treaty," as the CFC did here, "when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result *inconsistent* with the intent or expectations of its signatories." *Maximov*, 373 U.S. at 54 (emphasis added); *see also Sumitomo*, 457 U.S. at 180 ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result *inconsistent* with the intent or expectations of its signatories.") (emphasis added and internal quotation omitted).  These authorities suggest that what is relevant is the absence of any evidence of an

*inconsistent* understanding by France, not the lack of evidence that France agrees with or does not object to the United States' contemporaneous understanding of the treaty provision at issue, as the CFC held (Appx56-57).

To be sure, this Court has held that the Executive branch's position "merits less deference where an agency and another country disagree on the meaning of a treaty" and when "Treasury's contemporaneous interpretation . . . conflict[s] with the contemporaneous intent of the Senate." *Nat'l Westminster*, 512 F.3d at 1358 (quotations and citations omitted).  But neither concern is raised in this case, where there is no indication that France disagrees with the Government's position and where the Senate expressly relied on the Treasury's Technical Explanation during the ratification process.

Therefore, the CFC erred by failing to give any deference to the Technical Explanation, which confirms the Government's interpretation of Article 24(2)(b) is correct.

## C.    The Government's interpretation of Article 24(2)(b) is consistent with the Treaty's purposes

The Government's interpretation of Article 24(2)(b) is also consistent with the Treaty's purposes, while the CFC's interpretation is not.

The Treaty's title indicates dual purposes of "the avoidance of double taxation" and "the prevention of fiscal evasion" with respect to taxes on income and capital.  Article 24's own heading further indicates that while the Treaty's aim was to provide "*relief* from double taxation," the purpose was not to *eliminate* double taxation in every instance (*see* Article 24 ("Relief from Double Taxation")).  *See Toulouse*, 157 T.C. at 60 (stating that the U.S.-France tax treaty "provide[s] for general protection against double taxation," but "do[es] not provide absolute protection"); *id.* at 61 ("There is nothing in . . . article 24(2)(a) of the U.S.-France Treaty . . . that entitles U.S. taxpayers to an elimination of all double taxation.").  Indeed, the Treaty expressly recognizes that the parties did not eliminate double taxation altogether.  *See* Article 26(3) (flush language) ("They [*i.e.*, the U.S. and French competent authorities] may also agree to eliminate double taxation in cases not provided for in the Convention.").

For example, Article 24(2)(a) allows a foreign tax credit subject to the provisions and limitations of the Internal Revenue Code. Consequently, a U.S. citizen residing in the United States cannot claim a foreign tax credit in excess of § 904(a)'s source-based limitation and will, therefore, be subject to double taxation to the extent that taxes paid to France exceed the limit. This situation could arise where income classified as U.S.-source under the Code is taxable by France under the Treaty, but for which no re-sourcing provision applies. *See* New York State Bar Association Tax Section, *Report on Treaty Re-Sourcing Rules*, Rep. No. 1313, at 26 (November 24, 2014) (*see* Add123). Similarly, Article 24(2)(a) does not allow a U.S. citizen residing in the United States a credit against the § 1411 tax imposed outside of Chapter 1, with the result that such individual's net investment income will be subject to simultaneous taxes imposed by both France and the United States. *See Toulouse*, 157 T.C. at 60–61.

The Government interprets Article 24(2)(b) of the Treaty similarly with respect to the subset of U.S. citizens described in subparagraph (b)—*i.e.*, those resident in France. Under the Government's interpretation, the credit allowed to U.S. citizens resident in France

under Article 24(2)(b) is subject to Article 24(2)(a)'s introductory language restricting the credit just the same as is the credit allowed to U.S. citizens residing in the United States; therefore, it likewise may not eliminate double taxation in all circumstances. But interpreting the Treaty to achieve the same consistent result among U.S. citizens, whether they reside in France or in the United States, cannot be said to offend the purpose of the Treaty to provide general relief from double taxation.

Further, double taxation does not necessarily result from the disallowance of foreign tax credits against the tax imposed by § 1411. The Code's remedy for double taxation includes generous foreign-tax-credit carryover and carryback rules that permit excess credits to be carried over and used to reduce regular U.S. income tax in eleven additional tax years. To the extent that foreign income tax on the investment income were to exceed the Chapter 1 income tax on the same income, the excess credits would be eligible under I.R.C. § 904(c) to be carried back one year and forward ten years to reduce Chapter 1 taxes on other income in the carryover years. The generous foreign-tax-

credit carryover rules provide further relief for any potential double taxation.

Finally, it bears noting that here, even without a treaty-based credit against the § 1411 tax, the Christensens received substantial relief from double taxation. Their original return reported $478,702 in worldwide income in 2015, from which they claimed a foreign-earned income exclusion of $148,172, a deduction of $12,600, and an exemption of $16,400, thereby reducing their taxable income to $301,530. (Appx33-34.) On that taxable income of $301,530, the Christensens reported a U.S. income tax of $76,287 and an alternate minimum tax of $89, against which they claimed a foreign tax credit of $75,859, resulting in an income tax liability of $517 under Chapter 1 of the Code. (Appx34.) They also reported paying $4,115 in net investment income tax under Chapter 2A of the Code. (*Id.*) Taking the Chapter 1 and 2A tax liabilities together ($517 + $4,155, respectively), the Christensens reported a total tax liability of only $4,672 for 2015 on their original return—less than 1% of their total worldwide earnings. (*Id.*) The Code therefore provided them with substantial tax relief, requiring them to pay only a minor sum of tax in consideration for the privilege of their

U.S. citizenship. This confirms that the U.S. statutory foreign-tax-credit provisions referenced in Article 24(2) are, by any reasonable measure, consistent with an objective of relieving double taxation.

Conversely, the CFC's interpretation of Article 24(2)(b) is inconsistent with the Treaty's additional purpose to prevent fiscal evasion of income tax. As explained *supra* pp. 34-35, the CFC's ruling permits U.S. citizens resident in France to reap a significant windfall by both excluding their foreign earned income from U.S. tax under § 911 and simultaneously claiming a treaty-based credit against U.S. tax (imposed on other income) for the tax paid to France on the excluded income. That result is the essence of fiscal evasion of U.S. income tax, which the Treaty was designed to prevent. But the CFC's interpretation improperly allows it.

———————————

In sum, the text and context of Article 24(2)(b) demonstrate that the foreign tax credit referenced in subparagraph (b)(i), on which the CFC relied, is subject to subparagraph (a)'s language restricting the credit "[i]n accordance with the provisions and subject to the limitations of" U.S. law. That interpretation is confirmed by the U.S. Treasury

Department's contemporaneous Technical Explanation explaining the Treaty's terms, and it is consistent with the Treaty's purposes. Therefore, the credit referenced in Article 24(2)(b) is subject to the provisions and limitations of the Internal Revenue Code and cannot be applied against taxes imposed outside of Chapter 1 of the Code, including the tax on net investment income imposed by I.R.C. § 1411 in Chapter 2A. The CFC's invention of an independent, treaty-based foreign tax credit in Article 24(2)(b) that is not subject to the provisions or limitations of the Internal Revenue Code cannot withstand scrutiny.

## CONCLUSION

The judgment of the Court of Federal Claims was erroneous and should be reversed, with instructions that the Christensens' complaint be dismissed.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Kathleen E. Lyon

JACOB EARL CHRISTENSEN          (202) 307-0878
KATHLEEN E. LYON                (202) 307-6370
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

APRIL 22, 2024

# ADDENDUM

| Document | Page |
|---|---|
| CFC Opinion | Appx1 |
| Judgment | Appx93 |
| 1994 Treaty | Add1 |
| 1978 Protocol, T.I.A.S. No. 9500 | Add43 |
| S. Exec. Rep. No. 96-4 (June 15, 1979) | Add52 |
| Lori Hellkamp & Alden Dilanni-Morton, *Demystifying the Saving Clause and Re-Sourcing Rules in Treaties*, Tax Notes Federal, vol. 172, August 16, 2021 | Add76 |
| Kellar and Browne Jr., 6875-2nd T.M., *U.S. Income Tax Treaties—Benefits Provided by a Country to Its Own Residents and Citizens* (2019) | Add82 |
| New York State Bar Association Tax Section, *Report on Treaty Re-Sourcing Rules*, Rep. No. 1313 (November 24, 2014) | Add98 |
| Stephanie H. Simonard, *Newly Revised Income Tax Treaty with France: A Breakthrough in U.S. Tax Treaty Law*, 2 Nw. J. Int'l L. & Bus. 455 (1980) | Add135 |

# In the United States Court of Federal Claims

**No. 20-935T**
**Filed: September 13, 2023**
**Reissued for Publication: October 23, 2023[1]**

```
* * * * * * * * * * * * * * * * * *
                                    *
MATTHEW AND KATHERINE KAESS         *
CHRISTENSEN,                        *
                                    *
              Plaintiffs,           *
                                    *
v.                                  *
                                    *
UNITED STATES,                      *
                                    *
              Defendant.            *
                                    *
  * * * * * * * * * * * * * * * * * *
```

**Stuart E. Horwich**, Horwich Law LLP, London, U.K., for plaintiffs.

**Jason Bergmann**, Assistant Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him were **David I. Pincus**, Chief, Court of Federal Claims Section, and **David A. Hubbert**, Deputy Assistant Attorney General, Tax Division. **Mary M. Abate**, Assistant Chief, Court of Federal Claims Section, of counsel.

## O P I N I O N

<u>**HORN, J.**</u>

    Plaintiffs, Matthew and Katherine Kaess Christensen, filed their complaint in this court seeking a refund of $3,851.00 paid to the Internal Revenue Service (IRS) as a "net investment income tax" for tax year 2015, "plus interest and costs allowed by law, and such other relief as the Court may deem just and appropriate." Plaintiffs allege that, because they are United States citizens residing in France, "a foreign tax credit should have been allowed for French taxes that the plaintiffs paid with respect to the income giving rise to the net investment income tax, as provided by the income tax treaty that exists between the United States and France," namely the "Convention between the Government of the French Republic and the Government of the United States of America

---

[1] This Opinion was previously issued under seal on September 13, 2023. After asking for comments from with the parties, this Opinion is now issued in final form.

for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital," Fr.-U.S., Aug. 31, 1994, 1963 U.N.T.S. 67 [hereinafter the 1994 Treaty[2]], which plaintiffs refer to as the "French Treaty"[3] and defendant refers to as the "Convention."[4] After defendant filed an answer to plaintiffs' complaint, the parties engaged in fact discovery. The court held oral argument on the cross motions for summary judgment, after which, given the remaining issues on damages, the court, with the agreement of the parties, converted the motions for summary judgment into motions for partial summary judgment.

## BACKGROUND

**The 1994 Treaty**

This case concerns the intersection of the Internal Revenue Code (I.R.C.), Title 26 U.S.C. (2018), and binding treaties between the United States and France, namely the 1994 Treaty and subsequent amendatory protocols thereto. Before this court, plaintiffs argue that they are entitled to a tax refund due to the provisions of the 1994 Treaty, which was first signed by the United States and French Governments in 1994 and which was later amended in 2004 and 2009.[5] The 1994 Treaty, at Article 2, states:

---

[2] The 1994 Treaty was ratified by the United States Senate on August 11, 1995. See Tax Convention with the French Republic, CONGRESS.GOV, https://www.congress.gov/treaty-document/103rd-congress/32/resolution-text?q=%7B%22search%22%3A%22%5C%22French+Republic%5C%22%22%7D&s=3&r=1 (last visited Oct. 23, 2023).

[3] Plaintiffs consistently refer to the "French Treaty" in their filings, despite the fact that the treaty at issue is a bilateral treaty between the United States and France.

[4] Defendant consistently refers to the "Convention" in its filings, in reference to the first word of the full name of the 1994 Treaty, as well as "the Treaty." The court refers to the treaty between the United States and France at issue in this case, as it was originally agreed to by the signatory countries, as the "1994 Treaty," except when quoting the parties' filings in this case, documents in the record before this court, or publicly available documents, including legislative history, documents setting forth the executive's interpretation, and relevant judicial decisions.

[5] Defendant's cross-motion for partial summary judgment indicates that "[t]he Treasury Department publishes the texts of the 1994 convention, the 2004 protocol, and the 2009 protocol on its website," while "[t]he website of the French Embassy to the United States publishes a version that consolidates all three documents into one, at the following url: https://franceintheus.org/spip.php?article704." (alterations added). This "consolidated" version of the 1994 Treaty, as amended, is attached to defendant's cross-motion for partial summary judgment, however, at the time of issuing this Opinion, the "consolidated" version of the 1994 Treaty, as amended, is no longer available on the website of the French Embassy. See French/US Tax Treaties, FRANCE IN THE UNITED STATES,

1. The taxes which are the subject of this Convention are:
  (a) in the case of the United States:
    (i) the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes); and
    (ii) the excise taxes imposed on insurance premiums paid to foreign insurers and with respect to private foundations
    (hereinafter referred to as "United States tax"). The Convention, however, shall apply to the excise taxes imposed on insurance premiums paid to foreign insurers only to the extent that the risks covered by such premiums are not reinsured with a person not entitled to exemption from such taxes under this or any other income tax convention which applies to these taxes;
  (b) in the case of France, all taxes imposed on behalf of the State, irrespective of the manner in which they are levied, on total income, on total capital, or on elements of income or of capital, including taxes on gains from the alienation of movable or immovable property, as well as taxes on capital appreciation, in particular:
    (i) the income tax (l'impôt sur le revenu);
    (ii) the company tax (l'impôt sur les sociétés);
    (iii) the tax on salaries (la taxe sur les salaires) governed by the provisions of the Convention applicable, as the case may be, to business profits or to income from independent personal services; and
    (iv) the wealth tax (l'impôt de solidarité sur la fortune)
    (hereinafter referred to as "French tax").
2. The Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of signature of the Convention in

---

https://franceintheus.org/spip.php?article704 [https://perma.cc/YPJ8-GW9H] (last visited Oct. 23, 2023). Apart from the "consolidated" 1994 Treaty, as amended, the parties have not provided, and the court has not located, a version of the 1994 Treaty, as amended, which reflects the changes made by the 2004 and 2009 Protocols to the original 1994 Treaty. Moreover, as further discussed below, the 2004 and 2009 Protocols described changes to the 1994 Treaty without reproducing in full an amended version of the text of the 1994 Treaty as it had been changed. The court refers to the text of the 1994 Treaty with all changes from the 2004 and 2009 Protocols in effect as the "1994 Treaty, as amended," and to the historical, unamended 1994 Treaty as the "1994 Treaty." No version of the 1994 Treaty, as amended, appears to be included in official reporting services such as the United Nations Treaty Series or the United States Treaties and Other International Agreements Series. Neither plaintiffs nor defendant have objected to use of the "consolidated" version of the 1994 Treaty, as amended, provided to the court by defendant. Accordingly, to represent the present text of the 1994 Treaty, as amended, the court cites to the "consolidated" version of the treaty provided by defendant, originally from the website of the French Embassy to the United States.

addition to, or in place of, the existing taxes. The competent authorities[6] of the Contracting States shall notify each other of any significant changes which have been made in their respective taxation laws and of any official published material concerning the application of the Convention, including explanations, regulations, rulings, or judicial decisions.

1994 Treaty, art. 2 (footnote added). No text of any "notification" as contemplated by paragraph 2 of Article 2 of the 1994 Treaty is included in the record currently before the court. The 1994 Treaty further provides, at Article 3, paragraph 2:

> 3.  As regards the application of the Convention by a Contracting State, any term not defined herein shall, unless the competent authorities agree to a common meaning pursuant to the provisions of Article 26 (Mutual Agreement Procedure), have the meaning which it has under the taxation laws of that State.

1994 Treaty, art. 3, ¶ 2.

In the portion of the 1994 Treaty relied upon by plaintiffs in the above captioned case, Article 24, "Relief From Double Taxation," (capitalization and emphasis in original), the 1994 Treaty provides:

> 1.  (a) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States as a credit against the United States income tax:
>      (i)   the French income tax paid by or on behalf of such citizen or resident; and
>      (ii)  in the case of a United States company owning at least 10 percent of the voting power of a company that is a resident of France and from which the United States company receives dividends, the French income tax paid by or on behalf of the distributing corporation with respect to the profits out of which the dividends are paid.
>      (b) In the case of an individual who is both a resident of France and a citizen of the United States:
>      (i)   The United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph (a)(iii) of paragraph 2. However, the credit so

---

[6] The 1994 Treaty provides at Article 3, in relevant part, that the meaning of "competent authority" under the Treaty is "in the United States, the Secretary of the Treasury or his delegate," or "in France, the Minister in charge of the budget or his authorized representative." 1994 Treaty, art. 3, ¶ 1(h).

allowed against United States income tax shall not reduce that portion of the United States income tax that is creditable against French income tax in accordance with subparagraph (a)(iii) of paragraph 2;

(ii) Income referred to in paragraph 2 and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i). The provisions of this subparagraph (b)(ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. No provision of this subparagraph (b) relating to source of income shall apply in determining credits against United States income tax for foreign taxes other than French income tax as defined in subparagraph (e); and

(c) In the case of an individual who is both a resident and citizen of the United States and a national of France, the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions) shall apply to remuneration and pensions described in paragraph 1 or 2 of Article 19 (Public Remuneration), but such remuneration and pensions shall be treated by the United States as income from sources within France.

(d) If, for any taxable period, a partnership of which an individual member is a resident of France so elects, for United States tax purposes, any income which solely by reason of paragraph 4 of Article 14 is not exempt from French tax under this Article shall be considered income from sources within France. The amount of such income shall reduce (but not below zero) the amount of partnership earned income from sources outside the United States that would otherwise be allocated to partners who are not residents of France. For this purpose, the reduction shall apply first to income from sources within France and then to other income from sources outside the United States. If the individual member of the partnership is both a resident of France and a citizen of the United States, this provision shall not result in a reduction of United States tax below that which the taxpayer would have incurred without the benefit of deductions or exclusions available solely by reason of his presence or residence outside the United States.

(e) For the purposes of this Article, the term "French income tax" means the taxes referred to in subparagraph (b)(i) or (ii) of paragraph 1 of Article 2 (Taxes Covered), and any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes.

2. In the case of France, double taxation shall be avoided in the following manner:

(a) Income arising in the United States that may be taxed or shall be taxable only in the United States in accordance with the provisions

of this Convention shall be taken into account for the computation of the French tax where the beneficiary of such income is a resident of France and where such income is not exempted from company tax according to French domestic law. In that case, the United States tax shall not be deductible from such income, but the beneficiary shall be entitled to a tax credit against the French tax. Such credit shall be equal:

(i)     in the case of income other than that referred to in subparagraphs (ii) and (iii), to the amount of French tax attributable to such income;

(ii)    in the case of income referred to in Article 14 (Independent Personal Services), to the amount of French tax attributable to such income; however, in the case referred to in paragraph 4 of Article 14 (Independent Personal Services), such credit shall not give rise to an exemption that exceeds the limit specified in that paragraph;

(iii)   in the case of income referred to in Article 10 (Dividends), Article 11 (Interest), Article 12 (Royalties), paragraph 1 of Article 13 (Capital Gains), Article 16 (Directors' Fees), and Article 17 (Artistes and Sportsmen), to the amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income.

(b) In the case where the beneficial owner of the income arising in the United States is an individual who is both a resident of France and a citizen of the United States, the credit provided in paragraph 2 (a)(i) shall also be granted in the case of:

(i)     income consisting of dividends paid by a company that is a resident of the United States, interest arising in the United States, as described in paragraph 5 of Article 11 (Interest), or royalties arising in the United States, as described in paragraph 6 of Article 12 (Royalties), that is derived and beneficially owned by such individual and that is paid by:

(aa)    the United States or any political subdivision or local authority thereof; or

(bb)    a person created or organized under the laws of a state of the United States or the District of Columbia, the principal class of shares of or interests in which is substantially and regularly traded on a recognized stock exchange as defined in subparagraph (e) of paragraph 6 of Article 30 (Limitation on Benefits of the Convention); or

(cc)    a company that is a resident of the United States, provided that less than 10 percent of the outstanding shares of the voting power in such company was owned (directly or indirectly) by the resident of France at all times during the

part of such company's taxable period preceding the date of payment of the income to the owner of the income and during the prior taxable period (if any) of such company, and provided that less than 50 percent of such voting power was owned (either directly or indirectly) by residents of France during the same period; or

(dd) a resident of the United States, not more than 25 percent of the gross income of which for the prior taxable period (if any) consisted directly or indirectly of income derived from sources outside the United States;

(ii) capital gains derived from the alienation of capital assets generating income described in subparagraph (i); however, such alienation shall be taken into account for the determination of the threshold of taxation applicable in France to capital gains on movable property;

(iii) profits or gains derived from transactions on a public United States options or futures market;

(iv) income dealt with in subparagraph (a) of paragraph (1) of Article 18 (Pensions) to the extent attributable to services performed by the beneficiary of such income while his principal place of employment was in the United States;

(v) income that would be exempt from United States tax under Articles 20 (Teachers and Researchers) or 21 (Students and Trainees) if the individual were not a citizen of the United States; and

(vi) U.S. source alimony and annuities. The provisions of this subparagraph (b) shall apply only if the citizen of the United States who is a resident of France demonstrates that he has complied with his United States income tax obligations, and subject to receipt by the French tax administration of such certification as may be prescribed by the competent authority of France, or upon request to the French tax administration for refund of tax withheld together with the presentation of any certification required by the competent authority of France.

(c) A resident of France who owns capital that may be taxed in the United States according to the provisions of paragraph 1, 2, or 3 of Article 23 (Capital) may also be taxed in France in respect of such capital. The French tax shall be computed by allowing a tax credit equal to the amount of tax paid in the United States on such capital. That tax credit shall not exceed the amount of the French tax attributable to such capital.

(d) (i) For purposes of this paragraph, the term "resident of France" includes a "société de personnes," a "groupement d'intérêt économique" (economic interest group), or a "groupement européen d'intérêt économique" (European economic interest group) that is

constituted in France and has its place of effective management in France.

 (ii) The term "amount of French tax attributable to such income" as used in subparagraph (a) means:

  (aa) where the tax on such income is computed by applying a proportional rate, the amount of the net income concerned multiplied by the rate which actually applies to that income;

  (bb) where the tax on such income is computed by applying a progressive scale, the amount of the net income concerned multiplied by the rate resulting from the ratio of the French income tax actually payable on the total net income in accordance with French law to the amount of that total net income.

 (iii) The term "amount of tax paid in the United States" as used in subparagraph (a) means the amount of the United States income tax effectively and definitively borne in respect of the items of income concerned, in accordance with the provisions of the Convention, by the beneficial owner thereof who is a resident of France. But this term shall not include the amount of tax that the United States may levy under the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions).

 (iv) The interpretation of subparagraphs (ii) and (iii) shall apply, by analogy, to the terms "amount of the French tax attributable to such capital" and "amount of tax paid in the United States," as used in subparagraph (c).

(e) (i) Where French domestic law allows companies that are residents of France to determine their taxable profits on a consolidation basis, including the profits or losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States, the provisions of the Convention shall not prevent the application of that law.

 (ii) Where in accordance with its domestic law, France, in determining the taxable profits of residents, permits the deduction of the losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States and includes the profits of those subsidiaries or of those permanent establishments up to the amount of the losses so deducted, the provisions of the Convention shall not prevent the application of that law.

 (iii) Nothing in the Convention shall prevent France from applying the provisions of Article 209B of its tax code (code général des impôts) or any substantially similar provisions which may amend or replace the provisions of that Article.

1994 Treaty, art. 24.

The 1994 Treaty, at Article 26, "<u>Mutual Agreement Procedures</u>," (capitalization and emphasis in original), additionally provides:

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case to the competent authority of the Contracting State of which he is a resident or national. The case must be presented within three years of the notification of the action resulting in taxation not in accordance with the provisions of this Convention.

2. The competent authority shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits or other procedural limitations in the domestic law of the Contracting States.

3. The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular, they may agree:

   (a) to the same attribution of profits to a resident of a Contracting State and its permanent establishment situated in the other Contracting State;

   (b) to the same allocation of income between a resident of a Contracting State and any associated enterprise described in paragraph 1 of Article 9 (Associated Enterprises);

   (c) to the same determination of the source of particular items of income;

   (d) concerning the matters described in subparagraphs (a), (b), and (c) of this paragraph with respect to past or future years; or

   (e) to increase the money amounts referred to in Articles 17 (Artistes and Sportsmen) and 21 (Students and Trainees) to reflect economic or monetary developments.

   They may also agree to eliminate double taxation in cases not provided for in the Convention.

4. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs. When it seems advisable for the purpose of reaching agreement, the competent authorities or their representatives may meet together for an oral exchange of opinions.

6. [sic] If an agreement cannot be reached by the competent authorities pursuant to the previous paragraphs of this Article, the case may, if both competent authorities and the taxpayer agree, be submitted for

**Appx9**

arbitration, provided that the taxpayer agrees in writing to be bound by the decision of the arbitration board. The competent authorities may release to the arbitration board such information as is necessary for carrying out the arbitration procedure. The decision of the arbitration board shall be binding on the taxpayer and on both States with respect to that case. The procedures, including the composition of the board, shall be established between the Contracting States by notes to be exchanged through diplomatic channels after consultation between the competent authorities. The provisions of this paragraph shall not have effect until the date specified in the exchange of diplomatic notes.

1994 Treaty, art. 26 (alteration added). Moreover, the 1994 Treaty, at Article 29, provides, in relevant part:

1. The Convention shall not restrict in any manner any exclusion, exemption, deduction, credit, or other allowance now or hereafter accorded by
   (a) the laws of:
      (i) the United States;
      (ii) France, in the case of a resident (within the meaning of Article 4 (Resident)) or citizen of the United States. However, notwithstanding the preceding sentence, the provisions of paragraph 5 of Article 6 (Income from Real Property), Article 19 (Public Remuneration), Article 20 (Teachers and Researchers), and Article 24 (Relief From Double Taxation) shall apply, regardless of any exclusion, exemption, deduction, credit, or other allowance accorded by the laws of France; or
   (b) by any other agreement between the Contracting States.
2. Notwithstanding any provision of the Convention except the provisions of paragraph 3, the United States may tax its residents, as determined under Article 4 (Resident), and its citizens as if the Convention had not come into effect. For this purpose, the term "citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss.
3. The provisions of paragraph 2 shall not affect:
   (a) the benefits conferred under paragraph 2 of Article 9 (Associated Enterprises), under paragraph 1(b) of Article 18 (Pensions), and under Articles 24 (Relief From Double Taxation), 25 (Non-Discrimination), and 26 (Mutual Agreement Procedure); and
   (b) the benefits conferred under Articles 19 (Public Remuneration), 20 (Teachers and Researchers), 21 (Students and Trainees), and 31 (Diplomatic and Consular Officers), upon individuals who are neither citizens of, nor have immigrant status in, the United States.

1994 Treaty, art. 29, ¶¶ 1-3.

Attached to defendant's cross-motion for partial summary judgment is an Executive Report from the Senate Committee on Foreign Relations, dated August 10, 1995, titled "INCOME TAX CONVENTION WITH THE FRENCH REPUBLIC," which "reports favorably" on the 1994 Treaty, "without amendment, and recommends that the Senate give its advice and consent to ratification thereof, subject to one declaration [not relevant here] as set forth in this report and accompanying resolution of ratification." S. EXEC. REP. NO. 104-7, at 1 (1995) (capitalization in original; alteration added) (1995 Senate Report). The 1995 Senate Report states:

> The principal purposes of the proposed income tax treaty between the United States and the French Republic ("France") are to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country, and to prevent avoidance or evasion of income taxes of the two countries. The proposed treaty is intended to continue to promote close economic cooperation between the two countries and to eliminate possible barriers to trade caused by overlapping taxing jurisdictions of the two countries. It is also intended to enable the countries to cooperate in preventing avoidance and evasion of taxes.

Id. The 1995 Senate Report indicates that "[t]he proposed treaty was amplified by diplomatic notes signed the same day [August 31, 1994], and by additional notes signed on December 19, 1994 and December 20, 1994." Id. (alterations added). While the 1995 Senate Report and other documents relating to the 1994 Treaty and its subsequent amendatory Protocols refer to "diplomatic notes," no such diplomatic notes are included in the record currently before the court after the parties completed discovery. The 1995 Senate Report, with respect to paragraph 2 of Article 29 of the 1994 Treaty, a "savings clause," states that "[u]nder this provision, the United States generally retains the right to tax its citizens and residents as if the treaty had not come into effect," but also, in paragraph 1 of Article 29, that "the proposed treaty contains the standard provision that it does not apply to deny a taxpayer any benefits that person is entitled to under the domestic law of the country or under any other agreement between the two counties," or, as also stated in the 1995 Senate Report, "the treaty applies to the benefit of taxpayers." S. EXEC. REP. NO. 104-7, at 2-3 (alteration added). The 1995 Senate Report further states, with respect to Article 24 of the 1994 Treaty:

> The article provides special rules for U.S. citizens who reside in France. In this case, the proposed treaty provides that items of income which may be taxed by the United States solely by reason of citizenship (under the saving clause) are to be treated as French source income to the extent necessary to avoid double taxation. In no event, however, would the tax paid to the United States be less than the tax that would be paid if the individual were not a U.S. citizen. This rule is similar to corresponding rules in several recent U.S. treaties.

S. Exec. Rep. No. 104-7, at 13. Moreover, with respect to the binding arbitration provisions of Article 26 of the 1994 Treaty, the 1995 Senate Report explains: "The arbitration procedure can only be invoked by the agreement of both countries." S. Exec. Rep. No. 104-7, at 14.

Attached to the defendant's cross-motion for partial summary judgment is a document which defendant identifies as a "Treasury Department Technical Explanation" of the 1994 Treaty,[7] (capitalization in original) (1994 Treaty Treasury Department Technical Explanation), which states that it "is an official guide to the Convention" which "reflects the policies behind particular Convention provisions, as well as understandings reached with respect to the application and interpretation of the Convention." According to the 1994 Treaty Treasury Department Technical Explanation, "the saving clause in [Article 29 of] this Convention is, at France's request, unilateral, applying only for United States tax purposes." (alteration added). The 1994 Treaty Treasury Department Technical Explanation states with respect to the "competent authority" for the United States under the 1994 Treaty:

> The U.S. competent authority is the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the competent authority function to the commissioner of Internal Revenue, who has, in turn, redelegated the authority to the [IRS] Assistant Commissioner (International). With respect to interpretive issues, the Assistant Commissioner acts with the concurrence of the Associate Chief Counsel (International) of the Internal Revenue Service.

(alteration added). The 1994 Treaty Treasury Department Technical Explanation, with respect to Article 24, "Relief From Double Taxation," (capitalization and emphasis in original), of the 1994 Treaty, further states, in relevant part:

_____

[7] The full title of the 1994 Treaty Treasury Department Technical Explanation, as stated on the first page of that document, is

> TREASURY DEPARTMENT TECHNICAL EXPLANATION OF THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL SIGNED AT PARIS ON AUGUST 31, 1994.

(capitalization in original). The 1994 Treaty Treasury Department Technical Explanation is not dated. The 1994 Treaty Treasury Department Technical Explanation is available on the IRS website in a list of "complete texts" of "tax treaty documents," along with the 1994 Treaty, its subsequent amendatory Protocols, and their corresponding technical explanations. See France - Tax Treaty Documents, Internal Rev. Serv., https://www.irs.gov/businesses/international-businesses/france-tax-treaty-documents (last visited Oct. 23, 2023).

This Article describes the manner in which each Contracting State undertakes to relieve double taxation. The United States uses the foreign tax credit method exclusively. France uses a combination of foreign tax credit and exemption methods. The provisions of this Article are more complicated than in most U.S. income tax treaties, because they include special relief provisions for U.S. citizens resident in France. The format of the Article has been revised, but the provisions are substantially the same as in the 1967 Convention (as amended by subsequent Protocols).

In subparagraph 1(a) [of Article 24], the United States agrees to allow its citizens and residents to credit against their U.S. income tax the income taxes paid or accrued to France. Subparagraph 1(a) also provides for a deemed-paid credit, consistent with section 902 of the Code, to a U.S. corporation in respect of dividends received from a French corporation in which the U.S. corporation owns at least 10 percent of the voting power. The deemed-paid credit is for the tax paid by the French corporation on the portion of the profits that is distributed as dividends to the U.S. parent company.

The credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given. The limitations of U.S. law generally limit the credit against U.S. tax to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see [Internal Revenue] Code section 904(a)). Nothing in the Convention prevents the limitation of the U.S. credit from being applied on an overall or per-country basis or on some variation thereof.

Subparagraph 1(b) [of Article 24] provides special rules to avoid the double taxation of U.S. citizens who are residents of France. Under subparagraph 2(a)(iii), France agrees to credit the U.S. tax paid, but only for the amount of tax that the United States could impose under the Convention on a resident of France who is not a citizen of the United States. Under subparagraph 1(b), the United States agrees that, where additional U.S. tax is due solely by reason of citizenship, it will credit the French tax imposed on the basis of residence to the extent that the French tax exceeds the tax that the United States may impose on the basis of source (i.e., net of the credit allowed by France). Under subparagraph 2(b), France shares the burden of avoiding double taxation of U.S. citizens resident in France by exempting from French tax certain items of U.S. source income of such citizens that would otherwise be subject to French tax.

Subparagraph 1(b) also provides that certain U.S. source income will be treated as French source income to permit the additional credit to fit within the foreign tax credit limitation of [Internal Revenue] Code Section 904. This

resourcing provision applies only to items of income that are included in gross income for French tax purposes, and it cannot be used in determining the foreign tax credit limitation applicable to income taxes paid to any other country.

The following simplified example illustrates how subparagraph 1(b) works. The U.S. tax on a dividend paid by a U.S. corporation to a portfolio investor resident in France is limited by Article 10 (Dividends) of the Convention to 15 percent. The United States, therefore, will impose a tax of 15 on a dividend of 100, and France will allow a tax credit of 15. Suppose that the French individual income tax due is 22 percent. In that case, the net tax payable to France will be 7. However, assume that this individual is a U.S. citizen and, therefore, liable to U.S. tax of 22 percent. In the absence of a special relief provision, the individuals total tax would be 35: 28 to the United States, with no foreign tax credit because the dividend is from U.S. sources, and 7 to France. Under subparagraph 1(b), the 7 of French tax is credited against the 28 of U.S. tax, reducing the combined burden to 28, the higher of the two taxes. In this example, in order to credit the French tax of 7 at a U.S. rate of 28, 25 of the dividend would be treated as from French sources so that the 7 of French tax could be claimed as a foreign tax credit (7/28 x 100). Additional examples of the calculation of this additional credit are provided in IRS Publication 901 on U.S. tax treaties.

(alterations added).

Moreover, the 1994 Treaty Treasury Department Technical Explanation states, with respect to the "Mutual Agreement Procedure" set forth in Article 26 of the 1994 Treaty, that "[i]t is not necessary for the taxpayer to have fully exhausted the remedies provided under the national laws of the Contracting States before presenting a case to the competent authorities." (alteration added). Additionally, the 1994 Treaty Treasury Department Technical Explanation states with respect to arbitration procedures under the same Article 26 of the 1994 Treaty, "[i]t is expected that such procedures will ensure that arbitration will not generally be available where matters of either State's tax policy or domestic law are involved." (alteration added).

**The 2004 Protocol**

On December 8, 2004, the Government of the United States and the Government of the French Republic agreed to a "Protocol amending the Convention between the Government of the French Republic and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital," signed at Paris on 31 August 1994, Fr.-U.S., Dec. 8, 2004, 2478 U.N.T.S. 175 [hereinafter the 2004 Protocol],[8] which entered into force on

---

[8] The 2004 Protocol was ratified by the United States Senate on March 31, 2006. See Protocol Amending the Tax Convention with France, CONGRESS.GOV,

December 21, 2006.[9] As relevant to the above captioned case, the 2004 Protocol, in Article V, made the following amendment to Article 24 of the 1994 Treaty:

1. Subparagraph (b)(iv) of paragraph 2 [*Paragraph 1 in French language*] of Article 24 (Relief From Double Taxation) of the Convention shall be deleted.

2. Subparagraphs (b)(v) and (b)(vi) of paragraph 2 [*Paragraph 1 in French language*] of Article 24 (Relief From Double Taxation) of the Convention shall be renumbered as subparagraphs (b)(iv) and (b)(v), respectively.

3. Subparagraph (c) of paragraph 1 [*Paragraph 2 in French language*] of Article 24 (Relief From Double Taxation) of the Convention shall be deleted and replaced by the following:

   "(c) In the case of an individual who is both a resident and citizen of the United States and a national of France, the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions) shall apply to remuneration described in paragraph 1 of
   [sic]
   Article 19 (Public Remuneration), but such remuneration shall be treated by the United States as income from sources within France."

Id. art. V (emphasis in original; last alteration added).

Attached to defendant's cross-motion for partial summary judgment is a United States Treasury Department "Technical Explanation" of the 2004 Protocol (2004 Protocol Treasury Department Technical Explanation). Like the 1994 Treaty Treasury Department Technical Explanation, the 2004 Protocol Treasury Department Technical Explanation was prepared by the United States Treasury Department and states that it "is an official guide to the Protocol" which "explains policies behind particular provisions, as well as understandings reached during the negotiations with respect to the interpretation and application of the Protocol," and also states that "[t]o the extent that the Convention has not been amended by the Protocol, the Technical Explanation of the Convention remains the official explanation." (alteration added). With respect to the changes made by the 2004 Protocol to Article 24 of the 1994 Treaty, the 2004 Protocol Treasury Department Technical Explanation states:

---

https://www.congress.gov/treaty-document/109th-congress/4/resolution-text?s=4&r=2 (last visited Oct. 23, 2023).

[9] The title page of the 2004 Protocol states that the 2004 Protocol entered into force on "21 December 2006 by notification, in accordance with article VII." See 2004 Protocol, 2478 U.N.T.S. at 175. Article VII of the 2004 Protocol states, at paragraph 1: "The Contracting States shall notify each other when their respective constitutional and statutory requirements for the entry into force of this Protocol have been satisfied. The Protocol shall enter into force on the date of receipt of the later of such notifications." Id. art. VII ¶ 1.

**Appx15**

The Protocol deletes subparagraph (b)(iv) of paragraph 2 [Paragraph 1 in French language] of Article 24 (Relief From Double Taxation) of the treaty, which allows a U.S. citizen and resident of France a credit equal to the amount of French tax attributable to income dealt with in subparagraph (a) of paragraph 1 of Article 18 (Pensions) that was also subject to tax in the United States. Subparagraph (b)(iv) is rendered obsolete by the provisions of Article 18 as amended by the Protocol.

The Protocol renumbers subparagraphs (b)(v) and (vi) of paragraph 2 [Paragraph 1 in French language] of Article 24 subparagraphs (b)(iv) and (v) respectively to account for the deletion of subparagraph (b)(iv).

The Protocol replaces subparagraph (c) of paragraph 1 [Paragraph 2 in French language] of Article 24 to omit the reference to paragraph 2 of Article 19 (Public Remuneration). This change conforms to revisions made to Article 18 and Article 19 (Public Remuneration) by the Protocol.

(alterations in original).

Also attached to defendant's cross-motion for partial summary judgment is a report on the 2004 Protocol from the Senate Committee on Foreign Relations, dated March 27, 2006, and titled "PROTOCOL AMENDING THE INCOME TAX CONVENTION WITH FRANCE (TREATY DOC. 109-4)." S. Exec. Rep. No. 109-9, at 1 (2006) (capitalization in original) (2006 Senate Report). The 2006 Senate Report states that the Senate Committee on Foreign Relations "reports favorably" on the 2004 Protocol and recommends ratification thereof. See id. With respect to the purpose of the 1994 Treaty and the 2004 Protocol, the 2006 Senate Report states:

The principal purposes of the existing income tax treaty between the United States and France and the proposed protocol amending the treaty are to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country and to prevent avoidance or evasion of the taxes of the two countries. The existing treaty and proposed protocol also are intended to continue to promote close economic cooperation between the two countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the two countries.

Id. at 1-2 (footnote omitted).

**The 2009 Protocol**

On January 13, 2009, the Government of the United States of America and the Government of the French Republic agreed to a further

Protocol amending the Convention between the Government of the French Republic and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, signed at Paris on 31 August 1994, as amended by the Protocol signed on 8 December 2004 (with Memorandum of Understanding),

Fr.-U.S., Jan. 13, 2009, 2659 U.N.T.S. 82 [hereinafter the 2009 Protocol],[10] which entered into force on December 23, 2009.[11] As relevant to the above captioned case, the 2009 Protocol, at Article VIII, amends Article 24 of the 1994 Treaty. As particularly relevant to the above captioned case, and as described below, at paragraph 1 of Article VIII, the 2009 Protocol renumbers and reorders the paragraphs of Article 24 of the 1994 Treaty, resulting in the numbering of paragraphs 1 and 2 of Article 24 of the 1994 Treaty, as amended, currently in effect. The 2009 Protocol provides, in relevant part:

1. Regarding Article 24 (Relief From Double Taxation) of the Convention as incorporated in the alternat[[12]] of the United States, in both the English and French version of such alternat, paragraph 1 shall be renumbered paragraph 2, and paragraph 2 shall be renumbered paragraph 1.
2. Clause (iii) of subparagraph a) of paragraph 1 of Article 24 (Relief From Double Taxation) of the Convention, as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted and replaced by the following:

"(iii) in the case of income referred to in Article 10 (Dividends), Article 11 (Interest), paragraph 1 of Article 13 (Capital Gains), Article 16 (Director's Fees), and Article 17 (Artistes and Sportsmen), to the

---

[10] The 2009 Protocol was ratified by the United States Senate on December 3, 2009. See Protocol Amending Tax Convention with France, CONGRESS.GOV, https://www.congress.gov/treaty-document/111th-congress/4?q=%7B%22search%22%3A%22%5C%22French+Republic%5C%22%22%7D&s=6&r=1 (last visited Oct. 23, 2023).

[11] The title page of the 2009 Protocol states that it entered into force on "23 December 2009 by notification, in accordance with article XVI." See 2009 Protocol, 2659 U.N.T.S. at 82. Article XVI of the 2009 Protocol provides, at paragraph 1: "The Contracting States shall notify each other when their respective constitutional and statutory requirements for the entry into force of this Protocol have been satisfied. The Protocol shall enter into force on the date of receipt of the later of such notifications." Id. art. XVI ¶ 1.

[12] The term "alternat" is a French word meaning "[t]he rotation in precedence among states, diplomats, etc., esp. in the signing of treaties." Alternat, BLACK'S LAW DICTIONARY (11th ed. 2019) (alteration added). According to Black's Law Dictionary, "[t]his practice gives each diplomat a copy of the treaty with the diplomat's signature appearing first." Id. (alteration added).

amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income."

3. Clause (i) of subparagraph b) of paragraph 1 of Article 24 (Relief From Double Taxation) of the Convention, as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted and replaced by the following:

"(i) income consisting of dividends paid by a company that is a resident of the United States, or interest arising in the United States, as described in paragraph 5 of Article 11 (Interest), or royalties arising in the United States, as described in paragraph 4 of Article 12 (Royalties), that is derived and beneficially owned by such individual and that is paid by:

aa) the United States or any political subdivision or local authority thereof; or

bb) a person created or organized under the laws of a state of the United States or the District of Columbia, the principal class of shares of or interests in which is substantially and regularly traded on a recognized stock exchange as defined in subparagraph d) of paragraph 7 of Article 30 (Limitation on Benefits of the Convention); or

cc) a company that is a resident of the United States, provided that less than 10 percent of the outstanding shares of the voting power in such company was owned (directly or indirectly) by the resident of France at tall times during the part of such company's taxable period preceding the date of payment of the income to the owner of the income and during the prior taxable period (if any) of such company, and provided that less than 50 percent of such voting power was owned (either directly or indirectly) by residents of France during the same period; or

dd) a resident of the United States, not more than 25 percent of the gross income of which for the prior taxable period (if any) consisted directly or indirectly of income derived from sources outside the United States;".

4. Clause (i) of subparagraph e) of paragraph 1 of Article 24 (Relief From Double Taxation) of the Convention as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted and replaced by the following:

"(i) Where a company resident of France is taxed in that state according to French domestic law on a consolidated tax base, including the profits or losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States, the provisions of the Convention shall not prevent the application of that law."

**Appx18**

5. Subparagraph c) of paragraph 2 of Article 24 (Relief From Double Taxation) of the Convention, as amended by paragraph 1 of this Article VIII of this Protocol, shall be deleted.

2009 Protocol, art. VIII (footnote added).

The 2009 Protocol, at Article X, makes the following amendment to Article 26 of the 1994 Treaty:

Paragraph 5 of Article 26 (Mutual Agreement Procedure) shall be deleted and replaced by the following paragraphs:

"5. Where, pursuant to a mutual agreement procedure under this Article, the competent authorities have endeavored but are unable to reach a complete agreement, the case shall be resolved through arbitration conducted in the manner prescribed by, and subject to, the requirements of paragraph 6 and any rules or procedures agreed upon by the Contracting States, if:

a) tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case;

b) the case is not a particular case that both competent authorities agree, before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration; and

c) all concerned persons agree according to the provisions of subparagraph (d) of paragraph 6.

An unresolved case shall not, however, be submitted to arbitration if a decision on such case has already been rendered by a court or administrative tribunal of either Contracting State.

6. For the purposes of paragraph 5 and this paragraph, the following rules and definitions shall apply:

a) the term "concerned person" means the presenter of a case to a competent authority for consideration under this Article and all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement arising from that consideration;

b) the "commencement date" for a case is the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities;

c) arbitration proceedings in a case shall being on the later of:

(i) two years after the commencement date of that case, unless both competent authorities have previously agreed to a different date, and

(ii) the earliest date upon which the agreement required by subparagraph d) has been received by both competent authorities;

    d)  the concerned person(s), and their authorized representatives or agents, must agree prior to the beginning of arbitration proceedings not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration panel, other than the determination of such panel;

    e)  unless any concerned person does not accept the determination of an arbitration panel the determination shall constitute a resolution by mutual agreement under this Article and shall be binding on both Contracting States with respect to that case only; and

    f)  for the purposes of an arbitration proceeding under paragraph 5 and this paragraph, the members of the arbitration panel and their staffs shall be concerned "persons or authorities" to whom information may be disclosed under Article 27 (Exchange of Information) of the Convention."

2009 Protocol, art. X.[13]

        Attached to defendant's cross-motion for partial summary judgment is the United States Treasury Department's "Technical Explanation" for the 2009 Protocol (2009 Protocol Treasury Department Technical Explanation). Similar to the Technical Explanations for the 1994 Treaty and 2004 Protocol, the 2009 Protocol Treasury Department Technical Explanation was prepared by the United States Treasury Department and states that it "is an official guide to the [2009] Protocol and Memorandum of Understanding. It explains policies behind particular provisions, as well as

---

[13] Appended to the 2009 Protocol in the United Nations Treaty Series is a "**MEMORANDUM OF UNDERSTANDING**," (capitalization and emphasis in original), in which the Government of the United States of America and the Government of the French Republic "have agreed to define the mode of application of paragraphs 5 and 6 of Article 26 (Mutual Agreement Procedure) of the Convention," and in which the signatory governments state:

    In respect of any case where the competent authorities have endeavored but are unable to reach an agreement under Article 26 regarding the application of the Convention, binding arbitration shall be used to determine such application, unless the competent authorities agree that the particular case is not suitable for determination by arbitration. If an arbitration proceeding under paragraph 5 of Article 26 commences (the Proceeding), the following rules and procedures shall apply.

2009 Protocol, 2659 U.N.T.S. at 112. In the Memorandum of Understanding, the United States and France detail rules for the procedures of arbitration proceedings commenced pursuant to the 1994 Treaty. The Memorandum of Understanding entered into force on the same date on which the 2009 Protocol entered into force, December 23, 2009.

understandings reached during the negotiations with respect to the interpretation and application of the Protocol and Memorandum of Understanding." (alteration added). The 2009 Treasury Department Technical Explanation states, however, that it "is not intended to provide a complete guide to the existing [1994] Convention as amended by the [2009] Protocol and Memorandum of Understanding." (alterations added).

    With respect to the changes made to Article 24 of the 1994 Treaty by the 2009 Protocol, the 2009 Protocol Treasury Department Technical Explanation provides that the renumbering of paragraphs 1 and 2 of Article 24 "is intended to make the numbering of the paragraphs of Article 24 of the Convention in the alternat of the United States and the alternat of France consistent." The 2009 Protocol Treasury Department Technical Explanation further provides that other changes were made to Article 24 in order to "update[] cross-references and make[] them consistent with amendments made by this Protocol" and "to clarify" the application of provisions of the 1994 Treaty not relevant to the above captioned case. (alterations added). Moreover, with respect to the changes made to Article 26 of the 1994 Treaty by the 2009 Protocol, the 2009 Protocol Treasury Department Technical Explanation indicates that the added paragraphs "provide a mandatory binding arbitration proceeding" and that the Memorandum of Understanding included with the 2009 Protocol "provides additional rules and procedures that apply to a case considered under the arbitration provisions." The 2009 Protocol Treasury Department Technical Explanation states with respect to the arbitration proceedings:

    New paragraph 5 provides that a case shall be resolved through arbitration when the competent authorities have endeavored but are unable to reach a complete agreement regarding a case and the following three conditions are satisfied. First, tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case. Second, the case is not a case that the competent authorities agree before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration. Third, all concerned persons and their authorized representatives agree, according to the provisions of subparagraph (d) of paragraph 6, not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration board, other than the determination of the board (confidentiality agreement). The confidentiality agreement may also be executed by any concerned person that has the legal authority to bind any other concerned person on the matter. For example, a parent corporation with the legal authority to bind its subsidiary with respect to confidentiality may execute a comprehensive confidentiality agreement on its own behalf and that of its subsidiary.
New paragraph 5 provides that an unresolved case shall not be submitted to arbitration if a decision on such case has already been rendered by a court or administrative tribunal of either Contracting State.

    Attached to defendant's cross-motion for partial summary judgment is the Report of the Senate Committee on Foreign Relations on the 2009 Protocol, dated December 1,

2009, and titled "PROTOCOL AMENDING THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL (TREATY DOC. 111-4)." See S. Exec. Rep. No. 111-1, at 1 (2009) (capitalization in original) (2009 Senate Report). Similar to the Senate Reports on the 1994 Treaty and the 2004 Protocol, the 2009 Senate Report states that the Foreign Relations Committee "reports favorably" on the 2009 Protocol and recommends that the Senate ratify the 2009 Protocol. See id. The 2009 Senate Report provides, with respect to the purpose of the 2009 Protocol:

> The purpose of the Protocol, along with the underlying treaty, is to promote and facilitate trade and investment between the United States and France. Principally, the Protocol would amend the existing tax treaty with France (the "Treaty" or "Convention") in order to eliminate withholding taxes on cross-border dividend and royalty payments, establish a mandatory arbitration scheme for resolving disputes between the parties to the treaty, prevent inappropriate use of the treaty, as amended, by third-country residents, and facilitate the exchange of information between tax authorities in both countries.

Id. at 2. The 2009 Senate Report further provides that "[t]his [2009] Protocol was negotiated to modernize our relationship with France in the areas set forth above and to update the 1994 treaty to better reflect U.S. and French domestic law." Id. (alterations added). In the conclusion of the 2009 Senate Report, the Senate Committee on Foreign Affairs recommends ratification of the 2009 Protocol, subject to the condition that the Secretary of the Treasury submit to the Senate Committees on Finance and Foreign Relations and the Joint Committee on Taxation the rules and procedures to be used during mandatory arbitration proceedings under the 1994 Treaty as amended by the 2009 Protocol. See id. at 4-7.

**Relevant Internal Revenue Code Provisions**

In its cross-motion for partial summary judgment, defendant describes the statutorily provided process by which United States taxpayers living abroad may reduce their tax liability to the United States with respect to foreign income: "The Code provides U.S. citizens living abroad with two primary methods of relief from double taxation—an exclusion from U.S. tax of certain foreign earned income (under [I.R.C., 26 U.S.C.] § 911) and credits for foreign income taxes paid (under [I.R.C.] §§ 901-909)." (alterations added). Quoting I.R.C. § 911, defendant explains that "Section 911(a) allows a 'qualified individual' to elect to exclude 'foreign earned income' from his or her taxable income in the United States,"[14] and that "Foreign earned income is 'the amount received by such

---

[14] The statute at I.R.C. § 911(d)(1) (2018) defines "qualified individual" in the context of foreign tax credits as:

individual from sources within a foreign country . . . which constitute earned income attributable to services performed by such individual.'"[15] (ellipsis in defendant's brief) (quoting I.R.C. § 911(a), (b)(1)(A)). In addition, quoting I.R.C. § 901, defendant states that "the Code allows 'a citizen of the United States' to credit against 'the tax imposed by' Chapter 1 [of the I.R.C.] 'the amount of any income, war profits, and excess profits taxes paid or accrued' to 'any foreign country.'" (alteration added) (quoting I.R.C. § 901(a), (b)(1) (2018)).

---

> **(1) Qualified individual.--**The term "qualified individual" means an individual whose tax home is in a foreign country and who is--
>> **(A)** a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or
>> **(B)** a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period.

I.R.C. § 911(d)(1) (emphasis in original). The statute at I.R.C. § 911(d)(2)(A) further provides:

> The term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered.

I.R.C. § 911(d)(2)(A).

[15] The statute at I.R.C. § 911(b)(1)(A) provides:

> The term "foreign earned income" with respect to any individual means the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable.

I.R.C. § 911(b)(1)(A). The statute at I.R.C. § 911(b)(2)(A) further provides:

> The foreign earned income of an individual which may be excluded under subsection (a)(1) for any taxable year shall not exceed the amount of foreign earned income computed on a daily basis at an annual rate equal to the exclusion amount for the calendar year in which such taxable year begins.

I.R.C. § 911(b)(2)(A).

Three sections of the I.R.C., I.R.C. §§ 27, 901, and 904, are particularly relevant to understanding the case currently before this court. The statute section 27 of the I.R.C. provides: "The amount of taxes imposed by foreign countries and possessions of the United States shall be allowed as a credit against the tax imposed by this chapter [Chapter 1 of the I.R.C.[16]] to the extent provided in section 901[.]" I.R.C. § 27 (2018) (alterations and footnote added). Additionally, the statute at I.R.C. § 901 provides, in relevant part:

**(a) Allowance of credit.**--If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter [Chapter 1 of the I.R.C.] shall, subject to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under section 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year. The credit shall not be allowed against any tax treated as a tax not imposed by this chapter under section 26(b).

**(b) Amount allowed.**--Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

**(1) Citizens and domestic corporations.**--In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and

**(2) Resident of the United States or Puerto Rico.**--In the case of a resident of the United States and in the case of an individual who is a bona fide resident of Puerto Rico during the entire taxable year, the amount of any such taxes paid or accrued during the taxable year to any possession of the United States; and

**(3) Alien resident of the United States or Puerto Rico.**--In the case of an alien resident of the United States and in the case of an alien individual who is a bona fide resident of Puerto Rico during the entire taxable year, the amount of any such taxes paid or accrued during the taxable year to any foreign country; and

**(4) Nonresident alien individuals and foreign corporations.**--In the case of any nonresident alien individual not described in section 876 and in the case of any foreign corporation, the amount determined pursuant to section 906; and

---

[16] Chapter 1 of the I.R.C. is titled "Normal Taxes and Surtaxes" and includes certain I.R.C. sections which are relevant to the above captioned case, including I.R.C. §§ 27, 901, 904, and 911, but, as explained further below, Chapter 1 does not include I.R.C. § 1411, which imposes the net investment income tax and which is in Chapter 2A of the I.R.C., titled "Unearned Income Medicare Contribution."

> **(5)  Partnerships and estates.--**In the case of any person described in paragraph (1), (2), (3), or (4), who is a member of a partnership or a beneficiary of an estate or trust, the amount of his proportionate share of the taxes (described in such paragraph) of the partnership or the estate or trust paid or accrued during the taxable year to a foreign country or to any possession of the United States, as the case may be. Under rules or regulations prescribed by the Secretary, in the case of any foreign trust of which the settlor or another person would be treated as owner of any portion of the trust under subpart E but for section 672(f), the allocable amount of any income, war profits, and excess profits taxes imposed by any foreign country or possession of the United States on the settlor or such other person in respect of trust income.

I.R.C. § 901(a)-(b) (emphasis in original; alteration added). The provisions found in I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C. and are central to the issue currently before the court because, as explained further below, the net investment income tax, against which plaintiffs seek to apply a foreign tax credit, is imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C.

The I.R.C. further provides, at section 904, in relevant part:

> **(a)  Limitation.**--The total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

I.R.C. § 904(a) (emphasis in original). The statute at I.R.C. § 904 sets forth a number of detailed limitations on foreign tax credits which, however, are not relevant to the issues raised by plaintiffs' complaint in this court. See, e.g., I.R.C. § 904(c) (providing a one-year carryback and ten-year carryover for foreign tax credits exceeding the limitation of I.R.C. § 904(a)). Defendant, quoting Dirk Suringa, The Foreign Tax Credit Limitation Under Section 904, 6060 Tax Mgmt., at A-1 (BNA 2016), states that the statute at I.R.C. § 904's limitation of foreign tax credits "'prevent[s] the foreign tax credit from relieving a taxpayer of U.S. tax that would otherwise be payable against U.S.-source income.'" (alteration added).

The case currently before the court concerns the availability of foreign tax credits against the net investment income tax, which is imposed by I.R.C. § 1411 (2018). As plaintiffs indicate in their motion for partial summary judgment, the net investment income tax was originally created in 2010, when the Health Care and Education Reconciliation Act of 2010 inserted I.R.C. § 1411 into the newly created Chapter 2A of Subtitle A of the I.R.C., titled "UNEARED INCOME MEDICARE CONTRIBUTION." See Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1402(a)(1), 124 Stat. 1029,

1060-61 (capitalization in original). The statute at I.R.C. § 1411 has not been amended since it was first enacted in 2010 and describes the application of the net investment income tax to taxpayers:

**(a) In general.**--Except as provided in subsection (e)--
    **(1) Application to individuals.**--In the case of an individual, there is hereby imposed (in addition to any other tax imposed by this subtitle) for each taxable year a tax equal to 3.8 percent of the lesser of--
        **(A)** net investment income for such taxable year, or
        **(B)** the excess (if any) of--
            **(i)** the modified adjusted gross income for such taxable year, over
            **(ii)** the threshold amount.
    **(2) Application to estates and trusts.**--In the case of an estate or trust, there is hereby imposed (in addition to any other tax imposed by this subtitle) for each taxable year a tax of 3.8 percent of the lesser of--
        **(A)** the undistributed net investment income for such taxable year, or
        **(B)** the excess (if any) of--
            **(i)** the adjusted gross income (as defined in section 67(e)) for such taxable year, over
            **(ii)** the dollar amount at which the highest tax bracket in section 1(e) begins for such taxable year.
**(b) Threshold amount.**--For purposes of this chapter, the term "threshold amount" means--
    **(1)** in the case of a taxpayer making a joint return under section 6013 or a surviving spouse (as defined in section 2(a)), $250,000,
    **(2)** in the case of a married taxpayer (as defined in section 7703) filing a separate return, ½ of the dollar amount determined under paragraph (1), and
    **(3)** in any other case, $200,000.
**(c) Net investment income.**--For purposes of this chapter--
    **(1) In general.**--The term "net investment income" means the excess (if any) of--
        **(A)** the sum of--
            **(i)** gross income from interest, dividends, annuities, royalties, and rents, other than such income which is derived in the ordinary course of a trade or business not described in paragraph (2),
            **(ii)** other gross income derived from a trade or business described in paragraph (2), and
            **(iii)** net gain (to the extent taken into account in computing taxable income) attributable to the

disposition of property other than property held in a trade or business not described in paragraph (2), over

**(B)** the deductions allowed by this subtitle which are properly allocable to such gross income or net gain.

**(2) Trades and businesses to which tax applies.**--A trade or business is described in this paragraph if such trade or business is--

**(A)** a passive activity (within the meaning of section 469) with respect to the taxpayer, or

**(B)** a trade or business of trading in financial instruments or commodities (as defined in section 475(e)(2)).

**(3) Income on investment of working capital subject to tax.**--A rule similar to the rule of section 469(e)(1)(B) shall apply for purposes of this subsection.

**(4) Exception for certain active interests in partnerships and S corporations.**--In the case of a disposition of an interest in a partnership or S corporation--

**(A)** gain from such disposition shall be taken into account under clause (iii) of paragraph (1)(A) only to the extent of the net gain which would be so taken into account by the transferor if all property of the partnership or S corporation were sold for fair market value immediately before the disposition of such interest, and

**(B)** a rule similar to the rule of subparagraph (A) shall apply to a loss from such disposition.

**(5) Exception for distributions from qualified plans.**--The term "net investment income" shall not include any distribution from a plan or arrangement described in section 401(a), 403(a), 403(b), 408, 408A, or 457(b).

**(6) Special rule.**--Net investment income shall not include any item taken into account in determining self-employment income for such taxable year on which a tax is imposed by section 1401(b).

**(d) Modified adjusted gross income.**--For purposes of this chapter, the term "modified adjusted gross income" means adjusted gross income increased by the excess of--

**(1)** the amount excluded from gross income under section 911(a)(1), over

**(2)** the amount of any deductions (taken into account in computing adjusted gross income) or exclusions disallowed under section 911(d)(6) with respect to the amounts described in paragraph (1).

**(e) Nonapplication of section.**--This section shall not apply to--

**(1)** a nonresident alien, or

**(2)** a trust all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B).

I.R.C. § 1411 (2018) (emphasis in original). During the tax year at issue in this case, tax year 2015, and to the time of the issuance of this Opinion, Chapter 2A of Subtitle A of the I.R.C. included only I.R.C. § 1411.

The Treasury Department has promulgated regulations implementing I.R.C. § 1411 at Treasury Regulation, 26 C.F.R., § 1.1411-0 et seq., certain of which sections describe the net investment income tax and its relationship to the foreign tax credits at issue in this case. The regulation at Treasury Regulation § 1.1411-1(e) provides:

> **(e) Disallowance of certain credits against the section 1411 tax.** Amounts that may be credited against only the tax imposed by chapter 1 of the [Internal Revenue] Code may not be credited against the section 1411 tax imposed by chapter 2A of the Code unless specifically provided in the Code. For example, the foreign income, war profits, and excess profits taxes that are allowed as a foreign tax credit by section 27(a), section 642(a), and section 901, respectively, are not allowed as a credit against the section 1411 tax.

Treas. Reg. § 1.1411-1(e) (2022) (emphasis in original; alteration added).

The regulation at Treasury Regulation § 1.1411-2(a) provides, in relevant part, that "[s]ection 1411 applies to an individual who is a citizen or resident of the United States (within the meaning of section 7701(a)(30)(A)). Section 1411 does not apply to nonresident alien individuals (within the meaning of section 7701(b)(1)(B))." Treas. Reg. § 1.1411-2(a)(1) (alteration added). The regulation at the same section, Treasury Regulation § 1.1411-2, at paragraph (b), provides, in relevant part:

> In the case of an individual described in paragraph (a)(1) of this section, the tax imposed by [I.R.C.] section 1411(a)(1) for each taxable year is equal to 3.8 percent of the lesser of—
> (i)   Net investment income for such taxable year; or
> (ii)  The excess (if any) of—
>    (A)  The modified adjusted gross income (as defined in paragraph (c) of this section) for such taxable year; over
>    (B)  The threshold amount (as defined in paragraph (d) of this section).

Treas. Reg. § 1.1411-2(b)(1) (alteration added). The regulation at the same section, Treasury Regulation § 1.1411-2, at paragraph (c), provides, in relevant part:

> For purposes of [I.R.C.] section 1411, the term modified adjusted gross income means adjusted gross income increased by the excess of—
> (i) The amount excluded from gross income under [I.R.C.] section 911(a)(1); over
> (ii) The amount of any deductions (taken into account in computing adjusted gross income) or exclusions disallowed under [I.R.C.] section 911(d)(6) with respect to the amounts described in paragraph (c)(1)(i) of this section.

Treas. Reg. § 1.1411-2(c)(1) (alterations added).

The regulation at Treasury Regulation § 1.1411-4(a) defines net investment income in relevant part:

For purposes of [I.R.C.] section 1411 and the regulations thereunder, net investment income means the excess (if any) of—
(1) The sum of—
    (i) Gross income from interest, dividends, annuities, royalties, and rents, except to the extent excluded by the ordinary course of a trade or business exception described in paragraph (b) of this section;
    (ii) Other gross income derived from a trade or business described in § 1.1411–5; and
    (iii) Net gain (to the extent taken into account in computing taxable income) attributable to the disposition of property, except to the extent excluded by the exception described in paragraph (d)(4)(i)(A) of this section for gain or loss attributable to property held in a trade or business not described in § 1.1411–5; over
(2) The deductions allowed by subtitle A that are properly allocable to such gross income or net gain (as determined in paragraph (f) of this section).

Treas. Reg. § 1.1411-4(a) (alteration added).

Plaintiffs characterize the net investment income tax imposed by I.R.C. § 1411 as "an income tax, imposed using concepts identical to those already contained in Chapter 1 [of the I.R.C.] of the normal income tax provisions, and meets the definition in the Code for a tax on income as that concept is understood in the foreign tax credit provisions." (alterations added) (citing Treas. Reg. §§ 1.901-2(b)(4) (2022), 1.1411-1(a)). Plaintiffs further state that the net investment income tax "did not yet exist at the time of the ratification of the French Treaty" and that the net investment income tax "is a U.S. income tax applied on items of income on which a French resident U.S. citizen would also pay French taxes."

Defendant characterizes the net investment income tax as "a separate levy that is 'in addition to' the regular income tax imposed under Chapter 1" of the I.R.C. Defendant further states:

Each of those two levies has its own tax base, and each its own applicable deductions. For certain taxpayers, the NIIT [net investment income tax] may impose a second levy on investment income that is already subject to the Chapter 1 income tax. However, depending on the circumstances, investment income may be taxed under Chapter 1 but not be subject to the NIIT, and investment income may sometimes be subject to the NIIT but be exempt from regular income tax.

(alteration added).

      The IRS website provides the following description of the net investment income tax:

> If an individual has income from investments, the individual may be subject to net investment income tax. Effective Jan. 1, 2013, individual taxpayers are liable for a 3.8 percent Net Investment Income Tax on the lesser of their net investment income, or the amount by which their modified adjusted gross income exceeds the statutory threshold amount based on their filing status.
> The statutory threshold amounts are:
> - Married filing jointly — $250,000,
> - Married filing separately — $125,000,
> - Single or head of household — $200,000, or
> - Qualifying widow(er) with a child — $250,000.
>
> In general, net investment income includes, but is not limited to: interest, dividends, capital gains, rental and royalty income, and non-qualified annuities.
> Net investment income generally does not include wages, unemployment compensation, Social Security Benefits, alimony, and most self-employment income.
> Additionally, net investment income does not include any gain on the sale of a personal residence that is excluded from gross income for regular income tax purposes. To the extent the gain is excluded from gross income for regular income tax purposes, it is not subject to the Net Investment Income Tax.
> If an individual owes the net investment income tax, the individual must file Form 8960. Form 8960 Instructions provides details on how to figure the amount of investment income subject to the tax.

Net Investment Income Tax, INTERNAL REVENUE SERV., https://www.irs.gov/individuals/net-investment-income-tax (last visited Oct. 23, 2023).

      The IRS website also contains a "Questions and Answers" page with respect to the net investment income tax. See Questions and Answers on the Net Investment Income Tax, INTERNAL REVENUE SERV., https://www.irs.gov/newsroom/questions-and-answers-on-the-net-investment-income-tax (last visited Oct. 23, 2023). The "Questions and Answers" page provides:

> **4. What is modified adjusted gross income for purposes of the Net Investment Income Tax?**
> For the Net Investment Income Tax, modified adjusted gross income is adjusted gross income (Form 1040, Line 37) increased by the difference between amounts excluded from gross income under [I.R.C.] section 911(a)(1) and the amount of any deductions (taken into account in

computing adjusted gross income) or exclusions disallowed under section 911(d)(6) for amounts described in section 911(a)(1). In the case of taxpayers with income from controlled foreign corporations (CFCs) and passive foreign investment companies (PFICs), they may have additional adjustments to their AGI [adjusted gross income]. See section 1.1411-10(e) of the final regulations.

Id. (emphasis in original; alterations added). The "Questions and Answers" page further provides:

**8. What is included in Net Investment Income?**
In general, investment income includes, but is not limited to: interest, dividends, capital gains, rental and royalty income, non-qualified annuities, income from businesses involved in trading of financial instruments or commodities and businesses that are passive activities to the taxpayer (within the meaning of section 469). To calculate your Net Investment Income, your investment income is reduced by certain expenses properly allocable to the income (see #13 below).

Id. (emphasis in original). The "Questions and Answers" page additionally provides:

**10. What kinds of gains are included in Net Investment Income?**
To the extent that gains are not otherwise offset by capital losses, the following gains are common examples of items taken into account in computing Net Investment Income:
A. Gains from the sale of stocks, bonds, and mutual funds.
B. Capital gain distributions from mutual funds.
C. Gain from the sale of investment real estate (including gain from the sale of a second home that is not a primary residence).
D. Gains from the sale of interests in partnerships and S corporations (to the extent the partner or shareholder was a passive owner). See section 1.1411-7 of the 2013 proposed regulations.

Id. (emphasis in original). The "Questions and Answers" page also provides:

**13. What investment expenses are deductible in computing NII [Net Investment Income]?**
In order to arrive at Net Investment Income, Gross Investment Income (items described in items 7-11 above) is reduced by deductions that are properly allocable to items of Gross Investment Income. Examples of deductions, a portion of which may be properly allocable to Gross Investment Income, include investment interest expense, investment advisory and brokerage fees, expenses related to rental and royalty income, tax preparation fees, fiduciary expenses (in the case of an estate or trust) and state and local income taxes.

Id. (emphasis in original; alteration added). Moreover, the "Questions and Answers" page provides:

**17. Can tax credits reduce my NIIT liability?**
Any federal income tax credit that may be used to offset a tax liability imposed by subtitle A of the Code may be used to offset the NII. However, if the tax credit is allowed only against the tax imposed by chapter 1 of the Code (regular income tax), those credits may not reduce the NIIT. For example, foreign income tax credits (sections 27(a) and 901(a)) and the general business credit (section 38) are allowed as credits only against the tax imposed by chapter 1 of the Code, and therefore may not be used to reduce your NIIT liability. If you take foreign income taxes as an income tax deduction (versus a tax credit), some (or all) of the deduction amount may [sic] deducted against NII.

Id. (emphasis in original; alteration added).

A committee print from the United States Senate Committee on the Budget titled "Tax Expenditures: Compendium of Background Material on Individual Provisions," prepared by the Congressional Research Service, provides information on the net investment income tax enacted in I.R.C. § 1411, under the title "**SURTAX ON UNEARNED INCOME**." CONG. RSCH. SERV., 111TH CONG., TAX EXPENDITURES: COMPENDIUM OF BACKGROUND MATERIAL ON INDIVIDUAL PROVISIONS 413 (Comm. Print 2010) (capitalization and emphasis in original). The Senate Budget Committee print states:

This provision imposes a 3.8-percent unearned income Medicare contribution tax on the lesser of net investment income or the excess of modified adjusted gross income over the threshold amount of an individual. The threshold amount is $250,000 in the case of a joint return or surviving spouse, $125,000 in the case of a married individual filing a separate return, and $200,000 in any other case. In the case of an estate or trust, the tax is 3.8 percent of the lesser of undistributed net investment income or the excess of adjusted gross income over the dollar amount at which the highest income tax bracket applicable to an estate or trust begins. As the provision raises revenue, this special rate of tax represents a negative tax expenditure over the 2010-2014 time period.

Id. The Senate Budget Committee print describes the "***Impact***" of the net investment income tax: "This provision raises the Medicare taxes paid by high-income individuals and estates and trusts." Id. (capitalization and emphasis in original).

**Plaintiffs' 2015 Tax Returns**

As indicated above, plaintiffs Matthew and Katherine Kaess Christensen, a married couple, are United States citizens who currently reside in Paris, France and who resided

in France during the tax year at issue in this case, tax year 2015. According to plaintiffs' complaint, "[o]n or about December 15, 2016, plaintiffs filed a timely joint federal income return for the year 2010 [sic[17]] with the Internal Revenue Service Center at Charlotte, North Carolina. Plaintiffs timely paid income taxes in the amount of $4,672.00 on account of this return." (alterations and footnote added). Plaintiffs attached to their complaint their original tax return for tax year 2015, filed in 2016, and their complete amended tax return for tax year 2015 which, as noted above, was filed in January 2020. Plaintiffs' original tax return includes plaintiffs' original Form 1040, original Form 1116, and original Form 8960, as well as other documents not relevant to the issues currently before the court. Plaintiffs' amended tax return includes plaintiffs' Form 1040X, filed in January 2020, as well as amended versions of forms filed with plaintiffs' original tax return for tax year 2015, such as an amended Form 1040, Form 1116, and Form 8960. Plaintiffs' amended tax return also includes a Form 8833 and a Form 8275, which do not appear previously to have been included in plaintiffs' original tax return as it is included in the record before the court, and other documents not relevant to the issues currently before the court.

In their motion for partial summary judgment in this court, plaintiffs summarize the income they reported to the IRS in both their original and their amended tax returns for 2015:

> (i) earned income of $369,373; (ii) U.S. source passive income of $7,976; and (iii) foreign source passive income of $101,353. Before taking into account any foreign tax credits, Plaintiffs had a $76,376 U.S. federal income tax liability on this income arising under Chapter 1 of the Internal Revenue Code of 1986 (26 U.S.C.) (the "Code").

(footnote added). Plaintiffs further state in their motion for partial summary judgment that they paid a net investment income tax of 3.8 percent on the $7,976.00 of United States source passive income and also on the $101,353.00 foreign source passive income, for a total of $4,155.00 in net investment income tax. According to plaintiffs' motion for partial summary judgment, "[o]f that $4,155 NIIT liability, $3,851 related to the $101,342 of foreign source investment income." (alteration added). Plaintiffs further state in their motion for partial summary judgment that they "also incurred French income tax equal to $140,398 on their earned income and non-U.S. source investment income, of which $113,745 was attributable to the earned income and $26,635 was attributable to their passive foreign source investment income."

Attached to plaintiffs' complaint is plaintiffs' original IRS Form 1040 "**U.S. Individual Income Tax Return**" for the 2015 tax year, which bears the signature of plaintiffs' tax preparer, Steven R. Horton, CPA, the date December 15, 2016, and is stamped "AS ORIGINALLY FILED." (capitalization and emphasis in original). According to plaintiffs' original Form 1040 for tax year 2015, plaintiffs claimed an exclusion of

---

[17] After inquiry by the court, plaintiffs confirmed in a joint status report "that the reference in paragraph 4 of the initial complaint to 'federal income tax [sic] return for 2010' [sic] was mistaken and that the applicable tax year is 2015." (alterations added).

$148,172.00, as well as a deduction of $12,600.00 and an exemption of $16,400.00, all of which reduced plaintiffs' taxable income to $301,530.00, on which plaintiffs reported a United States income tax of $76,287.00 and an alternative minimum tax of $89.00. As documented by plaintiffs' original Form 1040, plaintiffs claimed a foreign tax credit of $75,859.00 against their reported United States income tax of $76,287.00. Plaintiffs' original Form 1040 for 2015 indicates that plaintiffs originally paid $4,155.00 in net investment income tax.

Plaintiffs allege that "[o]n or about January 8, 2020, plaintiffs filed a Form 1040X claim with the Internal Revenue Service Center in Austin, Texas for refund of the federal income tax and interest paid for 2015 in the amount of $3,851.00 together with interest as allowed by law." (alteration added). Plaintiffs' IRS Form 1040X "**Amended U.S. Individual Income Tax Return**," (capitalization and emphasis in original), for tax year 2015, is included in the record before the court and is signed by plaintiffs jointly and by their tax preparer, Mr. Horton, on December 9, 2019. Plaintiffs' Form 1040X for the year 2015 indicates that originally plaintiffs had claimed a "[t]otal tax" of $4,672.00 for tax year 2015, and that plaintiffs claimed on their amended tax return a "[t]otal tax" of $821.00 for tax year 2015, a difference of $3,851.00. (alterations added). On their Form 1040X for tax year 2015, plaintiffs claim a refund of $3,851.00. On the second page of plaintiffs' Form 1040X for tax year 2015, plaintiffs state, in a typewritten-in addition under the header "**Part III**" "**Explanation of changes**:" "THIS RETURN CLAIMS A REFUND OF NET INVESTMENT INCOME TAX (NIIT) FOR $3,851 AS EXPLAINED ON FORM 8833. SEE AMENDED FORM 8833 ATTACHED ALONG WITH AMENDED FORMS 8960 AND FORMS 1116." (capitalization and emphasis in original).

Included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is an IRS Form 8833 "**Treaty-Based Return position Disclosure Under Section 6114 or 7701(b)**," (capitalization and emphasis in original), which does not have a signature or date portion as it appears in the record before the court.[18] Plaintiffs' Form 8833 states that "[t]he taxpayer is disclosing a treaty-based return position as required by [I.R.C.] section 6114," (alterations added), and indicates, with respect to "the specific treaty position relied on," the country "FRANCE" and the articles "2 & 24." (capitalization in original). Plaintiffs' Form 8833 provides that plaintiffs claim that I.R.C. § 1411 is "overruled or modified by the treaty-based return position" in the 1994 Treaty, as amended. Moreover, in their Form 8833, plaintiffs provide the following typewritten-in explanation for their claimed treaty-based return:

---

[18] A number of plaintiffs' tax documents, which are attached to plaintiffs' complaint, do not bear plaintiffs' signatures, or the signature of plaintiffs' tax preparer, or the date of any signatures, as they are included in the record before the court. Moreover, some of plaintiffs' tax documents do not include signature and date portions. Some of these records appear be duplicates of documents previously submitted to the IRS. Defendant has not challenged the veracity of the information included on plaintiffs' tax forms, without regard to the lack of signatures and dates on certain forms, although defendant has raised the computational issue of whether plaintiffs have correctly applied the rule of tax calculation referred to as the "three-bite rule," which is discussed further below.

TAXPAYER IS FILING THIS CLAIM FOR REFUND TO SEEK A FOREIGN TAX CREDIT TO REDUCE THE NET INVESTMENT INCOME TAX (THE "NIIT", CODIFIED IN CODE SEC. 1411). TAXPAYER BELIEVES THAT EITHER THE NIIT IS A COVERED TAX UNDER THE TERMS OF THE UNITED STATES / FRANCE INCOME TAX TREATY (THE "FRENCH TREATY", [sic] IN WHICH CASE A FOREIGN TAX CREDIT SHOULD BE ALLOWED UNDER ARTICLES 2 & 24 OF THE FRENCH TREATY, OR THAT THE NIIT FALLS WITHIN THE DEFINITION OF A COVERED TAX UNDER THE UNITED STATES / FRANCE TOTALIZATION AGREEMENT (THE "TOTALIZATION AGREEMENT") IN WHICH CASE THE TAXPAYER IS EXEMPT FROM THE NIIT AS A FRENCH RESIDENT.

ON THE ASSUMPTION THAT THE FRENCH TREATY APPLIES, THE TAXPAYER HAS ADJUSTED THE FOREIGN TAX CREDIT FORMS (THE FORMS 1116) TO REFLECT THE USE OF THE CREDIT (THE "FORM 1116 ADJUSTMENT") AND HAS ELIMINATED THE TAX ON THE FORM 8960 BASED UPON THE FORM 1116 ADJUSTMENT. IN THE EVENT THE TOTALIZATION AGREEMENT POSITION APPLIES, THE SAME REFUND AMOUNT WOULD OCCUR, ALTHOUGH NO FOREIGN TAX CREDIT ADJUSTMENT WOULD BE REQUIRED.

(capitalization in original).[19]

Also included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is an IRS Form 8960, "**Net Investment Income Tax – Individuals, Estates, and Trusts**," for plaintiffs for tax year 2015, which does not include a signature and date portion and is stamped "AS AMENDED" as it appears in the record before the court. (capitalization and emphasis in original). Plaintiffs' amended Form 8960 indicates that in tax year 2015, plaintiffs had "[t]otal investment income" of $109,329.00. (alteration added). Plaintiffs' amended Form 8960 includes the instructions for calculation of the "[n]et investment income tax for individuals," according to which instructions plaintiffs would "[m]ultiply" their $109,329.00 "by 3.8% (.038)." (alterations added). Plaintiffs' amended Form 8960 indicates for the net investment income tax that plaintiffs owe $304.00, and plaintiffs also

---

[19] Also included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is a Form 1116 "**Foreign Tax Credit**" for plaintiffs for tax year 2015, which does not include a signature and date portion and is stamped "AS AMENDED" as it appears in the record before the court. (capitalization and emphasis in original). Plaintiffs' amended Form 1116 for tax year 2015 indicates that plaintiffs accrued $113,745.00 in "[o]ther foreign taxes," and $26,653.00 in foreign taxes withheld on dividends and interest, for a foreign tax credit of $75,859.00. (alteration added). Also on the amended Form 1116, plaintiffs indicate on the line "[t]axes reclassified under high tax kickout," $22,802.00 in taxes, and plaintiffs state in a handwritten explanation: "High tax kickout, $26,653, less foreign taxes claimed as credit against Net Investment Income Tax on Form 8960, $3851." (capitalization in original; alteration added).

include the following unexplained handwritten notation on the Form 8960: "A Net investment income tax before foreign tax credit $4155 Less Foreign Tax credit on foreign source investment income –(carried from general limitation Form 1116) $\frac{(3851)}{\$304}$ ." (capitalization in original).

In addition, included in plaintiffs' amended tax return, attached to plaintiffs' complaint, is an IRS Form 8275, "**Disclosure Statement**" for tax year 2015, which does not include a portion for signatures and dates as it appears in the record before the court. (capitalization and emphasis in original). On the Form 8275, under "**Part I**" "**General Information**," plaintiffs list the "Rev. Rul., Rev. Proc., etc.," as "T.D.9644 [sic], FED REG 72393," the "Item or Group of Items" as "SEC. 1411," the "Detailed Description of Items" as "FOREIGN TAX CREDIT FOR NET INVESTMENT INCOME TAX PURSUANT TO FRENCH/U.S. TREATY OR TOTALIZATION AGREEMNT [sic]," the "Form or Schedule" as 8960, and the "Amount" as $3,851.00. (capitalization and emphasis in original; alterations added). Plaintiffs provide the following "**Detailed Explanation**" on the Form 8275:

> TAXPAYERS BELIEVE THAT ARITCLES 2&24 [sic] OF THE FRENCH/US TAX TREATY PROVIDE AN INDEPENDENT BASIS FOR CLAIMING A FOREIGN TAX CREDIT TO REDUCE NET INVESTMENT INCOME TAX (NIIT) OR THAT THE FRENCH/US TOTALIZATION AGREEMENT WOULD EXEMPTS [sic] TAXPAYERS FORM [sic] PAYING THIS TAX. THIS IS CONTRARY TO THE POSITION ANNOUNCED BY THE IRS (WITHOUT ANY
> (SEE NEXT)

(capitalization in original; alterations added). Plaintiffs' detailed explanation continues in a separate section on the following page of the Form 8275: "ANALYSIS) IN THE ABOVE CITED PREAMBLE TO THE REGULATIONS PROMULGATED UNDER CODE SEC. 1411. THE IRS 1040 FORMS AND RELATED SCHEDULES DO NOT ALLOW FOR A FOREIGN TAX CREDIT CLAIM AND HAVE BEEN OVERRIDDEN TO ACHIEVE THAT RESULT." (capitalization in original).

Included in the record before the court is a letter dated February 20, 2020, from the IRS to plaintiffs, in which the IRS denied plaintiffs' claim for a foreign tax credit-based refund of the net investment income tax paid for tax year 2015. The IRS' denial letter states:

> WE CAN'T ALLOW YOUR CLAIM
> We disallowed your claim for credit for the tax period listed at the top of this letter.
> WHY WE CAN'T ALLOW YOUR CLAIM
> The postmark date on your tax return's envelope is Jan. 08, 2020. The last day to file a claim for tax year 2015 was Oct. 15, 2019. We can't allow your claim because the postmark is after the deadline.
> WHAT TO DO IF YOU DISAGREE

You can appeal our decision with the Office of Appeals (which is an independent organization within the IRS) if we disallowed your claim because our records show that you filed your claim late. Generally, a claim is late if you filed it after the later of:
- 3 years from the due date of a timely-filed return without an extension
- 3 years from the date we received a late return or a timely filed return with an approved extension
- 2 years after you paid the tax

In addition, for a claim filed within three years of the date you filed your tax return, we can only refund or credit the amount you paid during the three-year period before the date you file the claim (plus any approved extension of time to file). If you file your claim more than three years after the date you filed your return, we can only credit or refund the amount you paid during the two-year period before the date you file the claim. The Appeals Office can't change the amount of time the law allows you to file a claim for refund or credit.

If you decide to appeal our decision, send us an explanation of why you believe you filed your claim on time; for example, you had an extension of time to file your original tax return. We will consider your explanation before forwarding your request to the Office of Appeals.

(capitalization in original).

Plaintiffs state in their motion for partial summary judgment, however, that "Defendant now agrees that the refund suit has been timely filed as it relates to whether Plaintiffs are eligible for a foreign tax credit under the provisions of the French Treaty." Defendant indicated in a joint status report that it "agrees that the refund suit has been timely filed under I.R.C. Sec [sic] 6511(d)(3)." (alteration added). There is no dispute with respect to the timeliness of plaintiffs' claim in the case currently before the court.

**PROCEDURAL HISTORY**

The record before the court indicates that plaintiffs did not appeal the IRS' denial of their refund claim in administrative proceedings before the IRS, and that plaintiffs instead opted to commence litigation in this court. Plaintiffs filed suit in this court on July 31, 2020, seeking a refund of the net investment income tax paid by plaintiffs for tax year 2015. After the defendant filed an answer to plaintiffs' complaint, the parties engaged in lengthy fact discovery, offering different views of what should be disclosed. During fact discovery, despite extensive discussions as to how to proceed, the parties did not produce documents which offered an interpretation by the French Government of the 1994 Treaty as originally entered into or as amended by the 2004 and 2009 Protocols with respect to the issue of the availability of a foreign tax credit against the United States net investment income tax.

**Discovery and the Three-Bite Rule as Related to Plaintiffs' Tax Refund Claim**

In their briefing and at oral argument on the cross-motions for partial summary judgment, the parties contested the relevance and application of the "three-bite rule" in the above captioned case. In its cross-motion for partial summary judgment, defendant indicates that the three-bite rule is implemented in part by paragraph (2)(b) of Article 24 of the 1994 Treaty, as amended, and defendant states: "Article 24(2)(b) is an integral part of an ordering rule established by the Treaty (colloquially referred to as a 'three-bite rule') governing the application of foreign tax credits to both French and U.S. taxes on income earned by U.S. citizens residing in France." Defendant explains the three-bite rule, in which each "bite" is a tax by either the United States Government or the French Government assessed against the taxpayer, as follows:

> The three pertinent taxes, or "bites," are: (1) the Treaty-authorized U.S. tax on certain U.S.-source income earned by the French resident; (2) the French tax on income earned by the French residents; and (3) the U.S. tax on worldwide income imposed on the basis of U.S. citizenship that is preserved by the Treaty's saving clause. Under the three-bite rule, the imposition of U.S. tax on certain U.S.-source income (principally investment income) has primacy (the *first* bite), followed by the French income tax on its residents (the *second* bite), and then by the U.S. income tax on its citizens (the *third* bite). Under this framework, when France takes the second bite, it provides the U.S. citizen with foreign tax credits for the first-bite U.S. tax applied to U.S.-source passive income. And, when the United States takes the third bite, it provides its citizens with foreign tax credits for the second-bite income tax imposed by France on the basis of French residence (but the U.S. foreign tax credits may not reduce the first-bite U.S. tax claimed as a credit against the French second bite).

(emphasis in original; footnotes omitted).

Defendant further explains its view of how certain provisions of the 1994 Treaty, as amended, including paragraph 2(b) of Article 24, one of the provisions at issue in the above captioned case, implement the three-bite rule:

> The Treaty incorporates the three-bite rule in the following manner. To implement the second bite, article 24(1)(a)(iii) requires France to grant a foreign tax credit for "the amount of tax paid in the United States" on certain "income arising in the United States," including dividends, interest, and certain capital gains, among other things. To implement the third bite, article 24(2)(b)(i) requires the United States to "allow as a credit against the United States income tax the French income tax paid after the credit [for the first bite] referred to in subparagraph (a)(iii) of paragraph 2," but clarifies that the credit for French taxes paid would not affect "that portion of the United States income tax" imposed by the first bite. Then, to properly account for the second-bite French income tax when computing the § 904 limitation for

38

the foreign tax credit allowed by the United States against its third-bite, article 24(2)(b)(ii) provides that such income "shall be considered income from sources within France."

(alteration in original; footnote omitted). In a footnote to the above-quoted text, defendant also asserts that "[t]he technical explanation to the 1994 convention explains the operation of the three-bite rule under these provisions of the Treaty." (alteration added). The 1994 Treaty Treasury Department Technical Explanation states, at the portion cited by defendant:

> Subparagraph 1(b) [of Article 24[20]] provides special rules to avoid the double taxation of U.S. citizens who are residents of France. Under subparagraph 2(a)(iii), France agrees to credit the U.S. tax paid, but only for the amount of tax that the United States could impose under the Convention on a resident of France who is not a citizen of the United States. Under subparagraph 1(b), the United States agrees that, where additional U.S. tax is due solely by reason of citizenship, it will credit the French tax imposed on the basis of residence to the extent that the French tax exceeds the tax that the United States may impose on the basis of source (i.e., net of the credit allowed by France). Under subparagraph 2(b), France shares the burden of avoiding double taxation of U.S. citizens resident in France by exempting from French tax certain items of U.S. source income of such citizens that would otherwise be subject to French tax.
> Subparagraph 1(b) also provides that certain U.S. source income will be treated as French source income to permit the additional credit to fit within the foreign tax credit limitation of [Internal Revenue] Code Section 904. This resourcing provision applies only to items of income that are included in gross income for French tax purposes, and it cannot be used in determining the foreign tax credit limitation applicable to income taxes paid to any other country.

(alterations and footnote added).[21]

---

[20] As explained above, the order of the paragraphs of Article 24 of the 1994 Treaty were reversed by the 2009 Protocol, such that paragraph 1 of Article 24 of the 1994 Treaty was renumbered paragraph 2 of Article 24 of the 1994 Treaty, as amended.

[21] The 1994 Treaty Treasury Department Technical Explanation offers a "simplified example" to illustrate the operation of paragraph 1(b) of Article 24, which would be paragraph 2(b) of Article 24 in the 1994 Treaty, as amended:

> The U.S. tax on a dividend paid by a U.S. corporation to a portfolio investor resident in France is limited by Article 10 (Dividends) of the Convention to 15 percent. The United States, therefore, will impose a tax of 15 on a dividend of 100, and France will allow a tax credit of 15. Suppose that the French individual income tax due is 22 percent. In that case, the net tax

Plaintiffs provide their explanation of the three-bite rule and its implementation by provisions of the 1994 Treaty, as amended, specifically paragraph 2(b) of Article 24, which plaintiffs indicate aligns with defendant's explanation:

> Article 24(2)(b)(i) [of the 1994 Treaty, as amended,] provides that, in the case of a U.S. citizen living in France, the United States retains the same primary taxing rights regardless of the French resident's citizenship. Thus, for example, a dividend paid by a U.S. corporation to a French resident is subject to a 15 percent withholding tax (in the case of a non-U.S. citizen) and, hence, the United States retains the right to levy a 15 percent tax on the French resident U.S. citizen (referred to by the Defendant as the first bite of the three-bite rule). France, in turn, has the right to levy tax on any amount in excess of 15 percent (referred to as the second bite of the three-bite rule). Finally, any such French tax shall be allowed as a credit against U.S. tax (other than the first 15 percent allowed to the United States under the first bite), but if the French tax is less than any additional U.S. tax, the United States may top up the 15 percent collected in the first bite by such shortfall (the third bite). The parties do not disagree as to any of this.

(alteration added). As plaintiffs indicate in the foregoing quotation, plaintiffs and defendant appear to agree in principle on how the three-bite rule is implemented by the 1994 Treaty, as amended, however, as discussed further below, the parties disagree with respect to how to calculate any taxes due under the three-bite rule, with respect to plaintiffs' French and United States income taxes.

In its cross-motion for partial summary judgment, defendant challenges plaintiffs' calculations and states that "[w]hen plaintiffs computed their French income-tax liability, they applied 'foreign income tax credits,'" but that "the three-bite rule required plaintiffs to take foreign tax credits for the first-bite U.S. tax applied to their U.S. source passive income. Plaintiffs have not provided evidence that they performed this calculation properly." (alteration added). Defendant continues to dispute how plaintiffs' French and United States income tax were calculated, as represented in plaintiffs' amended tax return forms filed with the IRS.

---

> payable to France will be 7. However, assume that this individual is a U.S. citizen and, therefore, liable to U.S. tax of 22 percent. In the absence of a special relief provision, the individuals [sic] total tax would be 35: 28 to the United States, with no foreign tax credit because the dividend is from U.S. sources, and 7 to France. Under subparagraph 1(b), the 7 of French tax is credited against the 28 of U.S. tax, reducing the combined burden to 28, the higher of the two taxes. In this example, in order to credit the French tax of 7 at a U.S. rate of 28, 25 of the dividend would be treated as from French sources so that the 7 of French tax could be claimed as a foreign tax credit (7/28 x 100).

(alteration added).

After multiple discussions between plaintiffs' and defendant's attorneys about how to calculate the dollar impact of the three-bite rule and what documents defendant's attorney requested to verify that plaintiffs had properly accounted for the three-bite rule in their claims in this court, at oral argument, plaintiffs, after once again stating that the government had all it needed to confirm plaintiffs' calculations, stated:

> The Government takes issue with whether or not there should be a remand because we have not demonstrated that we complied with what they call the three-bite rule. That position is, again, simply wrong.
> I have submitted affidavits. I have submitted French tax returns or French avis d'impot, which is the -- effectively the receipt, and I've submitted U.S. tax returns. All of those show we did not try to claim a credit for any U.S. -- credit -- a French tax credit for any U.S. source income tax.
> I will go further and say that I have asked the Government from the very outset of this case, what do you need? What documents do you want from me? And they've repeatedly said none. It's only at the last minute that they came up and said we need a remand[22] because you haven't established it.

(footnote added). As plaintiffs' attorney emphasized, and as defendant had indicated in its cross-motion for partial summary judgment, the dispute between the parties with respect to the application of the three-bite rule is whether sufficient evidence exists that the three-bite rule was properly accounted for in plaintiffs' calculations of their French and United States income taxes.

Defendant's attorney responded during oral argument and confirmed that the issue of the three-bite rule concerned whether the three-bite rule taxes had been properly calculated by plaintiffs:

> The Government's issue here with respect to the computations in this case is not one that is based upon needing documents from the Plaintiff [sic] that they have not provided. What we asked for is for the Plaintiff [sic] to demonstrate that when they computed the foreign tax credits, when they computed their French tax, that they properly took account of U.S. tax on the first bite that applies to U.S. source investment income, and so it is essential for a taxpayer, when properly applying the three-bite rule, when they pay French tax in step two, to make sure that they account for the U.S. tax that was due in step one.
> And we asked the Plaintiff [sic] to -- really as part of their burden of proof in their summary judgment motion -- where we said, yeah, we agree you paid the tax. You've given us sufficient evidence to show your returns, but you

---

[22] Plaintiffs' new and only reference to requiring a "remand" at oral argument was not discussed in the parties' briefs on the cross-motions for partial summary judgment currently under consideration.

41

haven't showed us that when you computed the amount of French tax that you paid, that you properly took account of the first bite of U.S. income tax, and that's an issue that we believe is part of their burden of proof.

(alterations added). Defendant's attorney further stated:

We're not saying that, because they failed to meet this burden of proof, that if Your Honor agreed with them as a matter of law, that they should somehow lose. We're just saying that if the Court were to agree with them as a matter of law, that we have some work to do which might just involve the Plaintiff [sic] showing us how they specifically computed the dollar amounts of foreign tax credits that were claimed on both their U.S. foreign -- on their U.S. income tax returns and their French income tax returns.

(alteration added).

At oral argument, plaintiffs' attorney ultimately agreed to give plaintiffs' 2015 French income tax return to defendant in order for defendant's counsel to try to verify the calculation of the three-bite rule. In a subsequent status report submitted to the court, defendant stated:

Defendant's counsel has reviewed that return [plaintiffs' French tax return], along with the "taxpayers' annual statement issued by the French Government, the *Avis d'Impot*," that plaintiffs submitted in support of their motion for summary judgment. Dkt. 29-3 at 1, 6-13. Unfortunately, these documents do not themselves reveal how plaintiffs arrived at the numbers recorded thereon. Among other things, it is not possible, from review of the documents alone, to reconcile the income reported on plaintiffs' United States tax return with the income reported on their French return, or to determine whether the foreign tax credits reported on the French return properly include United States tax on U.S.-sourced passive income.
More specifically, it is not possible to determine, from review of those documents, whether plaintiffs properly applied the "three-bite rule" when they claimed foreign tax credits on their French income-tax return for tax they owed to the United States under the "first bite."

(emphasis in original; alteration added). Defendant's status report further stated that

during the course of the colloquy at oral argument on the parties' summary judgment motions, defendant's counsel may have been unclear in describing with particularity the information that the United States needed to review to determine whether plaintiffs properly applied the three-bite rule, leaving the erroneous impression that a review of plaintiffs' French tax return would be sufficient.

Defendant's status report indicated that defendant had asked plaintiffs' counsel a series of detailed questions related to plaintiffs' 2015 French and United States taxes, which "plaintiffs' counsel declined to answer," and defendant reiterated its position that "defendant has been unable to determine whether plaintiffs properly applied the three-bite rule in preparing their 2015 French return because defendant does not know how various sums appearing on the French return and on the *Avis d'Impot* were computed." (emphasis in original; footnote omitted). In a footnote to the foregoing quote from defendant's status report, however, defendant stated:

> If the Court is willing to defer the resolution of computational issues until after it resolves the disputed legal issues in this case, then this issue can be tabled at this time. However, if the Court would prefer that defendant state a definitive position as to whether plaintiffs properly applied the three-bite rule when preparing their 2015 returns, defendant will need to obtain additional information from plaintiffs.

In response, plaintiffs argued in another status report that,

> by email dated September 2, 2022, Plaintiffs reiterated to Defendant that the three-bite rule did not apply. Specifically, Plaintiffs explained that they did not claim a foreign tax credit against U.S. income taxes for French taxes paid on U.S. source income. Had Plaintiffs made any such claims, these would have been listed on a separate Form 1116 for the category "certain income re-sourced by treaty." As Defendant knows, no such Form 1116 was filed.

(footnote omitted). In a footnote to the foregoing quote in plaintiffs' status report, plaintiffs further stated:

> The September 2, 2022 email [from plaintiffs' counsel] to Defendant states "[y]ou have indicated an interest in how the "three-bite" rule has been applied. You are fundamentally mistaken in this inquiry as in their U.S. tax return, my clients did not claim any foreign tax credits on U.S. source income (there is no Form 1116 seeking to re-source U.S. source income for purposes of the 'three-bite' rule) and therefore the "three-bite" rule has not been applied and does not apply."

(second alteration in original). Also in plaintiffs' status report, plaintiffs argued that defendant's detailed "questions make no sense, do not reflect Plaintiffs' attempts to resolve the issue, or can be readily answered by reference to the materials provided," and that

> Defendant ignores that the amount of French tax imposed on Plaintiffs' French-source passive income exceeded the U.S. tax on that same income by over $10,000. (Horton Affidavit, Dkt 29-3.) The total U.S. source income shown on Plaintiffs' U.S. tax return was less than $8,000. As such, even if

the entire amount of U.S. income gave rise to a tax liability in France (it did not), a disallowance of that hypothetical tax would not preclude the Plaintiffs from the $3,851 refund in this case. Simply put, Defendant has not and cannot demonstrate that its concerns, even if well founded (they are not), would have any impact on Plaintiffs' entitlement to the claimed refund amount and thus, these concerns do not rise to a material issue of fact sufficient to defeat a summary judgment motion.

Finally, plaintiffs stated in their status report:

> Despite Defendant's approach, Plaintiffs remain convinced that it is in the interests of both the Government and all U.S. citizens living in France that there be a clear and timely resolution of this legal issue. To that end, Plaintiffs do not object to Defendant's proposed delay in resolution of the computational question until after the substantive issue – the proper interpretation of the French Treaty – is resolved (Def. Status Report fn. 1), [sic]

(alteration added).

As referred to above, because of the ongoing debate and the inability of the parties to resolve the issues regarding the three-bite rule, the court indicated, with the agreement of the parties, that the factual question of whether plaintiffs had properly calculated their United States and French income taxes with respect to the three-bite rule would be deferred until after a decision on the pending motions for partial summary judgment first to resolve the legal issue of whether foreign tax credits may be taken against the net investment income tax based on the 1994 Treaty, as amended. Therefore, as indicated above, the court issued an order converting the parties' cross-motions for summary judgment to cross-motions for partial summary judgment. This Opinion, therefore, only evaluates the parties' cross-motions for partial summary judgment with respect to the issue of whether the 1994 Treaty, as amended, provides a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411.

## DISCUSSION

**Subject Matter Jurisdiction**

The court ordered additional briefing to address jurisdictional concerns presented by plaintiffs' reliance solely on the terms of the 1994 Treaty, as amended, to provide plaintiffs a foreign tax credit. The statute at 28 U.S.C. § 1502 provides: "Except as otherwise provided by Act of Congress, the United States Court of Federal Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502 (2018). In supplemental briefing, the court ordered the parties to address whether the statute at 28 U.S.C. § 1502 resulted in plaintiffs' claims as beyond the jurisdiction of the United States Court of Federal Claims.

In the case of <u>United States v. Weld</u>, 127 U.S. 51 (1888), the United States Supreme Court considered the application of a predecessor to the modern version of 28 U.S.C. § 1502, identified as "section 1066, Rev. St. U. S.," which deprived the earlier United States Court of Claims of jurisdiction over any "case growing out of, and dependent upon," a treaty of the United States. <u>See</u> <u>United States v. Weld</u>, 127 U.S. at 54. The Supreme Court in <u>Weld</u> explained that jurisdiction was barred under the statute only when "the right itself, which the petition makes to be the foundation of the claim, must have its origin—derive its life and existence— from some treaty stipulation." <u>Id.</u> at 57; <u>Societe Anonyme Des Ateliers Brillie Freres v. United States</u>, 160 Ct. Cl. 192, 197 (1963) (explaining that "[t]he Supreme Court of the United States provided us with an objective standard when it defined section 1066 of the Revised Statutes, the forerunner of the present section [1502]" (alterations added)); <u>see also</u> <u>Wood v. United States</u>, 961 F.2d 195, 200 (Fed. Cir. 1992) ("Section 1502 has been given a narrow interpretation; its applicability is limited to those cases relying so heavily on a treaty that, but for the treaty, the plaintiff's claim would not exist." (citing <u>Hughes Aircraft Co. v. United States</u>, 209 Ct. Cl. 446, 534 F.2d 889, 904 (1976))); <u>Kuwait Pearls Catering Co., WLL v. United States</u>, 145 Fed. Cl. 357, 369 (2019) (quoting <u>United States v. Weld</u>, 127 U.S. at 57; <u>Wood v. United States</u>, 961 F.2d at 199; <u>Hughes Aircraft Co. v. United States</u>, 534 F.2d at 903-04).

Plaintiffs, in their supplemental brief, argue that a provision of the Internal Revenue Code, I.R.C. § 7422, creates an exception to 28 U.S.C. § 1502 and "provides this Court jurisdiction to hear the tax refund suit based upon the proper interpretation of the French Treaty." (alteration added). In its supplemental brief, defendant agrees that I.R.C. § 7422 provides a statutory exception to the jurisdictional bar imposed by 28 U.S.C. § 1502, and, therefore, "the jurisdictional bar does not apply." (citing <u>McManus v. United States</u>, 130 Fed. Cl. 613, 620 n.16 (2017); <u>De Archibold v. United States</u>, 57 Fed. Cl. 29, 32 n.6 (2003); <u>Sarkisov v. United States</u>, 95 A.F.T.R.2d 2005-738 (Fed. Cl. 1994)). The statute at I.R.C. § 7422 provides, in relevant part, that a tax refund "suit or proceeding may be maintained against the United States notwithstanding the provisions of section 2502 of title 28 of the United States Code (relating to aliens' privilege to sue) and <u>notwithstanding the provisions of section 1502 of such title 28</u> (relating to certain treaty cases)." I.R.C. § 7422(f)(1) (2018) (emphasis added). Because the statute at I.R.C. § 7422(f)(1) expressly provides an exception to the jurisdictional bar on treaty-based claims "by Act of Congress," <u>see</u> 28 U.S.C. § 1502, which is applicable to this case as also agreed to by the parties, jurisdiction for this court exists to hear plaintiffs' treaty-based claim.

**The Parties' Cross-Motions for Partial Summary Judgment**

Before the court are the parties' cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2021). RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (alteration added); Fed. R. Civ. P. 56(a)

(2023); see also Young v. United Parcel Serv., Inc., 575 U.S. 206, 231 (2015); Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Anderson v. United States, 23 F.4th 1357, 1361 (Fed. Cir. 2022); Shell Oil Co. v. United States, 7 F.4th 1165, 1171 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1014 (Fed. Cir. 2021); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Capitol Indem. Corp. v. United States, 162 Fed. Cl. 388, 397 (2022); King v. United States, 159 Fed. Cl. 450, 461 (2022); Desert Sunlight 250, LLC v. United States, 157 Fed. Cl. 209, 222 (2021).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011). Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); BASF Corp. v. SNF Holding Co., 955 F.3d 958, 963 (Fed. Cir. 2020); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. 607, 611 (2011); Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or

whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health & Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. 315, 316 (2012). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; 3rd Eye Surveillance, LLC v. United States, 151 Fed. Cl. 49, 54 (2020) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587); Pfizer Inc. v. United States, 149 Fed. Cl. 711, 715 (2020) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

Summary judgment, however, will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (alteration added); see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Lab'ys., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587-88; Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266-67 (Fed. Cir. 2008); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States,

584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; Univ. South Florida v. United States, 146 Fed. Cl. 274, 280 (2019).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co., Inc. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Lab'ys., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (Fed. Cir. 2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Beard v. United States, 125 Fed. Cl. 148, 156 (2016); Two Shields v. United States, 119 Fed. Cl. 762, 775 (2015), aff'd sub nom. Ramona Two Shields v. United States, 820 F.3d 1324 (Fed. Cir. 2016).

The parties' dispute in the current case concerns whether plaintiffs are allowed under the terms of certain provisions of the I.R.C. and the 1994 Treaty, as amended, a foreign tax credit against the United States net investment income tax. As explained above, both I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C., the statute at I.R.C. § 27 provides that "[t]he amount of taxes imposed by foreign countries and possessions of the United States shall be allowed as a credit against the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. § 27 (alteration added), and the statute at I.R.C. § 901(a) also provides that "the tax imposed by this chapter," Chapter 1 of the I.R.C., shall "be credited" with foreign tax credits. See I.R.C. § 901(a). The net investment income tax, however, is imposed by the statute at I.R.C. § 1411, which, as explained above, is located in Chapter 2A of the I.R.C. and is the sole statutory section in Chapter 2A. As a result, by their terms, I.R.C. §§ 27 and 901(a) do not provide for foreign income taxes from applying against the net

investment income tax, because I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C., which is not the case for the net investment income tax imposed by I.R.C. § 1411.

In their motion for partial summary judgment, plaintiffs argue that the net investment income tax at issue in this case "is an income tax, imposed using concepts identical to those already contained in Chapter 1 of the normal income tax provisions, and meets the definition in the Code for a tax on income as that concept is understood in the foreign tax credit provisions." (citing Treas. Reg. §§ 1.901-2(b)(4), 1.1411-1(a)). Plaintiffs argue that, because the net investment income tax is a United States income tax, it is covered by the 1994 Treaty, as amended. Plaintiffs contend that

> Article 2(1)(a) of the French Treaty defines the types of U.S. taxes to which it [the 1994 Treaty, as amended] applies. This article provides that, in the case of the United States, the treaty covers, inter alia "(i) the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes) * * *." Although the NIIT [net investment income tax] did not yet exist at the time of the ratification of the French Treaty, Article 2(2) contemplates the eventuality of new taxes by providing that "[t]he Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of the signature of the Convention in addition to, or in place of, the existing taxes." As a result, the NIIT is a covered income tax under the French Treaty.

(third alteration and ellipsis in original). Plaintiffs, therefore, claim that the 1994 Treaty, as amended, provides a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C., notwithstanding the restrictions in I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C. In their motion for partial summary judgment, plaintiffs agree that "absent application of the French Treaty, the Code would not provide for a foreign tax credit to offset the NIIT and instead would result in double taxation of the same income."

Defendant argues that the net investment income tax is imposed by the statute at I.R.C. § 1411, which is "in Chapter 2A [of the I.R.C.], a newly-created chapter entitled 'Unearned Income Medicare Contribution'" and that "[b]ecause the tax imposed by § 1411 on net investment income is not a Chapter 1 tax, the text and structure of the Code make clear that foreign tax credits are not allowed against it." (alterations added). Defendant states that "as they must, plaintiffs concede here that the 'U.S. domestic provisions of the Code . . . preclude a foreign tax credit for the NIIT.'" (ellipsis in original).

In order to avoid the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., plaintiffs, however, argue that "two separate provisions of the French Treaty," paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, each allow for a foreign tax credit against the net investment income tax. As described above, the renumbered paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, provides:

2.(a) In accordance with the provisions and subject to the limitations of the
law of the United States (as it may be amended from time to time without
changing the general principle hereof), the United States shall allow to
a citizen or a resident of the United States as a credit against the United
States income tax:
(i) the French income tax paid by or on behalf of such citizen or resident;
and
(ii) in the case of a United States company owning at least 10 percent of
the voting power of a company that is a resident of France and from
which the United States company receives dividends, the French
income tax paid by or on behalf of the distributing corporation with
respect to the profits out of which the dividends are paid.

Plaintiffs refer to the language in paragraph 2(a) of Article 24 of the 1994 Treaty, as
amended, "the provisions and . . . the limitations of the law of the United States," (ellipsis
added), which plaintiffs argue "refers to [I.R.C.] Section 904[23] principles regarding the
amount of the foreign tax credit and not something broader." (alteration and footnote
added).

The second provision relied on by plaintiffs, paragraph 2(b) of Article 24 of the
1994 Treaty, as amended, provides, in relevant part:

(b) In the case of an individual who is both a resident of France and a citizen
of the United States:
(i) the United States shall allow as a credit against the United States
income tax the French income tax paid after the credit referred to in
subparagraph (a)(iii) of paragraph 2.[24] However, the credit so

---

[23] As explained above, the statute at I.R.C. § 904 is titled "Limitation on credit" and
provides detailed limitations on the application of foreign tax credits under the I.R.C.,
which limitations are not at issue in the above captioned case. See I.R.C. § 904.

[24] Plaintiffs quote paragraph 2(b)(i) of Article 24 of the 1994 Treaty, as amended, as
including a reference to "subparagraph (a)(iii) of paragraph 1" of Article 24 of the 1994
Treaty, as amended, as opposed to the reference to "subparagraph (a)(iii) of paragraph
2" included in the court's quotation above. The 1994 Treaty as originally agreed-to by the
United States and France contains the language "subparagraph (a)(iii) of paragraph 2" of
the 1994 Treaty, as amended. See 1994 Treaty, art. 24, ¶ 1(b)(i). As noted above, the
2009 Protocol amended Article 24 of the 1994 Treaty such that "paragraph 1 shall be
renumbered paragraph 2, and paragraph 2 shall be renumbered paragraph 1," in effect
reversing the order of paragraphs 1 and 2 of Article 24 of the 1994 Treaty. See 2009
Protocol, art. VIII, ¶ 1. Accordingly, after the 2009 Protocol, the text of the renumbered
paragraph 2(b)(i) of Article 24 of the 1994 Treaty, as amended, should have referred to
"subparagraph (a)(iii) of paragraph 1," which is how plaintiffs quote that provision. The
"consolidated" 1994 Treaty, as amended, reverses the order of paragraphs 1 and 2 of the

allowed against United States income tax shall not reduce that portion of the United States income tax that is creditable against French income tax in accordance with subparagraph (a)(iii) of paragraph 2;

(ii) income referred to in paragraph 2 and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i). The provisions of this subparagraph (b)(ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. No provision of this subparagraph (b) relating to source of income shall apply in determining credits against United States income tax for foreign taxes other than French income tax as defined in subparagraph (e).[25]

(footnotes added). Drawing a distinction between the wordings of the two treaty provisions upon which they rely, plaintiffs point out that "Article 24(2)(b) neither contains nor refers to the Article 24(2)(a) limitations."

Defendant argues that neither paragraph 2(a) nor paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides a foreign tax credit against the net investment income tax. With respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, defendant argues that "the [1994] Treaty[, as amended,] provides for relief from double taxation in the form of a foreign tax credit, and the extent of a taxpayer's eligibility for that foreign tax credit is determined in accordance with the Code," (alterations added), including the restriction of I.R.C. §§ 27 and 901(a) to applying foreign tax credits only against taxes "imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). With respect to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, defendant

_____

1994 Treaty, consistent with the 2009 Protocol, however, the "consolidated" version erroneously retains the language "subparagraph (a)(iii) of paragraph 2" from the unamended 1994 Treaty. There is no "subparagraph (a)(iii) of paragraph 2" in Article 24 of the 1994 Treaty, as amended.

[25] In the "consolidated" version of the 1994 Treaty, as amended, which, as noted above, came from the website of the Embassy of France in the United States, although it is no longer available at that website, subparagraph 2(b)(ii) of Article 24 ends with the words "subparagraph (e). And[.]" (capitalization in original; alteration added). The inclusion of a period and the capitalized word "And" appears to be a typographical error in the "consolidated" version of the 1994 Treaty, as amended. In the original 1994 Treaty the corresponding paragraph ends "subparagraph (e); and[.]" See 1994 Treaty, art. 24, ¶ 1(b)(ii) (alteration added). The differences are that the "consolidated" version of the 1994 Treaty, as amended, capitalized "And" and replaced the semicolon after "(e)" with a period. These changes in the "consolidated" version are in error and are not a product of the amendments to the 1994 Treaty made by the 2004 and 2009 Protocols.

argues that "[t]o construe subsection 2(b) to sanction such bold departures from the foreign-tax-credit framework under U.S. law would frustrate the policy foundation on which the framework was built." (alteration added). This court, therefore, must consider whether, by the terms of the 1994 Treaty, as amended, plaintiffs are entitled to take a foreign tax credit for their French income taxes against the net investment income tax imposed by I.R.C. § 1411. Also at issue are which provisions of the 1994 Treaty, as amended, namely paragraphs 2(a) and 2(b) of Article 24, could provide such a foreign tax credit, and whether the language of paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, potentially conflict with two provisions of the I.R.C., I.R.C. §§ 27 and 901(a), which allow United States taxpayers to take foreign tax credits on their United States tax returns only against the taxes imposed by Chapter 1 of the I.R.C., given that the net investment income tax is imposed by I.R.C. § 1411, located in Chapter 2A of the I.R.C.

Defendant argues that, rather than this court conducting an independent interpretation of the 1994 Treaty, as amended, the court should afford deference to the United States' interpretation of the 1994 Treaty, as amended. According to defendant, "[t]he Treasury Department has consistently interpreted both article 24(2)(a) of the Treaty, and the model U.S. treaty[26] on which it was based, to provide for foreign tax credits against U.S. income taxes only to the extent that the Internal Revenue Code allows such credits." (alteration and footnote added). Defendant quotes the United States Supreme Court's decision in Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85

---

[26] In support of the United States' interpretation of the 1994 Treaty, as amended, defendant cites to three United States model tax treaties produced by the United States Treasury Department which are "dated 1981, 1996, and 2006," as well as technical explanations of the model treaties, also produced by the United States Treasury Department, which documents defendant claims "informed treaty negotiations between the United States and France." Defendant provides no evidence for its claim that the model treaties and their accompanying technical explanations, which set forth the United States' interpretations of the model treaties, "informed" the negotiations of the 1994 Treaty, the 2004 Protocol, or the 2009 Protocol when those agreements were negotiated by the United States and France. Defendant argues that because the most recent protocol between the Government of the United States and the Government of the French Republic, the 2009 Protocol, postdates the United States' creation and interpretation of the 2006 model treaty, the court should infer that the French Government assented to the United States' interpretation of the 2006 model treaty as controlling on the meaning of the 1994 Treaty, as amended. The model treaties relied on by defendant, however, were produced by only one government, the United States, and therefore represent only the United States' view of the language contained in the 2006 model treaty. As the court explains in this Opinion, the interpretation of treaties involves giving effect to the shared expectations of the sovereign authorities which have entered into agreement with one another. See, e.g., Air France v. Saks, 470 U.S. 392, 399 (1985). Defendant provides no citation to any authority by which the United States Department of the Treasury may unilaterally determine the meaning of treaties with foreign governments by interpreting the terms of a model treaty, however similarly worded the model treaty may be to a treaty under consideration.

(1982), for the proposition that "'[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.'" (alteration in original) (citing Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)). Defendant further argues that "when the U.S. and France executed two protocols [the 2004 and 2009 Protocols] amending the original 1994 convention, they left undisturbed the requirement [in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended,] that U.S. foreign tax credits be given 'in accordance with the provisions of U.S. law,' demonstrating an acquiescence by France in the Treasury Department's prior explanation of the function of article 24(2)(a)." (alterations added) (citing Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. 16, 53-54 (2021)). Defendant relies upon the United States Treasury Department's Technical Explanation of the 1994 Treaty to demonstrate the United States' interpretation, and defendant argues that "[w]hile courts sometimes decline to follow treaty interpretations reflected in technical explanations prepared by Treasury, they generally do so only when there is reason to doubt whether the documents reflect official U.S. policy." (alteration added) (citing Snap-On Tools, Inc. v. United States, 26 Cl. Ct. 1045, 1070 (1992), aff'd, 26 F.3d 137 (Fed. Cir. 1994)). In addition, defendant cites the Federal Circuit's opinion in Xerox Corp. v. United States to argue that the Federal Circuit "disregarded 'a position taken by Treasury' in the technical explanation, where the Senate executive report had criticized it," (alteration added), however, according to defendant, "the Federal Circuit recognized that 'extrinsic material is often helpful in understanding the treaty and its purposes.'" (quoting Xerox Corp. v. United States, 41 F.3d 647, 652 (Fed. Cir. 1994)).

Plaintiffs, however, argue that the court should not defer to the United States' interpretation of the 1994 Treaty, as amended. Plaintiffs argue that courts do not afford deference "when the Executive Branch's interpretation is not supported by negotiating history, diplomatic communications or the method by which the other sovereign has interpreted the treaty." (citing Nat'l Westminster Bank, PLC v. United States, 512 F.3d 1347 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Eshel v. Comm'r, 831 F.3d 512, 521 (D.C. Cir. 2016); Iceland S.S. Co., Ltd.-Eimskip v. United States Dep't of Army, 201 F.3d 451 (D.C. Cir. 2000); North West Life Assur. Co. of Canada v. Comm'r, 107 T.C. 363, 379 (1996)). Plaintiffs additionally argue that "'where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights that may be claimed under it, the more liberal interpretation is to be preferred.'" (quoting United States v. Stuart, 489 U.S. 353, 368 (1989) (internal quotations omitted), and citing Jordan v. Tashiro, 278 U.S. 123, 128 (1928)). Therefore, plaintiffs argue, because the 1994 Treaty, as amended, "has as one of its principal purposes to avoid" double taxation of citizens of one signatory country residing in the other, "the French Treaty should be read in a way to avoid that evil, not to perpetuate it."

The Supreme Court has held that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 184-85 (alteration added). The Supreme Court guidance, however, did not indicate that absolute deference is required to the position taken by the United States, but

rather that appropriate deference should be considered on a case-by-case basis, including in the current case. According to the Supreme Court:

> "It is our 'responsibility to read the treaty in a manner "consistent with the *shared* expectations of the contracting parties."' . . . Even if a background principle is relevant to the interpretation of federal statutes, it has no proper role in the interpretation of treaties unless that principle is shared by the parties to 'an agreement among sovereign powers[.]'"

Lozano v. Montoya Alvarez, 572 U.S. 1, 12 (2014) (emphasis in original; alteration and ellipsis added) (quoting Olympic Airways v. Husain, 540 U.S. 644, 650 (2004) (quoting Air France v. Saks, 470 U.S. 392, 399 (1985)); Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 226 (1996)); see also Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 185 ("When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation."). Therefore, "an agency's position merits less deference 'where an agency and another country disagree on the meaning of a treaty.'" See Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1358 (quoting Iceland S.S. Co., Ltd.-Eimskip v. United States Dep't of Army, 201 F.3d at 458). The United States Court of Appeals for the Federal Circuit also has explained that "effect must be given to the intent of both signatories" to a treaty. See id. at 1353 (citing Xerox Corp. v. United States, 41 F.3d at 656).

In the above captioned case, defendant has tried to rely on interpretations issued by the United States Treasury Department of the 1994 Treaty, as amended, as indicating that the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax. Defendant has not, however, presented evidence regarding the interpretation held by the Government of the French Republic with respect to this issue regarding a foreign tax credit against the net investment income tax. Moreover, the parties agree that no evidence has been produced regarding the Government of the French Republic's interpretation of the 1994 Treaty, as amended, in relation to the foreign tax credit issue presented by plaintiffs' claims.

Without evidence as to the Government of the French Republic's interpretation of the 1994 Treaty, as amended, with respect to the foreign tax credit issue currently before the court, this court cannot afford total deference to the United States' interpretation, because the United States cannot demonstrate that defendant's interpretation is shared by the Government of the French Republic. As the Federal Circuit explained in National Westminster Bank, "when the language of a treaty provision 'only imperfectly manifests its purpose,'" the court is "required to give effect to its underlying purpose," and "[t]o this end," the court "must 'examine not only the language, but the entire context of agreement.'" Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353 (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. 477, 481, 678 F.2d 180, 183 (1982) (citing In re Ross, 140 U.S. 453, 475 (1891))). The United States Supreme Court has addressed what may be considered within "the entire context of agreement," see Great West Life Assur. Co. v. United States, 230 Ct. Cl. at 481, including the public acts

of signatory governments. See United States v. Reynes, 50 U.S. (9 How.) 127, 147-148 (1850) (considering "the public acts and proclamations of the Spanish and French governments, and those of their publicly recognized agents, in carrying into effect those treaties" to which Spain and France were signatories). The Supreme Court also has held that negotiations and diplomatic correspondence, both prior to and after, a treaty or international agreement was executed, may be considered. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 183-84 and n.9 (considering a diplomatic cable "relaying the position of the Ministry of Foreign Affairs of Japan" and a later communication in which "'[t]he Government of Japan reconfirms its view'" (alteration added)); Factor v. Laubenheimer, 290 U.S. 276, 294-95 (1933) ("In ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it." (citing Nielsen v. Johnson, 279 U.S. 47, 52 (1929); Terrace v. Thompson, 263 U.S. 197, 223 (1923); United States v. Texas, 162 U.S. 1, 23 (1896); Kinkead v. United States, 150 U.S. 483, 486 (1893); In re Ross, 140 U.S. at 467)); Cook v. United States, 288 U.S. 102, 109, 112-15 nn.6-7, nn. 10-15 (1933) (explaining that "[i]n construing the Treaty its history should be consulted" including "note[s]" between diplomatic officials, "repl[ies] to "question[s]," "statement[s] of the American position," and "letter[s]" and other communications from the British Government (alterations added)); Todok v. Union State Bank of Harvard, Neb., 281 U.S. 449, 454 (1930) (considering "a note addressed by the Swedish Minister at Washington to the Department of State" in which "the Swedish Minister stated his understanding that the authorities in Sweden had always held that the words 'goods and effects' in article 6 of the treaty of 1783 include real estate"); Nielsen v. Johnson, 279 U.S. at 52 ("When their [treaties'] meaning is uncertain, recourse may be had to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter and to their own practical construction of it." (alteration added) (citing Terrace v. Thompson, 263 U.S. at 223; United States v. Texas, 162 U.S. at 23; Kinkead v. United States, 150 U.S. at 486; In re Ross, 140 U.S. at 467)); Terrace v. Thompson, 263 U.S. at 223 ("But if the language left the meaning of its provisions doubtful or obscure, the circumstances of the making of the treaty . . . would resolve all doubts against the appellants' contention." (ellipsis added)); United States v. Texas, 162 U.S. at 23 ("Before examining those articles [of the treaty], it will be useful to refer to the diplomatic correspondence that preceded the making of the treaty." (alteration added)).

Reliance by a court on evidence of the shared expectations of the signatory governments to a treaty or international agreement is exemplified by the Coplin cases and the decisions of the United States Claims Court, United States Court of Appeals for the Federal Circuit, and United States Supreme Court. See Coplin v. United States, 6 Cl. Ct. 115 (1984), rev'd, 761 F.2d 688 (Fed. Cir. 1985), aff'd on other grounds sub nom., O'Connor v. United States, 479 U.S. 27 (1986). In Coplin, the United States Claims Court, a predecessor court to this court, addressed the interpretation of an "Implementation Agreement" to the Panama Canal Treaty and negotiated in parallel with the Panama Canal Treaty between the United States and the Republic of Panama. See Coplin v. United States, 6 Cl. Ct. at 119. At issue in Coplin, similar to the above captioned case, was taxation of United States citizens in a foreign country pursuant to an international

agreement or treaty which addressed such taxation. See id. at 120 (considering the language in the Implementation Agreement to the Panama Canal Treaty which read: "*United States citizen employees and dependents shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the Commission*" (emphasis in original)). While the United States Claims Court in Coplin explained that a court should not "give literal effect to treaty language if it is persuaded that such language does not reflect the intention of the high contracting parties," the court noted that "[w]here the language is reasonably clear, the party proffering a contrary interpretation must persuade the court that its construction comports with the view of *both* parties" to the treaty. See id. at 128 (emphasis in original; alteration added) (citing Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180; United States v. Texas, 162 U.S. at 36). The United States Claims Court in Coplin emphasized that "there is *no evidence whatsoever* as to the interpretation given this language by Panama" and that "[w]hile the record provides valuable insights as to the interests and motivations of the parties, the court is left largely to surmise and conjecture as to how they resolved their differences and what might have motivated each side to agree to the language finally adopted." Id. at 128-29 (emphasis in original; alteration added). The Claims Court in Coplin did not afford deference to the United States' interpretation, stating that "nothing presented by defendant supports the finding that Panama and the United States 'intended to agree on something different from that appearing on the face of' Article XV of the Implementation Agreement" and that "'[w]ithout such a finding the agreement must be interpreted according to its unambiguous language.'" Id. at 145 (alteration added) (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 432 (1943)).

A panel of five judges of the United States Court of Appeals for the Federal Circuit reversed the Claims Court's decision in Coplin on narrow grounds. See Coplin v. United States, 761 F.2d 688, 691-92 (Fed. Cir. 1985), aff'd on other grounds sub nom., O'Connor v. United States, 479 U.S. 27 (1986). The Federal Circuit explained that, immediately prior to hearing oral argument in the appeal to the Federal Circuit of Coplin, the United States provided the Federal Circuit with a diplomatic note from the Panamanian Foreign Minister, containing "letters from the Panamanian team that negotiated the Implementation Agreement," which "confirmed" that Panama shared the United States' interpretation of the Implementation Agreement provisions at issue. See id. at 691. The Panamanian Foreign Minister's diplomatic note was dated after the United States Claims Court's earlier decision in Coplin had been issued, and, therefore, the diplomatic note was not available to the Claims Court at the time of the Claims Court's decision. See id. The Federal Circuit cited to the Supreme Court's decisions in United States v. Reynes, 50 U.S. (9 How.) at 147-48, Jones v. United States, 137 U.S. 202, 214-16 (1890), Factor v. Laubenheimer, 290 U.S. at 295, and Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. at 184 n.9, considering diplomatic correspondences and public acts of signatory governments to international agreements and treaties, and held that the Panamanian diplomatic note should be considered. See Coplin v. United States, 761 F.2d at 691. Relying on the Panamanian Foreign Minister's diplomatic note's expression of the Panamanian Government's interpretation of the Implementation Agreement, the Federal Circuit held that "the record now reveals the intent of each government," and because the

governments' interpretations of the Implementation Agreement were aligned, the judgment of the Claims Court was reversed. See id. at 692.

The United States Supreme Court affirmed the United States Court of Appeals for the Federal Circuit's Coplin decision on other grounds in O'Connor v. United States, 479 U.S. 27 (1986). As the Supreme Court explained, while "[t]here is some purely textual evidence, albeit subtle" in support of the United States' interpretation of the Implementation Agreement, "[m]ore persuasive than the textual evidence, and in our view overwhelmingly convincing, is the contextual case" for the United States' interpretation. See id. at 31 (alterations added). The Supreme Court further held that the United States' interpretation was

> in accord with the consistent application of the Agreement by the Executive Branch—a factor which alone is entitled to great weight, see Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85, 102 S. Ct. 2374, 2379, 72 L. Ed. 2d 765 (1982)—but that application has gone unchallenged by Panama.

O'Connor v. United States, 479 U.S. at 33. According to the Supreme Court, Panama "did not object" to the United States' interpretation. See id. The Supreme Court in O'Connor explained that "[t]he course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." Id. (alteration added) (citing Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 259-60 (1984); Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 158-61 (1934)). In a footnote to its decision in O'Connor, the Supreme Court addressed the Panamanian Foreign Minister's diplomatic note and described the parties' views of the note, but the Supreme Court concluded, "[s]ince we would sustain the Government's position without reference to the note, we need not resolve these disputes." See id. at 33 n.2 (alteration added).

The various precedential cases of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit direct that, in the above captioned case, for the United States' interpretation of the 1994 Treaty, as amended, to be afforded deference by this court, the United States' interpretation should be a shared interpretation by the French Government, because the court must give effect to the "shared expectations" of the signatory governments. As discussed by several cases above, including Air France v. Saks, "it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." Air France v. Saks, 470 U.S. at 399 (citing Reed v. Wiser, 555 F.2d 1079, 1090 (2d Cir. 1977); Day v. Trans World Airlines, Inc., 528 F.2d 31 (2d Cir. 1975)). As described above, neither party has produced any materials from the Government of the French Republic offering France's interpretation of the terms of the 1994 Treaty, as amended, with respect to the application of foreign tax credits against the United States net investment income tax. Moreover, there is no evidence before the court which indicates that the United States and France have engaged in diplomatic consultation with respect to the taxation issues presented by plaintiffs' claim for a foreign tax credit against the net investment income

tax imposed by I.R.C. § 1411, or that France was notified of the post-1994 Treaty, as amended, enactment of the net investment income tax at I.R.C. § 1411.[27]

While defendant argues that the Government of the French Republic has acquiesced to the United States' interpretation that foreign tax credits are exempted from the foreign tax credits allowed by the 1994 Treaty, as amended, no such inference can be drawn from the lack of evidence in the current case before the court. See O'Connor v. United States, 479 U.S. at 33. The Supreme Court in O'Connor observed that the Panamanian Government had not objected to the United States subjecting Panamanian citizens to United States income tax, which failure to object the Supreme Court understood as evidence of the Implementation Agreement's "meaning" consistent with the United States' interpretation. See id. In O'Connor, there was an opportunity for Panama to object, if Panama disagreed with the United States' interpretation. See id. In the above captioned case, however, there is no such certainty that France had an opportunity to object, or did object, to the United States' interpretation of the 1994 Treaty, as amended, with respect to the net investment income tax question at issue in the case before this court. This is, in part, because, as noted above, there is no evidence in the record before this court that the United States "notified" the Government of the French Republic of the enactment of the net investment income tax, as contemplated by the 1994 Treaty, as amended, and, as indicated above, I.R.C. § 1411 was enacted after the 1994 Treaty, as amended, was agreed to by the respective governments. Therefore, the court should not infer from the absence of an indication of the Government of the French Republic's interpretation that France agrees with the interpretation offered by the United States of the 1994 Treaty, as amended. The court does not assume that the interpretation of the 1994 Treaty, as amended, by the United States represents "the shared expectations of the contracting parties," see Air France v. Saks, 470 U.S. at 399, and the court does not give deference to the United States' interpretation that the 1994 Treaty, as amended, should exclude the net investment income taxes from the foreign tax credits available. The court does not afford deference to the United States' interpretation based on the non-binding interpretative documents which defendant cites to this court, namely the United States Treasury Department Technical Explanations of the 1994 Treaty, 2004 Protocol, and 2009 Protocol, and the United States Treasury Department's model treaties and accompanying technical explanations, because the technical explanations and model treaties represent only the United States' interpretation, and not the interpretation of the French Government.

---

[27] Plaintiffs allege, without further support in the record before the court, in their motion for partial summary judgment that they submitted "a Freedom of Information Act request," to which defendant responded and "confirmed that no discussions took place between the U.S. and French Governments at the time the NIIT was enacted and, after exhaustive discovery, Defendant has produced no evidence of any communications with the French Government that accords with the Defendant's treaty interpretation." (capitalization in original).

**The Parties' Arguments With Respect to Treaty Interpretation Standards**

The court ordered specific briefing from the parties in this case on the issue of determining whether a potential conflict might exist between the relevant treaty provisions and United States statutory sections, and if so, how the court should resolve that potential conflict. Plaintiffs state that they are "not aware of any case law that provides a comprehensive definition of when such a conflict exists, but there are clear standards as to when such a conflict does not exist," namely that "[a] conflict may arise only when it is not possible to harmonize inconsistent statutory and treaty provisions." (alteration added). Plaintiffs argue that "[w]hen provisions of a treaty and of a statute appear inconsistent, the Supreme Court has repeatedly held that, if possible, the two provisions should be harmonized to the maximum extent possible to avoid an actual conflict." (alteration added) (citing Weinberger v. Rossi, 456 U.S. 25, 32 (1982); Moser v. United States, 341 U.S. 41, 45 (1951); United States v. Lee Yen Tai, 185 U.S. 213, 221-22 (1902); Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804)). Moreover, plaintiffs quote from the United States Claims Court's decision in Snap-On Tools, Inc. v. United States, 26 Cl. Ct. 1045, to state that "'when the two [the treaty and the statute] are inconsistent, or irreconcilable, the last in time should take precedence.'" (alteration added) (quoting Snap-On Tools, Inc. v. United States, 26 Cl. Ct. at 1067). Plaintiffs argue that "there is no language in either the NIIT statutory provisions or any legislative history suggesting that the enactment of the NIIT was intended to modify any United States' treaty obligations." According to plaintiffs, "when a treaty obligation applies, reciprocal rights that can be harmonized with the Code are created" under which "the United States must allow a foreign tax credit to offset the NIIT based upon which country has primary taxing rights under the French Treaty on the income giving rise to the NIIT." Plaintiffs further argue that "[a]llowing for a foreign tax credit under the French Treaty gives full effect to both the Code (because no statutory-based credit is given) and the treaty (because a treaty-based credit is given)." (alteration added).

In response, defendant cites to Breard v. Greene, 523 U.S. 371, 376 (1998), and Kappus v. Commissioner of Internal Revenue, 337 F.3d 1053, 1058-60 (D.C. Cir. 2003), and quotes the Supreme Court's decision in Whitney v. Robertson, 124 U.S. 190, 194-95 (1888), to argue that "the Supreme Court established a last-in-date rule to resolve conflicts between statutes and treaties," such that "'[t]he duty of the courts is to construe and give effect to the latest expression of the sovereign will.'" (emphasis in original; alteration added). Defendant argues, however, that "the last-in-date rule applies only when a statute and a treaty conflict—i.e., when courts are not able to 'construe them to give effect to both' without 'violating the language of either.'" (quoting Whitney v. Robertson, 124 U.S. at 194). Defendant quotes the decision of the United States Tax Court in Adams Challenge (UK) Ltd. v. Commissioner to argue that "'[t]o carry out the process of harmonization, courts construe earlier and later provisions in a way that is consistent with the intent of each and that results in an absence of conflict between the two.'" (alteration added) (quoting Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. at 45 (internal quotations omitted)). Moreover, defendant argues that "plaintiffs' contention that the Internal Revenue Code cannot override a tax treaty absent an express statement of Congressional intent to do so has already been rejected by Congress," and defendant

quotes I.R.C. § 7852, "Other applicable rules," which states at paragraph (d), "**Treaty obligations**" (emphasis in original), in relevant part, "'[f]or purposes of determining the provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law.'" (alteration in original) (quoting I.R.C. § 7852(d)(1)). Defendant contends that "[w]hen Congress enacts a statute whose terms are inconsistent with a prior treaty, the text of the statute is sufficient to demonstrate the intent of Congress to override the treaty." (alteration added). According to defendant, "[h]armonization does not put a thumb on the scale in favor of the Treaty [in this case the 1994 Treaty, as amended,] or the Code, or in favor of the more lenient or the more restrictive," but rather, harmonization "examines the language and the intent of the statute and the treaty and considers whether they may be fairly construed in a way that results in an 'absence of conflict.'" (alterations added) (quoting Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. at 45). Defendant argues, based on the supposed principle that tax credits "'are a matter of legislative grace,'" (quoting Phila. Energy Sols. Refin. & Mktg., LLC v. United States, 159 Fed. Cl. 230, 236, appeal filed, No. 2022-1834 (Fed. Cir. May 27, 2022)), that "if it ever became necessary for the Court to apply a tie breaker to decide between two equally plausible interpretations of the Treaty—one allowing a tax credit and the other disallowing a credit—the tax credit should be denied consistent with domestic-law tax-credit principles." Defendant argues that, in the above captioned case, "the Treaty and the Code work in harmony" and that interpreting the 1994 Treaty, as amended, to allow a foreign tax credit against the net investment income tax "would conflict directly with [I.R.C.] §§ 27 and 901(a), which explicitly provide that foreign tax credits may reduce *only* taxes imposed 'by this chapter,'" i.e., Chapter 1 of the I.R.C. (emphasis in original; alteration added).

In their briefs and at oral argument on the cross-motions for partial summary judgment, the parties have made numerous further arguments concerning the potential conflict and overlap of the terms of the 1994 Treaty, as amended, and the statutory provisions at issue in this case, I.R.C. §§ 27 and 901(a), which restrict foreign tax credits to apply only against "the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. §§ 27, 901(a), and whether foreign tax credits may be claimed against the net investment income tax imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C.

Regarding the statute at I.R.C. § 1411, at issue in the current case, the United States Department of the Treasury issued Treasury Decision 9644, interpreting I.R.C. § 1411 on December 2, 2013. See T.D. 9644, 2013-51 I.R.B. 676.[28] Treasury Decision

---

[28] Treasury Decision 9644 was first published in the Federal Register at Net Investment Income Tax, 78 Fed. Reg. 72,393 (Dec. 2, 2013), and corrections to Treasury Decision 9644 were published in the Federal Register on April 1, 2014. See Net Investment Income Tax; Correction, 79 Fed. Reg. 18159 (Apr. 1, 2014). To explain the corrections to Treasury Decision 9644, the United States Treasury Department states in the corrective Federal Register document that "[a]s published, the final regulations (TD 9644) contain errors that may prove to be misleading and are in need of clarification." Net Investment Income Tax; Correction, 79 Fed. Reg. at 18159 (alteration added). The corrections provided by the Treasury Department at 79 Federal Register 18159 do not restate the entire Treasury

9644 addresses whether the net investment income tax imposed by I.R.C. § 1411 is subject to foreign tax credits, including based on tax treaties between the United States and other governments. Treasury Decision 9644 states, in relevant part:

> The Treasury Department and the IRS received comments asking whether foreign income, war profits, and excess profits taxes ("foreign income taxes") are allowed under sections 27(a) and 901 as a credit against the section 1411 tax. Under the express language of sections 27(a) and 901(a), foreign income taxes are not creditable against United States taxes other than those imposed by chapter 1 of the Code. Section 1.1411–1(e) of the final regulations clarifies that amounts that are allowed as credits only against the tax imposed by chapter 1 of the Code, including credits for foreign income taxes, may not be credited against the section 1411 tax, which is imposed by chapter 2A of the Code. This limitation is similar to the limitation applicable to a number of other credits that are allowed only against the tax imposed by chapter 1 of the Code. See, for example, section 38. The Treasury Department and the IRS also received comments asking whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax. The Treasury Department and the IRS do not believe that these regulations are an appropriate vehicle for guidance with respect to specific treaties. An analysis of each United States income tax treaty would be required to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country. If, however, a United States income tax treaty contains language similar to that in paragraph 2 of Article 23 (Relief from Double Taxation) of the 2006 United States Model Income Tax Convention, which refers to the limitations of United States law (which include sections 27(a) and 901), then such treaty would not provide an independent basis for a credit against the section 1411 tax.

T.D. 9644, 2013-51 I.R.B. at 679.

Defendant relies on Treasury Decision 9644 to interpret the statute at I.R.C. § 1411 as excluding the net investment income tax from foreign tax credits. Defendant argues that Treasury Decision 9644 "determined that such [foreign] tax credits were not available, because the NIIT 'is imposed by Chapter 2A of the Code.'" (alteration added) (quoting Net Investment Income Tax, 78 Fed. Reg. at 72,396). Defendant further argues that Treasury Decision 9644 addressed "'whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax,'" and that, with respect to treaties containing the language found in the 1994 Treaty,

---

Decision 9644, but only the changes made thereto, and the changes made at 79 Federal Register 18159 are not relevant to the above captioned case. See Net Investment Income Tax; Correction, 79 Fed. Reg. at 18159. Accordingly, the court cites to Treasury Decision 9644 as published at Internal Revenue Bulletin No. 2013-51.

as amended, "'such treaty would not provide an independent basis for a credit against the section 1411 tax.'" (quoting Net Investment Income Tax, 78 Fed. Reg. at 72,396).

In its cross-motion for partial summary judgment, defendant argues that "the enactment of the NIIT [at I.R.C. § 1411 by the Health Care and Education Reconciliation Act of 2010] *after* the Treaty was signed in a new Chapter 2A of the Code confirms the intent of Congress to exempt the NIIT from the allowance of a foreign tax credit, and would override any potentially inconsistent relief under the Treaty." (emphasis in original; alteration added). Defendant further argues, citing Whitney v. Robertson, 124 U.S. at 194-95, that "harmonization is self-evident here, as [I.R.C.] § 1411 and the [1994] Treaty[, as amended,] are fully consistent with each another," (alterations added), because the I.R.C. "does not allow a foreign tax credit against the NIIT because it is not a Chapter 1 tax," a reference to the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a).

Plaintiffs dispute the United States Treasury Department's analysis in Treasury Decision 9644 as applicable to the case currently before the court, arguing that the Treasury Department's

> interpretation [in Treasury Decision 9644] ignores the purpose of the French Treaty to eliminate double taxation, renders a series of inter-related treaty provisions moot, fails to harmonize the treaty with the Code provisions, and ignores the general principle established by Congress that treaty foreign tax credit entitlement is wider than that contained in the Code, unless subject to a specifically legislated treaty override.

(alteration added). Plaintiffs argue that "[t]he 'shared expectations' of the sovereigns govern the interpretation of the treaty as evidenced by the text used in the agreement, unless the result does not accord with the literal language used." (alteration added) (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481).[29]

Plaintiffs quote from the 1994 Treaty Treasury Department Technical Explanation, described above, to support their interpretation:

> The Technical Explanation provides the rationale of the language used by Article 24(2)(a): "[t]he credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., **the allowance of a credit**, is retained." (Emphasis added.) This Technical Explanation then provides that "the terms of the credit are determined by the provisions of the U.S. statutory credit at the time the

---

[29] Plaintiffs' citation to Great-West Life Assurance misidentifies that decision issued by the United States Court of Claims, as a decision issued by the United States Court of Appeals for the Federal Circuit.

credit is given. The limitation of law generally limits the credit against **U.S. tax to the amount of U.S. tax due** with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code Section 904(a))."

(emphasis and alteration in original; footnote omitted). Moreover, plaintiffs argue: "Enactment of the NIIT in 2010 is precisely the type of amendment contemplated by the provisions of Article 2(2) [of the 1994 Treaty, as amended,[30]] and the essential and meaningful parenthetical text of Article 24(2)(a) ensures that the general principle – that a credit is allowed for a subsequently enacted U.S. income tax – is guaranteed."[31] (footnote added).

---

[30] As described above, paragraph 2 of Article 2 of the 1994 Treaty, as amended, provides:

2. The Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any significant changes which have been made in their respective taxation laws and of any official published material concerning the application of the Convention, including explanations, regulations, rulings, or judicial decisions.

As also stated above, no "notification" as contemplated by paragraph 2 of Article 2 of the 1994 Treaty, as amended, is included in the record currently before the court. Although the relation of paragraph 2 of Article 2 of the 1994 Treaty, as amended, to paragraph 2 of Article 24 of the 1994 Treaty, as amended, is not fully explained by plaintiffs, plaintiffs state at a different point in their motion for partial summary judgment:

Although the NIIT did not yet exist at the time of the ratification of the French Treaty, Article 2(2) contemplates the eventuality of new taxes by providing that "[t]he Convention shall apply also to any identical or substantially similar taxes that are imposed after the date of the signature of the Convention in addition to, or in place of, the existing taxes." As a result, the NIIT is a covered income tax under the French Treaty.

(alteration in plaintiffs' brief).

[31] In a footnote to its cross-motion for partial summary judgment, defendant states that it

does not disagree with plaintiffs' claim (at 10-11) that the NIIT is a "covered tax" under article 2(2) of the Treaty. However, the Treaty does not by its terms require the United States to allow foreign tax credits against all covered U.S. taxes, but merely requires the United States to allow foreign tax credits in accordance with the provisions and subject to the limitations of U.S. law.

Plaintiffs also try to rely on paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, to contest defendant's interpretation of the net investment income tax, set forth in Treasury Decision 9644, as ineligible for foreign tax credits. As noted above, plaintiffs argue that the reference to "the provisions and . . . the limitations of the law of the United States" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "refers to [I.R.C.] Section 904 principles regarding the amount of the foreign tax credit and not something broader." (alteration and ellipsis added). Plaintiffs contend that the limitations on foreign tax credits imposed by I.R.C. § 904, described above, are the only "limitations" contemplated by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and that the other restrictions on foreign tax credit availability, namely the restriction in I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. §§ 27, 901(a), are not incorporated into the language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. As noted above, the limitations set forth in I.R.C. § 904 are not relevant to the above captioned case.

As described above, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, includes a parenthetical reference to "the law of the United States (as it may be amended from time to time without changing the general principle hereof) . . . ." (ellipsis added). Plaintiffs argue that "[t]he 'general principle' referred to in Article 24(2)(a) [of the 1994 Treaty, as amended,] is that a credit is allowed for French income taxes against U.S. income taxes." (alterations added). Plaintiffs claim that "[t]he passage into law of a new 'United States income tax' [after the 1994 Treaty, as amended,] cannot be said to have any bearing under the treaty on whether an amount of French tax paid is a foreign income tax that is creditable per se," because "Plaintiffs' French income taxes equal to $140,398 remain eligible for a foreign tax credit against their substantive U.S. tax liability." (alterations added). Plaintiffs also claim, "[n]or does a new 'United States income tax' alter the amount of the Code Section 904 limitation – Plaintiffs did not, and could not, argue that French income taxes are creditable against, for example, U.S. source income." (alteration added). Plaintiffs further argue that if the court did not adopt plaintiffs' interpretation, that "would result in it [paragraph 2(a) of Article 24 of the 1994 Treaty, as amended,] having no independent purpose if its language is limited by the Code, rendering the position superfluous." (alteration added). According to plaintiff, "[f]or Article 24(2)(a) [of the 1994 Treaty, as amended,] to have any purpose and effect, it must be that it ensures that a foreign tax credit will be allowed against any subsequently enacted United States income tax that is covered by the French Treaty, which would include the NIIT." (alterations added).

According to plaintiffs, "the [Internal Revenue] Code need *not* expressly provide for a foreign tax credit if the foreign levy in question falls within the treaty definition of a creditable tax" because "what constitutes a United States income tax for purposes of the application of a treaty derives from the treaty's definition and not from domestic law."[32]

---

[32] Plaintiffs argue that "[w]hat constitutes a creditable foreign tax under a treaty may be broader than the Code Section 901 definition . . . ." (ellipsis added). In support of this contention, plaintiffs argue that "[t]here are numerous instances where the terms of a

(emphasis in original; alteration added). Plaintiffs argue that "[d]omestic law therefore does not constitute an absolute limitation on the rights and entitlements that may be granted to treaty beneficiaries under the terms of a U.S. tax treaty." (alteration added). Plaintiffs state that "[t]he parties agree that the NIIT constitutes a United States income tax as defined in Article 2(1) and 2(2) of the French Treaty," and, therefore, "that when a treaty provides a definition of a covered tax, it is that definition, and not the more limited definition under United States or foreign law, that is applied." (alteration added).

In addition to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, plaintiffs also argue that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, "allows a foreign tax credit for the NIIT." Plaintiffs contrast paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, with the above-discussed paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, stating that "Article 24(2)(b) neither contains nor refers to the Article 24(2)(a) limitations." Plaintiffs disagree with defendant's claim that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, in plaintiffs' language, "incorporates" the limitations language of paragraph 2(a) of the same article, arguing that "Defendant confuses the question of what French taxes are creditable with the question of what United States income taxes can be offset by creditable French taxes, which, not surprisingly, gives an illogical outcome." Plaintiffs further argue, because paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, "allows as a credit against U.S. income tax, which by definition includes the NIIT, any French income taxes 'after the credit referred to in subparagraph (a)(iii) of paragraph 1 [of Article 24 of the 1994 Treaty, as amended],'"[33] that "the Article 24(1)(a)(iii) [of the 1994 Treaty, as amended,] credit is zero

---

bilateral treaty give a different result than would be achieved exclusively under domestic law," (alterations added), citing to a treaty between the United States and Denmark, a treaty between the United States and Italy, and a treaty between the United States and Mexico, all of which concern, among other issues, the availability of foreign tax credits against taxes imposed by the United States' respective treaty partners. Although plaintiffs may be correct that the definition of a "creditable foreign tax," to use plaintiffs' language, may have been found to be "broader" when the terms of a relevant treaty so provide, the treaties and taxes plaintiffs cite in support of this point are not presently before this court and are not determinative of the interpretation of the 1994 Treaty, as amended, between the United States and France.

[33] Plaintiff's quotation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, contains a reference to "subparagraph (a)(iii) of paragraph 1" of the same Article 24 of the 1994 Treaty, as amended. As explained above, the "consolidated" version of the 1994 Treaty, as amended, the version in the record before the court, refers instead to "subparagraph (a)(iii) of paragraph 2" of Article 24 of the 1994 Treaty, as amended. As also explained above, the "consolidated" version's reference to paragraph 2 in this quotation is an error, as there is no subparagraph (a)(iii) of paragraph 2 of Article 24 of the 1994 Treaty, as amended. Plaintiff's quotation, referring to "subparagraph (a)(iii) of paragraph 1," accurately reflects how Article 24 of the 1994 Treaty, as amended, should read after the re-ordering of the paragraphs of Article 24 by the 2009 Protocol.

as Plaintiffs did not incur French tax on any U.S. source income," and, therefore, "the language of Article 24(2)(b) [of the 1994 Treaty, as amended,] provides that a foreign tax credit is allowed." (alterations added).

As explained above, plaintiffs agree with defendant's characterization that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule.[34] Plaintiffs, in a passage which also is quoted above setting forth plaintiffs' understanding of the three bite rule, indicate that "the United States retains the right to levy a 15 percent tax on the French resident U.S. citizen," which is the first bite, while France may "levy tax on any amount in excess of 15 percent," which French income tax is the second bite. As a result of the second bite French tax, according to plaintiffs, "any such French tax shall be allowed as a credit against U.S. tax" in excess of the 15 percent United States income tax assessed in the first bite. It is this allowance of a credit for French taxes against United States taxes that plaintiffs argue, in agreement with defendant, is implemented by paragraph 2(b) of Article 24 of the 1994 Treaty, as amended. Plaintiffs also state that "Article 24(2)(b)(ii) further provides that U.S. source income is considered French source 'to the extent necessary to give effect to the provisions of subparagraph (b)(i),'" which "ensures that a foreign tax credit is allowed for U.S. source income to avoid the French taxing that income (the second bite) and the U.S. taxing that same amount (the third bite)."[35]

In response to plaintiffs' argument that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, incorporates only the limitations set forth in I.R.C. § 904, defendant argues that the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C., see I.R.C. §§ 27, 901(a), applies because the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "expressly defers to the provisions of the statute in determining when foreign tax credits may be allowed." (alteration added). According to defendant, "there are numerous provisions of the [Internal Revenue] Code and regulations that regulate the boundaries of the foreign-tax-credit framework under U.S. law," and that "[i]f the two countries had intended for [I.R.C.] § 904 to be the only relevant limitation, the [1994] Treaty[, as amended,] would have said so explicitly." (alterations added). According to defendant, "Congress intentionally placed the NIIT [in I.R.C. § 1411, in Chapter 2A] outside of Chapter 1 [of the I.R.C.], demonstrating unequivocally the intent

---

[34] As also explained above, plaintiffs and defendant disagree as to whether plaintiffs' calculations of their French income tax and United States income tax were properly conducted in light of the three-bite rule, but the parties do not appear to contest the framework of the three-bite rule.

[35] As explained above, the third bite of the three-bite rule represents the tax assessed by the United States against the taxpayer's income, after the United States' initial 15 percent tax on that income (the first bite) and France's tax on the taxpayer's income (the second bite). A tax credit is available against the third bite United States tax based on the amount of French income taxes paid in the second bite.

of Congress that the new levy be ineligible for foreign tax credits under [I.R.C.] §§ 27 and 901(a)." (alterations added).

In its briefs, defendant acknowledges that there are no documents in the record which indicate the interpretation of the 1994 Treaty, as amended, held by the Government of the French Republic regarding the tax issues relevant to plaintiffs' complaint in this court. Defendant nevertheless argues that in this case there is "no evidence that either the United States or France had any expectation that the United States would automatically apply foreign-tax credits against any and all income taxes subsequently enacted under the Code." With respect to France's understanding, defendant argues that "there is no evidence of French expectations regarding that provision [paragraph 2 of Article 24 of the 1994 Treaty, as amended] (other than the inference noted below), and nothing to suggest any disagreement by France with the interpretation of article 24(2) [of the 1994 Treaty, as amended,] expressed in the U.S. executive materials," by which defendant appears to mean the United States Treasury Department Technical Explanations of the 1994 Treaty, the 2004 Protocol, and the 2009 Protocol, as well as the model treaties and accompanying technical explanations, all prepared by the United States Treasury Department. (alterations added). Defendant urges a possible inference, however, without evidence, in the above quoted language, because "when the United States and France executed protocols amending the original 1994 convention, they left undisturbed the requirement that U.S. foreign tax credits be given 'in accordance with the provisions of U.S. law,'" which, according to defendant, demonstrated "an acquiescence by France in the Treasury Department's prior explanation of the function of article 24(2)(a)." (citing Adams Challenge (UK) Ltd. v. Comm'r, 156 T.C. at 53-54).

Defendant also argues that because paragraph 2 of Article 3 of the 1994 Treaty, as amended, provides that the United States "may apply to the Treaty's undefined terms 'the meaning . . . under [its own] taxation laws,'" (alteration and ellipsis in original), that "[w]hen U.S. taxation is at issue, the expectations of the United States have primacy, even if those expectations may not be 'shared' by the treaty partner." (alteration added) (citing Baturin v. Comm'r, 31 F.4th 170, 174 (4th Cir. 2022);[36] Adams Challenge (UK) Ltd. v.

---

[36] Defendant cites to the United States Court of Appeals for the Fourth Circuit's decision in Baturin v. Commissioner, which defendant characterizes as "applying U.S. tax law to determine whether particular payments were 'grants' or 'allowances' under article 18 of that treaty" between the United States and Russia. Baturin is a Fourth Circuit case concerning a treaty between the United States and Russia which provided that an undefined term in that treaty "'have the meaning which it has *under the laws of that State concerning the taxes to which this Convention applies.*'" See Baturin v. Comm'r, 31 F.4th at 174 (emphasis in original). Contrary to defendant's reason for citing Baturin, the Fourth Circuit in Baturin supported its interpretation of the United States-Russia treaty by reference to "the intent of the parties to the Treaty" and "the actual intent of the Treaty." See id. at 176. The Fourth Circuit in Baturin expressly states that "courts construe treaties liberally to effectuate the intent of the parties, not simply in favor of the party invoking the treaty," see id. (citing Nielsen v. Johnson, 279 U.S. at 51), therefore, not concluding support of defendant's argument that Baturin stands for the "primacy" of the United States'

Comm'r, 154 T.C. at 37, 58 (2020)).

Defendant further claims that plaintiffs "misinterpret the parenthetical," referring to "(as it may be amended from time to time without changing the general principle hereof)" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. Defendant argues that "[t]he parenthetical does not, as plaintiffs claim, 'guarantee[]' a 'general principle allowing a credit of French income taxes against U.S. income taxes' for any possible levy that could conceivably be made by the United States." (first alteration added; internal reference omitted). Quoting the 1994 Treaty Treasury Department Technical Explanation, defendant argues that the parenthetical language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "merely recognizes a general principle that, 'although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given.'" Defendant further argues: "Thus, while the United States may not outright repeal the foreign-tax-credit framework from its domestic law, it has wide leeway to decide the extent to which to allow the credit and any conditions to attach to it." Defendant's caution that "the United States may not outright repeal the foreign-tax-credit framework" appears to be the only caution to defendant's otherwise broad conception of the United States' "leeway to decide the extent to which to allow the credit and any conditions to attach to it."

Defendant further argues, although the purpose of the 1994 Treaty, as amended, is "to reduce, or even eliminate where appropriate, double taxation of citizens and residents of the United States and France," that "nothing suggests that the two countries expected or even intended to tailor the reduction or elimination of double taxation to any individual case." Additionally, defendant contends that

to the extent that double-taxation relief is targeted through article 24 of the Treaty (rather than through the allocation of taxing rights), the Treaty is explicit that double-taxation relief has meaningful limits. The Treaty, like any other, must be applied according to its terms; if a treaty's operative provisions provide no specific relief for a particular instance of double taxation, courts may not override the treaty to effect a more absolute conception of that goal than the treaty negotiators themselves intended and drafted.

As explained above, like plaintiffs, defendant makes the argument that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, interacts with the saving clause of Article 29 of the same treaty to implement the three-bite rule:

Article 29(3), which plaintiffs refer to as the "carve out to the savings clause," ensures that the saving clause does not undo the portions of article 24 that implement the three-bite rule (and alter U.S. law to do so). Article 24(2)(b)(ii)

---

expectations of a treaty, even when they "may not be 'shared' by the treaty partner," Baturin actually seems better to support interpreting treaties consistent with the shared intent of the signatory governments.

modifies U.S. tax law by allowing U.S. taxpayers to treat the portion of U.S.-source income on which France may impose a residency-based tax under the Treaty as foreign-source income. By modifying the source rules in the [Internal Revenue] Code, article 24(2)(b)(ii) increases the [I.R.C.] § 904 limitation that would otherwise cap the taxpayers' foreign tax credits at the pre-credit U.S. tax on their foreign source income. Together, Articles 24 and 29 of the Treaty implement the three-bite rule for U.S. citizens residing in France. They do not expand U.S. law to provide a foreign tax credit against the NIIT that the Code does not allow.

(alterations added; footnote and internal reference omitted). Defendant argues that, because paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule,[37]

[i]f the Court were to credit plaintiffs' claim that subsection (2)(b) authorizes a separate foreign tax credit for U.S. citizens residing in France that is not subject to limitations in the Internal Revenue Code, it would render meaningless the resourcing rule in subsection (2)(b)(ii), which is premised on the application of the foreign-tax-credit limitation in [I.R.C.] § 904.

(alterations added).

Defendant also argues that a ruling for plaintiffs in the current case "would frustrate the policy foundation" of the foreign tax credit system and "would provide U.S. citizens residing in France with a far more generous foreign tax credit than would be available to U.S. citizens residing in the United States." Defendant argues that, if the court were to accept plaintiffs' interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended,

then such taxpayers theoretically could, among other things:
- Claim foreign tax credits against U.S. tax on U.S.-sourced income, despite the policy behind the foreign-tax-credit limitation under [I.R.C.] § 904;

---

[37] Defendant offers various versions of its contention that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule: "Article 24(2)(b) is an integral part of an ordering rule established by the Treaty (colloquially referred to as a 'three-bite rule');" "the saving clause does not undo the portions of article 24 that implement the three-bite rule;" "Articles 24 and 29 of the Treaty implement the three-bite rule;" "article 24(2)(b) is an integral part of the 'three-bite rule' established by the Treaty, the ordering rule that governs the application of foreign tax credits to French and U.S. taxes on income earned by U.S. citizens residing in France." Defendant's full explanation of its contention that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule, is set forth above in the discussion of the three-bite rule, in which defendant clarifies the operation of paragraph 2(b) in the calculation of United States and French taxes under the three-bite rule.

**Appx69**

- Evade the [I.R.C.] § 904 limitation by cross-crediting foreign tax on general basket income against U.S. tax on passive basket income; or,
- Obtain a double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, contrary to [I.R.C.] § 911(d)(6).

(alterations added). None of the scenarios which defendant poses directly above, however, appear to be before this court based on the facts presented to this court by plaintiffs' case. Moreover, defendant appears to acknowledge by its reference to the "policy foundation" of foreign tax credits, that defendant is relying in large part on policy-based arguments against interpreting paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, and does not cite to any statute or regulation that prevent plaintiffs from entitlement to a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended.

**Treaty Interpretation Standards and Principles for Resolving Potential Conflict Between Treaties and Domestic Statutes**

The United States Supreme Court and the United States Court of Appeals for the Federal Circuit have established precedential standards by which interpretation of treaties and international agreements should occur. The United States Supreme Court stated in Medellin v. Texas that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text," Medellin v. Texas, 552 U.S. 491, 506-07 (2008) (alteration added) (citing Air France v. Saks, 470 U.S. at 396–97), but that "[b]ecause a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." Id. (alteration added) (quoting Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. at 226, and citing United States v. Stuart, 489 U.S. at 365–66; Choctaw Nation of Indians v. United States, 318 U.S. at 431–32); see also BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 37 (2014) ("As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." (citing Air France v. Saks, 470 U.S. at 399; Sullivan v. Kidd, 254 U.S. 433, 439 (1921); Wright v. Henkel, 190 U.S. 40, 57 (1903)); Lozano v. Montoya Alvarez, 572 U.S. at 11 (citing Medellin v. Texas, 552 U.S. at 505; United States v. Choctaw Nation, 179 U.S. 494, 535 (1900)); United States v. Alvarez-Machain, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." (citing Air France v. Saks, 470 U.S. at 397; Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 11 (1936))). In the case of Air France v. Saks, the United States Supreme Court stated that interpretation of an international agreement "must begin, however, with the text of the treaty and the context in which the written words are used." Air France v. Saks, 470 U.S. at 397 (citing Maximov v. United States, 373 U.S. 49, 53–54 (1963)). Moreover, the Supreme Court explained that "[i]t is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties."

Valentine v. United States ex rel. Neidecker, 299 U.S. at 10 (alteration added) (citing Factor v. Laubenheimer, 290 U.S. at 293; Jordan v. Tashiro, 278 U.S. at 127; Tucker v. Alexandroff, 183 U.S. 424, 437 (1902)); see also Factor v. Laubenheimer, 290 U.S. at 294-95 ("In ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it."); Cook v. United States, 288 U.S. at 112 ("In construing the Treaty its history should be consulted."); Jordan v. Tashiro, 278 U.S. at 127; Tucker v. Alexandroff, 183 U.S. at 437; In re Ross, 140 U.S. at 475 ("It is a canon of interpretation to so construe a law or treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances.").

Similarly, the Supreme Court in Eastern Airlines, Inc. v. Floyd stated that "'[w]hen interpreting a treaty, we "begin 'with the text of the treaty and the context in which the written words are used,'"'" E. Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991) (alteration added) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988) (quoting Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the S. Dist. of Iowa, 482 U.S. 522, 534 (1987) (quoting Air France v. Saks, 470 U.S. at 397))), but also that "'[o]ther general rules of construction may be brought to bear on difficult or ambiguous passages.'" Id. at 535 (alteration added) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. at 700); see also Water Splash, Inc. v. Menon, 581 U.S. 271, 276 (2017) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. at 699); Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 133-35 (1989) (explaining that "[w]e must thus be governed by the text," although "intricate drafting history" might "be consulted to elucidate a text that is ambiguous" (citing Air France v. Saks, 470 U.S. 392)); Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180 ("The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" (quoting Maximov v. United States, 373 U.S. at 54)); Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353 ("When construing a treaty, '[t]he clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories,"'" (alteration in original) (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180 (quoting Maximov v. United States, 373 U.S. at 54)), and also holding that "effect must be given to the intent of both signatories" (citing Xerox Corp. v. United States, 41 F.3d at 656 (citing Valentine v. United States ex rel. Neidecker, 299 U.S. at 11)), but "when the language of a treaty provision 'only imperfectly manifests its purpose,' we are required to give effect to its underlying purpose," and "[t]o this end, we must 'examine not only the language, but the entire context of agreement.'" (alteration added) (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481 (internal quotations omitted)))); United Techs. Corp. v. United States, 315 F.3d 1320, 1322 (Fed. Cir. 2003) ("The terms of a treaty are to be given their ordinary meaning in the context of the treaty, and are to be interpreted to best fulfill the purpose of the treaty." (citing Xerox Corp. v. United States, 41 F.3d at 652)); Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481 (citing Factor v. Laubenheimer, 290 U.S. at 294-95, and In re Ross, 140 U.S. at 475, as "requir[ing] that the underlying purpose [of the treaty] be given effect" (alterations added)).

In particular, "[t]he course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." O'Connor v. United States, 479 U.S. at 33 (alteration added) (citing Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 259-60; Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. at 158-61). Moreover, the Supreme Court has emphasized that "[i]t is our 'responsibility to read the treaty in a manner consistent with the *shared* expectations of the contracting parties.'" Lozano v. Montoya Alvarez, 572 U.S. at 12 (emphasis in original; alteration added) (quoting Olympic Airways v. Husain, 540 U.S. at 650 (internal quotations omitted)).

The United States Court of Appeals for the Federal Circuit succinctly summarized the Supreme Court's approach to treaty interpretation in Xerox Corp. v. United States:

> In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. See United States v. Stuart, 489 U.S. 353, 365–66, 109 S. Ct. 1183, 1190–91, 103 L. Ed. 2d 388 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); Kolovrat v. Oregon, 366 U.S. 187, 193–94, 81 S. Ct. 922, 925–26, 6 L. Ed. 2d 218 (1961) (a treaty should be interpreted to carry out its purpose). As discussed in Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 185, 102 S. Ct. 2374, 2379, 72 L. Ed. 2d 765 (1982), the court's role is "limited to giving effect to the intent of the Treaty parties." See generally Restatement (Third) of Foreign Relations Law of the United States, Part III, Introductory Note at 144–145 (1987). The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty. Valentine v. United States, 299 U.S. 5, 11, 57 S. Ct. 100, 103, 81 L. Ed. 5 (1936) ("it is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them.")
> Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. See Air France v. Saks, 470 U.S. 392, 400, 105 S. Ct. 1338, 1343, 84 L. Ed. 2d 289 (1985) ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation.") However, "the ultimate question remains what was intended when the language actually employed . . . was chosen, imperfect as that language may be." Great–West Life Assurance Co. v. United States, 678 F.2d 180, 188, 230 Ct. Cl. 477 (1982).

Xerox Corp. v. United States, 41 F.3d at 652 (alteration and ellipsis in original).

While both parties have provided the court with their view as to the "harmonization" of treaties and statutes in the event of a potential conflict, as is presented in this case, the precedents of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit provide more complicated analyses for the court to use to resolve such potential conflict than the parties have indicated. The Constitution of the United States provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. CONST. art. VI. (alteration added). In Weinberger v. Rossi, 456 U.S. 25, the Supreme Court explained, with respect to potential conflict between statutes and treaties of the United States:

> It has been a maxim of statutory construction since the decision in Murray v. The [Schooner] Charming Betsy, [6 U.S.] 2 Cranch 64, 118, 2 L. Ed. 208 (1804), that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." In McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20–21, 83 S. Ct. 671, 677–678, 9 L. Ed. 2d 547 (1963), this principle was applied to avoid construing the National Labor Relations Act in a manner contrary to State Department regulations, for such a construction would have had foreign policy implications. The McCulloch Court also relied on the fact that the proposed construction would have been contrary to a "well-established rule of international law." Id., at 21, 83 S. Ct., at 677–678.

Weinberger v. Rossi, 456 U.S. at 32 (ellipsis in original; alterations added). In the case of Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, which was cited in Weinberger as quoted above, the Supreme Court stated:

> It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118. In Whitney v. Robertson, 124 U.S. 190, cited above, the Supreme Court further explained:

> By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other: provided, always, the stipulation of the treaty on the subject is self-executing.

Id. at 194; see also MacLeod v. United States, 229 U.S. 416, 434 (1913) ("[I]t should not be assumed that Congress proposed to violate the obligations of this country to other nations, which it was the manifest purpose of the President to scrupulously observe, and which were founded upon the principles of international law." (alteration added)). The Supreme Court also has stated that "[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed." Cook v. United States, 288 U.S. at 120 (alteration added) (citing United States v. Payne, 264 U.S. 446, 448 (1924); Chew Heong v. United States, 112 U.S. 536 (1884)); see also Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 252 ("There is, first, a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action. 'A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.'" (quoting Cook v. United States, 288 U.S. at 120)); Clark v. Allen, 331 U.S. 503, 507, 512 (1947) ("We will not readily assume that when Congress enacted § 5(b) [of the Trading with the Enemy Act] and authorized the vesting of property, it had a purpose to abrogate all such treaty clauses" as the provisions of a treaty with Germany "governing the testamentary disposition of realty and personalty" (alteration added) (citing Cook v. United States, 288 U.S. at 120)); United States v. Lee Yen Tai, 185 U.S. at 221 ("[T]he purpose by statute to abrogate a treaty or any designated part of a treaty, or the purpose by treaty to supersede the whole or a part of an act of Congress, must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute or in the treaty." (alteration added)).

In 2013, in the case of In re City of Houston, the United States Court of Appeals for the Federal Circuit restated the longstanding principle from the Supreme Court's decision in Charming Betsy as "that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" In re City of Houston, 731 F.3d 1326, 1334 (Fed. Cir. 2013) (quoting Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118); see also In re Rath, 402 F.3d 1207, 1211 (Fed. Cir. 2005) ("In cases of ambiguity, we interpret a statute such as section 44(e) of the Lanham Act as being consistent with international obligations." (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; Allegheny Ludlum Corp. v. United States, 367 F.3d 1339, 1348 (Fed. Cir. 2004); Luigi Bormioli Corp., Inc. v. United States, 304 F.3d 1362, 1368 (Fed. Cir. 2002))); Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1347 (Fed. Cir. 2005) (referring to "the Charming Betsy doctrine of claim construction, which states that courts should interpret U.S. law, whenever possible, in a manner consistent with international obligations" (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64)); Allegheny Ludlum Corp. v. United States, 367 F.3d at 1345 ("[T]his court's interpretation of [19 U.S.C.] § 1677(5) avoids unnecessary conflict between domestic law and the international obligations of this country." (alterations added)); Timken Co. v. United States, 354 F.3d 1334, 1343-44 (Fed. Cir. 2004) ("The crux of its argument hinges on the Charming Betsy canon of claim construction, according to which courts should interpret U.S. law, whenever possible, in a manner consistent with U.S. international obligations." (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; Luigi Bormioli Corp., Inc. v. United States, 304 F.3d at 1368; Fed.-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995))). The Federal Circuit has recognized

the Supreme Court's rule set forth in <u>Charming Betsy</u> as a "two-century-old canon of construction" that a statute "'must be interpreted to be consistent with [international] obligations, absent contrary indications in the statutory language or its legislative history.'" <u>Allegheny Ludlum Corp. v. United States</u>, 367 F.3d at 1348 (alteration in original) (quoting <u>Luigi Bormioli Corp., Inc. v. United States</u>, 304 F.3d at 1368, and citing <u>Fed.-Mogul Corp. v. United States</u>, 63 F.3d at 1581; <u>see also Fed.-Mogul Corp. v. United States</u>, 63 F.3d at 1581 ("GATT [General Agreement on Tariffs and Trade] agreements are international obligations, and absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations." (alteration added)); <u>Abbott Lab'ys v. United States</u>, 84 Fed. Cl. 96, 107 and n.17 (2008) (describing a "canon of construction—that statutes and regulations should be construed consistently with international treaty obligations" (citing <u>Sale v. Haitian Ctrs. Council, Inc.</u>, 509 U.S. 155, 178-79 n. 35 (1993); <u>MacLeod v. United States</u>, 229 U.S. at 434; <u>Murray v. Schooner Charming Betsy</u>, 6 U.S. (2 Cranch) at 118; <u>Cannon v. United States Dep't of Justice, United States Parole Comm'n</u>, 973 F.2d 1190, 1193 (5th Cir. 1992))). The Federal Circuit, moreover, explained in <u>Xerox Corp.</u>:

> A treaty, when ratified, supersedes prior domestic law to the contrary, <u>United States v. Lee Yen Tai</u>, 185 U.S. 213, 220–22, 22 S. Ct. 629, 632–33, 46 L. Ed. 878 (1902), and is equivalent to an act of Congress. However, tacit abrogation of prior law will not be presumed and, unless it is impossible to do so, treaty and law must stand together in harmony.

<u>Xerox Corp. v. United States</u>, 41 F.3d at 658.

In addition to the principle articulated by the Supreme Court in the <u>Charming Betsy</u> case, other rules announced by the United States Supreme Court in the context of treaty interpretation bear on this court's interpretation of the 1994 Treaty, as amended. Particularly relevant to the above captioned case, the Supreme Court has instructed courts to afford a liberal interpretation to treaties, including treaties concerning the taxing power. In the case of <u>United States v. Stuart</u>, 489 U.S. 353, the Supreme Court explained

> that a treaty should generally be "construe[d] . . . liberally to give effect to the purpose which animates it" and that "[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred[.]"

<u>Id.</u> at 368 (alterations and ellipsis in original) (quoting <u>Bacardi Corp. of Am. v. Domenech</u>, 311 U.S. 150, 163 (1940) (internal citations omitted)). In <u>United States v. Stuart</u>, the Supreme Court ruled against an attempt to restrict the sending of information from the United States to Canada under the Convention between the United States and Canada Respecting Double Taxation. <u>See id.</u>

The Supreme Court in <u>Bacardi Corp. of America v. Domenech</u>, which was cited in <u>Stuart</u>, addressed a conflict between a statute of the United States territory of Puerto Rico

and a multilateral treaty, "the General Inter-American Convention for Trade Mark and Commercial Protection signed at Washington on February 20, 1929." See Bacardi Corp. of Am. v. Domenech, 311 U.S. at 157. The Supreme Court in Bacardi explained "the accepted canon" that "we should construe the treaty liberally to give effect to the purpose which animates it. Even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred." Id. at 163 (citing Factor v. Laubenheimer, 290 U.S. at 293-94; Nielsen v. Johnson, 279 U.S. at 52; Jordan v. Tashiro, 278 U.S. at 127). In the United States Supreme Court's decision in Kolovrat v. Oregon, 366 U.S. 187, the Supreme Court cited the Bacardi decision to consider a conflict between the succession laws of Oregon, which limited the ability of aliens to take under testate or intestate succession, and "an 1881 Treaty between the United States and Serbia, which country is now [in 1961] a part of Yugoslavia." See Kolovrat v. Oregon, 366 U.S. at 190 (alteration added). In Kolovrat, the United States Supreme Court rejected the "more restrictive interpretation" of the 1881 Treaty favored by the Supreme Court of Oregon, explaining that "[t]his Court has many times set its face against treaty interpretations that unduly restrict rights a treaty is adopted to protect." See id. at 193 and n.7 (alteration added) (citing Bacardi Corp. of Am. v. Domenech, 311 U.S. at 163; Jordan v. Tashiro, 278 U.S. at 128-29). The United States Supreme Court also addressed the rule that treaties should be afforded a "liberal interpretation" in Jordan v. Tashiro, 278 U.S. 123, a case cited by the United States Supreme Court in both Bacardi and Kolovrat. In Jordan, the Supreme Court explained:

> The principles which should control the diplomatic relations of nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. See [De] Geofroy v. Riggs, [133 U.S. 258, 267 (1890)[38]]; Tucker v. Alexandroff, 183 U.S. 424, 437, 22 S. Ct. 195, 46 L. Ed. 264; Wright v. Henkel, 190 U.S. 40, 57, 23 S. Ct. 781, 47 L. Ed. 948; In re Ross, 140 U.S. 453, 475, 11 S. Ct. 897, 35 L. Ed. 581. Upon like ground, where a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it and the other enlarging them, the more liberal construction is to be preferred. Asakura v. Seattle, 265 U.S. 332, 44 S. Ct. 515, 68 L. Ed. 1041 [(1924)]; Tucker v. Alexandroff, supra; [De] Geofroy v. Riggs, supra.

Jordan v. Tashiro, 278 U.S. at 127 (alterations and footnote added).

In addition to these precedential cases of the United States Supreme Court, decisions issued by the United States Court of Appeals for the Federal Circuit and by the United States Court of Federal Claims have applied the rule that treaties should be

---

[38] The Supreme Court in Jordan cites to the case of "Geofroy v. Riggs," see Jordan v. Tashiro, 278 U.S. at 126, 127, however, that case is originally captioned "De Geofroy v. Riggs" and the petitioner is identified by the name "Louis de Geofroy." See De Geofroy v. Riggs, 133 U.S. at 258.

liberally interpreted when interpreting tax treaties. See, e.g., Xerox Corp. v. United States, 41 F.3d at 652 (citing United States v. Stuart, 489 U.S. at 365-66, in the context of a treaty with the purpose of "the elimination of double taxation" between the United States and the United Kingdom); McManus v. United States, 130 Fed. Cl. at 616, 620 (citing United States v. Stuart, 489 U.S. at 365-66, in the context of a treaty for "the avoidance of double taxation" between the United States and Ireland); Nat'l Westminster Bank, PLC v. United States, 58 Fed. Cl. 491, 497 (2003) (citing United States v. Stuart, 489 U.S. at 368, in the context of a treaty for the avoidance of double taxation between the United States and the United Kingdom), aff'd, 512 F.3d 1347 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008).

In addition to the precedents of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit which establish the rules of treaty interpretation, including the cases in which the terms of a treaty and a statute potentially conflict, initially the parties and the court in the above captioned case also identified a non-precedential decision issued by the United States Tax Court, Toulouse v. Commissioner, 157 T.C. 49 (2021), which addressed, in part, the 1994 Treaty, as amended, between the United States and France. The Toulouse decision addressed whether the 1994 Treaty, as amended, with France provides for a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C. The Toulouse case concerned "whether petitioner is entitled to a credit against the net investment income tax (foreign tax credit) on the basis of certain provisions of the United States' income tax treaties with France and Italy." Toulouse v. Comm'r, 157 T.C. at 50. The petitioner in the Toulouse case relied on paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, between the United States and France, as well as

article 23(2)(a) of U.S. income tax treaty with Italy, the Convention for the Avoidance of Double Taxation With Respect to Taxes on Income and the Prevention of Fraud or Fiscal Evasion, Aug. 25, 1999, It.-U.S., Aug. 25, 1999, T.I.A.S. No. 09-1216, as supplemented by Protocol dated Aug. 25, 1999 (U.S.-Italy Treaty)

to argue that the two treaties "permit a foreign tax credit against the net investment income tax." Toulouse v. Comm'r, 157 T.C. at 52. As described by the Tax Court, the petitioner in Toulouse made a similar argument to the argument made by the current plaintiffs in this court with respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The United States Tax Court in Toulouse explained:

Petitioner concedes that the [Internal Revenue] Code does not provide a foreign tax credit against the net investment income tax. Instead, she argues that article 24(2)(a) of the U.S.-France Treaty[[39]] and article 23(2)(a) of the U.S.-Italy Treaty provide a foreign tax credit independent of the [Internal Revenue] Code. Under the Constitution, treaties are given the

---

[39] The Tax Court in Toulouse referred to the 1994 Treaty, as amended, as the "U.S.-France Treaty."

same force and effect as legislation enacted by Congress. U.S. Const. art. VI, cl. 2; see [I.R.C.] sec. 7852(d)(1) ("For purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status[.]").

Toulouse v. Comm'r, 157 T.C. at 57 (fourth alteration in original). The Tax Court decision briefly articulated the basic standards of treaty interpretation, including that "[w]here a treaty and a statute relate to the same subject, courts attempt to construe them to give effect to both." Id. at 58 (alteration added) (citing Whitney v. Robertson, 124 U.S. at 194). The Tax Court in Toulouse explained that "[t]he U.S.-France and U.S.-Italy Treaties are intended to limit the effects of double taxation between the treaty partners and contain specific provisions that provide each country's obligations to grant a foreign tax credit as part of the treaties' general goal of reducing the amount of double taxation." Id. (alteration added). The Tax Court in Toulouse reasoned that "[u]nder the express terms of the articles of the Treaties that petitioner relies on, any allowable foreign tax credit must be determined in accordance with the [Internal Revenue] Code and is limited by the Code's provision of a credit." Id. (alterations added). In a footnote, the Tax Court further stated: "Petitioner does not argue that she is entitled to relief under any other treaty provisions. Accordingly, we express no view on the potential application of other provisions." Id. at 58 n.4. The Tax Court in Toulouse considered the petitioner's arguments "that the Treaties do not conflict with the [Internal Revenue] Code because the Code is silent as to whether there is a foreign tax credit against the net investment income tax," and "that there is no explanation in the legislative history for Congress' decision to impose the net investment income tax under chapter 2A [of the I.R.C.] or any indication that Congress considered whether to provide a foreign tax credit against the net investment income tax." Toulouse v. Comm'r, 157 T.C. at 59 (alterations added).

With respect to the net investment income tax imposed by I.R.C. § 1411, the Tax Court explained that "[t]he fact that section 1411 was enacted after the execution of the Treaties is not determinative," because the 1994 Treaty, as amended, "covers all 'Federal income taxes imposed by the Internal Revenue Code' and further states that its terms are subject to identical or substantially similar tax imposed after the effective date of the Treaty." Toulouse v. Comm'r, 157 T.C. at 59. The Tax Court reasoned that "[t]he placement of section 1411 in a newly created chapter was not happenstance. An enumerated chapter of the [Internal Revenue] Code to impose a distinct and separate tax is part of the Code's fundamental structure." Toulouse v. Comm'r, 157 T.C. at 59 (alterations added). The Tax Court also stated that "[t]here is no provision for any credits against the section 1411 tax. The enactment of a 3.8% net investment income tax as part of chapter 2A [of the I.R.C.] is a clear expression of congressional intent that credits against section 1 not apply against the section 1411 tax." Toulouse v. Comm'r, 157 T.C. at 60 (alterations added).

The Tax Court further considered the petitioner's argument "that the enactment of the net investment income tax in chapter 2A is not a 'limitation' as that term is used in the Treaties," and that such limitation "should not be imposed on the basis of Congress'

silence on the issue." <u>Toulouse v. Comm'r</u>, 157 T.C. at 59-60. The Tax Court in <u>Toulouse</u> rejected the petitioner's argument, stating:

> It is immaterial that the [Internal Revenue] Code does not affirmatively state that a foreign tax credit against the net investment income tax is disallowed. Section 1411(c)(1)(B) expressly provides for deductions allowed by subtitle A in the computation of net investment income. There is no provision for any credits against the section 1411 tax. The enactment of a 3.8% net investment income tax as part of chapter 2A [of the I.R.C.] is a clear expression of congressional intent that credits against section 1 not apply against the section 1411 tax.

<u>Toulouse v. Comm'r</u>, 157 T.C. at 60 (alterations added). The Tax Court reasoned that "[t]here is nothing in either article 24(2)(a) of the U.S.-France Treaty or article 23(2)(a) of the U.S.-Italy Treaty that entitles U.S. taxpayers to an elimination of all double taxation" and, with respect to the 1994 Treaty, as amended, between the United States and France, that the Tax Court's interpretation was "confirmed by the contemporary explanation provided by the Treasury Department, the Government agency charged with the Treaty's negotiation and enforcement." <u>Toulouse v. Comm'r</u>, 157 T.C. at 61 (alteration added). The Tax Court concluded that "petitioner is not entitled to a foreign tax credit against her net investment income tax" because "Congress has allowed a foreign tax credit only against taxes imposed under chapter 1. There is no [Internal Revenue] Code provision for a foreign tax credit against the net investment income tax." <u>Toulouse v. Comm'r</u>, 157 T.C. at 62 (alteration added). The Tax Court, however, also stated:

> Petitioner questions the purpose of the Treaties if there is no independent, treaty-based credit and a credit is allowable only if it is provided in the [Internal Revenue] Code. But we do not so hold. Other provisions of the Treaties may well provide for credits that are unavailable under the Code. Petitioner, however, relies on provisions that by their express terms do not.

<u>Id.</u> at 61-62 (alteration added).

In addition to plaintiffs' arguments with respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, plaintiffs argue that the Tax Court's decision in <u>Toulouse</u> support's plaintiffs' interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to allow a foreign tax credit against the net investment income tax, because, when denying the <u>Toulouse</u> petitioner's argument, which had been limited to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, the Tax Court "referr[ed] to a possible other credit provision that would be available," which plaintiffs in this court argue "appears to agree that a plain reading of Article 24(2)(b) [of the 1994 Treaty, as amended,] would provide for a foreign tax credit even if the restrictions of Article 24(2)(a) [of the 1994 Treaty, as amended,] would otherwise apply." (alterations added). Plaintiffs, however, do not provide a citation from the <u>Toulouse</u> decision for their claim that the <u>Toulouse</u> decision "appears to agree" that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, "would provide for a foreign tax credit" independent of paragraph 2(a) of Article 24 of the

1994 Treaty, as amended. As noted above, the <u>Toulouse</u> court did not address paragraph 2(b) of Article 24 of the 1994 Treaty, as amended. Plaintiffs argue that "without any reference to the '[i]n accordance with the provisions and subject to the limitations of the law of the United States' Article 24(2)(a) language, Article 24(2)(b) [of the 1994 Treaty, as amended] allows a U.S. citizen living in France a credit for French taxes paid against that U.S. citizen's U.S. income tax liability." (first alteration in original). The <u>Toulouse</u> decision, however, explicitly did not interpret whether other provisions of the 1994 Treaty, as amended, provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, as the Tax Court solely analyzed paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. <u>See</u> <u>Toulouse v. Comm'r</u>, 157 T.C. at 58 n.4. Therefore, the Tax Court in the <u>Toulouse</u> decision left open the issue of whether paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides a tax credit against the net investment income tax imposed by I.R.C. § 1411. <u>See</u> <u>Toulouse v. Comm'r</u>, 157 T.C. at 61-62 ("Other provisions of the Treaties may well provide for credits that are unavailable under the Code. Petitioner, however, relies on provisions that by their express terms do not.").

After briefing was complete and oral argument was held on the cross-motions for partial summary judgment in the above captioned case, the United States District Court for the Central District of California issued a decision in <u>Kim v. United States</u>, No. 5:22-cv-00691-SPG-SP, 2023 WL 3213547 (C.D. Cal. Mar. 28, 2023), which considered, but was not limited to, the issue of whether an income tax treaty between the United States and the Republic of Korea provided a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411. <u>See</u> <u>Kim v. United States</u>, 2023 WL 3213547, at *10. The <u>Kim</u> decision addressed the inclusion in the United States-South Korea treaty of language which is "identical to the treaty language" of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, between the United States and France, which also was at issue in <u>Toulouse</u> and is at issue in the above captioned case. <u>See</u> <u>Kim v. United States</u>, 2023 WL 3213547, at *11. The District Court quoted the language of the United States-South Korea treaty as follows:

> In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the principles hereof), the United States shall allow a citizen or resident of the United States as a credit against the United States tax the appropriate amount of Korean tax . . . .

<u>Id.</u> at *14 (ellipsis added). The District Court in <u>Kim</u> deferred to the United States' interpretation of I.R.C. § 1411 as set forth in Treasury Regulation § 1.1411-1(e) and agreed with the Tax Court's decision in <u>Toulouse</u>: "As the <u>Toulouse</u> Tax Court found, and as this Court also finds, this language [in the United States-South Korea treaty] unambiguously mandates that any allowed foreign tax credit must conform to the statutory foreign-tax-credit framework already in place." <u>See</u> <u>Kim v. United States</u>, 2023 WL 3213547, at *14 (alteration added). While the <u>Kim</u> court analogized the United States-South Korea treaty to the 1994 Treaty, as amended, between the United States and France, the <u>Kim</u> court did so only to consider language which is identical to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and, therefore, the <u>Kim</u> decision is not

relevant to this court's interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, which was not addressed by the Kim court. Moreover, the Kim court interpreted the text of a treaty between the United States and South Korea, which is not determinative of the intent of the United States and France as to the meaning of the 1994 Treaty, as amended, in the above captioned case before this court.

Plaintiffs further argue that certain other "[f]ederal courts have already had the opportunity to consider the meaning of the Article 24(2)(a) phrase 'as it may be amended from time to time without changing the general principle thereof [sic]'." (alteration added). The cases cited by plaintiffs, however, do not concern the 1994 Treaty, as amended, between the United States and France, but rather concern other treaties which use language similar to that used in Article 24 of the 1994 Treaty between the United States and France, as amended. In particular, plaintiffs cite to Eshel v. Commissioner of Internal Revenue Service,[40] 831 F.3d 512 (concerning a "totalization agreement" with respect to Social Security taxes between the United States and France and the statute at I.R.C. § 1401 note),[41] Jamieson v. Commissioner of Internal Revenue Service, 584 F.3d 1074, 1076 (D.C. Cir. 2009) (concerning a treaty for the prevention of double taxation between the United States and Canada and foreign tax credits against the alternative minimum tax at I.R.C. § 59), Haver v. Commissioner of Internal Revenue Service, 444 F.3d 656 (D.C. Cir. 2006) (concerning a treaty for the avoidance of double taxation between the United States and Germany and foreign tax credits against the alternative minimum tax at I.R.C. § 59), and Kappus v. Commissioner of Internal Revenue Service, 337 F.3d 1053, 1058 (D.C. Cir. 2003) (concerning a treaty for the avoidance of double taxation between the United States and Canada and foreign tax credits against the alternative minimum tax at I.R.C. § 59).

Because this court is concerned with interpreting the 1994 Treaty, as amended, between the United States and France, in light of the shared expectations of the signatory governments to that treaty, and because plaintiffs cite to cases interpreting treaties other than the 1994 Treaty, the 2004 Protocol, and the 2009 Protocol, but rather concerned different provisions of the I.R.C. than are at issue in the current case before the court, plaintiffs' cited cases do not lead to a resolution of plaintiffs' case. See Lozano v. Montoya Alvarez, 572 U.S. at 12 (quoting Olympic Airways v. Husain, 540 U.S. at 650 (quoting Air France v. Saks, 470 U.S. at 399); Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. at 226).

In response to plaintiffs' arguments regarding the impact of the Tax Court's decision in Toulouse on the above captioned case, defendant quotes the Tax Court's decision argue that "'[u]nder the express terms' of article 24(2)(a), 'any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's

---

[40] Plaintiffs' counsel in the above captioned case was also counsel for the appellants in Eshel.

[41] The "note" from I.R.C. § 1401 is not visible on the commercial Westlaw database but appears in the statutory notes in the official published version of I.R.C. § 1401.

provision of a credit.'" (alteration added) (quoting <u>Toulouse v. Comm'r</u>, 157 T.C. at 58). Therefore, according to defendant, "the Treaty provides for relief from double taxation in the form of a foreign tax credit, and the extent of a taxpayer's eligibility for that foreign tax credit is determined in accordance with the Code." Quoting <u>Toulouse</u>, defendant argues: "The 'require[ment] [that] any foreign tax credit . . . be "in accordance with the Code"' necessarily means that, for plaintiff [sic] 'to prevail,' the 'Code must provide the credit if one exists.'" (ellipsis in original; last alteration added) (quoting <u>Toulouse v. Comm'r</u>, 157 T.C. at 60).

As described above, one of the treaty interpretation rules relevant to the court's analysis in the above captioned case is the rule, announced in <u>United States v. Stuart</u>, that a court should interpret a treaty "liberally." <u>See United States v. Stuart</u>, 489 U.S. at 369. Defendant, however, challenges the application of the liberal interpretation rule as announced in the United States Supreme Court's decision in <u>United States v. Stuart</u>, arguing that <u>Stuart</u> is the only case "in the last fifty years in which the Supreme Court suggested that that a *tax* treaty should generally be interpreted 'liberally.'" (emphasis in original) (quoting <u>United States v. Stuart</u>, 489 U.S. at 369). Defendant proposes that treaties relating to taxation should be interpreted differently than other treaties. According to defendant:

> While some courts have applied a general canon that treaties should be construed liberally to achieve their purpose, <u>e.g.</u>, <u>Bacardi Corp. of America v. Domenech</u>, 311 U.S. 150, 163 (1940), commentators have criticized application of the canon "in the tax treaty context." <u>See</u> [Rebecca M.] Kysar, [<u>Interpreting Tax Treaties</u>,] 101 IOWA L. REV. [1387,] 1441 [(2016)]. "[S]pecialized meanings in the tax context abound, as do express and implicit references to domestic law, thus constraining the interpreters." <u>Id.</u> "A liberal presumption is also at odds with the notion of sovereignty . . . in the tax context. Given the tie between taxation and the fisc, the relinquishing of taxing jurisdiction is not something that a sovereign would likely do implicitly or lightly." <u>Id.</u> Finally, because tax credits and exemptions are matters of legislative grace, they are narrowly construed in favor of the government, a factor weighing against a liberal construction of the Treaty here. <u>Schumacher [v. United States]</u>, 931 F.2d [650,] 652 [(10th Cir. 1991)]; [<u>United States v.] McFerrin</u>, 570 F.3d [672,] 675 [(5th Cir. 2009)].

(fifth alteration and ellipsis in original). The cases cited by defendant, however, do not concern treaty interpretation, but rather address the interpretation of the I.R.C. <u>See United States v. McFerrin</u>, 570 F.3d at 675; <u>Schumacher v. United States</u>, 931 F.2d at 652.

Defendant's sole cited source for the proposition that "commentators have criticized application of the [liberal interpretation] canon 'in the tax treaty context,'" which is the <u>Interpreting Tax Treaties</u> article by Professor Kysar, appears, however, to take a more nuanced view than defendant represents. (alteration added) (quoting Kysar, 101 IOWA L. REV. at 1441). While Professor Kysar argues that "[l]iberal interpretation is a poor fit in the tax treaty context" and "is also at odds with the notion of sovereignty," Professor Kysar also states a "recommendation for the presumption against double taxation,"

reasoning that "[a] presumption against double taxation is a softer version of the liberal presumption rule and more successfully navigates between the interests of sovereignty and harmonization." Kysar, 101 IOWA L. REV. at 1442 (alterations added). While a law review article may provoke thinking on difficult and unsettled questions of law, a law review article, even if well-reasoned, is not binding on any court, including the United States Court of Federal Claims. Moreover, as discussed above, the Supreme Court's decision in Stuart and its articulation of the liberal interpretation rule has been relied on by the Federal Circuit and Judges of the Court of Federal Claims to interpret tax treaties. See, e.g., Xerox Corp. v. United States, 41 F.3d at 652; McManus v. United States, 130 Fed. Cl. at 620. Defendant's argument that the liberal interpretation rule should not be applied in the context of tax treaties, relying only on a single law review article, is not persuasive. Therefore, without deference to defendant's interpretation, as determined above, the court applies the liberal interpretation of treaties rule announced in United States v. Stuart, as well as the principle announced in the Charming Betsy case, described above, to inform the court's determination of the shared expectations of the United States and French Governments with respect to paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended.

Mindful of the principles set forth above, including the Supreme Court's observation in Charming Betsy "that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," see Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118, the court interprets paragraphs 2(a) and 2(b) of Article 24 of the 1994 Treaty, as amended, in light of the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). As discussed above, a potential conflict exists because, if paragraphs 2(a) of Article 24 of the 1994 Treaty, as amended, is interpreted to provide a foreign tax credit without restriction, that would allow a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C., not in Chapter 1 of the I.R.C., and prohibited from the application of foreign tax credits by I.R.C. §§ 27 and 901(a). As quoted above, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, provides, in relevant part, that the United States shall allow a foreign tax credit against "the United States income tax" for French income tax paid by United States citizens living in France, "[i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof) . . . ." This "provisions" and "limitations" language is key to this court's interpretation of paragraph 2(a), just as it had been for the United States Tax Court in the Toulouse decision. The Tax Court in Toulouse, as discussed above, interpreted the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, as "subject[ing] the terms of the Treaties, and thus any allowable credit, to the provisions and limitations of the [Internal Revenue] Code." Toulouse v. Comm'r, 157 T.C. at 58 (alterations added). The Tax Court decision, which although not precedential for this court, states that under paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, "any allowable foreign tax credit must be determined in accordance with the [Internal Revenue] Code and is limited by the Code's provision of a credit." Toulouse v. Comm'r, 157 T.C. at 58 (alteration added). The reasoning of the Tax Court in Toulouse is consistent with this court's view of

the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended.

As explained above, the parties disagree about the meaning of the "[i]n accordance with the provisions and subject to the limitations of the law of the United States" language, (alteration added), in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. Plaintiffs argue that the "provisions" and "limitations" language of paragraph 2(a) makes foreign tax credits under that paragraph subject to one statute, the statute at I.R.C. § 904, "Limitation on credit." Defendant argues in response that the "provisions" and "limitations" language in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, includes the other provisions of the I.R.C. which affect the availability of foreign tax credits, as relevant here, I.R.C. §§ 27 and 901(a).

As described above, both I.R.C. §§ 27 and 901(a) restrict foreign tax credits only to apply against taxes imposed by Chapter 1 of the I.R.C. The statute at I.R.C. § 27 allows a foreign tax credit "against the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. § 27. The statute at I.R.C. § 901(a) similarly provides that "the tax imposed by this chapter [Chapter 1 of the I.R.C.] shall, subject to the limitation of section 904, be credited" with a foreign tax credit. See I.R.C. § 901(a) (alteration added). By their terms, I.R.C. §§ 27 and 901(a) prohibit foreign tax credits from applying against the net investment income tax imposed by I.R.C. § 1411 because I.R.C. § 1411 is in Chapter 2A, and not Chapter 1, of the I.R.C. In addition, the statute at I.R.C. § 904, as explained above, sets forth a number of limitations on foreign tax credits, which, however, are not relevant to the issues raised by plaintiffs' complaint in this court. See generally I.R.C. § 904.

Moreover, the use of the broad language of "provisions" and "limitations" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is instructive. Paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not refer to a specific United States tax statute, but rather states explicitly that it allows a foreign tax credit "[i]n accordance with the provisions and subject to the limitations of the law of the United States . . . ." (alteration and ellipsis added). The only qualification of this language is the clarification in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, that it refers to United States law "as it may be amended from time to time without changing the general principle" of the 1994 Treaty, as amended.

The plaintiffs have argued, as described above, that this "general principle" language refers to the "general principle" of the 1994 Treaty, as amended, to provide foreign tax credits for citizens of the signatory governments in order to avoid double taxation, and that an amendment to United States tax law denying a foreign tax credit that would otherwise be allowed would "chang[e] the general principle" of the 1994 Treaty, as amended. (alteration added). Such a change, including the enactment of an income tax not statutorily subject to foreign tax credits, as is the case for the net investment income tax imposed by I.R.C. § 1411, and one which adds a new type of United States taxation provision not envisioned at the time of the 1994 Treaty or its subsequent amendatory protocols, and, therefore, does not "chang[e] the general principle" of the 1994 Treaty, as amended. (alteration added).

Furthermore, plaintiffs' claim that the "provisions" and "limitations" of United States tax law incorporated by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, are exclusively the "limitations" set forth in the statute at I.R.C. § 904, is belied first by the fact that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not expressly refer to I.R.C. § 904. Nor can a reference only to I.R.C. § 904 be inferred from the use of "limitations." Although I.R.C. § 904 is titled "Limitation on credit" and sets forth statutory limitations on foreign tax credits, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, speaks not only of "limitations," but also of "provisions." The use of both "limitations" and "provisions" in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is sufficiently broad to indicate that foreign tax credits allowed by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, are subject not only to the "limitations" of I.R.C. § 904, but also to other "provisions" and "limitations" set forth in other provisions of the I.R.C., including I.R.C. §§ 27 and 901(a). The statutory sections at I.R.C. §§ 27 and 901(a), which both restrict foreign tax credits to apply against taxes imposed by Chapter 1 of the I.R.C., are both "provisions" of the I.R.C., and, therefore, "of the law of the United States," in the language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The foreign tax credits allowed by paragraph 2(a), therefore, must be "[i]n accordance with" the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C. (alteration added). Both I.R.C. §§ 27 and 901(a) "limit" foreign tax credits to apply only against taxes imposed by Chapter 1 of the I.R.C., and in that sense, I.R.C. §§ 27 and 901(a) are "limitations" to which foreign tax credits are "subject" under the plain text of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended.

Furthermore, the record before the court, including following supplemental briefing ordered by the court, produced no evidence of congressional intent when placing I.R.C. § 1411 in Chapter 2A of the I.R.C. The statute at I.R.C. § 1411 is in Chapter 2A of the I.R.C., and the placement of I.R.C. § 1411 in Chapter 2A of the I.R.C. is significant. Because paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, incorporates I.R.C. §§ 27 and 901(a), the net investment income tax is excluded from a foreign tax credit under paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. In this respect, this court finds that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, provides foreign tax credits against taxes imposed by Chapter 1 of the I.R.C., but does not provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C., enacted subsequent to the 1994 Treaty, as amended. This court's conclusion is consistent with the United States Tax Court's decision in Toulouse v. Comm'r, 157 T.C. at 58 ("[A]ny allowable foreign tax credit must be determined in accordance with the [Internal Revenue] Code and is limited by the Code's provision of a credit." (alterations added)).

Plaintiffs' reading of the "general principle" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is overbroad. The enactment of a tax which is excluded from the I.R.C.'s provision of foreign tax credits, as is the case with the net investment income tax imposed by I.R.C. § 1411 in Chapter 2A, does not violate the "general principle" of the 1994 Treaty, as amended. Plaintiffs' argument would require

that any new United States income tax be eligible for a foreign tax credit on the same terms and to the same extent as all other income taxes previously enacted in spite of the statutory requirements incorporated by paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The "provisions" and "limitations" language incorporates I.R.C. statutory restrictions on the availability of foreign tax credits, and the "general principle" language, although modifying this incorporation, does not nullify the immediately preceding incorporation of the "provisions" and "limitations" of United States law.

Plaintiffs acknowledge in their motion for partial summary judgment that the 1994 Treaty Treasury Department Technical Explanation, quoted at length above, describes the "general principle" of Article 24 in particular: "The credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article [24], i.e., the allowance of a credit, is retained." (alteration added). The 1994 Treaty Treasury Department Technical Explanation articulates the "general principle" of Article 24 of the 1994 Treaty, as amended, although it is generally self-serving insofar as it represents only the United States' interpretation, without anything in the record before this court to establish the Government of the French Republic's understanding of the 1994 Treaty, as amended. The "general principle" of the 1994 Treaty, as amended, even based on its formal title, is to avoid double taxation of each signatory government's citizens who reside in the other signatory country. As the court has explained, however, paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, conditions the allowance of foreign tax credits in service of that "general principle" upon compliance with the "provisions" and "limitations" of United States tax laws.

For these reasons, the court concludes that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, subjects its allowance of foreign tax credits to the "provisions" and "limitations" of the I.R.C. relating to foreign tax credits, including the restrictions of I.R.C. §§ 27 and 901(a) that foreign tax credits apply only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). The statute at I.R.C. §§ 27 and 901(a) foreclose the availability of foreign credits against the net investment income tax, which is imposed by I.R.C. § 1411, in Chapter 2A of the I.R.C. under paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. The enactment of the net investment income tax subsequent to the 1994 Treaty, as amended, in I.R.C. § 1411, was established subject to the restriction of foreign tax credits to Chapter 1 of the I.R.C. and does not "chang[e] the general principle" of the 1994 Treaty, as amended, (alteration added), which is consistent with the plain text of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. Accordingly, the court holds that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411.

As discussed above, plaintiffs also argue that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, independently provides a foreign tax credit against the net investment income tax. Paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, states that "the United States shall allow as a credit against the United States income tax the French income tax paid," but, according to plaintiffs, only after calculation of the credit

due against French tax on account of income tax due to the United States.[42] Defendant disagrees and argues that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, implements the second bite of the three-bite rule, in particular by providing a foreign tax credit against United States income tax corresponding to the amount of the French income tax assessed in the second bite. Defendant indicates, therefore, that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax independent of the I.R.C. Defendant's explanation is difficult to understand, given defendant's own description of the three-bite rule and the role that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, fulfills within the three-bite rule. Defendant indicates that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, allows a foreign tax credit, and that the foreign tax credit is to be assessed against United States income tax to account for the second bite income tax paid to France, above the 15 percent tax assessed by the United States in the first bite. This foreign tax credit against United States income tax is set forth by the text of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and not by a statute, according to defendant's own description of the three-bite rule. Plaintiffs, according to their argument, agree with respect to the mechanics of the three-bite rule. Therefore, by the plain text of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and by defendant's description, paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, provides for a treaty-based foreign tax credit against United States income tax commensurate with French income tax paid.

As relevant to the case brought by plaintiffs, the difference between paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, is that while paragraph 2(a) expressly conditions the availability of a foreign tax credit on the "provisions" and "limitations" of the United States tax laws, paragraph 2(b) does not contain such "provisions" and "limitations" language. As discussed above, the "provisions" and "limitations" language of paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, is the reason that the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., prohibits foreign tax credits pursuant to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, against the net investment income tax imposed by I.R.C. § 1411, which is in Chapter 2A of the I.R.C. Because paragraph 2(b) of Article 24 of the 1994 Treaty, as

---

[42] Paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, refers to another provision in paragraph 1(a) of the same Article 24 of the 1994 Treaty, as amended, which provides for a credit against French income tax which shall equal,

> [i]n the case of income referred to in Article 10 (Dividends), Article 11 (Interest), paragraph 1 of Article 13 (Capital Gains), Article 16 (Director's Fees), and Article 17 (Artistes and Sportsmen), to the amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income.

(alteration added).

amended, lacks such restraining language incorporating the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., a potential conflict exists between the text of paragraph 2(b) and the I.R.C., unless the treaty or statutory provisions can be interpreted to avoid or resolve such potential conflict. If paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a) can be interpreted to allow a foreign tax credit against the net investment income imposed by I.R.C. § 1411, plaintiffs would succeed in establishing legal entitlement to a foreign tax credit in the above captioned case.

In light of the potential conflict between paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a), the court relies on the principles of treaty interpretation, outlined above, concerning when potential conflict occurs between treaty and statutory language. The court recognizes that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, is a separate paragraph from paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, and the two paragraphs in each iteration of the treaty, the original 1994 Treaty, the 2004 Protocol, and the 2009 Protocol, have existed as independent provisions. Paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, in each iteration of the 1994 Treaty, as amended, has followed paragraph 2(a) of Article 24 of the 1994 Treaty, as amended. As explained above, the record before the court contains no evidence of the interpretation held by the French Government with respect to either paragraph 2(a) or paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, or the intent of either party regarding why the net investment income tax was placed in Chapter 2A of the I.R.C., rather than in Chapter 1 of the I.R.C. Therefore, in order to interpret paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, independently from paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, the court relies on the precedents of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit which concern treaty interpretation, including in instances of potential conflict between treaty and statutory provisions, giving effect to the shared expectations of both signatory governments to the treaty, here, the United States and France. See Lozano v. Montoya Alvarez, 572 U.S. at 12; Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 185. In so doing, as the United States Supreme Court and the United States Court of Appeals for the Federal Circuit have explained, the court must interpret 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a) to avoid conflict between the 1994 Treaty, as amended, and I.R.C. §§ 27 and 901(a). See, e.g., Weinberger v. Rossi, 456 U.S. at 32; Whitney v. Robertson, 124 U.S. at 194; In re City of Houston, 731 F.3d at 1334; Xerox Corp. v. United States, 41 F.3d at 658. The Supreme Court held in Charming Betsy that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; see also Weinberger v. Rossi, 456 U.S. at 32, and the Federal Circuit similarly has held that a statute "'must be interpreted to be consistent with [international] obligations, absent contrary indications in the statutory language or its legislative history.'" Allegheny Ludlum Corp. v. United States, 367 F.3d at 1348 (alteration in original) (quoting Luigi Bormioli Corp., Inc. v. United States, 304 F.3d at 1368, and citing Fed.-Mogul Corp. v. United States, 63 F.3d at 1581). Therefore, when determining whether a treaty and a statute "stand together in harmony," see Xerox Corp. v. United States, 41 F.3d at 658, the statute in question must be construed not to violate the treaty,

unless no other interpretation is possible. See, e.g., Allegheny Ludlum Corp. v. United States, 367 F.3d at 1348; Fed.-Mogul Corp. v. United States, 63 F.3d at 1581. Moreover, the court is required to afford a liberal interpretation to the terms of the 1994 Treaty, as amended. See United States v. Stuart, 489 U.S. at 365-66; Xerox Corp. v. United States, 41 F.3d at 652; McManus v. United States, 130 Fed. Cl. at 620. By applying this guidance on treaty interpretation, the court may give effect to the shared expectations of the United States and France with respect to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended.[43]

Also as discussed above, the statutes at I.R.C. §§ 27 and 901(a) restrict foreign tax credits to apply only against "the tax imposed by this chapter," Chapter 1 of the I.R.C. See I.R.C. §§ 27, 901(a). The text of I.R.C. §§ 27 and 901(a), however, does not indicate any intent that the restriction on foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C. should be interpreted to conflict with another international treaty obligation of the United States. See Fed.-Mogul Corp. v. United States, 63 F.3d at 1581 ("GATT agreements are international obligations, and absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations."). The statute at I.R.C. § 1411, which imposes the net investment income tax, does not mention foreign tax credits, or tax credits at all, although it does refer to "deductions" when defining the terms "net investment income," I.R.C. § 1411(c)(1)(B), and "modified adjusted gross income." Id. § 1411(d)(2). Moreover, as the parties stated in their briefs, nothing in the legislative history of the enactment of I.R.C. § 1411 indicates the congressional intent with respect to abrogating any foreign tax credit provided by the 1994 Treaty, as amended, when Congress enacted the net investment income tax in I.R.C. § 1411 in Chapter 2A of the I.R.C., and the record contains no information regarding France's intent beyond the words of the 1994 Treaty, as amended.

Defendant, as discussed above, asks this court to assume from the words of I.R.C. § 1411, and its placement in Chapter 2A of the I.R.C., rather than Chapter 1, that Congress intended to exclude the net investment income tax from all foreign tax credits. Absent additional information, however, the court should not make such assumptions. See MacLeod v. United States, 229 U.S. at 434 ("[I]t should not be assumed that Congress proposed to violate the obligations of this country to other nations, which it was the manifest purpose of the President to scrupulously observe, and which were founded upon the principles of international law." (alteration added)); see also Clark v. Allen, 331 U.S. at 512. Because the court can point to no "contrary indications in the statutory language or its legislative history," see Allegheny Ludlum Corp. v. United States, 367 F.3d at 1348 (internal quotations omitted), neither the Chapter 1 restriction of I.R.C. §§ 27 and 901(a) nor the text of I.R.C. § 1411 should be interpreted contrary to the international

---

[43] As explained above and for the same reasons as the court elaborated with respect to paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, the court does not afford deference to defendant's interpretation of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, in the absence of evidence of the interpretation held by the French Government.

obligations imposed by paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to allow foreign tax credits against United States income taxes.

Therefore, the court interprets the terms of paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, which provide that "the United States shall allow as a credit against the United States income tax the French income tax paid," to allow for foreign tax credits independent of the restrictions of I.R.C. §§ 27 and 901(a). See Corus Staal BV v. Dep't of Commerce, 395 F.3d at 1347 (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64). The statute at I.R.C. § 27 provides for "taxes imposed by foreign countries" to "be allowed as a credit against the tax imposed by this chapter to the extent provided in section 901[.]" See I.R.C. § 27 (alteration added). The statute at I.R.C. § 27, based on its text, may be read to impose a Chapter 1 restriction on foreign tax credits, but only "to the extent provided in section 901," which is to say, only insofar as I.R.C. § 901 imposes the restriction of foreign tax credits to Chapter 1 of the I.R.C. This reading of I.R.C. § 27 would contemplate the existence of foreign tax credits not subject to the Chapter 1 restriction, in particular credits not based on the I.R.C. itself, but originating outside the I.R.C. The statute at I.R.C. § 904 may be read to support this reading of I.R.C. § 27. The statute at I.R.C. § 904 refers to "the credit taken under section 901(a)," which can be read to refer only to foreign tax credits under I.R.C. § 901(a), rather than to all possible foreign tax credits which a taxpayer could claim. See I.R.C. § 904(a). This reading, like the above-described reading of I.R.C. § 27, would indicate the existence of foreign tax credits that are not restricted to those taken against taxes imposed by Chapter 1 of the I.R.C., because those credits arise from sources other than the I.R.C. § 901(a) provision for foreign tax credits.

Reading I.R.C. §§ 27 and 904 in this way avoids a potential conflict between the restriction of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C., and the unqualified foreign tax credit allowed by paragraph 2(b) of Article 24 of the 1994 Treaty, as amended. This acknowledges the existence of two distinct groups of foreign tax credits under United States law: "statutory" foreign tax credits, which are provided under the statute at I.R.C. § 901(a) and which only may be asserted against taxes imposed by Chapter 1 of the I.R.C., and "treaty" foreign tax credits, as in the context of the current case under review, which are provided by treaties concerning taxation, like the 1994 Treaty, as amended, and which are not bound by the restrictions on foreign tax credit availability set forth in the I.R.C. unless the terms of those treaties so provide. Under this reading, a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, is not a credit "taken under section 901(a)," see I.R.C. § 904(a), and, therefore, may be asserted against United States income taxes outside of Chapter 1, including the net investment income tax imposed by I.R.C. § 1411 in Chapter 2A at issue here.

The distinction between statutory and treaty based foreign tax credits is supported by another provision of the I.R.C., at I.R.C. § 6511, which concerns the period of limitations for claims by taxpayers of refunds or credits. Subparagraph (d)(3) of I.R.C. § 6511 is titled "Special rules relating to foreign tax credit," and provides:

If the claim for credit or refund relates to an overpayment attributable to any taxes paid or accrued to any foreign country or to any possession of the United States for which credit is allowed against the tax imposed by subtitle A in accordance with the provisions of section 901 or the provisions of any treaty to which the United States is a party, in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 10 years from the date prescribed by law for filing the return for the year in which such taxes were actually paid or accrued.

I.R.C. § 6511(d)(3)(A) (2018) (emphasis added). The text of I.R.C. § 6511(d)(3)(A) makes an explicit distinction between a foreign tax credit allowed "in accordance with the provisions of section 901," and a foreign tax credit allowed by "the provisions of any treaty to which the United States is a party . . . ." See I.R.C. § 6511(d)(3)(A) (ellipsis added). While the statute applies the same limitation period to both forms of foreign tax credit, the statute uses the disjunctive "or" to differentiate between statutory foreign tax credits under section 901 and treaty foreign tax credits. The distinction between the two indicates that a foreign tax credit may be allowed by the provisions of a treaty without also being provided by the terms of I.R.C. § 901.

In adopting this reading of the 1994 Treaty, as amended, and the I.R.C., the court has followed the direction, first set forth by the Supreme Court in Charming Betsy, to interpret I.R.C. §§ 27 and 901(a) not to conflict with the provision of a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, when doing so is "possible." See Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) at 118; In re City of Houston, 731 F.3d at 1334; Corus Staal BV v. Dep't of Commerce, 395 F.3d at 1347; Timken Co. v. United States, 354 F.3d at 1343-44. Moreover, this court's reading is consistent with the Supreme Court's decision in Stuart to give a "liberal interpretation" to the terms of the 1994 Treaty, as amended. See United States v. Stuart, 489 U.S. at 368. This liberal interpretation would "enlarge" the availability of foreign tax credits "which may be claimed thereunder," and, as demonstrated above, is applicable to the interpretation of tax treaties, including the 1994 Treaty, as amended. See id.; Xerox Corp. v. United States, 41 F.3d at 652; McManus v. United States, 130 Fed. Cl. at 620. Moreover, this liberal interpretation would be consistent with the general principle in the 1994 Treaty, as amended, to avoid double taxation of each signatory government's citizens who reside in the other signatory country. Accordingly, the court interprets paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to allow a foreign tax credit to be taken by a United States citizen residing in France against United States income tax without restricting that foreign tax credit to apply only against taxes imposed by Chapter 1 of the I.R.C. Based on the foregoing analysis, the provision of a foreign tax credit under paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, to United States citizens living in France, which is distinct from the limitation in paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, best gives effect to the apparent shared intent of the United States and France with respect to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, within the principles of treaty interpretation law and does not conflict with the relevant provisions of the I.R.C. For these reasons, the court concludes that, pursuant to paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, between the United States and France,

plaintiffs may assert a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411.

## CONCLUSION

Having resolved the legal question regarding the availability of foreign tax credits against the net investment income tax under the 1994 Treaty, as amended, there remains an outstanding matter which the parties agree prevents the court from entering judgment in this case at this time. The parties have not agreed on how to resolve the applicability and calculation of the three-bite rule to plaintiffs' tax refund in this case. Consistent with the foregoing analysis, plaintiffs' motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**, and defendant's cross-motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**. For the reasons stated above, the court concludes that paragraph 2(a) of Article 24 of the 1994 Treaty, as amended, does not provide a foreign tax credit against the net investment income tax for the French income taxes paid by plaintiffs. The court also concludes, however, that paragraph 2(b) of Article 24 of the 1994 Treaty, as amended, can provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411 for the French income taxes paid by plaintiffs. Further proceedings regarding the three-bite rule calculation will be scheduled in a separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

**Appx92**

# In the United States Court of Federal Claims

### No. 20-935 T
### Filed: October 20, 2023

```
***************************************
MATTHEW & KATHERINE KAESS       *
CHRISTENSEN,                    *
                 Plaintiffs,    *                    JUDGMENT
                                *
         v.                     *
                                *
THE UNITED STATES,              *
                 Defendant.     *
***************************************
```

Pursuant to the court's Opinion, filed September 13, 2023, granting in part and denying in part plaintiffs' motion for partial summary judgment and granting in part and denying in part defendant's cross-motion for partial summary judgment, and Order, filed October 15, 2023,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiffs recover from the United States the following amount:

- For plaintiffs' income-tax year ended December 31, 2015, an overpayment of income tax in the amount of $3,851.00, with statutory interest on such overpayment pursuant to section 6611 of the Internal Revenue Code.

<br>

Lisa L. Reyes
Clerk of Court

By:   s/ Ashley Reams
Deputy Clerk

<br>

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.   Filing fee is $505.00.

<br>

**Appx93**

CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL

GENERAL EFFECTIVE DATE UNDER ARTICLE 33: 1 JANUARY 1996

## TABLE OF ARTICLES

Article 1---------------------------------Personal Scope
Article 2---------------------------------Taxes Covered
Article 3---------------------------------General Definitions
Article 4---------------------------------Resident
Article 5---------------------------------Permanent Establishment
Article 6---------------------------------Income From Real Property
Article 7---------------------------------Business Profits
Article 8---------------------------------Shipping and Air Transport
Article 9---------------------------------Associated Enterprises
Article 10--------------------------------Dividends
Article 11--------------------------------Interest
Article 12--------------------------------Royalties
Article 13--------------------------------Capital Gains
Article 14--------------------------------Independent Personal Services
Article 15--------------------------------Dependent Personal Services
Article 16--------------------------------Directors' Fees
Article 17--------------------------------Artistes and Sportsmen
Article 18--------------------------------Pensions
Article 19--------------------------------Public Remuneration
Article 20--------------------------------Teachers and Researchers
Article 21--------------------------------Students and Trainees
Article 22--------------------------------Other Income
Article 23--------------------------------Capital
Article 24--------------------------------Relief From Double Taxation
Article 25--------------------------------Non-Discrimination
Article 26--------------------------------Mutual Agreement Procedure
Article 27--------------------------------Exchange of Information
Article 28--------------------------------Assistance in Collection
Article 29--------------------------------Miscellaneous Provisions
Article 30--------------------------------Limitation on Benefits of the Convention
Article 31--------------------------------Diplomatic and Consular Officers
Article 32--------------------------------Provisions for Implementation
Article 33--------------------------------Entry Into Force
Article 34--------------------------------Termination
Letter of Submittal---------------------of 9 September, 1994
Letter of Transmittal-------------------of 19 September, 1994
Notes of Exchange---------------------of 31 August, 1994
The "Saving Clause"-------------------Paragraph 2 of Article 29

**Add1**

MESSAGE

FROM

THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE AVOIDANCE OF
DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT
TO TAXES ON INCOME AND CAPITAL SIGNED AT PARIS ON AUGUST 31,1994,
TOGETHER WITH TWO RELATED EXCHANGES OF NOTES

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, September 9, 1994.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the
Senate for advice and consent to ratification, the Convention Between the Government of the
United States of America and the Government of the French Republic for the Avoidance of
Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and
Capital, signed at Paris on August 31, 1994, together with two related exchanges of notes signed
on the same date.

The new Convention will replace the existing income tax convention between the United
States and France, which was signed in 1967 and amended by Protocols signed in 1970, 1978,
1984, and 1988, and the side letters relating thereto. The new Convention maintains many
provisions of the existing convention; but it also provides certain additional benefits, and it
updates the text to reflect current tax treaty policies.

Like all U.S. income tax conventions, this Convention provides rules specifying when
income that arises in one of the countries and is derived by residents of the other country may be
taxed by the country in which the income arises (the "source country"). Rules are provided for
each category of income, such as business profits, investment income, and personal service
income. The Convention confirms that the country of residence will avoid international double
taxation by providing relief for the tax imposed by the source country. It also provides for
administrative cooperation between the tax authorities of the two countries in applying the
Convention and the taxes covered by the Convention. The benefits of the Convention are limited
to qualified residents of the two countries.

The new Convention confirms that residents of each country include tax-exempt
organizations created for charitable and other not-for-profit purposes or for purposes of providing
pension benefits, and extends to them part of the dividend tax credit that France provides in the

**Add2**

Convention to other U.S. portfolio investors. It also addresses the treatment of dividends paid by regulated investment companies and real estate investment trusts, bringing those provisions into line with current U.S. treaty policy. The new Convention clarifies the scope of the exemption at source of copyright royalties.

An important improvement in the new Convention is the modernization of the limitation on benefits provisions, designed to ensure that the benefits of the Convention are enjoyed only by those persons intended to derive such benefits. The compliance aspects of the Convention are also strengthened by bringing up to date the provisions concerning associated enterprises and the exchange of tax information.

The new Convention preserves the special French tax benefits for U.S. citizens residing in France and for French residents who are partners of U.S. partnerships.

The exchanges of diplomatic notes accompany the Convention and state the understandings of the two delegations with respect to the application of the Convention in specified cases.

The United States and France will notify each other when their respective constitutional and statutory requirements for the entry into force of the Convention have been satisfied. The Convention will enter into force on the date of receipt of the later of those notifications. The provisions concerning taxes on dividends, interests, and royalties and the U.S. excise tax on insurance premiums paid to foreign insurers will take effect on the first day of the second month following the entry into force. The provisions concerning other taxes generally will take effect for taxable years or taxable events occurring on or after January 1 of the year following the entry into force. However, certain provisions concerning the availability of the French dividend tax credit and the application of the copyright royalty exemption will apply for dividends and royalties paid or credited on or after January 1, 1991. The 1967 convention and the related exchanges of letters will cease to have effect as of the date on which the provisions of this Convention become effective.

A technical memorandum explaining in detail the provisions of the Convention will be prepared by the Department of Treasury and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of the Treasury and the Department of State cooperated in the negotiation of the convention. It has the full approval of both Departments.

Respectfully submitted,

WARREN CHRISTOPHER.

**Add3**

LETTER OF TRANSMITTAL

THE WHITE HOUSE, *September 19, 1994.*

*To the Senate of the United States:*

I transmit herewith for Senate advice and consent to ratification the Convention Between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, signed at Paris on August 31, 1994, together with two related exchanges of notes. Also transmitted for the information of the Senate is the report of the Department of State with respect to the Convention.

The Convention replaces the 1967 income tax convention between the United States of America and the French Republic and the related protocols and exchanges of notes. The new Convention more accurately reflects current income tax treaty policies of the two countries.

I recommend that the Senate give early and favorable consideration to the Convention and related exchanges of notes and give its advice and consent to ratification.

WILLIAM J. CLINTON.

CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED STATES
OF AMERICA AND THE GOVERNMENT OF THE FRENCH REPUBLIC FOR THE
AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL
EVASION WITH RESPECT TO TAXES ON INCOME AND CAPITAL

The Government of the United States of America and the Government of the French
Republic, desiring to conclude a new convention for the avoidance of double taxation and the
prevention of fiscal evasion with respect to taxes on income and capital, have agreed as follows:

ARTICLE 1
Personal Scope

This Convention shall apply only to persons who are residents of one or both of the
Contracting States, except as otherwise provided in the Convention.

ARTICLE 2
Taxes Covered

1. The taxes which are the subject of this Convention are:
    (a) in the case of the United States:
        (i) the Federal income taxes imposed by the Internal Revenue Code (but
excluding social security taxes); and
        (ii) the excise taxes imposed on insurance premiums paid to foreign
insurers and with respect to private foundations
(hereinafter referred to as "United States tax"). The Convention, however, shall apply to
the excise taxes imposed on insurance premiums paid to foreign insurers only to the
extent that the risks covered by such premiums are not reinsured with a person not
entitled to exemption from such taxes under this or any other income tax convention
which applies to these taxes;
    (b) in the case of France, all taxes imposed on behalf of the State, irrespective of
the manner in which they are levied, on total income, on total capital, or on elements of
income or of capital, including taxes on gains from the alienation of movable or
immovable property, as well as taxes on capital appreciation, in particular:
        (i) the income tax (1'impôt sur le revenu);
        (ii) the company tax (l'impôt sur les sociétés):
        (iii) the tax on salaries (la taxe sur les salaires) governed by the provisions
of the Convention applicable, as the case may be, to business profits or to income
from independent personal services; and
        (iv) the wealth tax (l'impôt de solidarité sur la fortune) (hereinafter
referred to as "French tax").

2. The Convention shall apply also to any identical or substantially similar taxes that are
imposed after the date of signature of the Convention in addition to, or in place of, the existing
taxes. The competent authorities of the Contracting States shall notify each other of any
significant changes which have been made in their respective taxation laws and of any official
published material concerning the application of the Convention, including explanations,
regulations, rulings, or judicial decisions.

ARTICLE 3
General Definitions

1. For the purposes of this Convention:

(a) the term "Contracting State" means the United States or France, as the context requires;

(b) the term "United States" means the United States of America, but does not include Puerto Rico, the Virgin Islands, Guam, or any other United States possession or territory. When used in a geographical sense, the term "United States" means the states thereof and the District of Columbia and includes the territorial sea adjacent to those States and any area outside the territorial sea within which, in accordance with international law, the United States has sovereign rights for the purpose of exploring and exploiting the natural resources of the seabed and its subsoil and the superjacent waters;

(c) the term "France" means the French Republic and, when used in a geographical sense, means the European and Overseas Departments of the French Republic and includes the territorial sea and any area outside the territorial sea within which, in accordance with international law, the French Republic has sovereign rights for the purpose of exploring and exploiting the natural resources of the seabed and its subsoil and the superjacent waters;

(d) the term "person" includes, but is not limited to, an individual and a company;

(e) the term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes;

(f) the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean, respectively, an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of the other Contracting State;

(g) the term "international traffic" means any transport by a ship or aircraft, except when the ship or aircraft is operated solely between places in a Contracting State;

(h) the term "competent authority" means:

(i) in the United States, the Secretary of the Treasury or his delegate; and

(ii) in France, the Minister in charge of the budget or his authorized representative.

2. As regards the application of the Convention by a Contracting State, any term not defined herein shall, unless the competent authorities agree to a common meaning pursuant to the provisions of Article 26 (Mutual Agreement Procedure), have the meaning which it has under the taxation laws of that State.

ARTICLE 4
Resident

1. For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature. But this term does not include any person who is liable to tax in that State in respect only of income from sources in that State, or of capital situated therein.

Add6

2.          (a) France shall consider a U.S. citizen or an alien admitted to the United States for permanent residence (a "green card" holder) to be a resident of the United States for the purposes of paragraph 1 only if such individual has a substantial presence in the United States or would be a resident of the United States and not of a third State under the principles of subparagraphs (a) and (b) of paragraph 3.

(b) The term "resident of a Contracting State" includes:

(i) that State, a political subdivision (in the case of the United States) or local authority thereof, and any agency or instrumentality of such State, subdivision, or authority;

(ii) a pension trust and any other organization established in that State and maintained exclusively to administer or provide retirement or employee benefits that is established or sponsored by a person that is a resident of that State under the provisions of this Article; and any not-for-profit organization established and maintained in that State, provided that the laws of such State or (in the case of the United States) a political subdivision thereof limit the use of the organization's assets, both currently and upon the dissolution or liquidation of such organization, to the accomplishment of the purposes that serve as the basis for such organization's exemption from income tax; notwithstanding that all or part of the income of such trust, other organization, or not-for-profit organization may be exempt from income taxation in that State;

(iii) in the case of the United States, a regulated investment company, a real estate investment trust, and a real estate mortgage investment conduit; in the case of France, a "société d'investissement a capital variable" and a "fonds commun de placement"; and any similar investment entities agreed upon by the competent authorities of both Contracting States;

(iv) a partnership or similar pass-through entity, an estate, an trust (other than one referred to in subparagraph (ii) or (iii) above), but only to the extent that the income derived by such partnership, similar entity state, or trust is subject to tax in the Contracting State as the income of a resident, either in the hands of such partnership, entity, estate, or trust or in the hands of its partners, beneficiaries, or grantors, it being understood that a "société de personnes," a "groupement d'intérêt économique" (economic interest group), or a "groupement européen d'intérêt économique" (European economic interest group) that is constituted in France and has its place of effective management in France and that is not subject to company tax therein shall be treated as a partnership for purposes of United States tax benefits under this Convention.

3. Where, by reason of the provisions of paragraphs 1 and 2, an individual is a resident of both Contracting States, his status shall be determined as follows:

(a) he shall be deemed to be a resident of the State in which he has a permanent home available to him; if he has a permanent home available to him in both Contracting States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (center of vital interests);

(b) if the State in which he has his center of vital interests cannot be determined, or if he does not have a permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;

(c) if he has an habitual abode in both States or in neither of them, he shall be

## Add7

deemed to be a resident of the State of which he is a national;
    (d) if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement.

4. Where, by reason of the provisions of paragraphs 1 and 2, a person other than an individual is a resident of both Contracting States, the competent authorities shall endeavor to settle the question by mutual agreement, having regard to the person's place of effective management, the place where it is incorporated or constituted, and any other relevant factors. In the absence of such agreement, such person shall not be considered to be a resident of either Contracting State for purposes of enjoying benefits under this Convention.


ARTICLE 5
Permanent Establishment

1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2. The term "permanent establishment" includes especially:
    (a) a place of management;
    (b) a branch;
    (c) an office;
    (d) a factory;
    (e) a workshop; and
    (f) a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

3. The term "permanent establishment" shall also include a building site or construction or installation project, or an installation or drilling rig or ship used for the exploration or to prepare for the extraction of natural resources, but only if such site or project lasts, or such rig or ship is used, for more than twelve months.

4. Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:
    (a) the use of facilities solely for the purpose of storage, display, or delivery of goods or merchandise belonging to the enterprise;
    (b) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display, or delivery;
    (c) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;
    (d) the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or of collecting information, for the enterprise;
    (e) the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;
    (f) the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs (a) to (e), provided that the overall activity of the fixed place of business resulting from this combination is of a preparatory or auxiliary character.

5. Notwithstanding the provisions of paragraphs 1 and 2, where a person - other than an agent of an independent status to whom paragraph 6 applies - is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts in the name of the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6. An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business as such.

7. The fact that a company which is a resident of a Contracting State controls or is controlled by a company which is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not of itself constitute either company a permanent establishment of the other.

ARTICLE 6
Income From Real Property

1. Income from real property (including income from agriculture or forestry) situated in a Contracting State may be taxed in that State.

2. The term "real property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated. The term shall in any case include options, promises to sell, and similar rights relating to real property, property accessory to real property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of real property and rights to variable or fixed payments as consideration for the working of or the right to work, mineral deposits, sources and other natural resources. Ships and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income from the direct use, letting, or use in any other form of real property.

4. The provisions of paragraphs 1 and 3 shall also apply to income from real property of an enterprise and to income from real property used for the performance of independent personal services.

5. Where the ownership of shares or other rights in a company entitles a resident of a Contracting State to the enjoyment of real property situated in the other Contracting State and held by that company, the income derived by the owner from the direct use, letting, or use in any other form of this right of enjoyment may be taxed in that other State to the extent that it would be taxed under the domestic law of that other State if the owner were a resident of that State. The provisions of this paragraph shall apply, notwithstanding the provisions of Articles 7 (Business

**Add9**

Profits) and 14 (Independent Personal Services).

6. A resident of a Contracting State who is liable to tax in the other Contracting State on income from real property situated in the other Contracting State may elect to be taxed on a net basis, if such treatment is not provided under the domestic law of that other State.

## ARTICLE 7
### Business Profits

1. The profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the profits of the enterprise may be taxed in the other State but only so much of them as is attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the profits which it might be expected to make if it were a distinct and independent enterprise engaged in the same or similar activities under the same or similar conditions.

3. In determining the profits of a permanent establishment, there shall be allowed as deductions expenses which are reasonably connected with such profits, including executive and general administrative expenses, whether incurred in the State in which the permanent establishment is situated or elsewhere.

4. A partner shall be considered to have realized income or incurred deductions to the extent of his share of the profits or losses of a partnership, as provided in the partnership agreement (provided that any special allocations of profits or losses have substantial economic effect). For this purpose, the character (including source and attribution to a permanent establishment) of any item of income or deduction accruing to a partner shall be determined as if it were realized or incurred by the partner in the same manner as realized or incurred by the partnership.

5. No profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise.

6. For the purposes of the preceding paragraphs of this Article, the profits to be attributed to the permanent establishment shall include only the profits or losses derived from the assets or activities of the permanent establishment and shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

7. Any profit attributable to a permanent establishment, according to the provisions of this Article, during its existence may be taxed in the Contracting State in which such permanent establishment is situated, even if the payments are deferred until such permanent establishment has ceased to exist.

8. Where profits include items of income which are dealt with separately in other Articles of

this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.


## ARTICLE 8
Shipping and Air Transport

1. Profits of an enterprise of a Contracting State from the operation of ships or aircraft in international traffic shall be taxable only in that State.

2.   For the purposes of this Article, profits from the operation of ships or aircraft in international traffic include:

(a) profits of the enterprise derived from the rental on a full basis of ships or aircraft operated in international traffic, and profits of the enterprise derived from the rental on a bareboat basis of ships or aircraft if such ships or aircraft are operated in international traffic by the lessee or such rental profits are accessory to other profits described in paragraph 1; and

(b) profits of the enterprise from the use, maintenance or rental of containers used in international traffic (including trailers, barges, and related equipment for the transport of such containers) if such profits are accessory to other profits described in paragraph 1.

3. The provisions of paragraphs 1 and 2 shall also apply to profits from participation in a pool, a joint business, or an international operating agency.


## ARTICLE 9
Associated Enterprises

1. Where:

(a) an enterprise of a Contracting State participates directly or indirectly in the management, control, or capital of an enterprise of the other Contracting State; or

(b) the same persons participate directly or indirectly in the management, control, or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State,

.    and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which, but for those conditions, would have accrued to one of the enterprises, but by reason of those conditions have not so accrued, may be included in the profits of that enterprise and taxed accordingly

2. Where a Contracting State includes in the profits of an enterprise of that State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other State, and the other Contracting State agrees that the profits so included are profits that would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those that would have been made between independent enterprises, then that other State shall, in accordance with the provisions of Article 26 (Mutual Agreement Procedure), make an appropriate adjustment to the amount of the tax charged therein on those profits. In determining such adjustment, due regard shall be paid to the other provisions

of this Convention.

## ARTICLE 10
### Dividends

1. Dividends paid by a company that is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. Such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

(a) 5 percent of the gross amount of the dividends if the beneficial owner is a company that owns:

(i) directly, at least 10 percent of the voting power in the company paying the dividends, if such company is a resident of the United States; or

(ii) directly or indirectly, at least 10 percent of the capital of the company paying the dividends, if such company is a resident of France;

(b) 15 percent of the gross amount of the dividends in other cases. The provisions of subparagraph (a) shall not apply in the case of dividends paid by a United States regulated investment company or real estate investment trust or by a French "société d'investissement a capital variable." In the case of dividends paid by a United States regulated investment company or a French "société d'investissement capital variable," the provisions of subparagraph (b) shall apply. In the case of dividends paid by a United States real estate investment trust, the provisions of subparagraph (b) shall apply only if the dividend is beneficially owned by an individual owning a less than 10 percent interest in such real estate investment trust; otherwise, the rate of withholding tax applicable under the domestic law of the United States shall apply.

3. The provisions of paragraph 2 shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

4. (a) A resident of the United States who derives and is the beneficial owner of dividends paid by a company that is a resident of France that, if received by a resident of France would entitle such a resident to a tax credit ("avoir fiscal") shall be entitled to a payment from the French Treasury equal to such tax credit ("avoir fiscal"), subject to deduction of the tax provided for in subparagraph (b) of paragraph 2.

(b) The provisions of subparagraph (a) shall apply only to a resident of the United States that is:

(i) an individual or other person (other than a company) ; or

(ii) a company that is not a regulated investment company and that does not own, directly or indirectly, 10 percent or more of the capital of the company paying the dividends; or

(iii) a regulated investment company that does not own, directly or indirectly, 10 percent or more of the capital of the company paying the dividends, but only if less than 20 percent of its shares is beneficially owned by persons who are neither citizens nor residents of the United States.

(c) The provisions of subparagraph (a) shall apply only if the beneficial owner of

Add12

the dividends is subject to United States income tax in respect of such dividends and of the payment from the French Treasury.

(d) Notwithstanding the provisions of subparagraphs (b) and (c), the provisions of subparagraph (a) shall also apply to a partnership or trust described in subparagraph (b) (iv) of paragraph 2 of Article 4 (Resident), but only to the extent that the partners, beneficiaries, or grantors would qualify under subparagraph (b) (i) or (b) (ii) and under subparagraph (c) of this paragraph.

(e)       (i) A resident of the United States described in subparagraph (ii) that does not own, directly or indirectly, 10 percent or more of the capital of a company that is a resident of France, and that derives and beneficially owns dividends paid by such company that, if derived by a resident of France, would entitle such resident to a tax credit ("avoir fiscal"), shall be entitled to a payment from the French Treasury equal to 30/85 of the amount of such tax credit ("avoir fiscal"), subject to the deduction of the tax provided for in subparagraph (b) of paragraph 2;

(ii) The provisions of subparagraph (i) shall apply to:

(aa) a person described in subparagraph (b) (i) of paragraph 2 of Article 4 (Resident), with respect to dividends derived by such person from the investment of retirement assets;

(bb) a pension trust and any other organization described in subparagraph (b) (ii) of paragraph 2 of Article 4 (Resident); and

(cc) an individual, with respect to dividends beneficially owned by such individual and derived from investment in a retirement arrangement under which the contributions or the accumulated earnings receive tax-favored treatment under U.S. law.

(f) The gross amount of a payment made by the French Treasury pursuant to subparagraph (a), (d), or (e) shall be deemed to be a dividend for the purposes of this Convention.

(g) The provisions of subparagraphs (a), (d), and (e) shall apply only if the beneficial owner of the dividends shows, where required by the French tax administration, that he is the beneficial owner of the shareholding in respect of which the dividend are paid and that such shareholding does not have as its principal purpose or one of its principal purposes to allow another person to take advantage of the provisions of this paragraph, regardless of whether that person is a resident of a Contracting State.

(h) Where a resident of the United States that derives and beneficially owns dividends paid by a company that is a resident of France is not entitled to the payment from the French Treasury referred to in subparagraph (a), such resident may obtain a refund of the prepayment (précompte) to the extent that it was actually paid by the company in respect of such dividends. Where such a resident is entitled to the payment from the French Treasury referred to in subparagraph (e), such refund shall be reduced by the amount of the payment from the French Treasury. The gross amount of the prepayment (précompte) refunded shall be deemed to be a dividend for the purposes of the Convention. It shall be taxable in France according to the provisions of paragraph 2.

(i) The competent authorities may prescribe rules to implement the provisions of this paragraph and further define and determine the terms and conditions under which the payments provided for in subparagraphs (a), (d), and (e) shall be made.

5.        (a) The term "dividends" means income from shares, "jouissance" shares or "jouissance" rights, mining shares, founders' shares or other rights, not being debt-claims,

participating in profits, as well as income treated as a distribution by the taxation laws of the State of which the company making the distribution is a resident; and income from arrangements, including debt obligations, that carry the right to participate in, or are determined with reference to, profits of the issuer or one of its associated enterprises, as defined in subparagraph (a) or (b) of paragraph 1 of Article 9 (Associated Enterprises), to the extent that such income is characterized as a dividend under the law of the Contracting State in which the income arises. The term "dividend" shall not include income referred to in Article 16 (Directors' Fees).

(b) The provisions of this Article shall apply where a beneficial owner of dividends holds depository receipts evidencing ownership of the shares in respect of which the dividends are paid, in lieu of the shares themselves.

6. The provisions of paragraphs 1 through 4 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State of which the company paying the dividends is a resident through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such a case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

7.        (a) A company that is a resident of a Contracting State and that has a permanent establishment in the other Contracting State or that is subject to tax on a net basis in that other State on items of income that may be taxed in that other State under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) may be subject in that other State to a tax in addition to the other taxes allowable under this Convention. Such tax, however, may not exceed 5 percent of that portion of the business profits of the company attributable to the permanent establishment, or of that portion of the income referred to in the preceding sentence that is subject to tax under Article 6 or paragraph 1 of Article 13, that:

(i) in the case of the United States, represents the "dividend equivalent amount" of those profits or income, in accordance with the provisions of the Internal Revenue Code, as it may be amended from time to time without changing the general principle thereof;

(ii) in the case of France, is included in the base of the French withholding tax in accordance with the provisions of Article 115 "quinquies" of the French tax code (code general des impôts) or with any similar provisions which amend or replace the provisions of that Article.

(b) The taxes referred to in subparagraph (a) also shall apply to the portion of business profits, or of the income subject to tax under Article 6 (Real Property) or paragraph 1 of Article 13 (Capital Gains) that is referred to in subparagraph (a), which is attributable to a trade or business conducted in one Contracting State through a partnership or other entity treated as a pass-through entity or transparent entity under the laws of that State by a company that is a member of such partnership or entity and a resident of the other Contracting State.

8. Subject to the provisions of paragraph 7, where a company that is a resident of a Contracting State derives profits or income from the other Contracting State, that other State may not impose any tax on the dividends paid by the company, except insofar as such dividends are

Add14

paid to a resident of that other State or insofar as the dividends are attributable to a permanent establishment or fixed base situated in that other State, nor subject to the company's undistributed profits to a tax on the company's undistributed profits, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in such other State.

ARTICLE 11
Interest

1. Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. Notwithstanding the provisions of paragraph 1:

(a) interest arising in a Contracting State that is determined with reference to the profits of the issuer or of one of its associated enterprises, as defined in subparagraph (a) or (b) of paragraph 1 of Article 9 (Associated Enterprises), and paid to a resident of the other Contracting State may be taxed in that other State;

(b) however, such interest may also be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article 10 (Dividends).

3. The term "interest" means income from indebtedness of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds, or debentures, as well as other income that is treated as income from money lent by the taxation law of the Contracting State in which the income arises. However, the term "interest" does not include income dealt with in Article 10 (Dividends). Penalty charges for late payment shall not be regarded as interest for the purposes of the Convention.

4. The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State, in which the interest arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the interest is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

5. Interest shall be deemed to arise in a Contracting State when the payer is a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment or a fixed base in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment or fixed base, then such interest shall be deemed to arise in the State in which the permanent establishment or fixed base is situated.

6. Where, by reason of a special relationship between the payer and the beneficial owner or

Add15

between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount that would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

## ARTICLE 12
### Royalties

1. Royalties arising in a Contracting State and paid to a resident of the other contracting State may be taxed in that other State.

2. Such royalties may also be taxed in the Contracting State in which they arise and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the tax so charged shall not exceed 5 percent of the gross amount of the royalties.

3. Notwithstanding the provisions of paragraph 2, royalties described in subparagraph (a) of paragraph 4 that arise in a Contracting State and are beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

4. The term "royalties" means:
      (a) payments of any kind received as a consideration for the use of; or the right to use, any copyright of literary, artistic, or scientific work or any neighboring right (including reproduction rights and performing rights), any cinematographic film, any sound or picture recording, or any software;
      (b) payments of any kind received as a consideration for the use of; or the right to use, any patent, trademark, design or model, plan, secret formula or process, or other like right or property, or for information concerning industrial, commercial, or scientific experience; and
      (c) gains derived from the alienation of any such right or property described in this paragraph that are contingent on the productivity, use, or further alienation thereof.

5. The provisions of paragraphs 1, 2, and 3 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State, in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the royalties are attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

6.      (a) Royalties shall be deemed to arise in a Contracting State when the payer is a resident of that State.
      (b) Where, however, the person paying the royalties, whether he is a resident of a Contracting State or not, has in a Contracting State a permanent establishment or a fixed base in Connection with which the liability to pay the royalties was incurred, and such royalties are borne by such permanent establishment or fixed base, then such royalties

## Add16

shall be deemed to arise in the State in which the permanent establishment or fixed base is situated.

(c) Notwithstanding subparagraphs (a) and (b), royalties paid for the use of,; or the right to use, property in a Contracting State shall be deemed to arise therein.

(d) Royalties shall be deemed to be paid to the beneficial owner at the latest when they are taken into account as expenses for tax purposes in the Contracting State in which they arise.

7. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right, or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

ARTICLE 13
Capital Gains

1. Gains from the alienation of real property situated in a Contracting State may be taxed in that State.

2. For purposes of paragraph 1, the term "real property situated in a Contracting State" means:

(a) where the United States is the Contracting State, real property referred to in Article 6 (Real Property) that is situated in the United States, a United States real property interest (as defined in section 897 of the Internal Revenue Code, as it say be amended from time to time without changing the general principle thereof), and an interest in a partnership, trust, or estate, to the extent attributable to real property situated in the United States; and

(b) where France is the Contracting State,

(i) real property referred to in Article 6 (Real Property) that is situated in France; and

(ii) shares or similar rights in a company the assets of which consist at least 50 percent of real property situated in France or derive at least 50 percent of their value, directly or indirectly, from real property situated in France;

iii) an interest in a partnership, a "société de personnes", a "groupement d'intérêt économique" (economic interest group), or a "groupement européen d'intérêt économique" (European economic interest group) (other than a partnership, a "société de personnes", a "groupement d'intérêt économique" (economic interest group), or a "groupement européen d'intérêt économique" that is taxed as a company under French domestic law), an estate, or a trust, to the extent attributable to real property situated in France.

3.        (a) Gains from the alienation of movable property forming part of the business property of a permanent establishment or fixed base that an enterprise or resident of a Contracting State has in the other contracting State, including such gains from the

alienation of such permanent establishment (alone or with the whole enterprise) or of such fixed base, may be taxed in that other State. Where the removal of such property from the other Contracting State is deemed to constitute an alienation of such property, the gain that has accrued as of the time that such property is removed from that other State may be taxed by that other State in accordance with its law, and the gain accruing subsequent to that time of removal may be taxed in the first-mentioned Contracting State in accordance with its law.

(b) Any gain attributable to a permanent establishment or a fixed base according to the provisions of subparagraph (a) during its existence may be taxed in the Contracting State in which such permanent establishment or fixed base is situated, even if the payments are deferred until such permanent establishment or fixed base has ceased to exist.

4. Gains derived by an enterprise of a Contracting State that operates ships or aircraft in international traffic from the alienation of such ships or aircraft or movable property pertaining to the operation of such ships or aircraft shall be taxable only in that State.

5. Gains described in subparagraph (c) of paragraph 4 of Article 12 (Royalties) shall be taxable only in accordance with the provisions of Article 12.

6. Subject to the provisions of paragraph 5, gains from the alienation of any property other than property referred to in paragraphs 1 through 4 shall be taxable only in the Contracting State of which the alienator is a resident.

## ARTICLE 14
## Independent Personal Services

1. Income derived by a resident of a Contracting State in respect of professional services or other activities of an independent character shall be taxable only in that State unless that resident performs activities in the other Contracting State and has a fixed base regularly available to him in that other State for the purpose of performing his activities. In such a case, the income may be taxed in the other State, but only so much of it as is attributable to that fixed base, and according to the principles contained in Article 7 (Business Profits).

2. Any income attributable to a fixed base during its existence, according to the provisions of paragraph 1, may be taxed in the Contracting State in which such fixed base is situated, even if the payments are deferred until such fixed base has ceased to exist.

3. The term "professional services" includes especially independent scientific, literary, artistic, educational, or teaching activities as well as the independent activities of physicians, lawyers, engineers, architects, dentists, and accountants.

4. The provisions of paragraph 4 of Article 7 (Business Profits) shall apply by analogy. In no event, however, shall those provisions or the provisions of Article 4 (Resident) result in France exempting under Article 24 (Relief from Double Taxation) more than 50 percent of the earned income from partnership accruing to a resident of France. The amount of such a partner's income which is not exempt under Article 24 (Relief from Double Taxation) solely by reason of the

preceding sentence shall reduce the amount of partnership earned income from sources within France on which France can tax partners who are not residents of France.


## ARTICLE 15
### Dependent Personal Services

1. Subject to the provisions of Articles 16 (Directors' Fees), 18 (Pensions), and 19 (Public Remuneration), salaries, wages, and other similar remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

(a) the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any 12-month period commencing or ending in the taxable period concerned;

(b) the remuneration is paid by, or on behalf of; an employer who is not a resident of the other State; and

(c) the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State.

3. Notwithstanding the preceding provisions of this Article, remuneration derived by a resident of a Contracting State in respect of an employment exercised as a member of the regular complement of a ship or aircraft operated in international traffic shall be taxable only in that State.


## ARTICLE 16
### Directors' Fees

Directors' fees and other remuneration derived by a resident of a Contracting State for services rendered in the other Contracting State in his capacity as a member of the board of directors of a company that is a resident of the other Contracting State may be taxed in that other State.


## ARTICLE 17
### Artistes and Sportsmen

1. Notwithstanding the provisions of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services), income derived by a resident of a Contracting State as an entertainer, such as a theater, motion picture, radio, or television artiste or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State. However, the provisions of this paragraph shall not apply where the amount of the gross receipts derived by such entertainer or sportsman from such activities,

including expenses reimbursed to him or borne on his behalf, does not exceed 10,000 United States dollars or its equivalent in French francs for the taxable period concerned.

2. Where income in respect of personal activities exercised by an entertainer or sportsman in his capacity as such accrues not to the entertainer or sportsman but to another person, whether or not a resident of a Contracting State, that income may, notwithstanding the provisions of Articles 7 (Business Profits), 14 (Independent Personal Services), and 15 (Dependent Personal Services), be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised. However, the provisions of this paragraph shall not apply where it is established that neither the entertainer or sportsman nor persons related to him derive from that other person any income, directly or indirectly, in respect of such activities that in the aggregate exceeds the amount specified in paragraph 1 for the taxable period concerned.

3. The provisions of paragraphs 1 and 2 shall not apply to income derived by a resident of a Contracting State as an entertainer or a sportsman from his personal activities as such exercised in the other Contracting State if the visit to that other State is principally supported, directly or indirectly, by public funds of the first-mentioned State or a political subdivision (in the case of the United States) or local authority thereof. In such case the income shall be taxable only in the first-mentioned State.

## ARTICLE 18
### Pensions

1. Subject to the provisions of paragraph 2 of Article 19 (Public Remuneration):
   (a) except as provided in subparagraph (b), pensions and other similar remuneration, including distributions from pension and other retirement arrangements, derived and beneficially owned by a resident of a Contracting State in consideration of past employment, whether paid periodically or in a lump sum, shall be taxable only in that State:
   (b) pensions and other payments made under the social security legislation of a Contracting State to a resident of the other Contracting State shall be taxable only in the first-mentioned State. Pensions and other payments made under the social security legislation of France to a resident of the United States who is a citizen of the United States shall be taxable only in France. The term "social security legislation" includes the Railroad Retirement Act in the case of the United States and the French social security regimes which are of a mandatory character.

2.        (a) In determining the taxable income of an individual who renders personal services and who is a resident of a Contracting State but not a national of that State, contributions paid by, or on behalf of, such individual to a pension or other retirement arrangement that is established and maintained and recognized for tax purposes in the other Contracting State shall be treated in the same way for tax purposes in the first-mentioned State as a contribution paid to a pension or other retirement arrangement that is established and maintained and recognized for tax purposes in that first-mentioned State, provided that the competent authority of the first-mentioned State agrees that the pension or other retirement arrangement generally corresponds to a pension or other retirement arrangement recognized for tax purposes by that State.

(b) For the purposes of subparagraph (a):

(i) where the competent authority of France agrees that a United States pension or other retirement arrangement generally corresponds to a mandatory French pension arrangement (without regard to the mandatory nature of such arrangement), it is understood that contributions to the United States pension or other retirement arrangement shall be treated in France in the same way for tax purposes as contributions to the French mandatory pension arrangement; and

(ii) where the competent authority of the United States agrees that a mandatory French pension or other retirement arrangement generally corresponds to a United States pension or other retirement arrangement (without regard to the mandatory nature of such arrangement), it is understood that contributions to the French pension or other retirement arrangement shall be treated in the United States in the same way for tax purposes as contributions to the United States pension or other retirement arrangement; and

(iii) a pension or other retirement arrangement is recognized for tax purposes in a State if the contributions to the arrangement would qualify for tax relief in that State.

(c) Payments received by a beneficiary in respect of an arrangement referred to in subparagraph (a) that satisfies the requirements of this paragraph shall be included in income for tax purposes of the Contracting State of which the beneficiary is a resident, subject to the provisions of Article 24 (Relief from Double Taxation), when and to the extent that such payments are considered gross income by the other Contracting State.

ARTICLE 19
Public Remuneration

1.        (a) Remuneration, other than a pension, paid by a Contracting State, a political subdivision (in the case of the United States) or local authority thereof; or an agency or instrumentality of that State, subdivision, or authority to an individual in respect of services rendered to that State, subdivision, authority, agency, or instrumentality shall be taxable only in that State.

(b) However, such remuneration shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of and a national of that State and not at the same time a national of the first-mentioned State.

2.        (a) Any pension paid by, or out of funds created by, a Contracting State, a political subdivision (in the case of the United States) or local authority thereof; or an agency or instrumentality of that State, subdivision, or authority to an individual in respect of services rendered to that State, subdivision, authority, agency, or instrumentality shall be taxable only in that State.

(b) However, such pension shall be taxable only in the other Contracting State if the individual is a resident of and national of that State and not at the same time a national of the first-mentioned State.

3. The provisions of Article 4 (Independent Personal Services), 15 (Dependent Personal Services), 16 (Directors' Fees, 17 (Artistes and Sportsmen) , and 18 (Pensions) shall apply to remuneration and pensions paid in respect of services rendered in connection with a business

**Add21**

carried on by a Contracting State, a political subdivision (in the case of the United States) or local authority thereof, or an agency or instrumentality of that State, subdivision, or authority.

ARTICLE 20
Teachers and Researchers

1. An individual who is a resident of a Contracting State immediately before his visit to the other Contracting State and who, at the invitation of the Government of that other State or of a university or other recognized educational or research institution situated in that other State, visits that other State for the primary purpose of teaching or engaging in research, or both, at a university or other recognized educational or research institution shall be taxable only in the first-mentioned State on his income from personal services for such teaching or research for a period not exceeding 2 years from the date of his arrival in the other State. An individual shall be entitled to the benefits of this paragraph only once.

2. The provisions of paragraph 1 shall not apply to income from research if such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

ARTICLE 21
Students and Trainees

1.       (a) An individual who is a resident of a Contracting State immediately before his visit to the other Contracting State and who is temporarily present in the other Contracting State for the primary purpose of:
        (i) studying at a university or other recognized educational institution in that other Contracting State;
        (ii) securing training required to qualify him to practice a profession or professional specialty; or
        (iii) studying or doing research as a recipient of a grant, allowance, or award from a not-for-profit governmental, religious, charitable, scientific, artistic, cultural, or educational organization,
shall be exempt from tax in that other State with respect to amounts referred to in subparagraph (b).
        (b) The amounts referred to in subparagraph (a) are:
        (i) gifts from abroad for the purposes of his maintenance, education, study, research, or training;
        (ii) a grant, allowance, or award described in subparagraph (a) (iii); and
        (iii) income from personal services performed in the other Contracting State in an amount not in excess of 5,000 United States dollars or its equivalent in French francs for any taxable period.
        (c) The benefits of this paragraph shall only extend for such period of time as may be reasonably or customarily required to effectuate the purpose of the visit, but in no event shall any individual have the benefits of this Article and Article 20 (Teachers and Researchers) for more than a total of five taxable periods.
        (d) The provisions of subparagraph (a) shall not apply to income from research if

such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

2. An individual who is a resident of a Contracting State immediately before his visit to the other Contracting State, and who is temporarily present in that other State as an employee of, or under contract with, a resident of the first-mentioned State for the primary purpose of:

(a) acquiring technical, professional, or business experience from a person other than that resident of the first-mentioned State, or

(b) studying at a university or other recognized educational institution in the other State,

shall be exempt from tax by that other State for a period of 12 consecutive months with respect to his income from personal services in an aggregate amount not in excess of 8,000 United States dollars or its equivalent in French francs.

ARTICLE 22
Other Income

1. Items of income of a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this convention shall be taxable only in that State.

2. The provisions of paragraph 1 shall not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from Real Property), if the recipient of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the right or property in respect of which the income is paid is effectively connected with such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

ARTICLE 23
Capital

1.        (a) Capital represented by real property referred to in Article 6 (Income from Real Property) and situated in a Contracting State may be taxed in that State.

(b) Capital represented by shares, rights, or an interest in a company the assets of which consist at least 50 percent of real property situated in a Contracting State, or derive at least 50 percent of their value, directly or indirectly, from real property situated in a Contracting State, may be taxed in that State.

(c) If and to the extent that the assets of a person other than an individual or a company consist of real property situated in a Contracting State, or derive their value, directly or indirectly, from real property situated in a Contracting State, capital represented by an interest in such person may be taxed in that State.

2. Capital of an individual represented by shares, rights, or an interest (other than shares, rights, or an interest referred to in subparagraph (b) or (c) of paragraph 1) forming part of a substantial interest in a company that is a resident of a Contracting State may be taxed in that

State. An individual is considered to have a substantial interest if he or she owns, alone or with related persons, directly or indirectly, shares, rights, or interests the total of which gives right to at least 25 percent of the corporate earnings.

3. Capital represented by movable property forming part of the business property of a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or by movable property pertaining to a fixed base that is available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services may be taxed in that other State.

4. Capital of an enterprise of a Contracting State that operates ships or aircraft in international traffic represented by such ships or aircraft and movable property pertaining to the operation of such ships or aircraft shall be taxable only in that State.

5. All other elements of capital of a resident of a Contracting State are taxable only in that State.

6. Notwithstanding the provisions of the preceding paragraphs of this Article, for the purposes of taxation with respect to the wealth tax referred to in subparagraph (b) (iv) of paragraph 1 of Article 2 (Taxes Covered) of an enterprise individual resident of France who is a citizen of the United States and not a French national, the assets situated outside of France that such a person owns on the first of January of each of the five years following the calendar year in which he becomes a resident of France shall be excluded from the base of assessment of the above-mentioned wealth tax relating to each of those five years. If such an individual loses the status of resident of France for a duration of at least three years and again becomes a resident of France, the assets situated outside of France that such a person owns on the first of January of each of the five years following the calender year in which he again becomes a resident of France shall be excluded from the base of assessment of the tax relating to each of those five years.


ARTICLE 24
Relief From Double Taxation

1.         (a) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States as a credit against the United States income tax:

(i) the French income tax paid by or on behalf of such citizen or resident; and

(ii) in the case of a United States company owning at least 10 percent of the voting power of a company that is a resident of France and from which the United States company receives dividends, the French income tax paid by or on behalf of the distributing corporation with respect to the profits out of which the dividends are paid.

(b) In the case of an individual who is both a resident of France and a citizen of the United States:

(i) the United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph

(a) (iii) of paragraph 2. However, the credit so allowed against United States income tax shall not reduce that portion of the United States income tax that is creditable against French income tax in accordance with subparagraph (a) (iii) of paragraph 2;

(ii) income referred to in paragraph 2 and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b) (i). The provisions of this subparagraph (b) (ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. No provision of this subparagraph (b) relating to source of income shall apply in determining credits against United States income tax for foreign taxes other than French income tax as defined in subparagraph (e) ; and

(c) In the case of an individual who is both a resident and citizen of the United States and a national of France, the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions) shall apply to remuneration and pensions described in paragraph 1 or 2 of Article 19 (Public Remuneration) , but such remuneration and pensions shall be treated by the United States as income from sources within France.

(d) If, for any taxable period, a partnership of which an individual member is a resident of France so elects, for United States tax purposes, any income which solely by reason of paragraph 4 of Article 14 is not exempt from French tax under this Article shall be considered income from sources within France. The amount of such income shall reduce (but not below zero) the amount of partnership earned income from sources outside the United States that would otherwise be allocated to partners who are not residents of France. For this purpose, the reduction shall apply first to income from sources within France and then to other income from sources outside the United States. If the individual member of the partnership is both a resident of France and a citizen of the United States, this provision shall not result in a reduction of United States tax below that which the taxpayer would have incurred without the benefit of deductions or exclusions available solely by reason of his presence or residence outside the United States.

(e) For the purposes of this Article, the term "French income tax" means the taxes referred to in subparagraph (b) (i) or (ii) of paragraph 1 of Article 2 (Taxes Covered), and any identical or substantially similar taxes that are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes.

2. In the case of France, double taxation shall be avoided in the following manner.

(a) Income arising in the United States that may be taxed or shall be taxable only in the United States in accordance with the provision of this Convention shall be taken into account for the computation of the French tax where the beneficiary of such income is a resident of France and where such income is not exempted from company tax according to French domestic law. In that case, the United States tax shall not be deductible from such income, but the beneficiary shall be entitled to a tax credit against the French tax. Such credit shall be equal:

(i) in the case of income other than that referred to in subparagraphs (ii) and (iii), to the amount of French tax attributable to such income;

(ii) in the case of income referred to in Article 14 (Independent Personal Services), to the amount of French tax attributable to such income; however, in the case referred to in paragraph 4 of Article 14 (Independent Personal Services),

such credit shall not give rise to an exemption that exceeds the limit specified in that paragraph;

(iii) in the case of income referred to in Article 10 (Dividends), Article 11 (Interest), Article 12 (Royalties), paragraph 1 of Article 13 (Capital Gains), Article 16 (Directors' Fees), and Article 17 (Artistes and Sportsmen), to the amount of tax paid in the United States in accordance with the provisions of the Convention; however, such credit shall not exceed the amount of French tax attributable to such income.

(b) In the case where the beneficial owner of the income arising in the United States is an individual who is both a resident of France and a citizen of the United States, the credit provided in paragraph 2 (a) (i) shall also be granted in the case of:

(i) income consisting of dividends paid by a company that is a resident of the United States, interest arising in the United States, as described in paragraph 5 of Article 11 (Interest), or royalties arising in the United States, as described in paragraph 6 of Article 12 (Royalties), that is derived and beneficially owned by such individual and that is paid by:

(aa) the United States or any political subdivision or local authority thereof; or

(bb) a person created or organized under the laws of a state of the United States or the District of Columbia, the principal class of shares of or interests in which is substantially and regularly traded on a recognized stock exchange as defined in subparagraph (e) of paragraph 6 of Article 30 (Limitation on Benefits of the Convention) or

(cc) a company that is a resident of the United States, provided that less than 10 percent of the outstanding shares of the voting power in such company was owned (directly or indirectly) by the resident of France at all times during the part of such company's taxable period preceding the date of payment of the income to the owner of the income and during the prior taxable period (if any) of such company, and provided that less than 50 percent of such voting power was owned (either directly or indirectly) by residents of France during the same period; or

(dd) a resident of the United States, not more than 25 percent of the gross income of which for the prior taxable period (if any) consisted directly or indirectly of income derived from sources outside the United States;

(ii) capital gains derived from the alienation of capital assets generating income described in subparagraph (i); however, such alienation shall be taken into account for the determination of the threshold of taxation applicable in France to capital gains on movable property;

(iii) profits or gains derived from transactions on a public United States options or futures market;

(iv) income dealt with in subparagraph (a) of paragraph 1 of Article 18 (Pensions) to the extent attributable to services performed by the beneficiary of such income while his principal place of employment was in the United States;

(v) income that would be exempt from United States tax under Articles 20 (Teachers and Researchers) or 21 (Students and Trainees) if the individual were not a citizen of the United States; and

(vi) U.S. source alimony and annuities. The provisions of this

subparagraph (b) shall apply only if the citizen of the United States who is a resident of France demonstrates that he has complied with his United States income tax obligations, and subject to receipt by the French tax administration of such certification as may be prescribed by the competent authority of France, or upon request to the French tax administration for refund of tax withheld together with the presentation of any certification required by the competent authority of France.

(c) A resident of France who owns capital that may be taxed in the United States according to the provisions of paragraph 1, 2, or 3 of Article 23 (Capital) may also be taxed in France in respect of such capital. The French tax shall be computed by allowing a tax credit equal to the amount of tax paid in the United States on such capital. That tax credit shall not exceed the amount of the French tax attributable to such capital.

(d)    (i) For purposes of this paragraph, the term "resident of France" includes a "société de personnes," a "groupement d'intérêt économique" (economic interest group), or a "groupement européen d'intérêt économique" (European economic interest group} that is constituted in France and has its place of effective management in France.

(ii) The term "amount of French tax attributable to such income" as used in subparagraph (a) means:

(aa) where the tax on such income is computed by applying a proportional rate, the amount of the net income concerned multiplied by the rate which actually applies to that income;

(bb) where the tax on such income is computed by applying a progressive scale, the amount of the net income concerned multiplied by the rate resulting from the ratio of the French income tax actually payable on the total net income in accordance with French law to the amount of that total net income.

(iii) The term "amount of tax paid in the United States" as used in subparagraph (a) means the amount of the United States income tax effectively and definitively borne in respect of the items of income concerned, in accordance with the provisions of the Convention, by the beneficial owner thereof who is a resident of France. But this term shall not include the amount of tax that the United States may levy under the provisions of paragraph 2 of Article 29 (Miscellaneous Provisions).

(iv) The interpretation of subparagraphs (ii) and (iii) shall apply, by analogy, to the terms "amount of the French tax attributable to such capital" and "amount of tax paid in the United States," as used in subparagraph (c).

(e)    (i) Where French domestic law allows companies that are residents of France to determine their taxable profits on a consolidation basis, including the profits or losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States, the provisions of the Convention shall not prevent the application of that law.

(ii) Where in accordance with its domestic law, France, in determining the taxable profits of residents, permits the deduction of the losses of subsidiaries that are residents of the United States or of permanent establishments situated in the United States and includes the profits of those subsidiaries or of those permanent establishments up to the amount of the losses so deducted, the provisions of the Convention shall not prevent the application of that law.

(iii) Nothing in the Convention shall prevent France from applying the

provisions of Article 209B of its tax code (code général des impôts) or any substantially similar provisions which may amend or replace the provisions of that Article.

ARTICLE *25*
Non-Discrimination

1. Individuals who are nationals of a Contracting State and residents of the other Contracting State shall not be subjected in that other State to any taxation or any requirement connected therewith that is other or more burdensome than the taxation and connected requirements to which individuals who are nationals and residents of that other State in the same circumstances are or may be subjected.

2. The taxation on a permanent establishment that an enterprise of a Contracting State has in the other Contracting State shall not be less favorably levied in that other State than the taxation levied on enterprises of that other State carrying on the same activities. This provision shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities that it grants to its own residents. The provisions of this paragraph shall not prevent the application by either Contracting State of the taxes described in paragraph 7 of Article 10 (Dividends).

3.          (a) Except where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 6 of Article 11 (Interest), or paragraph 7 of Article 12 (Royalties) apply, interest, royalties, and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable capital of such enterprise, be deductible under the same conditions as if they had been contracted a resident of the first-mentioned State.
          (b) Nothing in this Convention shall prevent the application of Article 212 of the French tax code (code général des impôts) as it may be amended from time to time without changing the general principle thereof or of any substantially similar provisions which may be enacted in addition to or in substitution for that provision (including provisions substantially similar to those applicable in the other Contracting State), to the extent that such application is consistent with the principles of paragraph 1 of Article 9 (Associated Enterprises).

4. Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

5. The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes Covered), apply to taxes of every kind and description imposed by a Contracting State or a

political subdivision (in the case of the United States) or local authority thereof.

ARTICLE 26
Mutual Agreement Procedure

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case to the competent authority of the Contracting State of which he is a resident or national. The case must be presented within three years of the notification of the action resulting in taxation not in accordance with the provisions of this Convention.

2. The competent authority shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits or other procedural limitations in the domestic law of the Contracting States.

3. The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising to the interpretation or application of the Convention. In particular, they may agree:
      (a) to the same attribution of profits to a resident of a Contracting State and its permanent establishment situated in the other Contracting State;
      (b) to the same allocation of income between a resident of a Contracting State and any associated enterprise described in paragraph 1 of Article 9 (Associated Enterprises);
      (c) to the same determination of the source of particular items of income;
      (d) concerning the matters described in subparagraphs (a), (b), and (c) of this paragraph with respect to past or future years; or
      (e) to increase the money amounts referred to in Articles 17 (Artistes and Sportsmen) and 21 (Students and Trainees) to reflect economic or monetary developments.
They may also agree to eliminate double taxation in cases not provided for in the Convention.

4. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs. When it seems advisable for the purpose of reaching agreement, the competent authorities or their representatives may meet together for an oral exchange of opinions.

5. If an agreement cannot be reached by the competent authorities pursuant to the previous paragraphs of this Article, the case may, if both competent authorities and the taxpayer agree, be submitted for arbitration, provided that the taxpayer agrees in writing to be bound by the decision of the arbitration board. The competent authorities may release to the arbitration board such information as is necessary for carrying out the arbitration procedure. The decision of the arbitration board shall be binding on the taxpayer and on both States with respect to that case. The procedures, including the composition of the board, shall be established between the Contracting States by notes to be exchanged through diplomatic channels afier consultation between the competent authorities. The provisions of this paragraph shall not have effect until

the date specified in the exchange of diplomatic notes.


ARTICLE 27
Exchange of Information


1. The competent authorities of the Contracting States shall exchange such information as is pertinent for carrying out the provisions of this Convention and of the domestic laws of the Contracting States concerning taxes covered by this Convention insofar as the taxation thereunder is not contrary to this Convention. The exchange of information is not restricted by Article 1 (Personal Scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of or the determination of appeals in relation to, the taxes covered by this Convention. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions.

2. In no case shall the provisions of paragraph 1 be construed so as to impose on a Contracting State the obligation:

(a) to carry out administrative measures at variance with the laws or the administrative practice of that or of the other Contracting State;

(b) to supply particulars that are not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

(c) to supply information that would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information, the disclosure of which would be contrary to public policy (ordre public).

3. The exchange of information shall be on request with reference to particular cases, or spontaneous, or on a routine basis. The competent authorities of the Contracting States shall agree on the list of information which shall be furnished on a routine basis.

4. (a) If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall obtain the information to which the request relates in the same manner and to the same extent as if its own taxation were involved, notwithstanding the fact that the other State may not, at that time, need such information for purposes of its own tax.

(b) If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall, if possible, provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of that other State with respect to its own taxes.

(c) A Contracting State shall allow representatives of the other Contracting State to enter the first-mentioned State to interview taxpayers and look at and copy their books and records, but only after obtaining the consent of those taxpayers and the competent authority of the first-mentioned State (who may be present or represented, if desired), and only if the two Contracting States agree, in an exchange of diplomatic notes, to allow such inquiries on a reciprocal basis. Such inquiries shall not be considered audits for

purposes of French domestic law.

5. Notwithstanding the provisions of Article 2 (Taxes Covered), all taxes imposed on behalf of a Contracting State shall be considered as taxes covered by the Convention for purposes of this Article.

## ARTICLE 28
### Assistance in Collection

1. The Contracting States undertake to lend assistance and support to each other in the collection of the taxes to which this Convention applies (together with interest, costs, and additions to the taxes and fines not being of a penal character) in cases where the taxes are definitively due according to the laws of the State making the application.

2. Revenue claims of each of the Contracting States which have been finally determined will be accepted for enforcement by the State to which application is made and collected in that State in accordance with the laws applicable to the enforcement and collection of its own taxes.

3. The application will be accompanied by such documents as are required by the laws of the State making the application to establish that the taxes have been finally determined.

4. If the revenue claim has not been finally determined, the State to which application is made will take such measures of conservancy (including measures with respect to transfer of property of nonresident aliens) as are authorized by its laws for the enforcement of its own taxes.

5. The assistance provided for in this Article shall not be accorded with respect to citizens, companies, or other entities of the Contracting State to which application is made except in cases where the exemption from or reduction of tax or the payment of tax credits provided for in paragraph 4 of Article 10 (Dividends) granted under the Convention to such citizens, companies, or other entities has, according to mutual agreement between the competent authorities of the Contracting States, been enjoyed by persons not entitled to such benefits.

## ARTICLE 29
### Miscellaneous Provisions

1. The Convention shall not restrict in any manner any exclusion, exemption, deduction, credit, or other allowance now or hereafter accorded by
    (a) the laws of:
        (i) the United States;
        (ii) France, in the case of a resident (within the meaning of Article 4 (Resident)) or citizen of the United States. However, notwithstanding the preceding sentence, the provisions of paragraph 5 of Article 6 (Income from Real Property), Article 19 (Public Remuneration), Article 20 (Teachers and Researchers), and Article 24 (Relief from Double Taxation) shall apply, regardless of any exclusion, exemption, deduction, credit, or other allowance accorded by the laws of France; or

## Add31

(b) by any other agreement between the Contracting States.

2. Notwithstanding any provision of the Convention except the provisions of paragraph 3, the United States may tax its residents, as determined under Article 4 (Resident), and its citizens as if the Convention had not come into effect. For this purpose, the term citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss.

3. The provisions of paragraph 2 shall not affect:
>        (a) the benefits conferred under paragraph 2 of Article 9 (Associated Enterprises), under paragraph 1(b) of Article 18 (Pensions), and under Articles 24 (Relief From Double Taxation), 25 (Non-Discrimination), and 26 (Mutual Agreement Procedure); and
>        (b) the benefits conferred under Articles 19 (Public Remuneration), 20 (Teachers and Researchers), 21 (Students and Trainees) and 31 (Diplomatic and Consular Officers), upon individuals who are neither citizens of; nor have immigrant status in, the United States.

4. Notwithstanding the provisions of Article 2 (Taxes Covered), any transaction in which an order for the purchase, sale, or exchange of stocks or securities originates in one Contracting State and is executed through a stock exchange in the other Contracting State shall be exempt in the first-mentioned State from stamp or like tax otherwise arising with respect to such transaction.

5. A resident of a Contracting State that maintains one or several abodes in the other Contracting State shall not be subject in that other State to an income tax according to an "imputed income" based on the rental value of that or those abodes.

6. Nothing in this Convention shall affect the U.S. taxation of an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit under section 860G of the Internal Revenue Code, as it may be amended from time to time without changing the general principle thereof.

7. For purposes of the taxation by France of residents of France who are citizens of the United States:
>        (a) benefits other than capital gain received by reason of the exercise of options with respect to shares of companies resident in the United States shall be considered income when and to the extent that the exercise of the option or disposition of the stock gives rise to ordinary income for United States tax purposes;
>        (b) United States state and local income taxes on income from personal services and any other business income (except income that is exempt under subparagraph 2(a) (i) or (ii) of Article 24 (Relief from Double Taxation)) shall be allowed as business expenses.

8. Notwithstanding the provisions of subparagraph 1(b):
>        (a) Notwithstanding any other agreement to which the Contracting States may be parties, a dispute concerning whether a measure is within the scope of this Convention shall be considered only by the competent authorities of the Contracting States, as defined in subparagraph 1(h) of Article 3 (General Definitions) of this Convention, and the

procedures under this Convention exclusively shall apply to the dispute.

(b) Unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the non-discrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade. No national treatment or most-favored-nation obligation under any other agreement shall apply with respect to that measure.

(c) For the purpose of this paragraph, a "measure" is a law, regulation, rule, procedure, decision, administrative action, or any other form of measure.

ARTICLE 30
Limitation on Benefits of the Convention

1. A resident of a Contracting State that derives income from the other Contracting State shall be entitled in that other State to all of the benefits of this Convention only if such resident is one of the following:

(a) an individual;

(b) a Contracting State, a political subdivision (in the case of the United States) or local authority thereof, or an agency or instrumentality of that State, subdivision, or authority;

(c) a company meeting one of the following conditions:

(i) the principal class of its shares is listed on a recognized securities exchange located in either Contracting State and is substantially and regularly traded on one or more recognized securities exchanges;

(ii) more than 50 percent of the aggregate vote and value of its shares is owned, directly or indirectly, by any combination of companies that are resident in either Contracting State, the principal classes of the shares of which are listed and traded as described in subparagraph (c) (i), persons referred to in subparagraph (b), and companies of which more than 50 percent of the aggregate vote and value of their shares is owned by persons referred to in subparagraph (b);

(iii)    (aa) at least 30 percent of the aggregate vote and value of its shares is owned, directly or indirectly, by any combination of companies that are resident in the first-mentioned Contracting State, the principal classes of the shares of which are listed and traded as described in subparagraph (c) (i), persons referred to in subparagraph (b), and companies of which more than 50 percent of the aggregate vote and value of their shares is owed by persons referred to in subparagraph (b); and

(bb) at least 70 percent of the aggregate vote and value of its shares is owned, directly or indirectly, by any combination of companies that are residents of either Contracting State or of one or more member states of the European Union, the principal classes of shares of which are listed and substantially and regularly traded on one or more recognized stock exchanges, persons referred to in subparagraph (b), companies of which more than 50 percent of the aggregate vote and value of their shares is owned by persons referred to in subparagraph (b), one or more member states of the European Union, political subdivisions or local authorities thereof, or agencies or instrumentalities of those member states,

subdivisions, or authorities, and companies of which more than 50 percent of the aggregate vote and value of their shares is owned by such member states, subdivisions, authorities, or agencies or instrumentalities;

(d) a person, if 50 percent or more of the beneficial interest in such person (or, in the case of a company, 50 percent or more of the vote and value of the company's shares) is not owned, directly or indirectly, by persons that are not qualified persons, and:

(i) less than 50 percent of the gross income of such person is used, directly or indirectly, to make deductible payments to persons that are not qualified persons; or

(ii) less than 70 percent of such gross income is used, directly or indirectly, to make deductible payments to persons that are not qualified persons and less then 30 percent of such gross income is used, directly or indirectly, to make deductible payments to persons that are neither qualified persons nor residents of member states of the European Union;

(e) a pension trust or an organization referred to in subparagraph (b) (ii) of paragraph 2 of Article 4 (Resident), provided that more than half of its beneficiaries, members, or participants, if any, are qualified persons; or

(f) an investment entity referred to in subparagraph (b) (iii) of paragraph 2 of Article 4 (Residence) provided that more than half of the shares, rights, or interests in such entity is owned by qualified parsons.

2.  (a) A resident of a Contracting State shall also be entitled to the benefits of the Convention with respect to income derived from the other Contracting State if:

(i) such resident is engaged in the active conduct of a trade or business in the first-mentioned State (other than the business of making or managing investments, unless the activities are banking or insurance activities carried on by a bank or insurance company);

(ii) the income is connected with or incidental to the trade or business in the first-mentioned State; and

(iii) the trade or business is substantial in relation to the activity in the other State that generated the income.

(b) For purposes of subparagraph (a), whether the trade or business of the resident in the first-mentioned State is substantial in relation to the activity in the other State will be determined based on all of the facts and circumstances. In any case, however, the trade or business will be deemed substantial if, for the first preceding taxable period or for the average of the three preceding taxable periods, each of the following ratios equals at least 7.5 percent and the average of the ratios exceeds 10 percent:

(i) the ratio of the value of assets used or held for use in the conduct of the trade or business of the resident in the first-mentioned State to the value of assets used or held for use in the conduct of the activity in the other State;

(ii) the ratio of the gross income derived from the conduct of the trade or business of the resident in the first-mentioned State to the gross income derived from the conduct of the activity in the other States;

(iii) the ratio of the payroll expense of the trade or business of the resident in the first-mentioned State for services performed in that State to the payroll expense of the activity in the other State for services performed in that other State.

In determining the above ratios, assets, income, and payroll expense shall be taken into account only to the extent of the resident's direct or indirect ownership interest in the activity in the other

State. If neither the resident nor any of its associated enterprises has an ownership interest in the activity in the other State, the resident's trade or business in the first-mentioned State shall be considered substantial in relation to such activity.

3. A resident of a Contracting State shall also be entitled to the benefits of this Convention if that resident functions as a headquarter company for a multinational corporate group.

4. A company resident in a Contracting State shall also be entitled to the benefits of the Convention in respect of income referred to in Articles 10 (Dividends), 11 (Interest), or 12 (Royalties) if:

    (a) more than 30 percent of the aggregate vote and value of all of its shares is owned, directly or indirectly, by qualified persons resident in that State;

    (b) more than 70 percent of all such shares is owned, directly or indirectly, by any combination of one or more qualified persons and persons that are residents of member states of the European Union; and

    (c) such company meets the base reduction test described in subparagraphs (d) (i) and (ii) of paragraph 1.

5. Notwithstanding the provisions of paragraphs 1 through 4, where an enterprise of a Contracting State that is exempt from tax in that State on the profits of its permanent establishments which are not situated in that State derives income from the other Contracting State, and that income is attributable to a permanent establishment which that enterprise has in a third jurisdiction, the tax benefits that would otherwise apply under the other provisions of the Convention will not apply to any item of income on which the combined tax in the first-mentioned State and in the third jurisdiction is less than 60 percent of the tax that would be imposed in the first-mentioned State if the income were earned in that State by the enterprise and were not attributable to the permanent establishment in the third jurisdiction. Any dividends, interest, or royalties to which the provisions of this paragraph apply shall be subject to tax in the other State at a rate not exceeding 15 percent of the gross amount thereof. Any other income to which the provisions of this paragraph apply shall be subject to tax under the provisions of the domestic law of the other Contracting State, notwithstanding any other provision of the Convention. The provisions of this paragraph shall not apply if:

    (a) the income derived from the other Contracting State is in connection with or incidental to the active conduct of a trade or business carried on by the permanent establishment in the third jurisdiction (other than the business of making or managing investments unless these activities are banking or insurance activities carried on by a bank or insurance company); or

    (b) when France is the first-mentioned State, France taxes the profits of such permanent establishment according to the provisions of its domestic law referred to in subparagraph (e) (iii) of paragraph 2 of Article 24 (Relief from Double Taxation) or the United States taxes such profits according to the provisions of subpart F of part II of sub-chapter N of chapter 1 of subtitle A of the Internal Revenue Code, as it may be amended from time to time without changing the general principle thereof.

6. The following definitions shall apply for purposes of this Article:

    (a) The reference in subparagraphs (c) (ii) and (c) (iii) of paragraph 1 to shares that are owned "directly or indirectly" shall mean that all companies in the chain of ownership must be residents of a Contracting State or of a member state of the European

Union, as defined in subparagraph (d) of paragraph 6.

(b) The term "gross income," as used in subparagraph (d) of paragraph 1, means gross income for the first taxable period preceding the current taxable period, provided that the amount of gross income for the first taxable period preceding the current taxable period shall be deemed to be no less than the average of the annual amounts of gross income for the four taxable periods preceding the current taxable period.

(c) The term "deductible payments" as used in subparagraph (d) of paragraph 1 includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident. Types of payments may be added to, or eliminated from, the exceptions mentioned in the preceding definition of "deductible payments" by mutual agreement of the competent authorities.

(d) The term "resident of a member state of the European Union," as used in paragraph 1, means a person that would be entitled to the benefits of a comprehensive income tax convention in force between any member state of the European Union and the Contracting State from which the benefits of this Convention are claimed, provided that if such convention does not contain a comprehensive Limitation on Benefits article (including provisions similar to those of subparagraphs (c) and (d) of paragraph 1 and paragraph 2 of this Article), the person would be entitled to the benefits of this Convention under the principles of paragraph 1 if such person were a resident of one of the Contracting States under Article 4 (Resident) of this Convention.

(e) The term "recognized securities exchange" as used in paragraph 1 means:

(i) the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange for purposes of the U.S. Securities Exchange Act of 1934;

(ii) the French stock exchanges controlled by the "Commission des opération bourse," and the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, London, Madrid, Milan, Sydney, Tokyo, and Toronto;

(iii) any other stock exchanges agreed upon by the competent authorities of both Contracting States.

(f) The term "qualified person" as used in paragraphs 1 and 4 means any person that is entitled to the benefits of the Convention under paragraph 1 or who is a citizen of the United States;

(g) the term "engaged in the active conduct of a trade or business" as used in paragraph 2 applies to a person that is directly so engaged or is a partner in a partnership that is so engaged, or is so engaged through one or more associated enterprises (wherever resident);

(h) the term "headquarter company" as used in paragraph 3 means a person fulfilling the following conditions:

(i) it provides in the Contracting State of which it is a resident a substantial portion of the overall supervision and administration of a multinational corporate group, which may include, but cannot be principally, group financing;

(ii) the corporate group consists of companies that are resident in, and engaged in an active business in, at least five countries, and the business activities carried on in each of the five countries (or five groupings of countries) generate at least 10 percent of the gross income of the group;

**Add36**

        (iii) the business activities carried on in any one country other than the Contracting State of which the headquarter company is a resident generate less then 50 percent of the gross income of the group;

        (iv) no more than 25 percent of its gross income is derived from the other State;

        (v) it has, and exercises, independent discretionary authority to carry out the functions referred to in subparagraph (i);

        (vi) it is subject to the same income taxation rules in the Contracting State of which it is a resident as persons described in paragraph 2; and

        (vii) the income derived in the other Contracting State either is derived in connection with, or is incidental to, the active business referred to in subparagraph (ii).

If the gross income requirements of subparagraph (ii), (iii), or (iv) of this paragraph are not fulfilled, they will be deemed to be fulfilled if the required ratios are met when calculated on the basis of the average gross income of the headquarters company and the average gross income of the group for the preceding four taxable periods.

    7. A resident of a Contracting State that is not entitled to the benefits of the Convention under the provisions of the preceding paragraphs of this Article shall, nevertheless, be granted the benefits of the Convention if the competent authority of the other Contracting State determines, upon such person's request,

        (a) that the establishment, acquisition, or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention, or

        (b) that it would not be appropriate, having regard to the purpose of this Article, to deny the benefits of the Convention to such person.

The competent authority of the other Contracting State shall consult with the competent authority of the first-mentioned State before denying the benefits of the Convention under this paragraph.

    8. The competent authorities of the Contracting States may consult together with a view to developing a commonly agreed application of the provisions of this Article.

## ARTICLE 31
### Diplomatic and Consular Officers

    1. Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.

    2. Notwithstanding the provisions of Article 4 (Resident), an individual who is a member of a diplomatic mission, consular post, or permanent mission of a Contracting State that is situated in the other Contracting State or in a third State shall be deemed for the purposes of the Convention to be a resident of the sending State if he is liable therein to the same obligations in relation to tax on his total income or capital as are residents of that State.

    3. The Convention shall not apply to international organizations, to organs or officials thereof, or to persons who are members of a diplomatic mission, consular post, or permanent

mission of a third State, who are present in a Contracting State and are not liable in either Contracting State to the same obligations in respect of taxes on income or on capital as are residents of that State.

# ARTICLE 32
## Provisions for Implementation

1. Notwithstanding the provisions of subparagraph 4 (i) of Article 10 (Dividends) and of paragraph 8 of Article 30 (Limitation on Benefits of the Convention), the competent authorities of the Contracting States may prescribe rules and procedures, jointly or separately, to determine the mode of application of the provisions of this Convention.

2. The requirements to which a resident of a Contracting State may be subjected in order to obtain in the other Contracting State the tax reductions, exemptions, or other advantages provided for by the Convention shall, unless otherwise settled, jointly or separately, by the competent authorities, include the presentation of a form providing the nature and the amount or value of the income or capital concerned, the residence of the taxpayer, and other relevant information. If so agreed by the competent authorities, the form shall include such certification by the tax administration of the first-mentioned State as may be prescribed by them.

# ARTICLE 33
## Entry Into Force

1. The Contracting States shall notify each other when their respective constitutional and statutory requirements for the entry into force of this Convention have been satisfied. The Convention shall enter into force on the date of receipt of the later of such notifications.

2. The provisions of the Convention shall have effect:
    (a) in respect of taxes withheld at source on dividends, interest, and royalties and the U.S. excise tax on insurance premiums paid to foreign insurers, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;
    (b) in respect of other taxes on income, for taxable periods beginning on or after the first day of January of the year following the year in which the Convention enters into force, and
    (c) in respect of taxes not mentioned in subparagraph (a) or (b), for taxes on taxable events occurring on or after the first day of January of the year following the year in which the Convention enters into force.

3. Notwithstanding the provisions of paragraph 2,
    (a) the provisions of subparagraph (e) of paragraph 4 of Article 10 (Dividends) and of Article 12 (Royalties) shall have effect for dividends and royalties paid or credited after the first day of January 1991;
    (b) The provisions of Article 26 shall apply in respect of cases presented to the competent authorities on or after the date of entry into force of the Convention.

4. The Convention Between the United States of America and the French Republic with Respect to Taxes on Income and Property, Signed on July 28, 1967 and Amended by Protocols of October 12, 1970, November 24, 1978, January 17, 1984 and June 16, 1988 and the exchanges of letters attached thereto shall cease to have effect from the date on which the provisions of this Convention become effective in accordance with the provisions of this Article.

## ARTICLE 34
### Termination

This Convention shall remain in force indefinitely. However, either Contracting State may terminate the Convention by giving notice of termination through diplomatic channels at least six months before the end of any calender year after the expiration of a period of five years from the date on which the Convention enters into force. In such event, the Convention shall cease to have effect:

(a) in respect of taxes withheld at source on dividends, interest, and royalties and the U.S. excise tax on insurance premiums paid to foreign insurers, for amounts paid or credited on or after the first day of January next following the expiration of the six-month period;

(b) in respect of other taxes on income, for taxable periods beginning on or after the first day of January next following the expiration of the six-month period; and

(c) in respect of taxes not described in subparagraph (a) or (b), for taxes on taxable events occurring on or after the first day of January of the year following the expiration of the six-month period.

DONE at Paris, this ___*31*<sup>st</sup>___ day of *August*, 1994, in duplicate, in the English and French languages, both texts being equally authentic.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA

FOR THE GOVERNMENT OF
FRENCH REPUBLIC

(s) Pamela Harriman

(s) Nicolas Sarkozy

## NOTES OF EXCHANGE

DEPARTMENT OF STATE
WASHINGTON

Excellency:

I have the honor to refer to the Income Tax Convention between the United States and France, signed today.

During the course of discussions leading to the development of the Convention, the United States and French delegations agreed that nothing in paragraph 5 of Article 11 (Interest) shall be understood to prevent or limit the application by a Contracting State of its internal law, or of its income tax treaty with a third State, with respect to interest paid by a permanent establishment

located in that Contracting State. The provisions of internal law referred to in the preceding sentence are, in the case of the United States, those provisions of the Internal Revenue Code that impose a tax on interest described in section 884(f)(1)(A) of such Code, and in the case of France articles 119 bis and 125 A of the code général des impôts.

The United States and French delegations further agreed that the term "business property," as used in paragraph 3 of Article 13 (Capital Gains) and paragraph 3 of Article 23 (Capital), has a narrower meaning in some cases than does the term "assets," as used in paragraph 2 of Article 13 and paragraph 1 of Article 23, not withstanding that the single French term "actif" is used throughout.

If this is in accord with your understanding, I would appreciate a confirmation from you to this effect. If so, this understanding and your reply agreeing to its terms shall constitute an integral part of the Convention.

Accept, Excellency, the renewed assurances of my highest consideration.

(s) Pamela Harriman
Embassy of the United States of America,
Paris, *31*st  *August 1994*


RÉPUBLIQUE FRANÇAISE
MINISTÈRE DU BUDGET

LE MINISTRE

Madame l'Ambassadeur,

J'ai l'honneur d'accuser réception de votre lettre de ce jour dont le texte est le suivant:

"Monsieur le Ministre,

J'ai l'honneur de me référer à Convention fiscale, signée ce jour, entre la France et les Etats-Unis.

Au cours des discussions qui ont abouti à la mise au point de cette Convention, les délégations de la France et des Etats-Unis sont convenues que rien dans le paragraphe 5 de son article 11 (Intérêts) ne peut être interprété comme empêchant ou limitant l'application par un Etat contractant de sa législation interne ou de sa convention fiscale avec un Etat tiers, en ce qui concerne les intérêts payés par un établissement stable situé dans cet Etat contractant à un résident d'un Etat tiers.

Les dispositions de la législation interne auxquelles se réfère la phrase précédente sont, dans le cas des Etats-Unis, les dispositions de l''Internal Revenue Code' relatives à l'imposition des intérêts définie à la section 884 (f)(1)(A) de ce code, et, dans le cas de la France, les articles 119 bis et 125 A du code général des impôts.

Les délégations des Etats-Unis et de la France sont convenues en outre que l'expression 'business property' employée au paragraphe 3 de l'article 13 (Gains en capital) et au paragraphe 3 de l'article 23 (Fortune) peut avoir un sens plus étroit que le terme 'assets' employé au paragraphe 2 de l'article 13 et au paragraphe 1 de l'article 23, bien que le terme français 'actif' soit utilisé dans tous les cas.

Je vous serais obligé de me confirmer que ce qui précède recueille votre agrément. Dans l'affirmative, cette lettre et votre réponse constitueront l'accord de nos deux Gouvernements sur ce point, accord qui fera partie intégrante de la Convention."

J'ai l'honneur de vous confirmer l'accord de mon Gouvernement sur ce qui précède.

Paris, le 31 *août   1994*

RÉPUBLIQUE FRANÇAISE
MINISTÈRE DU BUDGET

LE MINISTRE

Madame l'Ambassadeur,

Me référant à la Convention fiscale, signée ce jour, entre la France et les Etats-Unis, je souhaite, d'ordre de mon Gouvernement, vous proposer une position commune sur les deux points suivants.

En ce qui concerne le iv) du b) du paragraphe 2 de l'article 4 (Résident), dans la mesure où les associés ou membres d'une société de personnes, d'un groupement d'intérêt économique ou d'un groupement d'intérêt économique constitué en France, qui a son siège de direction effective en France et qui n'y est pas soumis à l'impôt sur les sociétés, sont des résidents d'un Etat tiers, l'assujettissement à l'impôt des Etats-Unis dans le cas de cette société de personnes ou de ce groupement est déterminé conformément à la convention fiscale en matière d'impôts sur le revenu, s'il en existe une, entre les Etats-Unis et cet Etat tiers, étant précisé que la société de personnes ou le groupement est traité comme un "partnership" aux fins de l'impôt des Etats-Unis pour l'octroi des avantages de cette convention avec l'Etat tiers.

En ce qui concerne l'application de l'article 8 (Navigation maritime et aérienne), nonobstant l'article 2 selon lequel la Convention ne s'applique qu'aux impôts nationaux des deux Etats, la France accepte que les entreprises des Etats-Unis qui exploitent des navires ou des aéronef en trafic international soient dégrevées d'office de la taxe professionnelle due en France à raison de cette exploitation, à condition que les entreprises de France qui exploitent des navires ou des aéronefs en trafic international ne soient pas soumises aux Etats-Unis, à raison de cette exploitation, aux impôts des Etats membres sur le revenu.

Je vous serais obligé de me confirmer que ce qui précède recueille l'agrément de votre Gouvernement. Dans l'affirmative, la présente lettre et votre réponse constitueront l'accord de nos deux Gouvernements sur ces points, accord qui fera partie intégrante de la Convention.

Paris , *le 31 août   1994*

# Add41

DEPARTMENT OF STATE
WASHINGTON

Excellency:

I have the honor to acknowledge receipt of your Note of  today's date which reads as follows:

"In connection with the Income Tax Convention between France and the United States, signed today, I should like, on behalf of my Government, to propose to you a common position with respect to the two following points.

With respect to the provisions of subparagraph 2 (b) (iv) of Article 4 (Resident), to the extent that the members of a "société de personnes," a "groupement d'intérêt économique" (economic interest group) or a "groupement européen d'intérêt économique" (European economic interest group) that is constituted in France and has its place of effective management in France and that is not subject to company tax therein are residents of a third State, the U.S. income tax liability in the case of such "société de personnes" or group shall be determined under the U.S. Income Tax Convention, if any, with that third State, it being understood that such "société de personnes" or group shall be treated as a partnership for the purposes of U.S. tax benefits under that Convention.

With respect to the application of Article 8 (Shipping and Air Transport), notwithstanding Article 2, under which the Convention applies only to taxes imposed by the national governments, France agrees that enterprises of the United States that operate ships or aircraft in international traffic shall be automatically relieved from the "taxe professionnelle" in France in respect of such operations, provided that enterprises of. France that operate ships or aircraft in international traffic are not subject to state income taxes in the United States in respect of such operations.

If this is in accord with your understanding, I would appreciate a confirmation from you to this effect. If so, this understanding and your reply agreeing to its terms shall constitute an integral part of the Convention."

I have the honor to confirm the agreement of my Government on the preceding points.


Accept, Excellency, the renewed assurances of my highest consideration.

(s) *Pamela Harriman*
Embassy of the United States of America, Paris,
*31 August 1994*

**Add42**

T.I.A.S. No. 9500 (U.S. Treaty), 30 U.S.T. 5109 (U.S. Treaty), 1979 WL 180199 (U.S. Treaty)

UNITED STATES OF AMERICA

France

**Double Taxation: Taxes on Income and Property**

Protocol, with exchange of notes, amending the convention of July 28, 1967, as amended.

Signed at Washington November 24, 1978;
Ratification advised by the Senate of the United States of America July 9, 1979;
Ratified by the President of the United States of America July 30, 1979;
Ratified by France August 1, 1979;
Ratifications exchanged at Paris September 27, 1979;
Proclaimed by the President of the United States of America October 20, 1979;
Entered into force October 27, 1979;
Effective January 1, 1979.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

**A PROCLAMATION**

PROTOCOL TO THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND THE FRENCH REPUBLIC WITH RESPECT TO TAXES ON INCOME AND PROPERTY OF JULY 28, 1967, AS AMENDED BY THE PROTOCOL OF OCTOBER 12, 1970

ARTICLE 1

"ARTICLE 7

Shipping and Air Transport

"Article 20

Social Security Payments

"Article 23

Relief from Double Taxation

ARTICLE 2

ARTICLE 3

[EXCHANGE OF NOTES]

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

Add43

### A PROCLAMATION

CONSIDERING THAT:

 **\*1**  The Protocol to the Convention between the United States of America and the French Republic with Respect to Taxes on Income and Property of July 28, 1967, as amended by the Protocol of October 12, 1970, was signed at Washington on November 24, 1978, together with a related exchange of notes, the texts of which are hereto annexed;

The Senate of the United States of America by its resolution of July 9, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Protocol and related exchange of notes;

The Protocol and related exchange of notes were ratified by the President of the United States of America on July 30, 1979, in pursuance of the advice and consent of the Senate, and was ratified on the part of the French Republic;

It is provided in Article 2 of the Protocol that the Protocol shall enter into force one month after the date of exchange of the instruments of ratification and have effectiveness as specified in Article 2;

The instruments of ratification of the Protocol were exchanged at Paris on September 27, 1979, and accordingly the Protocol, with related exchange of notes, enters into force on October 27, 1979, with effectiveness as specified in Article 2;

NOW, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Protocol with related exchange of notes, to the end that they shall be observed and fulfilled with good faith on and after October 27, 1979, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twentieth day of October in the year of our Lord one thousand nine hundred seventy-nine and of the Independence of the United States of America the two hundred fourth.


JIMMY CARTER
[SEAL]


By the President:

WARREN CHRISTOPHER
*Acting Secretary of State*

### PROTOCOL TO THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND THE FRENCH REPUBLIC WITH RESPECT TO TAXES ON INCOME AND PROPERTY OF JULY 28, 1967, AS AMENDED BY THE PROTOCOL OF OCTOBER 12, 1970

The President of the United States of America and the President of the French Republic, desiring to amend the Convention between the United States of America and the French Republic with respect to taxes on income and property of July 28, 1967, as amended by the Protocol of October 12, 1970,[1] have appointed for that purpose as their respective plenipotentiaries:

The President of the United States of America: The Honorable George S. Vest, Assistant Secretary of State for European Affairs, and

The President of the French Republic: His Excellency François de Laboulaye, Ambassador of France,

Add44

Who have agreed upon the following provisions.

## ARTICLE 1

1. In Article 1, paragraph (1) is replaced by the following:

"(1) The taxes which are the subject of the present Convention are:

(a) In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code and the excise tax on insurance premiums paid to foreign insurers. The excise tax imposed on insurance premiums paid to foreign insurers, however, is covered only to the extent that the foreign insurer does not reinsure such risks with a person not entitled to exemption from such tax under this or another convention.

(b) In the case of France:

(i) the income tax, the corporation tax, including any withholding tax, prepayment (précompte) or advance payment with respect to the aforesaid taxes; and

(ii) the tax on Stock Exchange transactions."

2. Article 2 is amended as follows:

(1) Subparagraph (1) (a) of Article 2 is replaced by:

"(a) The term 'United States' means the United States of America and, when used in a geographical sense, includes the States thereof and the District of Columbia. Such term also includes any area outside the States and the District of Columbia which is, in accordance with international law, an area within which the United States may exercise rights with respect to the natural resources of the seabed and sub-soil.

The term 'France' means the French Republic and, when used in a geographical sense, means the Republic. Such term also includes any area outside those departments which is, in accordance with international law, an area within which France may exercise rights with respect to the natural resources of the seabed and sub-soil."

(2) A new subparagraph (1) (e) is added, and the present subparagraph (1) (e) is renumbered (1) (f):

"(e) the term 'international traffic' means any transport by a ship or aircraft, except where such transport is solely between places in the other Contracting State."

3. Article 6 is amended by introducing the following new paragraph (4), the current paragraphs (4) and (5) becoming the new paragraphs (5) and (6):

"(4) A partner shall be considered to have realized income or incurred deductions to the extent of his ratable share of the profits or losses of the partnership. For this purpose, the character of any item of income or deduction accruing to a partner shall be determined as if it were realized or incurred from the same source and in the same manner as realized or incurred by the partnership. A partner will be considered to have realized or incurred a proportionate share of each item of income and deduction of the partnership, except to the extent that his share of the profits depends on the source of the income."

4. Article 7 is replaced by the following article:

### "ARTICLE 7

### Shipping and Air Transport

(1) Notwithstanding Articles 6 and 12:

(a) Where a resident of the United States derives income from the operation in international traffic of ships or aircraft, or gains from the sale, exchange or other disposition of ships or aircraft used in international traffic by such resident, such income or gains shall be taxable only in the United States.

(b) Where a resident of France derives income from the operation in international traffic of ships or aircraft, or gains from the sale, exchange or other disposition of ships or aircraft used in international traffic by such resident, such income or gains shall be taxable only in France.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add45**

(2) The provisions of this Article shall also apply to the proportionate share of income derived by a resident of a Contracting State from participation in a pool, a joint business or an international operating agency. The proportionate share shall be treated as derived directly from the operation in international traffic of ships or aircraft.

(3) In the case of a corporation, the provisions of paragraphs (1) and (2) shall apply only if more than 50 percent of the capital of such corporation is owned, directly or indirectly:

(a) by individuals who are residents of the Contracting State in which such corporation is resident or of a State with which the other Contracting State has a convention which exempts such income; or

(b) by such Contracting State. However, if more than 50 percent in value of the shares of a corporation or of its parent are listed on one or more recognized securities exchanges in a Contracting State, and there is substantial trading activity in those shares on such exchange or exchanges, then the provisions of paragraphs (1) and (2) shall apply if it can be shown that 20 percent or more of the capital of such corporation is owned, directly or indirectly, by individuals and the Contracting State specified in this paragraph.

(4) For the purposes of this Article, income derived from the operation in international traffic of ships or aircraft includes:

(a) profits derived from the rental on a full or bareboat basis of ships or aircraft if operated in international traffic by the lessee or if such rental profits are incidental to other profits described in paragraph (1), or

(b) profits of a resident of a Contracting State from the use or maintenance of containers (including trailers, barges and related equipment for the transport of containers) used for the transport in international traffic of goods or merchandise if such income is incidental to other profits described in paragraph (1)."

5. Article 10 is amended by adding a new paragraph (9) as follows:

"(9) Notwithstanding the provisions of paragraphs (2) and (3), and subject to the provisions of paragraph (4), interest on any loan of whatever kind granted by a bank shall be exempt in the State in which such interest has its source."

6. Article 14 is amended by adding a new paragraph (4) as follows:

"(4) Article 6, paragraph (4), shall apply by analogy. In no event, however, shall that provision result in France exempting under Article 23 more than 50 percent of the earned income from a partnership accruing to a United States citizen who is a resident of France. The amount of such a partner's income which is not exempt under Article 23 solely by reason of the preceding sentence shall reduce the amount of partnership earned income from sources within France on which France can tax partners who are not residents of France."

7. In Article 15, paragraph (3) shall be amended as follows:

"(3) Remuneration received by an individual for personal services performed aboard ships or aircraft operated by a resident of a Contracting State shall be exempt from tax by the other Contracting State if the income from the operation of the ship or aircraft is exempt from tax in the other Contracting State under Article 7 and such individual is a member of the regular complement of the ship or aircraft."

8. Article 20 is amended to read as follows:


**"Article 20**


**Social Security Payments**

Social security payments (whether representing employee or employer contributions or accretions thereto) paid by one of the Contracting States to an individual who is a resident of the other Contracting State or a citizen of the United States shall be taxable only in the former Contracting State."

9. In Article 22, paragraph (4) (a) is amended by adding the following sentence immediately after the first sentence:

"For this purpose the term 'citizen' shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss."

Protocol, with exchange of notes, amending the convention..., T.I.A.S. No. 9500 (1979)

10. Article 23 shall be replaced by the following new article:

### "Article 23

#### Relief from Double Taxation

Double taxation of income shall be avoided in the following manner:

(1) In the case of the United States: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof) the United States shall allow to a citizen, resident or corporation of the United States as a credit against its tax specified in paragraph (1) (a) of Article 1 the appropriate amount of income taxes paid to France. Such appropriate amount shall be based upon the amount of French tax paid but shall not exceed that portion of the United States tax which net income from sources within France bears to the entire net income.

(2) In the case of France:

(a) income referred to below derived by a resident of France shall be exempt from the French taxes mentioned in subparagraph (1) (b) (i) of Article 1:

(i) income (other than income referred to in paragraph (2) (b) of this Article) which is taxable in the United States under this Convention other than by reason of the citizenship of the taxpayer; and

(ii) in the case of an individual who is a citizen of the United States,

(a) income dealt with in Articles 14 or 15 to the extent the services are performed in the United States;

(b) income which would be exempt from United States tax under Articles 17 or 18 if the recipient were not an individual who is a citizen of the United States;

(c) income dealt with in paragraph (1) of Article 19, to the extent attributable to services performed while his principal place of employment was in the United States.

(b) As regards income taxable in the United States under Articles 9, 10, 11 or 12 and income to which paragraph (4)(b) of Article 22 applies, France shall allow to a resident of France a tax credit corresponding to the amount of tax levied by the United States under this Convention other than by reason of citizenship. Such tax credit, not to exceed the amount of French tax levied on such income, shall be allowed against taxes mentioned in subparagraph (1)(b)(i) of Article 1 of the Convention in the bases of which such income is included.

(c) Notwithstanding the provisions of subparagraphs (a) and (b), French tax may be computed on income chargeable in France by virtue of this Convention at the rate appropriate to the total of the income chargeable in accordance with French law.

(3) In the case of an individual who is both a resident of France and a citizen of the United States:

(a) the amount of the tax credit referred to in subparagraph (b) of paragraph (2) shall be equal to the amount of tax which the United States would be entitled to levy in respect of the item of income if the individual deriving the income were not a citizen of the United States, but shall not exceed the amount of French tax levied on such item of income;

(b) the United States, in determining the amount of credit allowable for foreign taxes, shall consider as income from sources within the United States only that portion of each item of income referred to in subparagraph (b) of paragraph (2) which is equal to the ratio of X??Y where:

(i) X is the rate of tax which the United States would be entitled to levy if the individual deriving the income were not a citizen of the United States, and

(ii) Y is the effective rate of tax (before reduction by investment tax credit or foreign tax credit) which the United States levies for the year on the individual's gross income.

The proportion of each item of income which is not considered as from sources within the United States under this subparagraph shall be considered as from sources within France. The provision of this subparagraph shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax.

(c) If for any taxable year a partnership of which an individual member is both a resident of France and a citizen of the United States so elects, for United States tax purposes,

(i) any income which solely by reason of paragraph (4) of Article 14 is not exempt from French tax under this Article shall be considered income from sources within France; and

Add47

(ii) the amount of income to which subparagraph (i) applies shall reduce (but not below zero) the amount of partnership earned income from sources outside the United States which would otherwise be allocated to partners who are not residents of France. For this purpose the reduction shall apply first to income from sources within France and then to other income from sources outside the United States.

This provision shall not result in a reduction of United States tax below that which the taxpayer would have incurred without the benefit of deductions or exclusions available solely by reason of his presence or residence outside the United States.

(4) A resident of a Contracting State who maintains one or several abodes in the territory of the other Contracting State shall not be subject in that other State to an income tax according to an "imputed" income based on the rental value of that or other abodes."


## ARTICLE 2

This Protocol shall be ratified and instruments of ratification shall be exchanged at Paris. It shall enter into force one month after the date of exchange of the instruments of ratification.

Its provisions shall for the first time have effect with respect to taxable years beginning on or after January 1, 1979.


## ARTICLE 3

This Protocol shall remain in force as long as the Convention between the United States of America and the French Republic with respect to taxes on income and property of July 28, 1967, as amended by the Protocol of October 12, 1970, shall remain in force.

IN WITNESS WHEREOF, the respective plenipotentiaries have signed the present Protocol and affixed thereto their seals.

DONE at Washington in duplicate, in the English and French languages, both texts being equally authoritative, this 24th day of November, 1978.


**For the President of the United States of America:**
(Signature)
George S. Vest.

**For the President of the French Republic:**
(Signature)
François de Laboulaye.

### [EXCHANGE OF NOTES]

DEPARTMENT OF STATE WASHINGTON

Washington, November 24, 1978

Excellency:

In connection with the Protocol signed today, I should like to state our understanding with respect to two important unresolved issues and certain other matters concerning the application of the Protocol.

1. The United States takes the position that the tax credit (avoir fiscal) available to French investors in French corporations should extend on a nondiscriminatory basis to United States investors in French corporations. Under the terms of the Protocol signed in 1970 to the income tax convention between our two countries, the avoir fiscal is extended to United States portfolio investors. But in the absence of a similar extension to United States direct investors, the United States Government considers

Add48

that the French tax credit system discriminates against investments made in France through the intermediary of a United States parent corporation, as compared to investments made by a French parent corporation.

We recognize the revenue concerns of France with respect to this issue and are prepared to accept, in the case of dividends from French subsidiaries to United States parent corporations, one half of the credit available to French shareholders less the 5 percent withholding tax at source allowed by the treaty (Article 9).

We are very concerned that the Government of France is not able to agree at this time to extend one half of the <u>avoir fiscal</u> to United States direct investors. We have agreed to conclude the Protocol without such a provision only because the change in French tax law which takes effect January 1, 1979 would otherwise subject United States citizens residing in France to double taxation, and we do not want them to be so penalized. We appreciate, however, that the Government of France will continue considering this issue and agrees to reopen discussions on the subject of the <u>avoir fiscal</u> as soon as feasible, and in any event if the credit is extended in full or in part to direct investors of other countries.

His Excellency

Francois de Laboulaye

Ambassador of France

2. It is the position of the Government of France that the so-called "unitary apportionment" method used by certain states of the United States to allocate income to the United States offices or subsidiaries of French corporations, results in inequitable taxation and imposes excessive administrative burdens on French corporations doing business in those states. Under that method the profit of a French company on its United States business is not determined on the basis of arm's length relations but is derived from a formula taking account of the income of the French company and its worldwide subsidiaries as well as the assets, payroll, and sales of all such companies.

For a French multinational corporation with many subsidiaries in different countries to have to submit its books and records for all of these corporations to a United States state, in English, imposes a costly burden.

It is understood that the Senate of the United States has not consented to any limitation on the taxing jurisdiction of the states by treaty and that a provision which would have restricted the use of unitary apportionment in the case of United Kingdom corporations was recently rejected by the Senate. The Government of France continues to be concerned about this issue as it affects French multinationals. If an acceptable provision on this subject can be devised, the United States agrees to reopen discussions with France on this subject.

3. The Explanatory Note issued by the French and American Governments will cease to have effect for periods to which this Protocol applies. With respect to the taxation of American residents in France under this Convention, the two governments have agreed that:

a. Contributions to pension, profit-sharing, and other retirement plans which qualify under the United States Internal Revenue Code will not be considered income to an employee and will be deductible from the income of a self-employed individual, to the extent that such contributions are required by the terms of the plan and are comparable to similar French arrangements;

b. Payments received by the beneficiary in respect of the plans referred to in (a) will be included in income for French tax purposes, to the extent not exempt under subparagraph (2) (a) (ii) (c) of Article 23 of the Convention, at the time when, and to the extent that, such payments are considered gross income under the Internal Revenue Code;

Add49

Protocol, with exchange of notes, amending the convention..., T.I.A.S. No. 9500 (1979)

c. Benefits received by reason of exercise of stock options will be considered compensation for French tax purposes at the time and to the extent the exercise of the option or disposition of stock gives rise to ordinary income for United States tax purposes;

d. United States state and local income taxes imposed in respect of income from personal services and any other business income (except income which is exempt from French tax under the Convention) shall be allowed as business expenses;

e. The French Government will attempt to reach a reasonable solution with American residents of France regarding the taxation of employer-provided benefits which are not considered income by the United States;

f. In applying the provisions of French law referred to by paragraph 2(c) of Article 23, the French Government clarified how the exemption with progression provision applies. The tax due is that proportion of the tax on total income which taxable (non-exempt) income bears to total (exempt plus taxable) income. For example, if a taxpayer has a total income of $20,000 of which by reason of this Convention only $12,000 is taxable by France, the French tax will be 60 percent (12,000/20,000) of the tax computed on a total income of $20,000.

If this is in accord with your understanding, I would appreciate a confirmation from you to this effect.

Accept, Excellency, the renewed assurances of my highest consideration.


(Signature)

Embassy of France in the United States

Washington, November 24, 1978

Excellency:

I have the honor to acknowledge receipt of your note of November 24, 1978, which reads as follows:

In connection with the Protocol signed today, I should like for us to state our understanding with respect to two important unresolved issues and certain other matters concerning the application of the Protocol.

1. The United States considers that the tax credit (avoir fiscal) available to French investors in French corporations should extend on a non-discriminatory basis to United States investors in French corporations. Under the terms of the Protocol signed in 1970 to the income tax convention between our two countries, the avoir fiscal is extended to United States portfolio investors. But in the absence of a similar extension to United States direct investors, the United States Government considers that the French tax credit system discriminates against investments made in France through a United States parent corporation, as compared to investments made by a French parent corporation.

We recognize the revenue concerns of France with respect to this issue and are prepared to accept, in the case of dividends paid by French subsidiaries to United States parent corporations, one-half of the avoir fiscal available to French shareholders after collection of the 5 percent withholding tax at source allowed by the Convention (Article 9).

We regret that the Government of France is not able to agree at this time to extend one-half of the avoir fiscal to United States direct investors. We have agreed to conclude the Protocol without such a provision only because the changes in French tax law which will take effect January 1, 1979 would otherwise subject United States citizens residing in France to double taxation, and we do not want them to be so penalized. We note, however, that the Government of France will continue considering this issue and that it agrees to reopen discussions on this subject as soon as possible, and, in any event if the avoir fiscal is extended in full or in part to direct investors of other countries.

2. The Government of France considers that the so-called "unitary apportionment" method used by certain states of the United States to allocate income to the United States offices or subsidiaries of French corporations results in inequitable taxation and imposes excessive administrative burdens on French corporations doing business in those states. Under that method the profit of a French company on its United States business is not determined on the basis of arm's-length relations but is derived

Add50

from a formula taking into account not only the income of the French company and its worldwide subsidiaries but also the assets, payroll, and sales of all such companies.

For a French multinational corporation with many subsidiaries in different countries to have to submit its books and records for all of these corporations to a United States state, in English, imposes a costly burden.

It is understood that the Senate of the United States has not consented to any limitation on the taxing jurisdiction of the states by treaty and that a provision which would have restricted the use of unitary apportionment in the case of United Kingdom corporations was recently rejected by the Senate. The Government of France continues to be concerned about this issue as it affects French multinationals. If an acceptable provision on this subject could be devised, the United States would agree to reopen discussions with France on this subject.

3. The explanatory note issued by the French and American Governments will cease to have effect for periods to which this Protocol applies. With respect to the taxation of American residents in France under this Convention, the two governments have agreed that:

a. Contributions to pension, profit-sharing, and other retirement plans which qualify under the United States Internal Revenue Code will not be considered income to an employee, and will be deductible from the income of a self-employed individual, to the extent that such contributions are required by the terms of the plan and are comparable to similar French arrangements;

b. Payments received by the beneficiary under the plans referred to in (a) will be included in income for French tax purposes, to the extent that they are not exempt under subparagraph (2) (a) (ii) (c) of Article 23 of the Convention, when and to the extent that such payments are considered gross income under the United States Internal Revenue Code;

c. Benefits received by reason of exercise of stock options will be considered compensation for French tax purposes when and to the extent that the exercise of the option or disposition of stock gives rise to ordinary income for United States tax purposes;

d. United States state and local income taxes imposed in respect of income from personal services and any other business income (except income which is exempt from French tax under the Convention) shall constitute a business expense;

e. The French Government will attempt to reach a reasonable solution with American residents of France regarding the taxation of employer-provided benefits which are not considered income by the United States;

f. In applying the provisions of French law referred to in paragraph 2(c) of Article 23, the French Government specified how the provision concerning exemption with progression applies. The tax due is that proportion of the tax on total income which taxable (non-exempt) income bears to total (exempt plus taxable) income. For example, if a taxpayer has a total income of $20,000, of which, by reason of this Convention, only $12,000 is taxable in France, the French tax will be 60 percent (12,000/20,000) of the tax for a total income of $20,000.

If this is in accord with your understanding, I should appreciate a confirmation from you to this effect.

I have the honor to confirm that the foregoing provisions are indeed in accord with the view of the French Government and are approved by it.

Accept, Excellency, the assurance of my very high consideration.

Francois de Laboulaye

**His Excellency**
George S. Vest,
Assistant Secretary of State for European Affairs.

### Footnotes

| 1 | TIAS 6518, 7270; 19 UST 5280; 23 UST 20. |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   Add51   9

| 96TH CONGRESS<br>*1st Session* | SENATE | EXECUTIVE REPT.<br>No. 96–4 |

# PROTOCOL TO THE INCOME TAX CONVENTION WITH THE FRENCH REPUBLIC

## REPORT

OF THE

## COMMITTEE ON FOREIGN RELATIONS UNITED STATES SENATE

ON

EXECUTIVE K, 96TH CONG., 1ST SESS.

PROTOCOL TO THE INCOME TAX CONVENTION WITH THE FRENCH REPUBLIC



JUNE 15, 1979.—Ordered to be printed

(Under authority of the order of the Senate of June 14, 1979.)

U.S. GOVERNMENT PRINTING OFFICE

46–737 O          WASHINGTON : 1979

FRANCE 800

**Add52**

## COMMITTEE ON FOREIGN RELATIONS

FRANK CHURCH, Idaho, *Chairman*

CLAIBORNE PELL, Rhode Island
GEORGE McGOVERN, South Dakota
JOSEPH R. BIDEN, Jr., Delaware
JOHN GLENN, Ohio
RICHARD STONE, Florida
PAUL S. SARBANES, Maryland
EDMUND S. MUSKIE, Maine
EDWARD ZORINSKY, Nebraska

JACOB K. JAVITS, New York
CHARLES H. PERCY, Illinois
HOWARD H. BAKER, Jr., Tennessee
JESSE HELMS, North Carolina
S. I. HAYAKAWA, California
RICHARD G. LUGAR, Indiana

WILLIAM B. BADER, *Staff Director*

(II)

FRANCE 801

Add53

CONTENTS

———

|  |  | Page |
|---|---|---|
| I. | Purpose | 1 |
| II. | Background | 2 |
| III. | Summary of Protocol | 2 |
| IV. | Date of Entry into Force and Termination | 3 |
| V. | Committee Action | 3 |
| VI. | Budget Impact | 3 |
| VII. | Explanation of Protocol Provisions | 4 |
| VIII. | Text of Resolution of Ratification | 21 |

APPENDICES

A. Protocol to the Income Tax Treaty with the French Republic and the Exchange of Notes (Message from the President of the United States, February 9, 1979 S.Exes.K 23
B. Treasury Department Technical Explanation of the Protocol 41
C. Written Responses by Treasury to Questions by Committee Staff 61
D. Letter from Alice M. Rivlin, Director, Congressional Budget Office, June 13, 1979 67

(III)

Add54

| 96TH CONGRESS<br>*1st Session* | SENATE | EXECUTIVE REPT.<br>No. 96–4 |
|---|---|---|

# PROTOCOL TO THE INCOME TAX CONVENTION WITH THE FRENCH REPUBLIC

JUNE 15, 1979.—Ordered to be printed

(Under authority of the order of the Senate of June 14, 1979.)

Mr. CHURCH, from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany Ex. K, 96th Cong., 1st sess.]

The Committee on Foreign Relations, to which was referred the Protocol to the Tax Treaty with the French Republic with respect to taxes on income and property (Executive K), as clarified by a simultaneous Exchange of Notes (collectively referred to as the proposed protocol), having considered the same, reports favorably thereon without reservation and recommends that the Senate give its advice and consent to ratification thereof.

## I. PURPOSE

The primary reason for negotiation of the protocol was a change in French domestic law which, effective January 1, 1979, for the first time subjected U.S. citizens resident in France to French tax on their worldwide income, including income from the United States. Prior to that time, these individuals were taxed by France on only their French-source income. This change could have resulted in significant double taxation of these individuals by France and the United States. The proposed protocol alleviates the impact of the new French law, essentially by dividing the tax revenue from U.S.-source income of these individuals between the U.S. and French Treasuries.

In the course of their negotiations concerning the double taxation issue, the U.S. and French representatives also agreed on a number of other changes to the existing treaty. Some of these changes deal with specific problems which have arisen in the administration of the treaty, while others generally modernize the treaty, bringing it into closer conformity with the current U.S. model income tax treaty.

(1)

## II. BACKGROUND

The proposed protocol to the income tax treaty between the United States and France was signed on November 24, 1978. A clarifying Exchange of Notes was signed on the same day. The protocol would amend the current U.S.-France income tax treaty, which entered into force on July 11, 1968. (The treaty was previously amended by another protocol which entered into force on January 21, 1972.)

The Protocol and the Exchange of Notes were transmitted to the Senate on February 9, 1979.

## III. SUMMARY OF PROTOCOL

The proposed protocol to the income tax treaty between the United States and France contains the following provisions:

(1) Double taxation by the United States and France of U.S. citizens who are French residents is avoided by division of the tax liability of these individuals between the United States and France. In general, France agrees not to tax these individuals on some of their U.S.-source business income, and to give a credit for some of the U.S. tax on their U.S.-source investment income. The United States in turn agrees to treat some of this income as from French sources, which would make French taxes on the income eligible for the U.S. foreign tax credit against their U.S. tax liability. Special rules are prescribed for taxing the income of partners of partnerships with income from U.S. sources and retirees whose pensions are attributable to U.S. sources.

(2) The United States generally agrees to exempt French insurers from the U.S. excise tax on foreign insurance of U.S. risks.

(3) The geographical scope of the treaty is revised so that the treaty expressly covers income from natural resources on each country's continental shelf.

(4) The provisions governing shipping and air transport are revised to bring them into closer conformity with the U.S. model income tax treaty. Changes are also made to the rules for taxing employees of shipping companies.

(5) Interest paid to banks is exempted from the 10-percent withholding tax allowed under the existing treaty.

(6) Social security payments made by either country to a U.S. citizen are exempted from tax by the other country.

(7) The "saving clause" of the treaty, which generally allows the United States to tax its own citizens and residents without regard to the treaty, is clarified so that it expressly applies to certain former U.S. citizens who expatriated to avoid U.S. tax.

(2)

## IV. DATE OF ENTRY INTO FORCE AND TERMINATION

### *Entry into force*

Article 2 of the proposed protocol provides that it will enter into force one month after instruments of ratification are exchanged and will be retroactively effective with respect to taxable years beginning on or after January 1, 1979. This effective date corresponds with the effective date of the new French law taxing U.S. citizens resident in France on their worldwide income.

### *Termination*

Article 3 of the proposed protocol provides that it will remain in force as long as the U.S.-France income tax treaty remains in force.

## V. COMMITTEE ACTION

The Committee on Foreign Relations held public hearings on the proposed French protocol, and on other proposed tax treaties, on June 6, 1979. The Committee considered the proposed treaty on June 12, 1979 and ordered it favorably reported by a vote of 13 yeas, no nays, with the recommendation that the Senate give its advice and consent to ratification of the treaty.

## VI. BUDGET IMPACT

The Committee estimates that the effect of the proposed treaty on budget receipts will be negligible.

In accordance with the objectives of section 403 of the Budget Act, the Committee advises that the Director of the Congressional Budget Office has examined the Committee's budget estimate and agrees that the effect on budget receipts will be negligible. In keeping with section 308(a) of the Budget Act, and after consultation with the Director of the Congressional Budget Office, the Committee states that the treaty does not provide any new budget authority or any new or increased tax expenditures.

(3)

## VII. EXPLANATION OF PROTOCOL PROVISIONS

A comprehensive article-by-article explanation of the proposed protocol to the income tax treaty between the United States and France is set forth below.

### Article 1. Substantive provisions

Article 1 of the protocol contains in ten paragraphs the substantive provisions of the agreement.

#### *Paragraph 1.— Taxes covered (including U.S. insurance excise tax)*

Paragraph 1 amends the existing treaty to provide that the U.S. excise tax on insurance premiums paid to a foreign insurer is a tax covered by the treaty. Under the Internal Revenue Code, premiums from insuring U.S. risks which are received by a foreign insurer having no U.S. trade or business are not subject to U.S. income tax but are subject to the U.S. insurance excise tax (Code secs. 4371–4373). However, the proposed protocol includes the insurance excise tax among the U.S. taxes covered by the French treaty, and thus, under the business profits Article of the treaty and Article 22 (*General rules of taxation*), income of a French insurer from the insurance of U.S. risks will not be subject to the insurance excise tax (except in situations where the risk is reinsured with a company not entitled to the exemption) if that insurance income is not attributable to a U.S. permanent establishment maintained by the French insurer. This treatment is a departure from the existing tax treaty with France and other U.S. tax treaties, except for the proposed tax treaties with the United Kingdom and Hungary. However, the excise tax on premiums paid to foreign insurers is a covered tax under the U.S. model income tax treaty.

Under the Internal Revenue Code (in the absence of a contrary treaty provision), a foreign insurer is subject to U.S. income tax on income derived from the insurance of risks situated in the United States in situations where that insurance income is effectively connected with a U.S. trade or business. A foreign insurer insuring U.S. risks ordinarily will not be viewed as conducting a U.S. trade or business and thus will not be subject to U.S. income tax if it has no U.S. office or agent and operates in the United States solely through independent brokers.

In these situations, a foreign insurer is not subject to U.S. income tax, but the insurance excise tax is imposed (except as otherwise provided in a treaty) on the premiums paid for that insurance.[1] The excise tax may be viewed as serving the same function as the withholding

[1] The excise tax is imposed at a rate of 4 percent of the premiums paid on casualty insurance and indemnity bonds, and one percent of the premiums paid on life, sickness, and accident insurance, annuity contracts, and reinsurance.

(4)

FRANCE 806

Add58

5

tax imposed on dividends, interest, and other types of passive income paid to foreign investors. In general, the excise tax applies to insurance covering risks wholly or partly within the United States where the insured is (i) a U.S. person or (ii) a foreign person engaged in a trade or business in the United States. Under the Code, the excise tax generally applies to any such life, sickness, or accident insurance, or annuity contract unless the foreign insurer is subject to U.S. income tax. It generally applies to any such casualty policy written by an insurer unless the policy is placed through an officer or agent of the foreign insurer within a state in which the insurer is authorized to do business.

The treatment of insurance income of foreign insurers is complicated somewhat in situations where, as is usually the case, some portion of the risk is reinsured with other insurers in order to spread the risk. In situations where the foreign insurer is engaged in a U.S. trade or business and thus subject to the U.S. income tax, reinsurance premiums, whether paid to a U.S. or a foreign reinsurer, are allowed as deductions. Accordingly, the foreign insurer is taxable only on the income attributable to the portion of the risk it retains. However, while no excise tax is imposed on the insurance policy issued by the foreign insurer doing business in the United States (and, in the case of casualty insurance, the policy is written by an officer or agent of the insurer within a State in which it is authorized to do business), the one-percent excise tax on reinsurance is imposed if and when that insurer reinsures that U.S. risk with a foreign insurer not doing business in the United States (and not subject to U.S. income tax).

The statutory rules governing the taxation of foreign insurers insuring U.S. casualty risks have been modified through interpretations of treaties contained in certain closing agreements which have been entered into between the IRS and a number of foreign insurers.[2] The closing agreements are intended to provide relief in those situations where there is the potential for both income tax and excise tax liability because the foreign insurer is subject to the income tax (because it is engaged in a U.S. trade or business) and the excise tax (because it is not licensed by a state to write insurance). It is understood that, if there is a tax treaty between the United States and the country of which the foreign insurer is a resident and the treaty includes an appropriate nondiscrimination clause, the foreign insurer agrees in the closing agreement to subject itself to the U.S. income tax by treating its U.S. operations (frequently an unrelated agent) as a permanent establishment, and the IRS agrees to waive the excise tax on premiums effectively connected with that U.S. trade or business under the nondiscrimination clause of the treaty.

In exempting from the U.S. income tax and the insurance excise tax all insurance income which is not attributable to a permanent establishment in the United States, the proposed protocol makes two changes in the statutory rules governing the taxation of insurance income of French insurers. First, any insurance income which is effectively connected with a U.S. trade or business but is not attrib-

---

[2] One such agreement with a German insurer is described in Letter Ruling 7846060 (Aug. 18, 1978).

6

utable to a U.S. permanent establishment will not be subject to U.S. income tax. This exemption is contained in the existing treaty. Second, French insurers not engaged in a U.S. trade or business will no longer be subject to the insurance excise tax. This exemption is not contained in the existing treaty. However, those French insurers which continue to maintain a U.S. permanent establishment after the proposed protocol enters into force will remain subject to the U.S. income tax on their net U.S. insurance income attributable to the permanent establishment.

In addition, the insurance excise tax will continue to apply in situations where a French insurer with a U.S. trade or business reinsures a policy it has written on a U.S. risk with a foreign reinsurer other than a resident of France or another insurer entitled to exemption under a different tax treaty (such as the proposed U.S.-U.K. treaty). The tax is imposed on the French insurer which in this situation is viewed as the U.S. resident person transferring the premium to the foreign reinsurer. The excise tax will apply to such reinsurance even where the French insurance company has a U.S. trade or business but no U.S. permanent establishment and thus will not subject to U.S. income tax on the net income it derives on the portion of the risk it retains.

If the excise tax would apply to premiums paid to the French insurer in the absence of the treaty exemption, the tax will continue to apply to that insurer to the extent of reinsurance with a nonexempt person. For example, a French company not engaged in a U.S. trade of business insures a U.S. casualty risk and receives a premium of $200. The company reinsures part of the risk with a German insurance company (not currently entitled to exemption from the excise tax) and pays that German company a premium of $100. The 4-percent excise tax on casualty insurance applies to the premium paid to the French insurance company to the extent of the $100 reinsurance premium. Thus, the U.S. insured is liable for an excise tax of $4, which is 4 percent of the portion of its premium to the French insurer which was used by the French insurer to reinsure the risk. It is the responsibility of the U.S. insured to determine to what, if any, extent the risk is to be reinsured with a nonexempt person.

Paragraph 1 of the protocol also deletes from the list of taxes covered by the treaty certain taxes which are no longer in force.

### Paragraph 2.—Definitions

The protocol modifies the treaty definitions of "France" and "United States" to include their respective continental shelf areas. The definition of the United States continental shelf is in general accord with the principles of U.S. domestic law (Code sec. 638). Inclusion of these areas within the geographical scope of the treaties permits, for example, the United States to tax the business profits of a French company extracting oil outside U.S. territorial waters but on the U.S. continental shelf. The Treasury Department takes the position that this is a clarification of the provisions of the existing treaty.

The protocol also adds a definition of "international traffic" by ships or aircraft. This is discussed in connection with Paragraph 4 (*Shipping and air transport*).

7

### *Paragraph 3.—Partnership income*

Paragraph 3 of the proposed protocol adds a new rule to the treaty for taxation of partnership income. In general, a partner's distributive share of partnership income, loss, and other items is to have the same character and source in his hands as those items had in the hands of the partnership. The intent of this provision is to reduce double taxation of partnership income. It is discussed in greater detail in connection with Paragraph 10 of the proposed protocol (*Relief from double taxation*).

### *Paragraph 4.—Shipping and air transport*

The proposed protocol comprehensively revises the rules in the existing treaty which govern taxation of income from shipping and air transport. In general, the changes bring the treaty into closer conformity with the U.S. model income tax treaty. In addition, the proposed protocol would prevent "treaty shopping" by third-country nationals acting through French or U.S. corporations in order to get the benefits intended to be provided to U.S. and French residents.

Under the current treaty, income which a resident of one country derives from the operation in international traffic of ships or aircraft registered in that country is not subject to tax by the other country.

The proposed protocol removes the domestic registration, or "flag," requirement. Thus, income of a U.S. resident from a ship flying the Liberian flag would generally not be subject to French tax. One effect of removal of the "flag" requirement is that French shipping companies and airlines will be able to lease equipment from U.S. owners who obtained the benefits of the investment tax credit. These benefits may be passed on by the U.S. owners to the French shipping companies and airlines in the form of lower rentals. The credit is available for ships and aircraft which are used predominantly outside the United States only if they are registered or documented under U.S. law. (Code sec. 48(a)(2)). Because a French shipping company or airline could benefit from the treaty shipping article only if its equipment flew the French flag, it was not possible under the existing treaty to combine the treaty benefits with those of the investment tax credit. It was made clear by the United States representatives in negotiating this provision that this modification would in no way restrict the right of the United States to amend its statutory investment credit rules so that the credit would not be available to ships or aircraft used predominantly outside the United States by persons exempt from U.S. tax under the treaty.

The protocol amends the shipping article to make it clear that all gains from the sale, exchange or other disposition of ships and aircraft operated in international traffic are also to be covered under the shipping article of the treaty. Thus, these gains generally are taxable only in the country of residence.

The protocol makes the shipping exemption expressly applicable to profits derived from the rental on a full or bareboat basis of ships and aircraft if either the lessee operates them in international traffic or the profits are incidental to the lessor's operation of the ships or aircraft

8

in international traffic. The protocol would also expressly cover profits from the use or maintenance of containers used for the transportation of goods in international traffic if the income is incidental to other income from the operation of ships or aircraft in international traffic. The protocol also makes it clear that the proportionate share of income derived from participation in a pool, joint business or international operating agency is covered by the shipping article to the extent that the pool, joint business, or operating agency derives income from operation in international traffic of ships or aircraft.

The meaning of the term "international traffic" is clarified by Paragraph 2 of the proposed protocol (*Definitions*). The definition is the same as that in the U.S. model income tax treaty. The term "international traffic" means any transport by a ship or aircraft, except where such transport is solely between places in the other country. Thus, coastal shipping along the Atlantic coast of the United States is not international traffic. Nor is transport solely between Metropolitan France and the French Overseas Departments (Guadaloupe, Guiane, Martinique, and Reunion) international traffic. However, transport between France and its overseas territories, such as Saint Pierre and Miquelon, or between the United States and American Samoa, for example, is international traffic. If a resident of France transports goods by ship from Canada to the United States, leaving some of the goods in New York and the remainder in Norfolk. the portion of the transport between New York and Norfolk is international traffic; if it also loads other merchandise in New York which it takes to Norfolk, the income from the transport of the goods loaded in New York is not from international traffic.

The proposed protocol also provides a new rule intended to prevent abuse of the treaty by persons having no substantial economic connection with either treaty partner. Under the provision, a corporation "resident" in the U.S. or France may claim the benefits of the shipping exemption only if more than 50 percent of its capital is owned by the government of that country or residents of that country (or residents of a country with which the other country has a treaty with a similar exemption). The ownership requirement is reduced to 20 percent if more than 50 percent in value of the shares of the corporation or its parent are listed on a recognized exchange and there is substantial trading activity in those shares. Thus, for example, a resident of a country with which the United States has no tax treaty could not establish a wholly-owned French corporation to take advantage of the shipping article and exempt its shipping income from U.S. tax.

For purposes of determining ownership, "capital" includes long-term debt as well as equity. If the French corporation is owned by individual residents of a country with which the United States has a treaty exempting income from ships flying the flag of that country, then the exemption in the United States–France treaty will be available only with respect to ships of French flag or the flag of that country. The inclusion in the protocol of this specific rule denying the benefits of the shipping article (or other specific rules) is not intended to preclude any arguments the Treasury would have in the absence of such rules that, under the particular facts and circumstances, a person is not a "resident" entitled to this or any other treaty benefit.

FRANCE 810

# Add62

9

### Paragraph 5.—Bank interest

The proposed protocol would exempt loan interest from sources in one country from tax by that country if the interest is paid to a bank which is a resident of the other country.

Under the treaty, interest from sources in one country paid to a resident of the other generally is subject to tax by the source country at the rate of 10 percent of the gross amount. However, interest from sources in one country paid to the government of the other country or an instrumentality of that country may not be taxed by the source country.

Under these provisions, there was some question as to whether the Banque Francaise du Commerce Exterieur would qualify as an instrumentality of France, and therefore be eligible for exemption from U.S. tax. The Banque is established by the French government and performs functions similar to those of the U.S. Export-Import Bank. The proposed protocol provides an exemption for interest from sources in one country on loans granted by any bank which is a resident of the other country. This amendment is consistent with the U.S. model income tax treaty which provides for exemption from tax at source by one country for all interest paid to residents of the other country.

The exemption provided by the protocol is subject to the treaty provision that if the recipient of the interest has in the source country a "permanent establishment" (e.g., a branch or office) the interest is taxable under Article 6 (*Business profits*) of the treaty. Also, the exemption would not apply in a case in which a loan by a bank which is a resident of one country to a resident of the other country is followed (or preceded) by a deposit in the bank of a similar amount by a party related to the borrower. For purposes of the exemption, such a transaction would be treated by a loan from the related party, rather than the bank.

### Paragraph 6.—Independent personal services

The proposed protocol adds to the treaty a new rule for determining the tax on partners. This provision is part of the protocol's provisions to avoid double taxation of French resident partners of partnerships with U.S.-source income and is described in detail in connection with paragraph 10 of the proposed protocol (*Relief from double taxation*).

### Paragraph 7.—Dependent personal services

The proposed protocol prescribes a new rule for the taxation of crew members of ships and aircraft to take into account the protocol's changed rules (paragraph 4 of the proposed protocol) for taxation of income from the operation of the ships and aircraft. Under the new provision, if an individual is a regular crew member of a ship or aircraft and income from the operation of the ship or aircraft is exempt from tax by a treaty partner under the protocol, the crew member's income for services performed on the ship or aircraft is also exempt from tax by that country. The individual need not be a resident of the other treaty country to qualify for this exemption.

If not all of the ship's or aircraft's operations are in international traffic, the crew member's income will still be exempt if his service is in international traffic. For example, if an airline pilot flies from Paris

FRANCE 811

**Add63**

10

to New York and then continues to Miami, his income from both portions of the journey will be exempt even if all the income of the airline on the New York-to-Miami portion is not exempt.

### Paragraph 8.—Social security payments

The existing treaty provides that social security payments made by one country to a resident of the other country may only be taxed by the country making the payment. (The United States under its domestic rules exempts U.S., but not foreign, social security payments from tax.) However, the existing treaty exemption does not cover the case of a U.S. citizen who receives French social security payments and resides outside the United States. The Internal Revenue Service has held that these individuals are subject to U.S. tax on their French social security benefits. (Rev. Rul. 75–489, 1975–2 C.B. 511.) The proposed protocol expands this existing treaty rule, so that social security payments by either country to a U.S. citizen may not be taxed by the other country, regardless of where the U.S. citizen is resident.

The United States allows, within limits, a credit against its tax for income taxes paid to foreign countries. If French social security taxes imposed on employees qualify as creditable income taxes, and if these employees received social security payments from France, these individuals in effect could obtain a double benefit. They could reduce their U.S. tax liability dollar-for-dollar by social security taxes paid to the French government, but if they received social security payments from France, the payments would be exempt from U.S. tax.

### Paragraph 9.—U.S. expatriates

Under the Internal Revenue Code, if a U.S. citizen becomes a non-resident alien and one of his principal purposes for giving up his U.S. citizenship is the avoidance of U.S. income, estate or gift taxes, he can be taxed on his U.S. income as though he were a citizen for 10 years after the loss of citizenship (Code sec. 877). If such an individual became a resident of France, he might argue that the existing French treaty prevents this result. The treaty currently contains a "saving clause" under which, with certain specified exceptions, the United States may continue to tax its citizens and residents as if the treaty had not come into effect. The proposed protocol provides that for this purpose the term "citizen" includes a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax. Treatment as a U.S. citizen will continue for a period of 10 years following the loss (the same period contained in the Code). This will generally allow the United States, without regard to the treaty, to impose its tax under Code section 877 on individuals who expatriate to avoid tax. The Treasury Department takes the position that this is a clarifying change and that the treaty benefits would not apply to Americans who expatriate to avoid tax even in the absence of such a provision. Rev. Rul. 79–152, 1979–20 Int. Rev. Bull. 14. The protocol provision is in conformity with the principles of the U.S. model income tax treaty.

### Paragraph 10.—Relief from double taxation

*Introduction*

The proposed protocol thoroughly revises the provisions of the treaty (*Article 23*) which deal with the avoidance of double taxation.

11

The revision became necessary because France amended its laws to tax U.S. citizens resident in France on their worldwide income, including income from U.S. sources. The United States also taxes its citizens, wherever they may be resident, on their worldwide income. The United States generally allows its citizens a credit against their U.S. income tax liability for foreign income taxes paid, but the credit does not apply to foreign taxes on U.S.-source income. Thus, in the absence of treaty provisions, there would be considerable potential for taxation by both the United States and France of the U.S.-source income of U.S. citizens residing in France. The potential for double taxation would be especially strong in the case of partners of partnerships which have U.S.-source income and retirees receiving pensions attributable to services performed in the United States. The protocol establishes a mechanism for the avoidance of double taxation of U.S.-source income. Generally, this is accomplished by French agreement to exempt part of the income from, or to give a partial credit against, its tax and U.S. agreement to treat part of the income as if from French sources, making French taxes on it eligible for the U.S. foreign tax credit.

*General rules for avoidance of double taxation*

The new rules affecting U.S. citizens resident in France modify more general rules for the avoidance of double taxation which are described below.

*Business income*

In the case of a U.S. resident subject to French tax on business income, the United States agrees to avoid double taxation through the foreign tax credit mechanism established under its domestic law. However, the United States is not precluded from amending its foreign tax credit rules without changing the general principle thereof.

France agrees to avoid double taxation of its residents subject to U.S. tax on business income by exempting from its tax any such income which is taxable by the United States under the treaty. This rule does not apply, however, if the French resident is a U.S. citizen and the income is taxable by the United States by reason of his citizenship. The exemption under this provision is "with progression." That is, although the French resident does not pay French tax on the income, the rate of French tax on his remaining income takes into account the excluded income. The Note accompanying the protocol gives the example of a French resident with $20,000 of income, $8,000 of which is exempt from French tax under the treaty. His French tax on the remaining $12,000 will be 60 percent ($12,000/$20,000) of the amount of French tax he would have paid on $20,000 of income.

*Investment income*

The United States avoids double taxation on the investment income (dividends, royalties, interest, and capital gains) of its residents through the foreign tax credit mechanism. France avoids double tax on investment income of its residents by allowing a credit against French tax for the U.S. tax imposed on the income. However, this rule does not apply if the French resident is a U.S. citizen and the income is taxable by the United States by reason of his citizenship.

FRANCE 813

**Add65**

12

*Change in French domestic law*

France generally taxes individuals who are French residents on their worldwide income, allowing a deduction, but not a credit, for foreign income taxes paid. A foreign tax credit is only allowed by France pursuant to a tax treaty. Prior to 1979, however, this general rule did not apply to U.S. citizens resident in France. Article 164–1 of the French income tax law exempted from French tax foreign (to France) income of a French resident if that individual was subject to tax on his worldwide income by his country of citizenship. As a practical matter, this provision applied predominantly to U.S. citizens. In 1976, however, France generally revised its jurisdictional tax rules. As part of this revision, the protection of Article 164–1 was repealed, subjecting U.S. citizens resident in France to the same tax rules as applied to other foreign nationals resident in that country. The effective date of the repeal was, however, delayed to January 1, 1979.

France took the position that the provisions in the existing treaty for relief from double taxation were insufficient to prevent the imposition of French tax on U.S. citizens who were French residents.

*Special rules for U.S. citizens resident in France*

The proposed protocol mitigates the effect of the change in French law through a set of special rules designed generally to divide the revenue from U.S. citizens resident in France between the U.S. and French Treasuries. These rules are described below.

*(1) Partners*

Partnership income requires complex rules under the proposed protocol because of different rules for the treatment of that income under U.S. and French law. In general, under U.S. law, each partner is treated as receiving a pro rata share of the partnership's income, and each item of that income retains the same source and character in his hands as it had in the partnership's. For example, assume that a U.S. law partnership with 10 partners has an office in France. Each partner is entitled to an equal share of the partnership's income, and one of the partners is a U.S. citizen resident in France. The partnership earns $1,000,000, of which $150,000 is attributable to French sources and $850,000 is attributable to U.S. sources. Under U.S. law, each partner generally is treated as receiving $100,000 of income, of which $15,000 is from French sources and $85,000 is from U.S. sources.

There are two exceptions to this rule. First, if the partner's share of partnership income depends on the profits of a foreign branch of the partnership, rather than overall partnership income and loss (a "special allocation"), then his partnership income may be treated to that extent as from foreign, rather than domestic, sources. In that case, the partnership income of the other partners which is treated as from foreign sources is decreased, and their share from domestic sources is increased. Second, if a payment is made to a partner by the partnership for services without regard to partnership income (a "guaranteed payment"), that payment has its source where the services are per-

13

formed. Thus, if a partner performing services abroad receives a $20,-000 guaranteed payment, that entire amount is treated as from foreign sources. If this expense to the partnership is allocable to the partnership's foreign source income, then the foreign source income of the partners is reduced by a like amount, in proportion to their partnership shares.

France, on the other hand, applies two different source rules. Income of partners who perform services outside of France is treated as French source income in proportion to the French source income of the partnership. (This is similar to the U.S. rule.) However, France also treats all of a partner's income from the performance in France of services for a partnership as from French sources and subjects its residents to tax on that entire amount, providing no exemption or credit for U.S. tax on amounts which, under U.S. rules, would be treated as from U.S. sources. Thus, in the previous example, the entire $100,000 partnership distributive share of the French partner would be treated by France as from French sources and fully taxable without exemption or credit. Moreover, an additional $135,000 ($900,000, their distributive shares, multiplied by $150,000/$1,000,000) may be taxed to the remaining U.S. partners as French source income.

The possibility of double taxation of the French partner arises from these different source rules. In the case of the French partner, France taxes his partnership share in full. However, this tax may not be fully creditable against U.S. tax. A fundamental premise of the U.S. foreign tax credit is that it should not offset the U.S. tax on amounts which the United States considers to be U.S.-source income. Accordingly, the computation of the foreign tax credit contains a limitation to insure that the credit only affects the U.S. tax on the taxpayer's foreign income.[3]

In the preceding example, the French partner had $15,000 of French source income and $85,000 of U.S. source income under U.S. rules. Assume that the French tax on the French partner's $100,000 of income is $45,000. Assume also that the partner's pre-credit U.S. tax on this amount is $50,000, and that the partner has no other income or foreign taxes. Since 15 percent ($15,000/$100,000) of the taxpayer's total worldwide income is from foreign sources, his foreign tax credit is limited to $7,500, or 15 percent of his $50,000 pre-credit U.S. tax. Thus, without the benefit of the protocol, he would pay $45,000 in income taxes to France and $42,500 ($50,000 pre-credit U.S. tax less $7,500 foreign tax credit) to the United States, or a total for both countries of $87,500. The taxpayer would be allowed to carry over to other years the $37,500 in French taxes for which he was not allowed a credit in the current year. However, these credits may not be usable in the other

---

[3] The limitation operates by prorating the taxpayer's total U.S. tax liability before tax credits ("pre-credit U.S. tax") between his U.S. and foreign source taxable income. Therefore, the limitation is determined by using a simple ratio of foreign source taxable income divided by total taxable income. The resulting fraction is multiplied by the total pre-credit U.S. tax to establish the amount of U.S. taxes paid on the foreign income and, thus, the upper limit on the foreign tax credit.

14

years and in any event do not relieve the burden of double taxation in the current year.[4]

France would tax each of the remaining nine partners on $15,000 ($135,000 divided by 9). However, the U.S. tax rules treat them each as having received $15,000 of foreign source income. Accordingly, they would generally be allowed to credit the French taxes against their U.S. tax liability on the French-source income and would not be subject to double taxation.

The proposed protocol deals with the potential for double taxation by prescribing special source rules for the income of partners. First, paragraph 3 of the protocol adds a new provision to Article 6 (*Business profits*) of the treaty. The new paragraph provides that each partner is treated as realizing his ratable share of partnership income and losses. That income is generally to be treated as having the same source and character in his hands as in the hands of the partnership, except to the extent that his share of the profits depends on the source of the income (i.e., a special allocation). This provision is a restatement of the U.S. rules for the source of partnership income and overrides the conflicting French rule which treats all of a partner's income from services performed in France as from French sources. It does not apply to guaranteed payments.

By itself, this rule would exempt from French tax (under the general provisions for the avoidance of double taxation) all of the partner's distributive share treated as from U.S. sources under U.S. source rules because that amount would be taxable by the United States other than by reason of the U.S. citizenship of the partner. However, France was unwilling to go that far. Accordingly, the application of this rule is limited by paragraph 6 of the proposed protocol which adds a new provision to Article 14 (*Independent personal services*) of the treaty. This rule provides that the special partnership source rules of the proposed protocol may not result in the exemption from French tax (under the general provisions for avoidance of double taxation) of more than 50 percent of the earned income from a partnership of the U.S. citizen who is resident in France. For purposes of this limitation, the partner's "earned income" includes any guaranteed payments which he receives from the partnership for his services; so if, for example, he receives a $20,000 guaranteed payment and a $100,000 distributive share of profits, application of the proposed protocol's partnership source rules could not result in French exemption of more than $60,000 (50 percent of $120,000) of the distributive share of partnership income.

The proposed protocol further provides that if, solely because of the 50-percent limitation, not all of the U.S. source income of the part-

---

[4] Instead of electing to credit French taxes against his U.S. income tax liability, subject to the limitations on the credit discussed above, the French partner could deduct his French taxes paid from his U.S. income subject to tax. In that case, his taxable income from the partnership would be $55,000 ($100,000 less the $45,000 of French taxes paid). Assuming that his effective U.S. rate of tax on the income remains 50 percent, his U.S. tax liability would be $27,500 (50 percent of $55,000). His total income tax liability to France and the United States for the year would thus be $72,500 ($45,000 plus $27,500). This would be $15,000 less than the liability if he elected the foreign tax credit. However, he would have no excess tax credits to carry over to other years.

15

ners who are U.S. citizens resident in France is exempt, the amount of partnership earned income from French sources on which France can tax the nonresident partners is to be reduced by the difference between the total U.S. source partnership income of the resident partners and the amount they are allowed to treat as exempt.

These rules may be illustrated by returning to the earlier example. Under the general rule in paragraph 3 of the protocol, the French resident partner would be allowed to treat $85,000 of his partnership distributive share as from U.S. sources and exempt from French tax. However, assuming that he receives no guaranteed payments, the amount he may exempt is limited by paragraph 6 to 50 percent of his $100,000 distributive share, or $50,000. Thus, he will still be subject to French tax on the remaining $50,000. However, France agrees not to tax the nonresident partners on the $35,000 difference between the resident partner's $85,000 of U.S. source income and the $50,000 he is allowed to exempt. Thus, each of the nonresident partners has $15,000 of French source income under the general source rule, reduced by $3,889 ($35,000 divided by 9) as a result of the special limitation, or $11,111 of income subject to French tax.

Thus, there is still a potential for double taxation, but that potential is reduced. The French resident partner is taxed by France on $50,000 (rather than $100,000) of income and is treated by the United States as having $15,000 in foreign source income for purposes of the foreign tax credit. His partners are taxed by France on $11,111 (rather than $15,000) of income and are treated by the United States as having $15,000 of foreign source income. This reduces the overall tax burden on the French resident partner (at the expense of the French Treasury). It generally leaves unchanged the aggregate French and U.S. tax on the nonresident partners because these individuals will generally be allowed a U.S. foreign tax credit for the full amount of French tax paid, and a decrease in French taxes will increase their residual U.S. tax liability. However, in that case, there would in effect be a transfer of revenue from the French to the U.S. Treasury.

The proposed protocol provides a further mechanism to bring the U.S. and French source rules into correspondence, but it requires the consent of the affected partnership. For any taxable year, the partnership may make an election under which the U.S.-source income of a partner resident in France which cannot be treated as exempt because of the proposed protocol's 50-percent limitation will be treated by the United States as though it were from French (rather than U.S.) sources, increasing the French partner's foreign tax credit limitation. At the same time, the partnership share of foreign source income of each of the other partners is correspondingly reduced. (The amount that they will be treated as receiving from domestic sources is correspondingly increased.)

The effect of this election may be illustrated by returning to the example. The French partner is taxed by France on $50,000 of income and is treated by the United States as having $50,000 ($15,000 plus $35,000), rather than $15,000, of foreign source income, increasing his foreign tax credit limitation. His partners are taxed by France on $11,111 of income and are treated by the United States as having $11,111 ($15,000, minus $35,000/9), rather than $15,000, in foreign

FRANCE 817

**Add69**

16

source income. Thus, the U.S. and French rules are brought into correspondence.

This special rule is made elective for two reasons. First, although it is favorable to the French partner, it may have an unfavorable effect on the partners resident outside of France by reducing their U.S. foreign tax credit limitations. Second, the proposed protocol provides that, if the election is made, the partners resident in France are denied any benefits of the special exclusion or deduction (Code secs. 911 and 913) for Americans working abroad. It is possible that the French resident partners would prefer the benefits of these Code provisions to the additional relief provided under the protocol election. It was therefore believed that the question of whether the election should be made should be settled among the partners in accordance with their partnership agreement. Once the election is made, however, it is binding on all the partners, including those (if any) who opposed it.

### (2) Retirees

Under the French system of worldwide taxation, France would tax all the pension income of U.S. citizens resident in France. The United States would treat as foreign source income the portion of the pension attributable to services performed outside the United States. (Rev. Rul. 72–149, 1972–1 C.B. 218.) However, the remainder would be treated as from U.S. sources. Thus, under the foreign tax credit limitation rules, it is likely, where part or all of the retiree's services were performed in the United States, that he would not receive a full credit against his U.S. tax liability for French taxes paid.

The proposed protocol prevents double taxation through France's agreement to exempt private pension income from French tax to the extent it is attributable to services performed while the retiree's principal place of employment was in the United States. Thus, France exempts the income attributable to services performed in the United States, while the United States gives a credit for French taxes on income attributable to services performed outside the United States.

### (3) Investment income

The United States and France divide the tax revenues on investment income (dividends, interest, royalties, and capital gains) from U.S. sources of a U.S. citizen resident in France basically by treating him as though he were not a U.S. citizen (i.e., as though he were a non-resident alien). This is accomplished by each country's allowing limited credits for the other's taxes on the income. However, if the allowable credit for French tax on the income is less than what the U.S. tax on these citizens would be, the United States may impose its tax on the difference.

The United States generally taxes nonresident aliens on dividends, interest and royalties not connected with a U.S. business of the alien by withholding at source a tax of 30 percent of the *gross* amount. This withholding tax generally satisfies the nonresident alien's U.S. tax liability on the income, and if he does not have other U.S. income he ordinarily need not file a tax return. The United States does not tax U.S.-source capital gains of a nonresident alien (i.e., the tax

17

rate is zero) unless he is present in the United States more than a half year or the gains are connected with a U.S. business.

The 30-percent statutory withholding rate is frequently reduced by treaty. Under the French treaty, the rate on dividends paid to individuals is 15 percent, the rate on interest is generally 10 percent, and the rate on royalties is 5 percent.

The proposed protocol provides that, when a U.S. citizen resident in France receives U.S.-source investment income, France will give a credit for the amount of tax the U.S. would have been allowed to collect under the treaty had the recipient been a nonresident alien. For example, if the individual receives a $100 interest payment from U.S. sources, France agrees to give a credit of $10 (10 percent of $100) against its tax on the income. Thus, France, through the credit, gives the United States the first opportunity to tax the income on the basis of its source.

Because the income is U.S. source, the U.S. foreign tax credit limitation would ordinarily prevent a credit against U.S. tax for any remaining French tax on the income (after the French credit for $10). However, under the protocol, the United States gives France the next opportunity to tax the income by agreeing to treat part of the income as from French sources, increasing the recipient's foreign tax credit limitation, and thereby, as a practical matter, allowing French tax on the income to be credited against the individual's U.S. tax liability.

The portion of the income which will continue to be treated as U.S. source is determined by a fraction. The numerator of the fraction is the rate of tax at which the United States could tax the income if the recipient were not a citizen (the same rate at which France agrees to give a credit against its tax under the previous step). The denominator is the effective rate of U.S. tax (before reduction by the foreign tax credit and the investment tax credit) on the individual's *gross* income. The difference between the total amount of the investment income and the part which retains its character as U.S. source income is treated as French source income.

This rule may be illustrated by an example. Suppose a U.S. citizen resident in France has $100,000 in gross earned income and business deductions of $20,000. He also receives $5,000 in U.S. dividend income. His gross income is $105,000 ($100,000 plus $5,000) and his taxable income is $85,000 ($105,000 less $20,000). Assume that his pre-credit U.S. tax on this income is $42,000. The portion of investment income which will be treated as U.S. source is a fraction the numerator of which is 15 percent, the rate of tax the U.S. may impose under the treaty on U.S. source dividend income of French residents who are not U.S. citizens. The denominator is 40 percent, the effective rate of pre-credit U.S. tax on his *gross* income ($42,000/$105,000). Thus, the amount of the dividend treated as U.S. source is $1,875 ($5,000 times 15/40). The remaining $3,125 is treated as if it were from French sources. However, the protocol prevents abuse of this rule by providing that it applies only to the extent that the item of income is included in the taxpayer's income for purposes of determining his French tax.

Finally, the United States, after conceding (through the U.S. foreign tax credit mechanism) the priority of France's right to impose a tax based on residence, reserves the right to impose its tax based

Add71

18

on the citizenship of the taxpayer. In the foregoing example, the pre-credit U.S. tax on the $5,000 of dividend income is $2,471 ($5,000 of taxable income multiplied by the effective pre-credit tax rate on *taxable* income of $42,000/$85,000). The maximum credit which the United States will allow for French tax on this income is $1,544 ($2,471 multiplied by $3,125/$5,000). Thus, if the full credit is allowed, the United States will collect a tax of $927 ($2,471 less $1,544) on this income. Of this amount, $750 (15 percent of $5,000) is collected by virtue of the source of the income. The additional $177 ($927 less $750) is collected by virtue of the U.S. citizenship of the taxpayer.[5]

*(4) Other special rules*

France also agrees to exempt from its tax income of U.S. citizens who are resident in France to the extent that the income is for services performed (independently or as an employee) in the United States, if certain conditions (spelled out in the treaty) are met. The United States treats this income as U.S. source, which would lead to double taxation in the absence of the exemption from French tax provided in the protocol.

Similarly, France agrees to exempt from tax the income of a U.S. citizen who is a resident of France from certain services performed in the U.S. as a teacher, or as a student or trainee. This income would be exempt from U.S. tax if earned by a French resident who is not a U.S. citizen, but is subject to U.S. tax when earned by a U.S. citizen.

The Note accompanying the proposed protocol spells out the proper treatment under French tax law of contributions to, and distributions from, pension plans; stock options; and U.S. state and local income taxes. The Note also provides that France will attempt to reach a reasonable solution concerning the treatment of employer-provided benefits which are not taxable by the United States (such as certain group life and medical insurance benefits).

The Note also provides that the Explanatory Note issued by the U.S. and French governments (Treasury Department News Release WS 1190 (Nov. 29, 1976)) shortly after France amended its law to tax U.S. citizens resident in France on their worldwide income will cease to have effect for periods to which the proposed protocol applies. The Explanatory Note prescribed an interim arrangement for avoidance of double taxation.

*French tax based on use of a residence*

Under French law, an individual who is not domiciled in France, and who therefore is not subject to the regular French tax rules, is nevertheless generally subject to French tax if he has the use of an abode in France. The tax base, to which regular French tax rates apply, is three times the rental value of the abode. The proposed protocol continues the rule in effect under the existing treaty that this tax does not apply to a U.S. resident.

---

[5] The taxpayer's creditable foreign taxes and his foreign tax credit limitation are computed on the basis of his total worldwide income, not on the basis of each item of income, as in the foregoing example. Accordingly, the taxpayer may in a particular case pay more or less U.S. tax than the amount shown. However, the example helps to illustrate the extent to which double taxation is avoided under the protocol.

Add72

19

## Article 2. Entry into force

Article 2 of the proposed protocol provides that it will enter into force one month after instruments of ratification are exchanged and will be retroactively effective with respect to taxable years beginning on or after January 1, 1979. This effective date corresponds with the effective date of the new French law taxing U.S. citizens resident in France on their worldwide income.

## Article 3. Termination

Article 3 of the proposed protocol provides that it will remain in force as long as the U.S.-France income tax treaty remains in force.

### EXCHANGE OF NOTES

In an exchange of Notes accompanying the signing of the proposed protocol, various points regarding the avoidance of double taxation under the protocol were clarified, as is explained in the discussion above of paragraph 10 of article 1 of the proposed protocol (*Avoidance of double taxation*).

The Note also states the positions of the two governments on two issues which were not resolved in the protocol.

#### *French avoir fiscal*

Under the French system of integrated corporation taxation, French residents who receive a dividend from a French corporation are treated as having paid part of the corporate income tax which was imposed on the corporate income from which the dividend was paid. They are allowed to credit this amount (*avoir fiscal*) against their personal income tax liability. French law does not allow this credit to nonresident shareholders. However, the first protocol (signed in 1970) to the French treaty extends similar treatment to portfolio shareholders (corporations owning less than 10 percent of the French corporation's stock and individuals and other noncorporate shareholders) who are U.S. residents. U.S. direct investors (corporations owning 10 percent or more of the French corporation's stock) are still excluded.

The United States took the position that the denial of the French *avoir fiscal* to U.S. direct investors was unfair discrimination. In recognition of France's revenue concerns, however, the U.S. negotiators were prepared to accept a refund to direct investors of one-half the credit available to French shareholders, minus the 5-percent withholding tax allowed under the treaty on dividend payments to direct investors. This would be similar to the arrangement in the proposed income tax treaty between the United States and the United Kingdom for refund to U.S. direct investors of the U.K. Advance Corporation Tax (ACT). France agreed to reopen discussions on this subject as soon as possible and in any event if the credit for the *avoir fiscal* is extended in full or in part to direct investors of other countries.

#### *State taxation*

Some states of the United States (particularly, California, Oregon, and Alaska), in determining the amount of income of a business operating within the state which is to be apportioned to that state for

20

income tax purposes, require combined reporting of all related business operations (including related business operations of affiliated U.S. and foreign corporations, whether or not doing business within the state). France took the position that for a French multinational corporation with many subsidiaries in different countries to have to submit its books and records for all of these corporations to a state of the United States, in English, imposes a costly burden.

The United States negotiated, as part of the proposed U.S.-U.K. income tax treaty, a provision which would have restricted the ability of states to use this worldwide combination/unitary method of apportionment. However, when the U.S. Senate gave its advice and consent to the ratification of the treaty, it did so with a reservation that nullified this provision as it applied to the states. As a result, certain terms of the proposed U.S.-U.K. treaty had to be renegotiated in a proposed protocol. France understood this, but continued to be concerned about the issue as it affects French multinationals. The United States agreed to reopen discussions with France on this subject if an acceptable provision can be devised.

FRANCE 822

Add74

# VIII. TEXT OF RESOLUTION OF RATIFICATION

96TH CONGRESS }       { IN EXECUTIVE SESSION,
*1st Session* }       { SENATE OF THE UNITED STATES

PROTOCOL TO THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND THE FRENCH REPUBLIC WITH RESPECT TO TAXES ON INCOME AND PROPERTY OF JULY 28, 1967, AS AMENDED BY THE PROTOCOL OF OCTOBER 12, 1970 (1978 TAX PROTOCOL WITH THE FRENCH REPUBLIC)

---

## IN THE SENATE OF THE UNITED STATES

---

### RESOLUTION OF RATIFICATION

*Resolved (two-thirds of the Senators present concurring therein),* That the Senate advise and consent to the ratification of the 1978 Tax Protocol with the French Republic, together with an exchange of notes relating thereto, done at Washington on November 24, 1978 (Ex. K, Ninety-sixth Congress, first session).

(21)

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

# TAX PRACTICE

## tax notes federal

# Demystifying the Saving Clause and Re-Sourcing Rules in Treaties

**by Lori Hellkamp and Alden DiIanni-Morton**




Lori Hellkamp                    Alden DiIanni-Morton

Lori Hellkamp is a partner and Alden DiIanni-Morton is an associate in the Washington office of Jones Day.

In this article, Hellkamp and DiIanni-Morton explore two lesser-known provisions in U.S. income tax treaties that can cause unexpected challenges for taxpayers trying to claim treaty benefits.

The views and opinions expressed in this article are solely the authors' and do not necessarily reflect those of Jones Day.

In a global economy, it is not uncommon for businesses to operate with an international footprint or for individuals to live and work in multiple countries over the course of their careers. The network of income tax treaties in place around the world can ease some of the tax frictions inevitable to this reality. The United States currently has income tax treaties with 68 countries.[1] Significantly, these treaties seek to facilitate cross-border investment and movement by, among other things, reducing or eliminating the excess (double) taxation that can otherwise result. That said, U.S. taxpayers and even tax professionals sometimes fail to appreciate some of the impediments to this goal inherent in many U.S. treaties. While countless articles have discussed the "limitation on benefits" clause in U.S. treaties — perhaps the most well-known potential roadblock to treaty access — this article focuses on two other, less-known (or at least, less-understood) provisions: the presence of a saving clause and the absence of a re-sourcing provision. These two dry and technical provisions, which are usually buried within the dense text of other articles, can pose a trap for the unwary by producing unexpected, and generally unfavorable, tax results for U.S. taxpayers — including sometimes turning off treaty benefits entirely.

## I. Overview

A primary goal of U.S. income tax treaties is to alleviate double taxation when each country views a taxpayer as its own resident or claims the right to tax the same income. The United States' magnanimity has limits, however. U.S. treaties typically contain a saving clause, which can add significant complexity to the determination of a U.S. person's tax liability by essentially turning off, in whole or in part, otherwise available treaty benefits. Similarly, the absence of a (sufficiently robust) re-sourcing provision can sometimes render ineffective the U.S. foreign tax credit by which double taxation is supposed to be relieved.

---

[1] While negotiations are ongoing and several new treaties have been signed in recent years, few protocols and no new treaties have been ratified since 2010 because of political impediments in the Senate.

Add76

For more *Tax Notes*® *Federal* content, please visit www.taxnotes.com.

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

## A. Saving Clause

All U.S. tax treaties have a saving clause[2] permitting the United States to continue to tax its own citizens and residents[3] — and in many cases, former citizens and noncitizen residents[4] — as if the treaty were not in effect.[5] Translated into plain English, this means that the United States, subject to some exceptions discussed below, can impose U.S. tax on U.S. persons (and some former U.S. persons) despite anything to the contrary in the relevant treaty. Fundamentally, treaties do not alter the U.S. system of worldwide taxation, and U.S. persons remain subject to U.S. income tax even if they are foreign residents under a treaty's tiebreaker provision or have (only) foreign operations and income. Further, U.S. citizens residing abroad will not be entitled to all the treaty benefits allowed to other, similarly situated residents of the same foreign country because of the operation of the saving clause.

The saving clause is most often (but not always) found in the general scope, personal scope, or miscellaneous articles of U.S. tax treaties. For example, the current U.S. model treaty has a saving clause in the general scope provision,[6] while the relevant language in the treaties with Canada and France is in the miscellaneous provision.[7] Regardless of where it is located, a typical saving clause will generally contain language similar to this:

> *Notwithstanding any provision of the Convention*, a Contracting State may tax its residents (as determined under [the Residence article]), and by reason of citizenship may tax its citizens, as if the Convention had not come into effect.[8]

The saving clause is, however, typically tempered by exempting specific provisions from its application — although which ones are carved out varies from treaty to treaty and can sometimes further vary depending on the relevant U.S. person's citizenship or immigration status.[9] U.S. treaties generally exempt three core articles from the saving clause: (1) relief from double taxation, (2) nondiscrimination, and (3) access to mutual agreement procedures. Perhaps the most important among these, and the most relevant for purposes of this article, is the relief from double taxation (or sometimes the elimination of double taxation) provision, without which the utility of a treaty would be significantly diminished.[10]

Many treaties exempt additional benefits beyond these three core articles from the saving clause.[11] For example, the U.K.-U.S. treaty also exempts the articles on associated enterprises, pensions, social security, annuities, alimony and child support, pension schemes, government service, students, teachers, diplomatic agents, and consular officers.[12] On the other hand, the Morocco-U.S. treaty offers additional exemptions

---

[2] While the treaty with Pakistan, signed in 1957, does not contain a traditional saving clause, U.S. citizens and corporations are excluded from the definition of "resident of Pakistan," thus essentially producing a similar effect as a saving clause. *See* Pakistan-U.S. treaty, article 2(1)(i).

[3] Generally, a noncitizen is treated as a U.S. resident under domestic law if the person (1) is a lawful permanent resident (*i.e.*, a green card holder), (2) meets the substantial presence test, or (3) otherwise elects to be so treated under section 7701(b). *See* section 7701(b)(1)(A). Most U.S. tax treaties have tiebreaker rules to prevent an individual from being treated as a resident of both the United States and the other country under the treaty. *See, e.g.*, Australia-U.S. treaty, article 4(2), and 2016 U.S. model treaty, article 4(3). This determination can have a limited effect in some situations, however, because these rules are trumped by the saving clause.

[4] Certain former citizens and former long-term residents are often brought within the scope of the saving clause to allow the United States to impose tax under section 877. *See, e.g.*, 2016 U.S. model treaty, article 1(4) ("Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of a Contracting State may be taxed in accordance with the laws of that Contracting State.").

[5] *See, e.g.*, Netherlands-U.S. treaty, article 24(1); U.K.-U.S. treaty, article 1(4); and 2016 U.S. model treaty, article 1(4).

[6] 2016 U.S. model treaty, article 1(4).

[7] Canada-U.S. treaty, article 29(2), and France-U.S. treaty, article 29(2).

[8] Ireland-U.S. treaty, article 1(4) (emphasis added).

[9] *See, e.g.*, Mexico-U.S. treaty, article 1(5); *see also* 2016 U.S. model treaty, article 1(5).

[10] As discussed in more detail in the next section, even though the saving clause does not apply to (and thus does not override) the relief from double taxation article, U.S. taxpayers will still need to navigate the gauntlet of domestic law requirements and limitations to claim a U.S. FTC.

[11] *See* 2016 U.S. model treaty, article 1(5).

[12] U.K.-U.S. treaty, article 1(5).

Add77

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

for only visiting students, trainees, and government employees, while the Greece-U.S. treaty contains no exemptions.[13]

## B. Re-Sourcing Income

Also relevant, and just as capable of potentially turning off treaty benefits, are the re-sourcing rules — or rather, some treaties' lack thereof.

While U.S. tax treaties seek to prevent double taxation, the principal mechanism for actually relieving double tax generally remains subject to U.S. domestic law. Specifically, the relief from double taxation article typically provides that the United States will allow an FTC to a U.S. person against their U.S. federal income tax liability for taxes paid or accrued to a foreign treaty country to prevent double taxation. In general, the FTC granted by a treaty is not broader than the FTC permitted by U.S. domestic law and is made available only "in accordance with the provisions and subject to the limitations of" domestic U.S. law.[14]

Because the U.S. FTC permitted by a treaty remains subject to domestic law requirements and limitations, when a treaty allows the foreign country to tax income that is viewed, under U.S. law, as U.S.-source income, the U.S. taxpayer may be unable to claim a U.S. FTC unless that income is re-sourced to the foreign country. In other words, when the income in question is not viewed as foreign-source income by the United States, U.S. FTCs may not be available to offset all the foreign taxes borne, despite the existence of the treaty and the benefits purportedly conferred under its relief from double taxation article. This

is because under U.S. domestic law, FTCs are generally available only for foreign taxes paid on foreign-source (not U.S.-source) income.[15] Therefore, the re-sourcing provisions come into play when there is a discrepancy between the relevant sourcing rules of the code and the assignment of taxing rights under the treaty. The application of a re-sourcing provision can allow U.S.-source income subjected to foreign tax by the foreign country under the terms of the treaty to be considered foreign-source income for U.S. FTC purposes.

For example, the key re-sourcing language in the 2016 U.S. model treaty provides:

> For the purposes of applying [the relief from double taxation paragraph granting a U.S. FTC], an item of gross income . . . derived by a resident of the United States that, under this Convention, may be taxed in [foreign treaty country] shall be deemed to be income from sources in [foreign treaty country].[16]

The specifics of the re-sourcing language can vary significantly from treaty to treaty, but the language is typically contained in the relief from double taxation article.[17] Some treaties contain comprehensive re-sourcing rules, which generally ensure that any income the other country is permitted to tax in accordance with the treaty will be deemed foreign-source income for U.S. FTC purposes.[18] These broad provisions are the most helpful for U.S. taxpayers. This approach also

---

[13] Morocco-U.S. treaty, article 20(4), and Greece-U.S. treaty, article 14(1). An interesting variation on this is the China-U.S. treaty, which appears to contain no exemptions from the saving clause for U.S. citizens. *See* 1984 Protocol to China-U.S. treaty, section 2. The technical explanation (TE) clarifies, however, that it is understood that the benefits of the core provisions (relief from double taxation, nondiscrimination, and MAP) are not subject to the saving clause. *See* China-U.S. treaty TE, article 1.

[14] *See, e.g.,* Netherlands-U.S. treaty, article 25(4); Switzerland-U.S. treaty, article 23(2); and 2016 U.S. model treaty, article 23(2). Because of the U.S. system of worldwide taxation, it generally falls on the United States (rather than the treaty partner) to provide a credit against U.S. tax to relieve double taxation resulting from a person's U.S. citizenship. *But see* 1992 Protocol to Russia-U.S. treaty, section 8(a) (credit required to be granted by Russia against the Russian tax on income generally includes a credit for U.S. income taxes paid by U.S. citizens imposed solely by reason of their U.S. citizenship).

[15] This is a simplification, but a detailed discussion of the section 904 mechanics, particularly when a taxpayer has multiple sources of foreign income, is beyond the scope of this article.

[16] 2016 U.S. model treaty, article 23(3).

[17] *See, e.g.,* 2016 U.S. model treaty, article 23. There is also sometimes sourcing language in operative provisions specific to the type of income being addressed (*see, e.g.,* Spain-U.S. treaty, article 11(5)) or in dedicated sourcing provisions in older treaties (*see, e.g.,* Israel-U.S. treaty, article 4, and South Korea-U.S. treaty, article 6). Most of these provisions are subject to the saving clause, however, which is why the re-sourcing language contained in (or incorporated by cross-reference into) the relief from double taxation article can be important, as then it is insulated from the effects of the saving clause and clearly intended to be available for U.S. FTC purposes. *See, e.g.,* TE to 2006 Protocol to Germany-U.S. treaty, article 12.

[18] *See, e.g.,* Mexico-U.S. treaty, article 24(3) and (4)(c); Germany-U.S. treaty, article 23(2) and (5)(c); and Japan-U.S. treaty, article 23(2) and (3)(c).

Add78

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

seems to be Treasury's current preferred approach based on the 2006 and 2016 model treaties.[19] Many older U.S. treaties, however, still contain more limited re-sourcing rules, which apply in only some of the circumstances in which a foreign treaty country is permitted to tax amounts potentially viewed as U.S.-source income under the code.[20] Commonly, these provisions are limited to providing relief in situations in which the affected U.S. taxpayer is a U.S. citizen resident in the foreign treaty country and do not address situations in which the U.S. taxpayer is a U.S. citizen resident in the United States or a corporation.

There are also some treaties containing re-sourcing rules that are made expressly "subject to" domestic source rules.[21] These treaties are the subject of much debate, as a re-sourcing provision that is literally subject to, and thus possibly trumped by, domestic source rules could be read to mean that any conflicting domestic sourcing rules (for example, sections 861-865) apply instead of the treaty. Under this reading, a treaty would defer to the code in the event of any sourcing conflict, effectively rendering the treaty re-sourcing rules moot. Presumably this is not the intent.[22] Finally, there are also treaties with no re-sourcing language at all.[23]

This discussion would be incomplete without highlighting a couple of additional, practical points. First, even when treaty re-sourcing is available for the relevant income, it is still generally the section 901 FTC that is the mechanism by which double taxation relief is granted. Consequently, just as is so often the case outside of the treaty context, there will frequently be at least some leakage because of the various requirements and limitations of section 904 (for example, separate basket limitations, required expense allocations, etc.). Also, any item of income re-sourced by a treaty is generally subject to its own special, separate basket limitation and cannot be cross-credited.[24]

Second, when re-sourcing is unavailable under the relevant treaty and double taxation results, a taxpayer can still seek recourse by pursuing competent authority relief. Practically, however, this can be costly and take significant time to resolve. Requesting competent authority assistance also does not provide any guarantee of a favorable outcome. Alternatively, if no U.S. FTC is available, the foreign taxes paid may be deductible under section 164 (although a deduction is generally less favorable than a credit).

Finally, a few code-based re-sourcing elections may be available in narrow circumstances under section 865(h) (certain gains from the sale of stock and certain intangibles), section 904(h)(10) (certain dividends and interest),[25] and section

---

[19]2016 U.S. model treaty, article 23(3) and (4)(c); and 2006 U.S. model treaty, article 23(3) and (4)(c).

[20]See, e.g., Denmark-U.S. treaty, article 23(2)(c); France-U.S. treaty, article 24(2)(b); Switzerland-U.S. treaty, article 23(3)(c); South Africa-U.S. treaty, article 23(2)(c); Pakistan-U.S. treaty, article 15(3); and Netherlands-U.S. treaty, article 25(6)(c) and (7).

[21]See, e.g., India-U.S. treaty, article 25(3); Luxembourg-U.S. treaty, article 25(4); Sweden-U.S. treaty, article 23(4); Austria-U.S. treaty, article 22(4); and Thailand-U.S. treaty, article 25(3).

[22]It seems far more likely Treasury negotiated the "subject to domestic source laws" language to accommodate only the special and limited sourcing rules in section 904, specifically section 904(h) (previously codified at section 904(g)). Indeed, the better answer, and the one that more closely aligns with Treasury's stated treaty policy of preventing double taxation, is that the "subject to" language should not cause domestic sourcing rules to override a treaty's re-sourcing concessions in every instance of conflict but rather in only the narrow and specific instances clearly contemplated by Congress under the source maintenance rules of section 904(h). See, e.g., New York State Bar Association, "Report on Treaty Re-Sourcing Rules," at 28-30 (Nov. 24, 2014); Warren Crowdus, "The Interaction of Treaty and Code Source Rules," J. Int'l Tax'n (Apr. 2002). Guidance from Treasury confirming this interpretation would certainly be well received by the tax bar, however.

[23]See, e.g., Hungary-U.S. treaty; U.S.-Venezuela treaty; Morocco-U.S. treaty; Poland-U.S. treaty; and Greece-U.S. treaty.

[24]See section 904(d)(6). Although a discussion of the domestic FTC rules is beyond the scope of this article, there may be situations in which a taxpayer chooses not to use an available treaty re-sourcing benefit because of the effect of section 904(d)(6) on the taxpayer's FTC calculations.

[25]Although the better answer is that this election is also available when a treaty's relief from double taxation provision is made expressly subject to domestic source rules, the TE to the Luxembourg-U.S. treaty casts some doubt on this interpretation (albeit rather unpersuasively) by asserting that a section 904(h)(10) election is unavailable. See TE to Luxembourg-U.S. treaty, article 25; but see TEs to each of the other treaties with this "subject to" language, supra note 22 (containing no language precluding the election). Further, many authorities explicitly contemplate permitting the election in the treaty context. See, e.g., reg. section 1.904-5(m)(7)(i); TE to 2006 U.S. model treaty, article 23(3); TE to 2006 Protocol to Germany-U.S. treaty, article 12(2); TE to Belgium-U.S. treaty, article 22(3); and TE to Japan-U.S. treaty, article 23(2).

Add79

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

245(a)(10) (certain dividends), if the relevant income is taxed by a foreign country under an applicable treaty but would be considered U.S.-source income in the absence of re-sourcing relief.

## II. Examples

Broadly speaking, U.S. income tax treaties can, and do, successfully operate to ensure that U.S. taxpayers qualifying for treaty benefits are taxed only once on most (if not all) of their income. There are, however, situations in which the interaction of treaty provisions and U.S. domestic law can undermine the availability of treaty benefits that would otherwise theoretically be available — and that many assume are available. That is why when these issues arise, both the taxpayers trying to claim treaty benefits and their advisers can be caught by surprise. In practice, problems most commonly occur when the U.S. income tax rate exceeds the applicable foreign rate or the absence of re-sourcing relief means income taxed by the foreign country is characterized as U.S.-source income under domestic law. The following examples are intended to illustrate these potential issues in some common fact patterns.

**Example 1:** Assume the U.S. income tax treaty with Country A generally permits the imposition of tax on capital gains by only the country of residence and contains a traditional saving clause and a tiebreaker clause to determine residency for purposes of the treaty. John, a U.S. citizen living in Country A and a Country A resident under the treaty, owns stock in a U.S. company (US Co.). John is exempt from Country A taxes on certain capital gains under a Country A tax holiday regime. While the holiday is still in effect, John sells all his US Co. stock and assumes that, as a resident of Country A, he is not subject to U.S. tax on the resulting gain because the treaty exempts Country A residents from U.S. capital gains tax. However, John is incorrect: The saving clause overrides the treaty's capital gains article. Accordingly, all of John's gain is subject to U.S. income tax, and no U.S. FTC is available because no Country A taxes were paid on the gain. Further, even if Country A had imposed some amount of tax on John's gain, to the extent that tax was less than the applicable U.S. tax rate, John would still generally be required to pay the

difference to the United States because the available FTC would be less than the applicable U.S. tax.[26]

**Example 2:** Assume the U.S. income tax treaty with Country B permits the imposition of tax by Country B on certain shareholders for the gain attributable to the sale of stock in a company if that company is itself resident in Country B or holds material Country B real estate.[27] Further assume that the treaty with Country B contains a traditional saving clause and has either no re-sourcing provision or a very limited re-sourcing provision. Holdco, a Delaware corporation and U.S. resident for purposes of the Country B-U.S. treaty, owns stock in Country B Corp. (B Co.). B Co. holds significant rental real estate, most of which is in Country B. When Holdco sells its B Co. stock, Holdco is subject to Country B income tax on the gain in accordance with the treaty. Under U.S. domestic law, all that gain is generally U.S.-source income under section 865(a) and would be subject to U.S. corporate income tax. Accordingly, if this gain is not able to be re-sourced under the Country B-U.S. treaty, double taxation could result — although Holdco may be able to make an affirmative section 865(h) election.

**Example 3:** Assume the U.S. income tax treaty with Country C generally permits the imposition of tax on a resident's wages and other services income by only the country of residence and contains (1) a tiebreaker clause to determine residency for purposes of the treaty, (2) a traditional saving clause, and (3) limited or no re-sourcing provisions. Alice, a U.S. citizen and resident of Country C under the terms of the Country C-U.S. treaty, lives in Country C and is

---

[26]For similar facts, *see, e.g., Cole v. Commissioner*, T.C. Summ. Op. 2016-22 (Israel-U.S. treaty's capital gain exemption does "not stand alone, and its effect is completely eliminated here under the saving clause . . . since petitioner is a United States citizen" (citing *Filler v. Commissioner*, 74 T.C. 406, 410 (1980))).

[27]Most U.S. treaties in effect generally allow the foreign treaty country to impose tax on gains from the sale of shares in a company if the assets of that company consist of significant real ("immovable") property located in that country. (This is essentially a reverse-FIRPTA right.) *See, e.g.,* France-U.S. treaty, article 13(2)(b); Australia-U.S. treaty, article 13(2)(b); and Netherlands-U.S. treaty, article 14(1)(b). Some treaties also permit taxation of a U.S. person by the other country on gain attributable to the sale of stock in a company resident in that foreign country if the U.S. seller meets (or met) a prescribed ownership threshold (*see, e.g.,* China-U.S. treaty, article 12(5); Israel-U.S. treaty, article 15(1)(e); and Kazakhstan-U.S. treaty, article 13(3)) or if the other country's domestic law would otherwise permit taxation of that gain (*see, e.g.,* India-U.S. treaty, article 13).

Add80

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

employed by a Country C employer. Occasionally, Alice travels to the United States to perform work for her employer. While the income from employment article of the Country C-U.S. treaty generally exempts her wage income from U.S. income tax (which is taxed by Country C) because she is a Country C resident, the saving clause overrides this article.[28] Accordingly, Alice is still (also) subject to U.S. income tax on all her wage income[29] and must rely on the U.S. FTC to avoid double taxation — and will still generally be subject to U.S. taxation to the extent of any difference between the Country C rate and applicable U.S. income tax rate (if the U.S. rate is higher). Further, if there is no re-sourcing provision or the treaty's re-sourcing provision does not apply to the portion of her wages attributable to her work performed in the United States, she has double taxation exposure because those amounts are generally U.S.-source income under section 861(a)(3).[30]

**Example 4:** Assume the U.S. income tax treaty with Country D permits withholding on royalties that, under the treaty, are generally deemed to arise in the country of the payer's residence.[31] The Country D-U.S. treaty also contains a traditional saving clause but limited or no re-sourcing rules. IP Co., a U.S. corporation, licenses U.S. intellectual property rights to a resident of Country D, for which a royalty is paid to IP Co.

Under the royalties article in the Country D-U.S. treaty, Country D withholding (at the prescribed reduced rate) is permitted. IP Co. may, however, have difficulty taking a U.S. FTC for the Country D tax withheld unless re-sourcing relief is available, as the tax would generally be viewed for U.S. tax purposes as having been imposed on U.S.-source income under section 861(a)(4).

### III. Conclusion

U.S. income tax treaties are an important tool for helping taxpayers manage cross-border taxation in a global economy. In most cases, the U.S. treaty network provides an adequate framework for ensuring that taxpayers avoid double taxation and enjoy nondiscriminatory tax treatment and access to administrative procedures for resolving issues that arise. However, it is always important to take into consideration the potential effect of the saving clause and whether re-sourcing relief is or may be available, because failure to do so can lead to unpleasant surprises when taxpayers try to take advantage of treaty benefits they thought were available.                    ∎

---

[28] *See also* 2020 Competent Authority Agreement, Italy-U.S. treaty, article 19 ("Pursuant to the saving clause . . . the United States retains its right to tax the income of its citizens and lawful permanent residents as if there were no convention. . . . As such, a U.S. citizen or lawful permanent resident would not be entitled to claim the benefit of [the relevant treaty provision] to exempt remuneration from U.S. federal income tax. Rather the individual would be subject to tax in both the United States and Italy." (Internal quotations omitted.)); *Abrahamsen v. Commissioner*, 142 T.C. 405, 410-411 (2014) (saving clause overrides relevant treaty article for U.S. person); *Savary v. Commissioner*, T.C. Summ. Op. 2010-150, at 4-5 (same); *Filler*, 74 T.C. 406 (same); LTR 9628024 (same); FSA 1999-792 (May 20, 1993) (same).

[29] Subject to any foreign earned income able to be excluded under section 911.

[30] *See also Savary*, T.C. Summ. Op. 2010-150, at 9-10 (no U.S. FTC available for U.S.-source income earned by U.S. citizen resident in France). Similar re-sourcing complications can arise if a U.S. citizen or resident performs services in the United States as a director of a foreign company because some U.S. treaties do not limit the foreign country's right to tax directors' fees to only compensation for services performed in that foreign country. *See, e.g.*, Denmark-U.S. treaty, article 16, and Switzerland-U.S. treaty, article 16. In these situations, the foreign country and the United States may both seek to tax the U.S. person on those fees. To the extent they are attributable to services performed in the United States, such fees would generally be U.S.-source income for FTC purposes under section 861 unless re-sourcing relief is available.

[31] *See, e.g.*, Italy-U.S. treaty, article 12(6).

---

Add81

## III.  Relief From Double Taxation

### A.  Methods of Double Tax Relief

An important function of the bilateral tax treaty network is to relieve residents of Contracting States from double taxation, that is, tax imposed by both States on the same item of income due to asymmetric domestic tax laws of the treaty countries. The various substantive articles of a tax treaty define and prescribe rules concerning the types of income protected from double taxation and generally assign primary taxing jurisdiction over a particular type of income to one or the other Treaty Partner.[62] As a general rule, tax treaties assign primary taxing jurisdiction to the Source Country, with the Residence (or citizenship) Country bearing the burden of providing double tax relief.[63] In some cases, such as interest, royalties, and dividends, treaties permit both countries to tax the same item of income, though the Source Country tax is usually at a reduced rate.

#### 1.  In General

There are three potential methods of providing double tax relief: (1) the "deduction method"; (2) the "credit method"; and (3) the "exemption method."

Under the deduction method, foreign taxes may be deducted to reduce income and thus domestic tax. As a rule, the international tax treaty network does not utilize the deduction method, as that method fails to provide full relief from double tax; a taxpayer limited to the deduction method ends up paying a higher combined tax rate on foreign-source income than on domestic-source income.[64] No U.S. tax treaty relies on the deduction method.

Under the credit method, a taxpayer may credit foreign taxes paid or accrued against its domestic tax liability, usually subject to limitations as discussed below. Under the exemption method, all or specified types of foreign-source income are exempt from domestic tax.

Many, though not all, countries attempt to provide double tax relief unilaterally as part of their domestic tax laws. For example, in the United States, taxpayers may elect either to deduct, or to take a credit for, foreign taxes paid or accrued.[65] As discussed below, such unilateral domestic provisions may not always provide full double tax relief due to asymmetries between the tax laws of the relevant jurisdictions. Therefore, countries enter into bilateral tax treaties, in large part, to provide relief from double taxation arising from such inconsistent tax systems. In general, tax treaties implement double tax relief through the credit method, the exemption method, or some combination thereof.

#### 2.  The Credit Method

U.S. tax treaties invariably use the credit method to grant relief from taxes imposed by the other country Treaty Partner on U.S. residents (or citizens). In addition, many U.S. tax treaties utilize the credit method to provide relief from U.S. taxes imposed on residents of the other country, though as discussed below, some U.S. Treaty Partners utilize a combination of the credit method and the exemption method.

The credit method can be further categorized theoretically as either an "ordinary credit" method or a "full credit" method.[66] Under the ordinary credit method, the taxpayer's foreign tax credit is limited to the portion of its Residence State tax liability that is attributable to income taxed by the Source State Treaty Partner. Thus, if the Source State's effective tax rate is greater than that of the Residence State, the taxpayer would not receive full credit for its foreign taxes paid. In the case of the United States, this is accomplished by means of the U.S. domestic tax law foreign tax credit limitation.[67]

By contrast, under the full credit method, the taxpayer can claim as a credit against its Residence State tax the full amount of tax paid to the Source State, even if such Source State tax exceeds the amount of Residence State tax payable with respect to the Source State income — that is, even if the Source State's effective tax rate is higher than the Residence State's effective tax rate on the income. No U.S. tax treaty adopts the full credit approach, either with respect to U.S. credits for foreign taxes, or with respect to foreign credits for U.S. taxes.

*Example:* The difference between the full credit method and the ordinary credit method can be illustrated by the following example. Individual I is a U.S. citizen who earns $500 of U.S.-source general basket[68] taxable income and $500 of general basket taxable income sourced to his PE in Country X. The U.S. income tax rate is 35%, while the Country X income tax rate is 50%. I, prior to considering the foreign tax credit, would thus owe $350 U.S. income tax (35% of $1,000 total U.S. and Country X income) and $250 of Country X income tax (50% of $500 Country X-source income). Under the full credit method, I could credit the entire $250 of Country X tax against his U.S.

---

[62] *See generally* 900 T.M., *Foundations of U.S. International Taxation*; 938 T.M., *U.S. Income Tax Treaties — Income Not Attributable to a Permanent Establishment.*

[63] The assignment of primary taxing jurisdiction predominantly to the Source Country, while in a sense an international norm, is hardly universal. For example, U.S. treaty policy is to eliminate Source Country withholding tax on interest payments. In general, lesser-developed countries tend to prefer more robust source-based taxation arrangements, while developed countries tend to prefer residence-based taxation. This stems from the perception that residents of more developed countries are more likely to invest in developing countries, than vice versa. *See generally* Julie A. Roin, *Rethinking Tax Treaties in a Strategic World with Disparate Tax Systems*, 81 Va. L. Rev. 1753 (1995). Roin posits that this difference in viewpoints explains why the United States has tended to enter into tax treaties with more developed nations, with relatively few treaties between the United States and lesser-developed nations.

[64] See the discussion and example provided in Thomas M. Brinker & Richard W. Sherman, *Relief from International Double Taxation: The Basics*, 16 J. Int'l Tax'n 16, 20 (2005).

[65] *See generally* § 901(a) (foreign tax credit); § 164(a)(3) (deduction for foreign income taxes paid); *see also* 6020 T.M., *The Creditability of Foreign Taxes — General Issues.*

[66] 2014 OECD Commentary on Articles 23A and 23B, ¶23.

[67] § 904(a); 6060 T.M., *The Foreign Tax Credit Limitation Under Section 904.*

[68] *See* § 904(d).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

income tax, resulting in a U.S. tax of $100 and Country X tax of $250. Under the ordinary credit method, I could credit only $175 of Country X tax (i.e., the 35% effective U.S. tax rate as applied to the $500 of Country X-source income) against his U.S. tax, meaning that he would pay $175 U.S. tax and $250 Country X tax. The $175 credit is determined by application of the foreign tax credit limitation fraction as follows:

$$\frac{\text{Foreign-source income (\$500)}}{\text{Total worldwide income (\$1000)}} \times \frac{\text{U.S. tax}}{(\$350)} = \$175$$

Not all foreign tax regimes provide for double tax relief through a credit mechanism. Nevertheless, in some of these cases a treaty may use the credit method to prevent double taxation.[69] In such cases, the treaty relief is the exclusive avenue for a resident of the foreign Treaty Partner to avoid double tax without resorting to competent authority proceedings.[70]

### 3. The Exemption Method

Under the exemption method, income subject to the First State's tax under the treaty will be exempt from tax imposed by the Other State Treaty Partner, even if otherwise subject to tax under the Other State's domestic tax law. For example, assume Country X taxes its residents on the basis of their worldwide income and has no foreign tax credit mechanism to relieve them from double taxation. Under the U.S.-Country X tax treaty, however, the United States is granted primary taxing jurisdiction over income earned by a U.S. PE of a Country X resident. In order to prevent double taxation, the treaty provides that Country X will treat such income as exempt from Country X taxes.

In rare cases, a treaty may provide relief from double taxation to residents of the Treaty Partner solely through the exemption method.[71] However, it is far more common for U.S. Treaty Partners that do not use the credit method exclusively to provide double tax relief through a combination of the credit method and the exemption method.[72]

### 4. Policy Considerations: Credit Method vs. Exemption Method

Use of the credit method, at first glance, seems counterintuitive. Relief from double taxation could more easily be accomplished by assigning primary taxing jurisdiction over a given type of income to one or the other Treaty Partner, and providing that such income is exempt from tax by the other Treaty Partner. The ordinary credit method, by contrast, is more complicated, as a tax credit limitation provision of some sort must be applied.

Although a pure exemption method may be simple, countries are loath to give up taxing jurisdiction with respect to

foreign-source income taxed at a lower rate than applicable to domestic-source income under their domestic tax law. Under such a case the exemption system can be seen as unfair because two residents with the same amount of income could be subject to different effective worldwide tax rates; for example, a resident with low-taxed foreign-source income would be subject to less total tax than a resident with purely domestic-source income.[73] Such a result would encourage investment abroad, particularly investment in tax havens, which is contrary to a general policy that allocation of business investment should be based on nontax economic efficiency concerns.[74]

This infirmity is avoided by the ordinary credit approach, which bases the credit on the amount of foreign taxes actually paid (or accrued). A resident taxpayer receives no tax advantage from investing in a low-rate tax haven because the domestic tax still applies to the extent domestic rates are greater than foreign rates.[75] Conversely, due to the foreign tax credit limitation mechanism, an "aggressive" foreign jurisdiction's high tax rates are not fully "subsidized" by the foreign tax credit.[76] For these reasons, the ordinary credit method is generally preferred as the best method for eliminating double taxation.[77]

### B. U.S. Treaty Practice

#### 1. U.S. Model Treaty Approach

Article 23 of the 2016 U.S. Model Treaty ("Relief From Double Taxation") adopts the ordinary credit method approach for relieving U.S. residents from U.S. tax on income also subject to Other Contracting State tax, thereby alleviating double taxation. For relief of the Other Contracting State's residents from double taxation, the 2016 U.S. Model Treaty simply inserts a "placeholder," with the terms to be adopted on

---

[69] See, e.g., U.S.-France Treaty, art. 24.

[70] See VII., below, for a discussion of competent authority proceedures.

[71] U.S. treaties with the former Soviet Republics (but not Russia) do not follow the pattern of other U.S. tax treaties and instead list various types of income exempt from tax in the Source Country.

[72] See discussion and examples in III.B.2., below.

[73] This discussion is indebted to Thomas M. Brinker & Richard W. Sherman, *Relief from International Double Taxation: The Basics*, 16 J. Int'l Tax'n 16, 20 (2005), discussed in III.A.1., above, which provides further examples.

[74] To avoid this result, some foreign countries with an exemption method limit the exemption to foreign-source income taxed at a given minimum rate; others apply an "exemption with progression" method, which allows the foreign income to enjoy an exemption from domestic tax, but includes the foreign income in the domestic tax base for purposes of determining the rate at which domestic-source income will be taxed. See Thomas M. Brinker & Richard W. Sherman, *Relief from International Double Taxation: The Basics*, 16 J. Int'l Tax'n 16, 20 (2005).

[75] In practice, however, the U.S. foreign tax credit limitation is imperfect because it permits "blending" of foreign-source income taxed at lower rates with other foreign-source income taxed at higher rates, meaning that a taxpayer with operations in several foreign jurisdictions may be able to receive a credit even for foreign taxes paid at a higher rate than the U.S. rate. Historically, Congress and the IRS have adopted various statutory and regulatory provisions, such as the separation of income into various "baskets," to minimize taxpayers' ability to engage in such blending of high- and low-tax foreign-source income. See 6060 T.M., *The Foreign Tax Credit Limitation Under Section 904*.

[76] That is, a country utilizing the full credit method would in effect cede its tax base to the foreign jurisdiction with a higher tax rate; thus it would forgo its own taxes on domestic-source income.

[77] Thomas M. Brinker & Richard W. Sherman, *Relief from International Double Taxation: The Basics*, 16 J. Int'l Tax'n 16, 20 (2005), discussed in III.A.1., above. Use of the credit method to relieve double taxation is by no means a perfect solution, however; for example, the availability of a foreign tax credit reduces the incentive for U.S. taxpayers to attempt to reduce their foreign tax liability, which can result in economic inefficiency and U.S. revenue loss. By contrast, an exemption system (i.e., making foreign-source income exempt from U.S. tax) would eliminate such disincentives and thereby perhaps promote economic efficiency, though it would not address the revenue loss issue. See Julie A. Roin, *Rethinking Tax Treaties in a Strategic World with Disparate Tax Systems*, 81 Va. L. Rev. 1753, 1768–83, for further discussion of this issue.

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

Add83

a case-by-case basis depending on the Treaty Partner's domestic tax law and policy.[78]

### a.  U.S. Credit for Tax Paid to Treaty Partner

Article 23 of the 2016 U.S. Model Treaty is straightforward. Article 23(2)(a) provides that the United States must allow, as a credit against its federal income tax, income tax paid or accrued to the Other Contracting State. Article 23(2)(b) provides a "deemed paid" credit that allows a U.S. company owning at least 10% of the voting stock of a company that is a resident of the Other Contracting State, and from which the U.S. company receives dividends, to receive a credit for the income tax paid or accrued by or on behalf of the payor corporation with respect to profits out of which the dividends are paid. This is equivalent to the deemed paid credit provided under former § 902 until its repeal in 2017.[79]

Note that allowance of both the direct credit and the deemed paid credit is to be made "in accordance with the provisions and subject to the limitations of" U.S. tax law. This means that the credits are subject to the foreign tax credit limitation found in § 904, as well as other restrictions and limitations on the use of such credits.[80] Likewise, the deemed paid credit provided in Article 23(2)(b) was subject to the rules and limitations of former § 902 while that provision was part of the Code.[81]

*Observation:* Because the repeal of § 902 was accompanied by the enactment of § 245A, which in effect substitutes an exemption mechanism for the indirect foreign tax credit associated with dividends paid by foreign subsidiaries, it is almost certain that the repeal of § 902 will render actual treaty provisions corresponding to Article 23(2)(b) moot for tax years following repeal, although there is no discussion in the legislative history of that repeal that discusses its effect on income tax treaties.

Given this structure, from a U.S. taxpayer's perspective, one might ask why bother to have a tax treaty at all? Domestic U.S. law already provides a foreign tax credit mechanism intended to provide relief from double taxation. The answer is that the domestic law foreign tax credit is in effect available only with respect to foreign taxes paid on foreign-source income,[82] as defined under U.S. law sourcing rules.[83] A treaty — at least in theory — protects U.S. residents from double taxa-

tion in the case of taxes attributable to income that is U.S. source under U.S. law but nevertheless is subject to taxation by the foreign treaty country under that jurisdiction's tax laws. Thus the credit mechanism provided under the treaty is intended to protect U.S. residents from double taxation resulting from inconsistent assertion of taxing jurisdiction by the two contracting states.[84]

*Example:* I, an individual U.S. citizen, resides in and is employed in Country A. The United States asserts jurisdiction to tax its citizens on their worldwide income, even if they are not U.S. residents, and therefore I's compensation income is subject to U.S. income tax. Country A also asserts jurisdiction to tax such income on the basis of I's residence and employment in Country A. Without a tax credit mechanism, I would be subject to double taxation on the same income.[85]

An additional benefit provided by the treaty stems from the U.S. domestic law rule that foreign tax credits are available only with respect to income taxes. The United States has taken an increasingly restrictive view concerning the types of foreign taxes considered income taxes and thus eligible for the foreign tax credit. The final sentence of Article 23(2) of the 2006 and 2016 U.S. Model Treaties, however, provides that the taxes covered under the treaty are automatically considered income taxes and thereby eliminates that problem for taxes covered by the treaty.

### b.  Treaty Partner Relief for Taxes Paid to the United States

The Treaty Partner's mechanism for providing double tax relief with respect to U.S. taxes paid by its residents varies depending on the Treaty Partner's domestic tax system. Article 23(1) of the 2016 Model merely provides a placeholder, with details to be determined through bilateral treaty negotiations. Article 23(1) of the 2016 Model Treaty is the same as Article 23(1) of the 2006 Model Treaty. The 2006 Technical Explanation states that the Treaty Partner will provide relief through the credit method, the exemption method, or a mixture of the two. By contrast, the 1996 U.S. Model Treaty was drafted as if the Treaty Partner, like the United States, used the credit method. However, the 1996 Technical Explanation made clear that "[a]lthough the Model Article is drafted as though the Other Contracting State uses a credit system, in bilateral Conventions

---

[78] Interestingly, the 1996 U.S. Model Treaty did not adopt the "placeholder" approach, but instead used reciprocal credit language. 1996 Model Treaty, art. 23(2). In practice, however, the method adopted in actual treaties in force varied depending on the foreign government's tax policy and views. See III.B.2., below. (The 1996 U.S. Model Treaty contained language almost identical to that of the 2006 and 2016 U.S. Model Treaties with respect to double tax relief for U.S. residents or citizens.)

[79] § 902(a); *see* 902 T.M., *Indirect Foreign Tax Credits.*

[80] *See generally* § 901–§ 908. For example, the 2006 Technical Explanation explains that the dollar amounts of such credits are subject to the foreign currency rules of § 986, and that such credits are subject to rules concerning excess credit carryover periods, the alternative minimum tax foreign tax credit limitation, and so forth.

[81] *See* 902 T.M., *Indirect Foreign Tax Credits.*

[82] As a technical matter, this statement is not strictly accurate, as the domestic law U.S. foreign tax credit is available with respect to foreign taxes paid regardless of the source of the income on which such foreign tax is levied. For example, the IRS ruled in Rev. Rul. 55-414 that a Canadian tax on U.S.-source income of a U.S. beneficiary was eligible for the U.S. credit. However, the foreign tax credit limitation found in § 904 has the effect of

limiting the amount of credit that can be claimed to that portion of foreign taxes attributable to foreign-source income. The greater the proportion of foreign-source income, the higher the credit limitation; a taxpayer who has no foreign-source income (as defined under the Code) will not be able to claim any foreign tax credit as a matter of domestic U.S. tax law, because the numerator of the foreign tax credit fraction will be zero. Thus as a practical matter, and for convenience of reference, this section of the Portfolio will discuss availability of foreign tax credits in terms of whether the foreign tax is imposed on foreign-source income.

[83] For U.S. law sourcing rules, see § 861–§ 865. *See also* 6620 T.M., *Source of Income Rules.*

[84] See the discussion below in III.D., concerning re-sourcing of income, which is used to ensure double tax relief is available.

[85] For illustrative purposes, this example ignores the § 911 foreign earned income exclusion.

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-190-3

Add84

the relief may be in the form of a credit, exemption, or a combination of the two."[86]

### 2. Variations Among Treaties in Force

There are substantial variations among U.S. treaties in force, turning on details of the relevant foreign tax law.

Many U.S. treaties in force adopt the ordinary credit method for the Treaty Partner's grant of double tax relief to its residents. Some of these treaties that use the ordinary credit method refer to the Treaty Partner's domestic tax law limitations on such credits, using language similar to the reciprocal U.S. grant of double tax relief to its citizens and residents.[87] Others incorporate a foreign tax credit limitation concept in the language of the double tax relief provision itself.[88]

In other U.S. treaties, the Treaty Partner provides double tax relief to its residents through a combination of the exemption method and the credit method.[89] There is much variation among treaties in force, but one common theme is the combination of: (1) exemption for income taxable by the United States without limitation; and (2) foreign tax credit relief for other income (i.e., dividends, interest, and royalties, which under a typical treaty are subject to tax by both states).[90] Usually the treaty will contain a provision that permits the Treaty Partner to calculate the rate of tax on the resident's non-exempt income as if the exempt income had been included.[91] Such provisions are designed to preserve the Treaty Partner's effective tax rate under a progressive rate structure.

*Example:* The U.S.-Country X Treaty utilizes a combination exemption and credit system in order to provide double tax relief to Country X residents. Country X resident earns $10,000 through a U.S. PE and $20,000 from Country X sources. Country X's domestic tax law applies a 10% rate to the first $15,000 of a taxpayer's income and a 30% rate to any income in excess of $15,000. Under the double tax relief provision of the treaty, Country X exempts the $10,000 of U.S.-source income. The Country X tax on the remaining $20,000 of income is $5,000 (10% rate applied against $5,000, or $500, and 30% rate applied against $15,000, or $4,500). Without this provision, the Country X tax would have been only $3,000. That is, if the exempt income were not taken into account in determining the tax rate, the $20,000 of non-exempt income would have been subject to a 10% tax on the first $15,000, or

$1,500 tax, plus a 30% rate on the remaining $5,000, or $1,500 tax, for a total of $3,000 tax.

### C. Taxes Covered

Given the mechanism of Article 23 of the 2016 U.S. Model Treaty for reducing or eliminating double tax, the taxpayer must determine whether the taxes in question are covered by the treaty, and if so, which treaty country has primary taxing jurisdiction over the income subject to tax. As discussed below, the answer to this latter question turns on what type of income is involved and in which treaty country the taxpayer resides.

Article 2 of the 2016 U.S. Model Treaty specifies the taxes of the Contracting States to which the tax treaty applies. With certain exceptions, the same article specifies that the protections afforded by the treaty are limited to the taxes specified in the article. Article 2(1) provides that the treaty applies to all "taxes on income imposed on behalf of a Contracting State irrespective of the manner in which they are levied."[92] Article 2(1) of the 2016 U.S. Model Treaty is the same as Article 2(1) of the 2006 U.S. Model Treaty. The 2006 Technical Explanation notes two exceptions to the limited scope of treaty coverage: (1) taxes imposed by any state and local governments are encompassed within Article 24 (Non-Discrimination) and (2) the requirement to exchange information between competent authorities imposed by Article 26 (Exchange of Information and Administrative Assistance) applies to all national taxes. Thus, the obligations not to subject nonresidents to taxation that is more burdensome and to share information apply with respect to taxes that are not federal income taxes.

Article 2(3) of the 2016 U.S. Model Treaty explicitly lists existing legislation of the Contracting States that is deemed to be an "income tax" for purposes of the treaty. This means that the taxes listed in Article 2(3) of a treaty in force will be deemed to be an income tax for purposes of claiming double tax relief under Article 23 (Relief from Double Taxation) even if such tax would not be considered an "income tax" under § 901 or "a tax paid in lieu of a tax on income" under § 903.[93] In addition, Article 2(4) provides that legislation enacted by one of the Contracting States after the date that the treaty is

---

[86] 1996 Technical Explanation, art. 23(2).

[87] *See, e.g.,* U.S.-Australia Treaty, art. 22(2); U.S.-Ireland Treaty, art. 24(4); U.S.-Japan Treaty, art. 23(1); U.S.-Mexico Treaty, art. 24(1); and U.S.-U.K. Treaty, art. 24(4).

[88] *See, e.g.,* U.S.-China Treaty, art. 22(1); U.S.-Egypt Treaty, art. 25(2).

[89] *See, e.g.,* U.S.-Germany Treaty, art. 23(3), art. 23(4) (exemption and credit method); U.S.-Luxembourg Treaty, art. 25(2) (exemption and credit method); and U.S.-Netherlands Treaty, art. 25(2), art. 25(3) (exemption and credit method). *See also* U.S.-Hungary Treaty, art. 20(2) (exemption and credit method); U.S.-Venezuela Treaty, art. 24(2) (exemption *or* credit method).

[90] *See, e.g.,* U.S.-Belgium Treaty, art. 22(1); U.S.-Hungary Treaty, art. 20(2); U.S.-Iceland Treaty, art. 5(2).

[91] *See, e.g.,* U.S.-Belgium Treaty, art. 22(1)(a) ("Where a resident of Belgium derives income . . . which has been taxed by the United States . . . Belgium shall exempt such income from tax but may, in calculating the amount of tax on the remainder of the income of that resident, apply the rate of tax which would have been applicable if such income had not been exempted."). This is the "exemption with progression" system referred to in III.A.4., above.

[92] The 2016 U.S. Model Treaty, art. 2(2), further elaborates that "taxes on income" includes "all taxes imposed on total income, or on elements of income, including taxes on gains from the alienation of property." The 2006 Technical Explanation, art. 2, ¶2, however, provides that the treaty "does not apply, however, to social security charges, or any other charges where there is a direct connection between the levy and individual benefits" and only applies to property taxes for purposes of Article 24 (Non-Discrimination). Nevertheless, the IRS opined that the so-called employee's portion of Federal Insurance Contribution Act (FICA), the social security tax imposed by § 3101–§ 3128, was a "covered tax" under the U.S.-Japan Treaty in force at that time, but that the so-called employer's portion of FICA was an excise tax and therefore not a "covered tax." TAM 200017043.

[93] FSA 1997 WL 33314914 ("For [a taxpayer] to be entitled to the [foreign tax] credits, it must: (1) identify the separate levies involved, and (2) establish that the levies themselves are either creditable 'income taxes' under section 901, taxes 'in lieu of' income taxes under section 903, *or taxes covered by an applicable income tax treaty.*") (emphasis added); FSA 200047041 (holding that the modified Canadian Income Tax Act was a creditable income tax for purposes of § 901 and § 903 under the U.S.-Canada Treaty as then in effect, which specifically provided that such tax was to be considered an income tax, but was not a creditable tax for purposes of § 901 and § 903 under the prior 1942 U.S.-Canada Treaty, which provided only that the Canadian income taxes would be creditable subject to the otherwise applicable limits of those sections).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

## Add85

signed will also be deemed to be income taxes under Article 2(3) if such newly enacted legislation is "identical or substantially similar" to the legislation listed in Article 2(3).

Rev. Rul. 2002-16 addresses the meaning of "identical or substantially similar" legislation in the context of such a treaty provision. In that ruling, the IRS confirmed that the Netherlands investment yield tax was substantially similar to a prior Dutch tax that was a "covered tax." In making the decision, the IRS applied a facts and circumstances test to determine whether the new Dutch tax was substantially similar to the prior Dutch tax.[94] It is not clear that the substitution of a vaguely defined facts and circumstance test is an analytical improvement over the vaguely defined term "substantially similar"; however, it appears that the IRS intended for the analysis to focus on whether the new Dutch tax was intended to tax effectively the same tax base as the prior Dutch tax.[95] The ruling also notes that the "substantially similar" inquiry will be revisited if the new legislation is further amended.[96]

### D.   Re-Sourcing

#### 1.   General Re-Sourcing Issue and Types of Re-Sourcing Provisions

Given that the United States (and in many cases the Treaty Partner) already provides a foreign tax credit mechanism, Article 23's double taxation relief would be essentially superfluous except in cases where the treaty in question permits the Treaty Partner to tax U.S.-source income of U.S. citizens or residents; or, conversely, permits the United States to tax Treaty Partner-source income of Treaty Partner residents. That is, as discussed in III.A., above, even without a treaty, U.S. income tax law provides a tax credit for foreign taxes paid with respect to foreign-source income earned by a U.S. resident or citizen, subject to the limitations of § 904 and other Code provisions. But in some cases a foreign government will assert taxing authority over income that U.S. tax law defines as U.S. source. Indeed, a tax treaty may cede primary taxing jurisdiction over such income to the foreign country. If such income is not recharacterized as foreign-source income — commonly referred to as "re-sourced" income — the taxpayer would not be protected from double taxation.

For a case illustrating how the absence of a re-sourcing provision in the applicable treaty results in double taxation, see *Filler v. Commissioner*.[97] That case involved a U.S. citizen who was a resident of and employed in France. He spent a few days a year on business in the United States, resulting in an allocation of a small portion of his income to U.S. sources under domestic U.S. tax law. France asserted the right to tax his entire income on the basis of residence, and under Article 15 (the personal services article) of the then-applicable treaty,[98] would have had sole jurisdiction to tax his income because he was not resident of the United States. However, due to the Saving Clause,[99] the Tax Court held that the United States retained the right to tax him as a U.S. citizen. The Tax Court further held that the relief from double taxation article of the treaty neither prevented the United States from taxing the income, nor required a credit for French taxes paid on the U.S.-source income.

> [T]he effect of [the Saving Clause] is to reserve the right of the United States to tax its citizens and residents on the basis of the provisions of the Internal Revenue Code without regard to the provisions of the treaty. . . . Since the savings clause does not include article 15 among the articles which take precedence over the savings clause, the savings clause has the effect of providing that the source of income allocation rules found in the Internal Revenue Code are applicable to U.S. citizens, rather than the provisions of article 15.

> ***

> It is true that the savings clause does not affect the convention rules on relief from double taxation, found in article 23. However, a fair reading of this provision indicates that petitioner is entitled to a tax credit from France, and not the United States, in respect of compensation for services performed in the United States. . . . It is reasonable to infer that since the convention contemplated the use of a per-country limitation (as was then provided in section 904(a)(1) of the Code), it was also assumed that the related Code sections determining the source of income (including section 861(a)(3)) would also be applicable, as those source of income provisions are necessary for application of a per-country limitation on the credit. . . . *Thus, it seems clear that in Article 23 of the Convention, the United States consented only to provide a foreign tax credit on income attributable to sources in France, as determined under the source of income rules of the Internal Revenue Code, and not to income from United States sources.*[100]

---

[94] Rev. Rul. 2002-16 ("There is no definitive test for whether a tax is substantially similar to a covered tax; rather, the outcome rests on the facts and circumstances of each particular case.")

[95] This apparent focus is seen in Rev. Rul. 2002-16, which analyzed the amount of the prior law's tax base covered by the new tax:

> Under the new system, each form of income may be included in only one box. If there is a loss in one box, it may not offset positive income in the other two boxes. The loss may, however, be carried over and deducted against income in that box in a later year. In addition, if a taxpayer incurs a loss on the complete termination of his or her substantial interest that is subject to tax in Box 2, as much as 25% of that loss may be applied against the Box 1 tax.

> Box 1 taxable income comprises approximately 95% of the total income tax base. Boxes 2 and 3 comprise approximately 1.5% and 3.5% respectively of the total income tax base.

[96] Rev. Rul. 2002-16 ("If it is concluded that a newly enacted tax is substantially similar to a covered tax, it also becomes a covered tax, but remains so only until such time as it is amended. When that occurs, a separate analysis must be made in order to determine whether the amended tax is substantially similar to the taxes in force at the time the treaty was signed.").

[97] 74 T.C. 406 (1980). The applicable treaty was the U.S.-France Treaty of 1967, as amended by the 1970 protocol.

[98] Under that provision, standing alone, the United States would not have had the power to tax such income because the taxpayer was not present in the United States for a period exceeding 183 days.

[99] See II., above.

[100] 74 T.C. at 410–13 (footnotes and citations omitted, emphasis added).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-55871-827-6

Thus, the court implicitly rejected the position that income should be re-sourced to avoid double taxation in the absence of a specific treaty provision to that effect.[101]

The implication of such a holding is that a treaty, in effect, gives no further protection from double taxation — at least to a U.S. citizen or resident — than is afforded under the Code itself. The unfortunate taxpayer's only remaining remedy would be to seek competent authority relief on a case-by-case basis.[102]

U.S. model treaties and many U.S. treaties in force have adopted a variety of explicit re-sourcing provisions to avoid this result. Although varying in specifics, such re-sourcing provisions generally attempt to avoid double taxation by sourcing the income in question consistently with the treaty's assignment of primary taxing jurisdiction, thereby enabling the taxpayer to claim a foreign tax credit with respect to the income.

Very generally, there are four types of re-sourcing provisions in U.S. treaties.[103] The first type of re-sourcing provision in U.S. treaties uses a general (or blanket) re-sourcing approach. With respect to U.S. Model Treaties, as noted in III.D.3., III.D.4., and III.D.5, below, a version of this type of re-sourcing provision first appeared in the 1981 U.S. Model, was dropped from the 1996 U.S. Model Treaty, and returned in the 2006 U.S. Model Treaty. The Technical Explanation to Article 23(3) of the 2006 U.S. Model Treaty explains that such an approach is "intended to ensure that a U.S. resident can obtain an appropriate amount of U.S. foreign tax credit for income taxes paid to the other Contracting State when the Convention assigns to the other Contracting State primary taxing rights over an item of gross income." This general re-sourcing provision is also contained in the 2016 U.S. Model Treaty, and U.S. treaties with China, Germany, Japan, and the United Kingdom.[104]

The second type of re-sourcing provision in U.S. treaties re-sources only income earned by U.S. citizens residing in the Treaty Partner country. U.S. treaties containing this type of re-sourcing provision include treaties with Denmark, France, Italy, South Africa, and Switzerland.[105] The problem with such a re-sourcing provision can be illustrated as follows. Assume that a U.S. individual does not reside in the applicable treaty country (e.g., Italy), but instead resides in the United States. If, in accordance with the U.S.-Italy Treaty, an item of income is subject to Italian tax, but is U.S. source under the Code, no relief from double taxation generally is available to such U.S. individual because the United States limits its obligation to provide a foreign tax credit.[106]

The third type of re-sourcing provision in U.S. treaties contains a re-sourcing rule, but it is subject to those domestic sourcing rules of the Treaty Partners that apply for purposes of limiting the foreign tax credit.[107] U.S. treaties containing this type of re-sourcing provision include treaties with Austria, Estonia, Latvia, Luxembourg, and Sweden.[108]

The fourth type of re-sourcing provision is found in certain older U.S. treaties, and is a location-of-sale test for sourcing sales of personal property. U.S. treaties containing this type of re-sourcing provision include treaties with Cyprus, Egypt, Indonesia, Israel, Jamaica, Korea, Morocco, and Norway.[109] These treaties generally provide sourcing rules for various types of income. Two key exceptions to these four categories of re-sourcing rules are the U.S. treaties with India and Thailand.[110]

---

Department technical explanation ("Paragraph 1 [of Article 27 of the U.S.-Australia Treaty] provides source rules. Income derived by a resident of the United States, which, under the Convention, may be taxed by Australia, is deemed to have its source in Australia . . . . With respect to U.S. citizens who are residents of Australia, to the extent that income which they derive is taxed by the United States by virtue of paragraph 3 of Article 1 (Personal Scope), such income is deemed to have its source in Australia for purposes of giving [e]ffect to paragraph 4 of Article 22 (Relief from Double Taxation).").

In addition, Article 23 of the 2013 proposed U.S.-Poland Treaty and Article 24 of the 2015 proposed U.S.-Vietnam Treaty contain a general re-sourcing provision.

[105] See U.S.-Denmark Treaty, art. 23; U.S.-France Treaty, art. 24; U.S.-Italy Treaty, art. 23; U.S.-South Africa Treaty, art. 23; and U.S.-Switzerland Treaty, art. 23.

[106] See, e.g., U.S.-Italy Technical Explanation, art. 23, ¶2 ("The credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.").

[107] See, e.g., U.S.-Latvia Treaty, art. 24(3) ("For the purposes of allowing relief from double taxation pursuant to this Article, and subject to such source rules in the domestic laws of the Contracting States as apply for purposes of limiting the foreign tax credit, income derived by a resident of a Contracting State which may be taxed in the other Contracting State in accordance with this Convention (other than solely by reason of citizenship in accordance with paragraph 4 of Article 1 (General Scope)) shall be deemed to arise in that other State.").

[108] See U.S.-Austria Treaty, art. 22; U.S.-Estonia Treaty, art. 23; U.S.-Latvia Treaty, art. 24; U.S.-Luxembourg Treaty, art. 25; and U.S.-Sweden Treaty, art. 23.

[109] See U.S.-Cyprus Treaty, art. 6; U.S.-Egypt Treaty, art. 4; U.S.-Indonesia Treaty, art. 7; U.S.-Israel Treaty, art. 4; U.S.-Jamaica Treaty. art. 24; U.S.-Korea Treaty, art. 6; U.S.-Morocco Treaty, art. 5; and U.S.-Norway Treaty, art. 24.

[110] See U.S.-India Treaty, art. 25; and U.S.-Thailand Treaty, art. 25. For example, the Treasury Department's Technical Explanation to Article 25 of the U.S.-India Treaty explains that

---

[101] Subsequent treaties, including the U.S. model treaties, have addressed the specific issue arising in *Filler*, that is, the double tax that can arise when a U.S. citizen is a resident of a Treaty Partner. See III.D.6., below. The U.S.-France Treaty rules have also undergone significant modification. GCM 38792 (Aug. 28, 1981) refused to imply a re-sourcing provision more liberal than that literally applying under the amended U.S.-France Treaty re-sourcing rule in order to relieve a U.S. citizen resident in France from double taxation on alimony income — alimony not being a type of income specifically included in the applicable re-sourcing provision of the treaty.

[102] See VII., below. In addition to case-by-case resolution, competent authorities sometimes enter into general agreements designed to address recurring instances of double taxation. For example, a 1997 agreement between the U.S. and French competent authorities alleviates double taxation for compensation received for services rendered to the French government by a U.S. permanent resident; the agreement requires the United States to grant a foreign tax credit for French taxes on such compensation, even though the income would be considered U.S. source under U.S. domestic law. Announcement 97-61.

[103] See N.Y. State Bar Ass'n Tax Section, *Report on Treaty Re-Sourcing Rules*, Nov. 24, 2014, *available at* http://www.nysba.org/Sections/Tax/Tax _Section_Reports/Tax_Reports_2014/Tax_Section_Report_1313.html (2014 NYSBA Report) (discussing the four types of treaty re-sourcing provisions in U.S. treaties).

[104] See 2016 U.S. Model Treaty, art. 23; U.S.-China Treaty, art. 22; U.S.-Japan Treaty, art. 23; U.S.-Germany Treaty, art. 23; and U.S.-U.K. Treaty, arts. 6, 13, and 24. The U.S.-U.K. Treaty, art. 13(6), provides that one Contracting State may tax income from the disposition of property of taxpayers who have resided within that Contracting State within the prior six years, notwithstanding the general "state of residence" rule for personal property in art. 13(5). The U.S.-Australia Treaty contains a modified version of the general re-sourcing provision. See U.S.-Australia Treaty, art. 27 and its accompanying Treasury

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

**Add87**

### 2. *Additional Source-Mismatch Examples*

Although in most instances a treaty's assignment of primary taxing jurisdiction will be consistent with U.S. domestic tax law sourcing rules, the mismatch problem can arise under a variety of circumstances. In each of these cases, the mismatch could result in double taxation in the absence of a treaty with an applicable re-sourcing provision.

*Example 1:* Individual I is a U.S. citizen who is a resident of Country X. I is the beneficiary of several U.S. trusts that hold marketable securities consisting primarily of publicly traded stocks. I does not have any non-U.S.-source income other than through these trusts.

Under Country X's tax law, a capital gains tax is imposed upon Country X resident-beneficiaries arising from the deemed disposition of the trust assets. I is subject to the Country X tax because I resides in Country X. Assume that the Country X capital gains tax rate is 35%; however, on such a deemed disposition, the capital gains tax is based only on asset appreciation from a certain date and not the assets' actual historical cost. Also, assume that the Country X capital gains tax is a creditable foreign tax for U.S. federal income tax purposes, and that the Country X tax rules treat the gain as Country X-source income.

As discussed above, the § 904 limitation may disallow a foreign tax credit that would have otherwise eliminated double taxation of income. Section 865(a)(2) provides the general rule that income from the sale of personal property is sourced outside the United States if sold by a nonresident of the United States (such as I). Section 865(g)(2), however, further provides that a U.S. citizen (such as I) will not be treated as a nonresident of the United States with respect to the gain on the sale of personal property unless "an income tax equal to at least 10% of the gain derived from such sale is actually paid to a foreign country with respect to that gain."[111] This requirement presents two potential issues with respect to I:

(1) will the effective rate of Country X tax be at least 10% of the gain realized under U.S. tax principles? and

(2) will the tax be considered imposed on the "sale" for U.S. tax purposes?

As to the first issue, in order to meet the requirements of § 865(g)(2), the Country X tax must be at least 10%, applying U.S. tax principles.[112] For example, if the Country X tax imposed had a nominal rate of 35% of the taxable gain under Country X tax principles, but the effective rate of tax amounted only to 5% of the gain as computed under U.S. tax principles (i.e., without the special Country X rule that counts only gain after a certain date), there would be significant doubt as to whether the Country X tax would meet the "10% or more" tax requirement of § 865(g)(2).

As to the second issue, there is a disconnect between the taxable event for Country X purposes (the option grant) and the taxable event for U.S. purposes (exercise of the option), which may prevent the Country X tax from being considered imposed on a sale or exchange giving rise to income for U.S. tax purposes. Upon the occurrence of the deemed disposition that is a taxable event for Country X purposes, no gain is recognized and thus no gain is able to be re-sourced under § 865 for U.S. tax purposes. Even if I actually sold I's share of the marketable securities, the § 865 sourcing rules would not apply because no Country X tax of at least 10% would be imposed on the actual sale.

Consequently, the § 865 sourcing rules do not source the gain (either the deemed disposition or an actual sale) outside the United States. Thus, in the absence of a treaty re-sourcing provision, I will be unable to claim a foreign tax credit for the Country X taxes paid on the deemed disposition.[113]

*Example 2:* Different timing rules can create a mismatch. Individual I is a U.S. citizen who is issued stock options by his employer in connection with I's work performed in the United States and Country X. Assume that Country X (a U.S. Treaty Partner) taxes stock options upon their grant (with a formulary determination of income). The United States generally taxes stock options only upon their exercise. Moreover, assume that the United States and Country X have differing views on sourcing I's income attributable to the stock options. This example is similar to *Example 1*

---

[p]aragraph 3 [of Article 25] provides rules for determining the source of income for purposes of the treaty foreign tax credit. The general rule is (1) that income of a resident of a Contracting State is deemed to arise in the other Contracting State, if that other State is given the right to tax that income by the Convention, so long as that taxing right is not solely on the basis of citizenship in accordance with the saving clause of paragraph 3 of Article 1 (General Scope); and (2) if a resident of a Contracting State derives income which, in accordance with the Convention, may not be taxed in the other State, the income is deemed, for purposes of the credit, to be sourced in the first-mentioned Contracting State. If, however, the rules in the laws of a Contracting State for the determination of source of income for foreign tax credit purposes differ from the general rule stated above, the statutory rule will apply. This granting of precedence of statutory source rules over the treaty source rule, however, does not apply to determining the source for credit purposes of royalties and fees for included services dealt within Article 12 (Royalties and Fees for Included Services).

See also 2014 NYSBA Report; Shefali Goradio & Carol P. Tello, *Conflicts and Issues Under the U.S.-India Tax Treaty*, 10 Int'l Tax'n 35 (Jan. 2014).

[111] *See also* § 865(e)(1) (providing similar sourcing rules and a minimum 10% foreign country income tax for sales of personal property by a U.S. citizen attributable to an office or other fixed pace of business in a foreign country).

[112] *See, e.g.*, PLR 9735014 (for purposes of § 865, a U.S. citizen or resident is treated as a nonresident if such individual (1) maintains a tax home outside the United States and (2) pays an income tax equal to at least 10% of the gain realized under U.S. tax principles to a foreign country); Notice 88-35 (U.S. citizens will be treated as U.S. residents for purposes of § 865 unless the taxpayer pays to a foreign country a tax on the sales income at an effective rate of at least 10%).

[113] Note that even if the relevant treaty has a re-sourcing provision, it may not necessarily apply. In that case, individual I would need to seek competent authority relief. For example, the re-sourcing rules under the 1975 U.S.-U.K. Treaty would not have sourced such income to the United Kingdom. *See* Article 23(3) of the 1975 U.S.-U.K. Treaty and the accompanying technical explanation. Specifically, the 1975 treaty technical explanation provides that if a U.S. citizen is subject to U.S. tax by reason of his citizenship under the Saving Clause of the treaty, the United States will allow that person to claim a credit for U.K. taxes with respect to income *that is U.K. source under U.S. internal law*. Because the income in example 1 is not foreign-source income under U.S. law, this re-sourcing provision does not resolve individual I's double tax quandary. Thus, individual I would need to seek competent authority relief to ameliorate the situation. Similarly, the current U.S.-U.K. Treaty would not resolve individual I's double tax quandary. *See* Article 24 of the 2001 U.S.-U.K. Treaty and the accompanying technical explanation.

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-55871-987-6

above due to the disconnect between the taxable event for Country X purposes (grant) and the taxable event for U.S. purposes (exercise). Without an applicable treaty re-sourcing provision, individual I will likely be unable to claim a U.S. foreign tax credit for the Country X taxes paid upon the grant of the stock options. Note that the re-sourcing provision in the 2016 U.S. Model Treaty (Article 23(3)) would not ameliorate individual I's income timing mismatch problem.[114]

*Example 3:* Directors' fees. Individual I is a resident of the United States and provides director's services for a corporation resident in Country X, with which the United States has a treaty. Article 15 of the 2016 U.S. Model provides that such fees may be taxed by Country X to the extent the services are rendered in Country X. Such fees would be compensation income and treated as foreign source under § 862(a)(3). Thus, a foreign tax credit would be available under U.S. law and re-sourcing would not be necessary. However, Article 16 of the OECD Model Treaty, and some treaties to which the United States is a party, do *not* limit the Treaty Partner's right to tax director's fees solely to compensation attributable to services performed in that country (i.e., Country X).[115] In such a case, Country X could tax I on compensation received for director services performed in the United States. Such income would be deemed U.S. source under U.S. law, and therefore not eligible for a foreign tax credit in the absence of an applicable treaty re-sourcing provision.[116]

*Example 4:* FC is a foreign corporation resident in Country X, but earns all of its income from sales in the United States. Any dividend paid to a U.S. shareholder would be subject to withholding tax by FC under Article 10(2), but would be treated as U.S.-source income under § 861(a)(2)(B). Absent an applicable treaty re-sourcing provision, double tax relief for the U.S. shareholder would not be assured.

*Example 5:* Assume that U.S. citizens employed by a U.S. engineering firm (US Firm) prepare construction drawings for a project in Country X. US Firm also provides certain advisory services to a local Country X construction engineering company. The incidental services are provided in the United States by U.S.-based employees. US Firm has no employees, principals, office, or other operations in Country X, and none of US Firm's services-related income is foreign-source income under U.S. law. Under Country X domestic tax law, though, such incidental services are treated as royalty income and subject to tax by Country

X.[117] In the absence of an applicable treaty re-sourcing provision treating such income as foreign source, US Firm will be unable to claim a foreign tax credit for the Country X taxes paid on its advisory service income.[118]

*Example 6:* Individual I is a U.S. citizen who resides in the United States and owns one-third of the stock of Corporation C, a Country X corporation. Assume that I sells all of her Corporation C stock and that I has no foreign-source income. Country X domestic tax law imposes tax on stock sales by significant shareholders of Country X corporations, including sales by non-Country X citizens or residents such as I.[119] Generally, the sale of stock by a U.S. resident is U.S.-source income under § 865(a)(1).[120] In the absence of an applicable treaty re-sourcing provision treating such income as foreign source, I will be unable to claim a foreign tax credit for the Country X taxes paid on the stock sale.[121]

In each of these cases, the absence of a re-sourcing provision would lead to double taxation. The various U.S. Model Treaties, as well as treaties in force, have addressed this problem in a variety of ways.

### 3. The 1981 U.S. Model Treaty

Article 23 of the 1981 U.S. Model Treaty provided double tax relief through a credit mechanism, similar to the 2016 (and 2006) U.S. Model Treaty provision discussed above.[122] To effectuate such relief, Article 23(3) of the 1981 U.S. Model Treaty provided a re-sourcing rule as follows:

> For the purpose of allowing relief from double taxation pursuant to this Article, income shall be deemed to arise exclusively as follows
>
> (a) income derived by a resident of a Contracting State which may be taxed in the Other Contracting State in accordance with this Convention (other than solely by reason of citizenship in accordance with [the Saving Clause]) shall be deemed to arise in that other State;
>
> (b) income derived by a resident of a Contracting State which may not be taxed in the Other Contracting State in accordance with the Convention shall be deemed to arise in the first-mentioned State.

---

[114] *See* N.Y. State Bar Ass'n, *Report on the Model Income Tax Convention Released by the Treasury on November 15, 2006*, Report No. 1127, at 49-50 (Apr. 11, 2007), *available at* http://www.nysba.org/Sections/Tax/Tax_Section_Reports/Tax_Reports_2007/1127_Report_pdf.html.

[115] *See, e.g.,* U.S.-Denmark Treaty, art. 16; U.S.-China Treaty, art. 15; U.S.-India Treaty, art. 17 and accompanying technical explanation; U.S.-Latvia Treaty, art. 16 and accompanying technical explanation.

[116] As discussed in II.D.1., above, the U.S.-Italy Treaty, for example, contains a limited re-sourcing provision and thus this situation could result in double taxation absent Competent Authority relief. In particular, the re-sourcing provision of Article 23(4) of the U.S.-Italy Treaty sources certain income as Italian if it is earned by a U.S. citizen resident in Italy.

[117] *See, e.g.,* Article 12 of the U.S.-India Treaty, dealing with royalties, which permits a Contracting State to collect withholding tax with respect to "included services."

[118] Article 25(3) of the U.S.-India Treaty (including flush language) contains a re-sourcing provision that should eliminate this problem with respect to Article 12 included services. Although the re-sourcing provision is generally neutered by a sentence that states "the determination of the source of income for purposes of this Article shall be subject to such source rules in the domestic laws of the Contracting States as apply for the purpose of limiting the foreign tax credit," the next sentence relaxes this rule for Article 12 income: "The preceding sentence shall not apply with respect to income dealt with in Article 12 (Royalties and Fees for Included Services)."

[119] *See, e.g.,* Article 12(5) of the U.S.-China Treaty, which permits a Contracting State to tax gains from the sale of stock representing a 25% participation in a company resident in that Contracting State.

[120] *But see* § 865(h) (discussed in III.E.2., below).

[121] Article 22(3) of the U.S.-China Treaty contains a re-sourcing provision that should eliminate this problem.

[122] Interestingly, though not directly relevant here, in addition to making the credit subject to the rules of the Code, the 1981 U.S. Model Treaty provided an independent limitation mechanism. *See* 1981 U.S. Model Treaty, art. 23(1) (flush language).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

The rules of this paragraph shall not apply in determining credits against United States tax for foreign taxes other than the taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes Covered).

In other words, if Taxpayer, a resident of Country 1, had income that was taxable by Country 2 under the treaty, such income would be re-sourced to Country 2 in order for Taxpayer to obtain double tax relief through use of the foreign tax credit. This was intended to solve the double taxation problem referred to in III.D.1., above.

However, query whether the clause was broad enough to accomplish this goal in all instances. For example, under the facts of the *Filler* case,[123] Mr. Filler was a resident of France, and a U.S. citizen, who earned income from services in the United States that was sourced to the United States under U.S. domestic tax law, but to France under the treaty (leaving aside the Saving Clause). Article 23(3)(a) of the language quoted above would not protect Mr. Filler due to the parenthetical language "(other than solely by reason of citizenship in accordance with [the Saving Clause])," which has the effect of carving out taxes imposed pursuant to the Saving Clause. That is, Mr. Filler was a resident of a contracting state, France, and derived income taxable by the Other Contracting State, the United States, solely by reason of citizenship in the United States under the Saving Clause; therefore, the U.S.-source income would not be re-sourced. Nor would Article 23(3)(b) protect Mr. Filler, because the income in question *could* be taxed by the United States under the treaty (again due to the Saving Clause).

### 4. The 1996 U.S. Model Treaty

Article 23(1) of the 1996 U.S. Model Treaty also, for U.S. citizens or residents, provided relief from double taxation via the credit method with language virtually identical to that of the 2006 and 2016 U.S. Model Treaties, Article 23(2), discussed above at III.B.1. Thus, the credit provided under the 1996 U.S. Model Treaty was subject to the limitations applicable under U.S. domestic tax law, just as it is under the 2016 Model and the 1981 U.S. Model Treaty. Interestingly, though, the 1996 Model did not include a general re-sourcing provision as contained in the 1981 Model,[124] and the 1996 Technical Explanation did not explain why the re-sourcing provision was dropped. Some commentators suggest that re-sourcing is implied under the general concept of double tax relief,[125] so the drafters may have considered the re-sourcing provision unnecessary.

Such an "implied re-sourcing" position appears questionable, however. The language in the 1996 Technical Explanation

can be read to undermine the argument that re-sourcing is necessarily implied through the concept of double tax relief: "As indicated, the U.S. credit under the Convention is subject to the various limitations of U.S. law . . . . For example, the credit against U.S. tax generally is limited to the amount of U.S. tax due with respect to *net foreign source income* within the relevant foreign tax credit limitation category (*see* § 904(a) and (d) . . . .)."[126] Also undermining the implied re-sourcing position are *Filler v. Commissioner*[127] and GCM 38792.[128] Moreover, the implied re-sourcing argument is undercut by the fact that some treaties that were either negotiated around the time of the issuance of the 1996 U.S. Model Treaty (September 20, 1996), or entered into after the issuance of the 1996 U.S. Model Treaty, contain a general re-sourcing provision.[129] This would not have been necessary if re-sourcing were available even in the absence of a specific provision to that effect. If re-sourcing is not a remedy implied to effectuate double tax relief, the absence of an explicit re-sourcing provision in the 1996 Model means that the only recourse for taxpayers adversely impacted by incompatible income sourcing rules of the two domestic tax systems would be to seek relief through the mutual agreement procedure of Article 25.[130]

Alternatively, the drafters may have omitted the re-sourcing provision because they felt it would not be appropriate to provide relief to any greater extent than provided under U.S. domestic tax law.[131] As such an attitude is at odds with a major purpose of the tax treaty network,[132] relief from double taxation, it may also be that the drafters omitted a re-sourcing provision from the 1996 U.S. Model Treaty based on the belief

---

[123] 74 T.C. 406 (1980); see the discussion of *Filler* in III.D.1., above.

[124] The 1996 U.S. Model Treaty did, however, contain a limited re-sourcing provision applicable to cases where a U.S. citizen was a resident of the Treaty Partner. See discussion in III.D.6., below.

[125] *See, e.g.*, Donald A. Finlayson, *U.S. Source Income Earned by Foreign Branches and Affiliates*, 47 Tax Law. 349, 366–67 (1994). Writing before the 1996 Model was released, Finlayson discussed the problem of double tax relief in treaties that did not contain an explicit re-sourcing rule such as contained in the 1981 Model. He suggested that "[t]he general relief from double taxation provision may be interpreted to require the U.S. to re-source income as foreign to allow a foreign tax credit for the Treaty Partner country taxes paid," but concluded that "substantial uncertainty" was associated with such a position, and that specific re-sourcing provisions were preferable.

[126] 1996 Technical Explanation to Article 23(1) (emphasis added). The reference to foreign-source income and the Code could be read to reject re-sourcing of U.S.-source income for double tax relief purposes.

[127] 74 T.C. 406 (1980), discussed in III.D.1., above; *Filler* held that the Code sourcing rules applied and declined to re-source income to avoid double taxation.

[128] Discussed above in III.D.1. The IRS in GCM 38792 (Aug. 28, 1981) refused to apply a liberal reading to expand the literal terms of a treaty re-sourcing provision in order to avoid double tax.

[129] *See, e.g.*, U.S.-Austria Treaty, art. 22(4); U.S.-Estonia Treaty, art. 23(3); U.S.-Ireland Treaty, art. 24(5); U.S.-Latvia Treaty, art. 24(3); U.S.-Luxembourg Treaty, art. 25(4). Other U.S. treaties entered into after the issuance of the 1996 U.S. Model Treaty contain a limited re-sourcing provision similar to Article 23(3)(c) of the 1996 U.S. Model Treaty. *See, e.g.*, U.S.-Denmark Treaty, art. 23(2)(c); U.S.-Japan Treaty, art. 23(3)(c); U.S.-South Africa Treaty, art. 23(2)(c); U.S.-Sweden Treaty, art. 23(3)(c); and U.S.-U.K. Treaty, art. 24(6)(d); *see also* U.S.-U.K. Treaty, Technical Explanation to Article 24(2) (stating that "the [1996 U.S.] Model [Treaty] does not contain a re-sourcing rule"). *See also* Staff of the Joint Committee on Taxation, Comparison of the United States Model Income Tax Convention of September 20, 1996 with the United States Model Income Tax Convention of November 15, 2006 (JCX-27-07) at 19, 110th Cong., 1st Sess. (2007) (characterizing the re-sourcing provision in Article 23 of the 2006 U.S. Model Treaty as "new").

[130] In *Filler*, discussed in III.D.1., above, the Tax Court suggested that the Taxpayer could resort to the mutual agreement procedure to obtain relief. For an explanation of the mutual agreement procedure, see VII., below; see also 940 T.M., *U.S. Income Tax Treaties — U.S. Competent Authority and Procedures*.

[131] *See* Richard L. Doernberg & Kees van Raad, *The 1996 United States Model Income Tax Convention: Analysis, Commentary and Comparison* at 190 (1997) (suggesting that the "U.S. view seems to be that Article 23 is intended to do almost precisely what would be permitted under U.S. domestic law").

[132] Richard L. Doernberg & Kees van Raad, *The 1996 United States Model Income Tax Convention: Analysis, Commentary and Comparison* at 190 (1997) (characterizing abandonment of the re-sourcing provision, and resulting potential for double taxation, as "entirely unsatisfactory" and "a step away from resolving the problem of double taxation.").

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-

Add90

that it would be more appropriate to address the issue on a case-by-case basis as actual treaties were negotiated.

Note, however, that the 1996 U.S. Model Treaty did include a limited re-sourcing rule applicable to U.S. citizens subject to U.S. tax due to the Saving Clause.[133] This provision would eliminate double taxation for Mr. Filler and other U.S. citizens in a similar position. An identical provision is included in the 2006 and 2016 U.S. Model Treaties and is discussed in III.D.6., below.

### 5. The 2006 and 2016 U.S. Model Treaties

As discussed in III.D.1., above, an explicit general re-sourcing provision returned with the release of the 2006 U.S. Model Treaty. The 2016 U.S. Model Treaty also contains the same provision. Article 23(3) of both model treaties provides:

> For the purposes of applying paragraph 2 of this Article, an item of gross income, as determined under the laws of the United States, derived by a resident of the United States that, under this Convention, may be taxed in ----- shall be deemed to be income from sources in -----.

In other words, if under the treaty the other country is permitted to tax an item of gross income derived by a U.S. resident, the United States will treat that income item as foreign source for U.S. foreign tax credit purposes. This rule is necessary (or at least desirable from a certainty standpoint) to enable the U.S. resident to receive the appropriate foreign tax credit (which, as has been noted, is subject to the rules and limitations of U.S. domestic law) for foreign taxes paid on income items of a type that are subject to tax by the Other Contracting State under the treaty.

This re-sourcing rule applies to gross, not net, income. Therefore, U.S. tax rules governing the allocation and apportionment of expenses[134] apply for the purpose of determining net income.[135] This reference to U.S. law expense allocation rules can in itself create mismatches similar to the income source mismatches targeted by the general re-sourcing provision. For example, even if an item of gross income is deemed to be foreign source, double tax could result if U.S. law allocated more expense to the foreign-source income than provided under the relevant Source State foreign law; this would have the effect of reducing the amount of foreign-source income, thus reducing the amount of foreign taxes eligible for the U.S. foreign tax credit, because the § 904 foreign tax credit limitation is imposed on the basis of taxable income. More complete double tax relief could be afforded by requiring the Residence State (in this case the United States) to allocate expenses to an income item consistent with the domestic tax rules of the Source State, which is the country with primary taxing jurisdiction over that income item.[136] The U.S. Model Treaties do not take this approach, however.

The 2006 Technical Explanation creates unnecessary uncertainty about the scope and application of the general re-sourcing rule, and without a 2016 Technical Explanation, this uncertainty remains unresolved in the 2016 U.S. Model. Under the language of the 2006 and 2016 U.S. Model Treaties, the re-sourcing provision applies to "an item of gross income . . . derived by a resident of the United States that, under this Convention, *may* be taxed in _____ [the Treaty Partner] . . . ,"[137] while the 2006 Technical Explanation states that re-sourcing applies to provide relief when the treaty "assigns to the Other Contracting State *primary taxing rights* over an item of gross income."[138] It is not clear if the drafters of the Technical Explanation intended that the formulation "primary taxing rights" have any significance, but on its face the phrase seems more restrictive than "may" tax. For example, a Treaty Partner "may" impose withholding tax on dividends payable by a resident corporation to a U.S. resident, but such dividends are also subject to tax by the United States. It is a matter of semantics which country has the "primary" right to tax such dividends. One could argue that it is the United States because its right to tax the recipient is not limited, while the Treaty Partner's withholding tax is limited to 5% or 15%.[139] If this were the case, though, re-sourcing would not be available under the language of the Technical Explanation, at least if taken literally, while it would be available under the language of the treaty itself.[140] It stands to reason that the treaty language would prevail, but it is curious that the Technical Explanation uses the "primary taxing rights" language.

An interesting issue arises under each of the 2006 and 2016 U.S. Model Treaties' general re-sourcing provisions, concerning the scope of those provisions for general U.S. foreign tax credit purposes: Does the general re-sourcing provision apply only to increase foreign-source income for purposes of computing the foreign tax credit limitation for taxes paid to the Treaty Partner, or does it apply generally for purposes of computing the foreign tax credit limitation for taxes paid to third

---

jurisdiction over such income; but further suggested that "the residence country should be permitted . . . to apply its own rules to apportion expenses not directly allocable to any item of income (i.e., in accordance with section 861 of the Internal Revenue Code)."

[137] 2016 U.S. Model Treaty, art. 23(3) (emphasis added).

[138] 2006 Technical Explanation of Article 23(3) (emphasis added).

[139] See 2016 U.S. Model Treaty, art. 10(2).

[140] As a practical matter this question often might not present a difficulty, because dividends payable by a foreign corporation are usually foreign source under § 861(a)(2)(B); thus re-sourcing to achieve double tax relief would not be necessary. However, this is not always the case. For example, a foreign branch of a U.S. corporation might be considered a resident of the foreign treaty country under its law, but dividends would nevertheless be considered U.S. source under U.S. law because they are payable by a U.S. corporation. § 861(a)(2)(A).

This potential conflict may be resolved by the Article 4 definition of resident in the 2006 and 2016 U.S. Models. The corporation could be considered a resident of the United States because it is liable to tax by reason of its place of incorporation, but also a resident of the foreign country due to its place of management or some similar criterion. See, e.g., 2016 U.S. Model Treaty, art. 4(1). In the case of such dual-resident corporations, Article 4(4) provides that the corporation is considered a resident of the state under whose laws it is created or organized. In that case, the corporation would be considered a resident of the United States and the foreign country would not be able to impose withholding tax because, under Article 10(2), the corporation would not be its resident. However, the point remains that under some circumstances the "primary taxing authority" language of the Technical Explanation may unnecessarily create uncertainty as to eligibility for double tax relief.

---

[133] See 1996 U.S. Model Treaty, art. 23(3)(c).

[134] See, e.g., Reg. § 1.861-9; Prop. Reg. § 1.861-9.

[135] 2006 Technical Explanation, art. 23(3).

[136] See TEI Calls for Stronger Protection From Double Taxation, 92 TNI 94-11 (Dec. 8, 1992). In its comments on a 1992 proposal to revise the 1981 U.S. Model Treaty, the Tax Executives Institute discussed this issue and recommended that the residence country be required to allocate expenses to an item of income consistent with the rules of the country with primary taxing

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

countries as well? Another way of stating this question is whether the re-sourcing provision in effect establishes a "per country" limitation with respect to taxes paid to the Treaty Partner.[141]

This issue may be best understood by the following example.

*Example:* Under U.S. sourcing rules, individual I is a U.S. citizen who under U.S. law sourcing rules has $600 of U.S.-source income, $0 of Country A-source income, and $100 of Country B-source income. Of the $600 U.S.-source income, $100 is subject to tax under the domestic law of Country A. The U.S.-Country A treaty cedes primary taxing jurisdiction over that income to Country A and contains a re-sourcing provision identical to that contained in the 2006 and 2016 U.S. Model Treaties. There is no U.S.-Country B treaty. The United States imposes tax on the income in question at a flat 35% rate; Country A at a 25% rate; and Country B at a 45% rate.

Under U.S. domestic law, without a treaty (and leaving aside foreign tax credits for a moment), I would owe $245 of U.S. tax (35% of $700 total income), $25 of Country A tax, and $45 of Country B tax. I's maximum potential foreign tax credit under U.S. law would be $70, but the U.S. foreign tax credit limitation would reduce that amount to $35.[142] Thus, I would pay a total of $280 tax to the three countries[143] and would be subject to $35 of double taxation.

The U.S.-Country A treaty would modify this result because the $100 of income subject to tax by Country A would be re-sourced to Country A. If such re-sourcing applied generally, I would have $200 of foreign-source income and the foreign tax credit limitation would increase to $70.[144] I could take a foreign tax credit of $70, pay a total tax of $245, and not be subject to double taxation.

If, however, the income were re-sourced only for purposes of providing a credit for Country A taxes, but not Country B taxes, I would still bear double tax in the amount of $10.[145]

Most U.S. tax treaties that contain a general re-sourcing provision apply the latter approach, making it clear that re-

sourcing applies only for purposes of eliminating double taxation with respect to taxes imposed by the Treaty Partner, not a third country. For example, the U.S.-Canada Treaty provides: "The provisions of this Article relating to the source of profits, income or gains shall not apply for the purpose of determining a credit against United States tax for any foreign taxes other than income taxes paid or accrued to Canada."[146] The 2006 and 2016 U.S. Model Treaties, however, do not contain such a provision, nor do several other treaties in force. Thus, it may be possible to argue, under treaties lacking such a provision, that the general re-sourcing provision applies for purposes of applying the U.S. foreign tax credit with respect to the entirety of the affected taxpayer's foreign taxes.

However, the introductory phrase to each of the 2006 and 2016 U.S. Model Treaties' general re-sourcing provision states that the provision applies "[f]or the purposes of applying paragraph 2 of this Article" (i.e., the general provision granting double tax relief to U.S. citizens or residents via a credit for taxes paid to the Treaty Partner). Arguably this phrase achieves the same result as more explicit language such as contained in the U.S.-Canada Treaty and similar treaties. That is, the re-sourcing provision applies for the purpose of granting double tax relief with respect to taxes paid to the particular Treaty Partner, not for taxes paid to other countries.[147] However, this intended result would be clearer if specific language to that effect were added, or even if the introductory phrase read "*Solely* for the purpose . . . ."[148]

### 6. U.S. Citizens Resident in the Other Contracting State

Article 23(4) of the 2006 and 2016 U.S. Model Treaties provides a special rule regarding U.S. citizens who are residents of the Other Contracting State, thus directly addressing the problem presented in the *Filler* case.[149] This rule is necessitated by the fact that the United States taxes its citizens on their worldwide income, regardless of their residence. The Saving Clause,[150] discussed in II., above, preserves the right of the United States to tax its citizens in accordance with U.S. domestic tax law even if they are residents of the Treaty Partner, and thus under the treaty would otherwise be eligible for treaty relief from (or eligible for a lower rate of) U.S. tax on U.S.-source income. The language of Article 23(4) is somewhat confusing, but its purpose is to enable the United States and the Treaty Partner to provide tax credits to prevent double tax while

---

[141] Since the Tax Reform Act of 1986, foreign-source income has been categorized into various "baskets," with the foreign tax credit limitation computed separately for each basket. This provision is designed to prevent taxpayers from averaging income subject to a high foreign tax rate with other, lower-taxed foreign-source income (thereby maximizing the total foreign tax credit available). *See* § 904(d). Prior to 1986, however, the foreign tax credit limitation was applied on a "per country" rather than a "per basket" basis. *See* 6060 T.M., *The Foreign Tax Credit Limitation Under Section 904*.

[142] That is, I would owe $70 total foreign tax ($25 to Country A and $45 to Country B), but the amount of foreign taxes creditable against $245 of U.S. tax could not exceed the ratio of foreign-source income ($100) to total income ($700); 1/7 of $245 is $35.

[143] That is, $210 U.S. tax ($245 − $35), plus $25 Country A tax, plus $45 Country B tax.

[144] That is, the ratio of foreign-source income to U.S.-source income would increase to $200/$700; 2/7 of $245 is $70.

[145] For purposes of crediting the Country A tax, I would have $200 of foreign-source income and the foreign tax credit limitation would be $70, derived as explained above. Therefore, the $25 of Country A tax would be fully covered. For purposes of crediting the Country B tax, however, I would be considered to have only $100 of foreign-source income, meaning that the foreign tax credit limitation applicable to Country B tax would be $35. As I

paid $45 of Country B tax, there would be double taxation with respect to $10.

[146] U.S.-Canada Treaty, art. 24(9) (as added by art. 11(3) of the First Protocol); *see similarly* U.S.-Austria Treaty, art. 22(4); U.S.-India Treaty, art. 25(3) (virtually identical to the Austrian treaty language); U.S.-Sweden Treaty, art. 23(3)(c) (same); U.S.-Thailand Treaty, art. 25(3) (same); U.S.-New Zealand Treaty, art. 22(4) (same).

[147] This argument gains force from the bilateral treaty context; the IRS could forcefully argue that an agreement between two sovereign states should not have any effect on tax credits granted with respect to taxes paid to a third country.

[148] Compare the language in the specific re-sourcing provision applicable to United States citizens residing in the Other Contracting State, discussed in III.D.6., below, which applies "for the exclusive purpose" of relieving double taxation between the two Treaty Partners, with re-sourcing applied "to the extent necessary" to prevent such double taxation.

[149] *Filler v. Commissioner*, 74 T.C. 406 (1980); see discussion of *Filler* in III.D.1., above.

[150] 2016 U.S. Model Treaty, art. 1(4).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-55871-376-6

preserving the United States' right to tax its citizens on world-wide income. The policy underlying Article 23(4) is that the United States, and not the Treaty Partner, should bear the burden of providing double tax relief in cases where double taxation results from the U.S. imposition of tax solely on the basis of U.S. citizenship.[151]

Article 23(4)(a) provides that the Other Contracting State need not provide tax credits for U.S. taxes paid by a U.S. citizen who is a resident of that Other Contracting State in excess of the amount of tax the United States could impose if that person were not a U.S. citizen, and thus not precluded from treaty benefits under the Saving Clause. For example, if the relevant treaty provided a 10% rate for withholding on U.S.-source dividends, but the United States imposed a rate of 33%, the Other Contracting State's tax credit need not exceed 10%.

Of course, under such circumstances, the U.S. citizen would be subject to double taxation if the Other Contracting State's tax rate exceeded 10%.[152] To alleviate this double taxation, Article 23(4)(b) of each of the 2006 and 2016 U.S. Model Treaties states that the United States will provide a tax credit for the Other Contracting State's tax remaining after the credit provided in Article 23(4)(a). Such credit, however, may not reduce the U.S. tax creditable against the Other Contracting State's tax under Article 24(4)(a), meaning that the United States need not offset U.S. tax to the extent it could be collected from a non-U.S. citizen resident of the Other Contracting State.

Finally, in order to provide the appropriate double tax relief, Article 23(4)(c) provides that the items of income described in Article 23(4)(a) are deemed to arise in the Other Contracting State, thus re-sourcing them. As discussed above, such re-sourcing is necessary to avoid double taxation, permitting the United States to credit foreign taxes paid on such income without violating U.S. rules.

*Examples*: The following two examples from the 2006 Technical Explanation illustrate the application of Article 23(4) in the case of a U.S.-source portfolio dividend received by a U.S. citizen resident of the Other Contracting State (FC). In both examples, the U.S. rate of tax on residents of FC under Article 10(2)(b) of the 2006 U.S. Model Treaty is 15%. In both examples, the U.S. income tax rate on the U.S. citizen is 35%. In Example 1, the income tax rate of FC on its residents (i.e., the U.S. citizen) is 25% (below the U.S. rate), and in Example 2, the rate on its residents is 40% (above the U.S. rate).

|  | Example 1 | Example 2 |
|---|---|---|
| **Paragraph 4(a)** |  |  |
| U.S. dividend declared | $100.00 | $100.00 |
| Notional U.S. withholding tax per Article 10(2)(b) | 15.00 | 15.00 |
| FC taxable income | 100.00 | 100.00 |
| FC tax before credit | 25.00 | 40.00 |
| FC foreign tax credit | 15.00 | 15.00 |
| Net post-credit FC tax | 10.00 | 25.00 |
|  |  |  |
| **Paragraphs 4(b) and (c)** |  |  |
| U.S. pre-tax income | $100.00 | $100.00 |
| U.S. pre-credit citizenship tax | 35.00 | 35.00 |
| Notional U.S. withholding tax | 15.00 | 15.00 |
| U.S. tax available for credit | 20.00 | 20.00 |
| Tax paid to FC | 10.00 | 25.00 |
| Income re-sourced from U.S. to FC[153] | 28.57 | 57.14 |
| U.S. tax on re-sourced income | 10.00 | 20.00 |
| U.S. credit for FC tax | 10.00 | 20.00 |
| Net post-credit U.S. tax | 10.00 | 0.00 |
| Total U.S. tax | 25.00 | 15.00 |

### 7. Hybrid Entities and Re-Sourcing

As discussed above, the 2006 and 2016 U.S. Model Treaties (as well as many treaties in force) provide for re-sourcing of what would otherwise be U.S.-source income to the extent such income is taxed by the Treaty Partner in order to provide relief from double taxation. In cases where the Treaty Partner uses the ordinary credit method as well, the treaty typically contains a reciprocal re-sourcing provision to protect the other country residents from double taxation. Under this provision,

---

[151] This policy provides a result that is the opposite of the Tax Court's conclusion in *Filler* that the French government erred by refusing to provide a French tax credit against the U.S. tax imposed on the taxpayer's U.S.-source income.

[152] Thus, for example, if the Other Contracting State had a 30% tax rate, U.S. Citizen would pay a combined rate of 55% — 35% U.S. tax plus 30% for that Other Contracting State's tax, less a 10% credit.

[153] In Example 1, the amount resourced is the net post-credit FC tax ($10) divided by the U.S. tax rate (35%). In Example 2, because the FC tax rate exceeds the U.S. tax rate, the amount re-sourced is the maximum amount of U.S. tax available for credit ($25) divided by the U.S. tax rate (35%). The 1996 Technical Explanation, art. 23, ¶3, containing a similar example based on a 36% tax rate, explains that:

In order for a U.S. credit to be allowed for the full amount of the [FC] tax, an appropriate amount of the income must be resourced. The amount that must be resourced depends on the amount of [FC] tax for which the U.S. citizen is claiming a U.S. foreign tax credit. In example I, the [FC] tax was $10.00. In order for this amount to be creditable against U.S. tax, $27.77 ($10 divided by .36) must be resourced as foreign source. When the [FC] tax is credited against the U.S. tax on the resourced income, there is a net U.S. tax of $11.00 due after credit. In example II, [FC] tax was $25 but, because the amount available for credit is reduced under subparagraph 3(c) by the amount of the U.S. source tax, only $21.00 is eligible for credit. Accordingly, the amount that must be resourced is limited to the amount necessary to ensure a foreign tax credit for $21 of [FC] tax, or $58.33 ($21 divided by .36). Thus, even though [FC] tax was $25.00 and the U.S. tax available for credit was $21.00, there is no excess credit available for carryover.

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

Add93

income subject to tax by the United States is deemed to be U.S.-source income.[154]

Application of such reciprocal re-sourcing rules in the case of income derived by a hybrid entity[155] is not entirely clear.[156] Consider the following example, based on the U.S.-U.K. Treaty's reciprocal re-sourcing provisions:

*Example:* U.S. Corp. owns U.K. Entity. U.K. Entity checks the box to be disregarded for U.S. federal tax purposes but is treated as a separate taxable entity for U.K. purposes. U.K. Entity earns interest income. The interest income would be considered under U.S. law to be derived by U.S. Corp., a U.S. resident, because U.K. Entity is disregarded. Under U.K. law, however, the interest income would be subject to U.K. tax as income of a U.K. resident entity.

Under Article 24(2)(a) of the U.S.-U.K. Treaty (equivalent to Article 23(3) of the 2006 and 2016 U.S. Model Treaties), an item of gross income derived by a resident of the United States but subject to tax by the United Kingdom is deemed to be U.K. source. Thus the interest income should be considered U.K. source because it is considered derived by U.S. Corp., a U.S. resident, but is subject to taxation by the United Kingdom. However, under the reciprocal provision providing re-sourcing for the benefit of U.K. residents (Article 24(5)), income of a U.K. resident that may be taxed by the United States is deemed to arise from sources in the United States. Under U.K. law, the interest income is considered earned by U.K. Entity, but because it is subject to tax by the United States, it should be deemed U.S.-source income. Thus the two provisions give circular, and diametrically opposed, results — depending on the starting point — the interest income can be viewed as U.S. source or U.K. source.

A workable resolution of this conflict would be to apply one or the other of the conflicting provisions, depending on

which country's domestic tax law was implicated. Thus, in the example, U.K. Entity is considered a resident taxpayer of the United Kingdom under U.K. domestic tax law. It would thus be liable for U.K. income tax on its interest income. The United Kingdom would not consider U.S. Corp. as subject to the U.K. tax. The United States, by contrast, would treat U.K. Entity as a branch of U.S. Corp. (due to its disregarded status) and therefore consider U.S. Corp. to have paid the U.K. tax. Therefore, it would be appropriate to credit the U.K. tax against any U.S. tax due on the interest income, which would be foreign source under Article 24(2) of the U.S.-U.K. Treaty. Although this is a reasonable result, the provisions could be read to provide other results as well. For example, U.K. Entity could argue that the interest income was subject to U.S. tax and claim a credit. Under Article 24(5), the interest income would be U.S. source because it is subject to U.S. tax.

In the case of the U.S.-U.K. Treaty, the Notes exchanged between the two governments resolve this apparent conflict. The Notes recognize that the treaty may permit one Treaty Partner (in our example, the United States) to tax its citizens or residents on income derived through a fiscally transparent entity, and may permit the other country (the United Kingdom) to tax the fiscally transparent entity on the same income.

> Under such circumstances, the tax paid or accrued by the entity shall be treated as if it were paid or accrued by the first-mentioned person [in our example, U.S. Corp.] for the purposes of determining the relief from double taxation to be allowed by the State of which that first mentioned person is a resident (or, in the case of the United States, a citizen) [in our example, the United States] . . . . It is further understood that paragraphs 2 and 5 of Article 24 shall apply to such an item of income, profit or gain to the extent necessary to provide relief from double taxation.[157]

In other words, the diplomatic Notes resolve the issue by adopting the first option in the preceding paragraph; the tax is treated as paid by U.S. Corp., with the income sourced to the United Kingdom for purposes of granting U.S. foreign tax credit relief to U.S. Corp. But in the absence of such clarifying diplomatic Notes, it would not be clear how the reciprocal re-sourcing provisions should be applied to effect double tax relief. It would be helpful if such clarification were provided in the case of U.S. treaties containing such reciprocal re-sourcing provisions, either in protocols or in the technical explanations.[158]

## E. Code Provisions Related to Re-Sourcing

### 1. Source Maintenance Rules Under Section 904(h)

There is an interesting interplay between the treaty re-sourcing rules and § 904(h), which provides its own set of statutory re-sourcing rules. The § 904(h) rules, sometimes referred to as "source-maintenance" rules, were designed to

---

[154] *See, e.g.,* U.S.-U.K. Treaty, art. 24(5): "For the purposes of paragraph 4 of this Article, profits, income and chargeable gains owned by a resident of the United Kingdom which may be taxed in the United States in accordance with this Convention shall be deemed to arise from sources within the United States."

[155] A "hybrid entity" is an entity that is treated as "fiscally transparent" (i.e., a pass-through entity) under the tax law of one jurisdiction but as a separate taxpayer under the tax law of the other jurisdiction. For example, a U.S. corporate shareholder may cause its wholly-owned foreign entity to "check the box," in which case the foreign entity will generally be disregarded for U.S. federal income tax purposes. *See* Reg. § 301.7701-3. But under the laws of the Other Contracting State, such entity may be treated as a separate taxpayer corporation. In a "reverse hybrid" situation, a U.S. entity may be recognized for U.S. federal tax purposes but disregarded as a separate entity under the laws of the Other Contracting State. The United States has entered into protocols to its treaties with France and Canada clarifying some aspects of the treatment of hybrid entities under those treaties. *See* Article 1(4) of the Protocol Amending the Convention Between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, Signed at Paris on August 31, 1994, as Amended by the Protocol Signed on December 8, 2004 (adding new paragraph 3 to Article 4 of the existing Treaty), entered into force on December 23, 2009 (2009 France Protocol); Article 2(2) of the Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and Capital Done at Washington on 26 September 1980 as Amended by the Protocols Done on 14 June 1983, 28 March 1984, 17 March 1995 and 29 July 1997 (adding paragraphs 6 and 7 to Article 4 of the existing Treaty), entered into force on December 15, 2008 (2008 Canada Protocol).

[156] Much of the following examples and discussion is indebted to Philip D. Morrison, *Re-Sourcing Income Under Treaties — Issues With Hybrid Entities*, 36 Tax Mgmt. Int'l J. 385 (Aug. 10, 2007).

[157] There is an exception for income or gains derived from real property; in that case, tax paid or accrued by a person resident in the country where the real property is located is treated as if paid by the resident of the other country.

[158] See further discussion in Philip D. Morrison, *Re-Sourcing Income Under Treaties — Issues With Hybrid Entities*, 36 Tax Mgmt. Int'l J. 385 (Aug. 10, 2007), above.

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

prevent U.S. taxpayers from avoiding U.S. tax by converting U.S.-source income to foreign-source income (thus achieving a higher foreign tax credit limitation) by routing the income through a foreign corporation that would then pay dividends to the U.S. shareholder.[159] These rules generally re-source a certain portion of otherwise foreign-source income (e.g., interest and dividends) as U.S.-source income; thus, they can be viewed as the converse of the 2006 and 2016 U.S. Model Treaty Article 23(3) re-sourcing rule. The source-maintenance rules add complexity to the Code and are in large part viewed as unnecessary, given subsequent amendment of the foreign tax credit provisions, but they continue in effect.

Section 904(h)(10), however, provides a rule for coordinating the statutory rule with treaty re-sourcing rules. In cases where the treaty would re-source an item of income derived from a U.S.-owned foreign corporation as foreign source, the taxpayer can elect to treat such an item of income as foreign-source income, even if § 904(h) would otherwise cause the income item to be treated as U.S. source. If the election is made, a separate credit limitation is computed for such item of income, with the rules of former § 902 (with respect to taxable years of foreign corporations beginning before 2018), § 904(a), § 904(b), § 904(c), § 904(d), and § 904(f), § 907, and § 960 applying separately to that income item.[160] Legislation enacted in 2010 generally extends the § 904(h)(10) treaty coordination concept to foreign branches and disregarded entities; thus, the foreign tax credit treatment of foreign branches and disregarded entities matches that of U.S.-owned foreign corporations.[161] Section 904(d)(6), enacted in 2010, is intended to extend the separation rule of § 904(h)(10) to entities other than U.S.-

owned foreign corporations; it thus limits taxpayers' ability to use enterprises such as branches and disregarded entities to bundle high-taxed foreign-source income with low-taxed resourced income to make excess foreign tax credits on the high-taxed foreign-source income available to offset U.S. tax on the low-taxed foreign-source income.[162] Practitioners have called for further guidance on this new provision, and the Treasury, at least shortly after enactment of § 904(d)(6), agreed that regulations elucidating this new law are a "high priority."[163] However, although such guidance appeared as a priority as recently as the 2016-2017 IRS Priority Guidance Plan, it has not appeared in later priority guidance plans.

In addition, although many treaties acknowledge the availability of the § 904(h)(10) election,[164] some treaties provide that U.S. sourcing rules (including § 904(h)) apply instead of the general treaty re-sourcing rule.[165]

### 2. Code Re-Sourcing for Gain From Sales of Foreign Stock and Intangibles

Section 865(h)(2)(A) contains a special sourcing rule that allows taxpayers to elect to treat gains from foreign stock and certain intangibles — which would otherwise be U.S.-source income under the § 865 sourcing rules — as foreign-source income, if such gains are treated as foreign-source income under an applicable tax treaty to which the United States is a party. Thus, § 865(h) permits taxpayers to elect to override the normal § 865 sourcing rules. Section 865(h) also has its own

---

[159] *See* H.R. Conf. Rep. No. 98-861, at 918–19 (1984); S. Rep. No. 98-432, at 1346 (1984). These provisions apply in the case of "United States-owned foreign corporations," defined as foreign corporations, 50% or more of whose vote or value is owned directly or indirectly by U.S. persons. § 904(h)(6). Note that § 402(a) of the AJCA redesignated former § 904(g) as § 904(h), effective for taxable years starting after 2006.

[160] § 904(h)(10)(A); Reg. 1.904-5(m)(7)(i). An illustration of the consequences that flow from the § 904(h)(10) election is set forth in Reg. § 1.904-5(m)(7)(ii). In addition, the preamble to the regulation package that includes Reg. § 1.904-5(m)(7) explains that:

> . . .if the taxpayer elects the benefits of the treaty, the income shall be treated as foreign source but the foreign tax credit rules shall be applied separately with respect to income treated as foreign source pursuant to each treaty under which the taxpayer has claimed benefits. Thus, the taxpayer must segregate income treated as foreign source under each treaty and then allocate the income within each treaty to a separate group of section 904(d) categories. For example, a taxpayer may not average general limitation income treated as foreign source under one treaty with general limitation income treated as foreign source under another treaty. A taxpayer also may not average general limitation income treated as foreign source under a treaty with passive income treated as foreign source under the same treaty.

*See* T.D. 8412, 57 Fed. Reg. 20,639, 20,641 (May 14, 1992).

[161] *See* § 904(d)(6); Education Jobs and Medicaid Assistance Act, Pub. L. No. 111-226, § 213 (EJMAA). Note that § 904(d)(6), which is effective for taxable years beginning after the date of enactment of the EJMAA (August 10, 2010), does not apply to any item of income to which § 904(h)(10) or § 865(h) applies. *See* § 904(d)(6)(B). In addition, § 904(d)(6)(C) provides Treasury with the authority to issue regulations or other guidance to carry out the purposes of § 904(d)(6), including regulations or other guidance which provide that related items of income may be aggregated. For a more detailed discussion of § 904(d)(6) and its implications, see 6060 T.M., *The Foreign Tax Credit Limitation Under Section 904*; Dirk J.J. Suringa, *The New § 904(d)(6) Limitation Category for Income Re-Sourced by Treaty*, 39 Tax Mgmt. Int'l J. 781 (Dec. 2010).

[162] *See* Staff of the Joint Committee on Taxation, *Technical Explanation of the Revenue Provisions of the Senate Amendment to the House Amendment to the Senate Amendment to H.R. 1586 Scheduled for Consideration by the House of Representatives on August 10, 2010* (JCX-46-10) at 19, 111th Cong., 2d Sess. (2010).

[163] *See* Dirk J.J. Suringa, *The New § 904(d)(6) Limitation Category for Income Re-Sourced by Treaty*, 39 Tax Mgmt. Int'l J. 781 (Dec. 2010) ("[T]he new limitation category will require some implementing guidance."); Shamik Trivedi, *FTC Splitter Guidance Still Coming, but Will Be a Challenge, IRS Official Says*, Tax Notes Today, Jan. 24, 2011 (noting that an attorney-adviser in the Treasury Department noted shortly after enactment of § 904(d)(6) that the Department had prioritized the issuance of guidance on that provision); Dep't of Treasury, 2011-2012 Priority Guidance Plan, at 1, 19 (Oct. 31, 2011) (listing "[g]uidance under 904(d)(6). . . on the separate application of the foreign tax credit limitation to items resourced under treaties" as one of the "priorities for allocation of [ ] resources").

[164] *See, e.g.,* 2006 Technical Explanation to Article 23 (referencing former § 904(g)(10)); Technical Explanation to Article 23 of the U.S.-Japan Treaty (referencing former § 904(g)(10)); Technical Explanation to Article 24 of the U.S.-U.K. Treaty (referencing former § 904(g)(10)).

[165] *See, e.g.,* Article 24 of the U.S.-Czech Republic Treaty and Technical Explanation (stating that the treaty's sourcing rules are generally "consistent with the Code source rules for foreign tax credit and other purposes. Where, however, there is an inconsistency between [the treaty] and Code source rules, the Code source rules (e.g., [former] Code section 904(g)) will be used to determine the limits for the allowance of a credit under the [treaty]. (Paragraph 3 of the Article provides an exception to this general rule with respect to certain U.S. source income of U.S. citizens resident in the Czech Republic.)"); Article 25(4) of the U.S.-Luxembourg Treaty and Technical Explanation; Article 22 of the U.S.-China Treaty and Technical Explanation (stating that "the amount of the credit to be allowed is determined in accordance with the limitations provided in the Code (*e.g.,* section 904(g) [now section 904(h)].)"); *see also* Article 24(3) of the U.S.-Mexico Treaty and Technical Explanation, as in effect prior to the 2003 Protocol ("domestic law source rules that apply for purposes of limiting the foreign tax credit will govern if they differ from the rules resulting from the treaty source rules. This permits the United States to apply the anti-abuse rules of [former] Code section 904(g), for example. An exception is made in the case of capital gains").

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

foreign tax credit limitation regime.[166] Therefore, any applicable gains under § 865(h) are foreign-source income, but the taxpayer cannot use the related credit for the foreign tax imposed on such gains to offset U.S. tax on any other item of income.[167] The legislative history explains that § 865(h) is an exception to the rule that the § 865 sourcing rules "generally prevail over any conflicting treaty sourc[ing] rules under the general later-in-time rule."[168]

An example in the legislative history to § 865(h) illustrates its application. The example provides that gain from the stock sale of a less-than-80%-owned foreign corporation by a U.S. resident is U.S.-source income. An applicable treaty, however, may treat such gain as foreign-source income. The statutory provision permits the U.S. resident to elect to treat the gain as foreign-source income, but the U.S. resident may credit only the foreign tax imposed on that gain against the U.S. tax imposed on that gain.[169]

### F. Variations in Treaties in Force

The most notable variation from the 2006 and 2016 U.S. Model Treaties in treaties in force is with respect to Other Contracting States that employ an exemption system rather than a credit system.[170] Under such treaties, the Other Contracting State fulfills its obligation to prevent double taxation by excluding items from income rather than providing a credit.[171]

Some treaties in force adopt a provision similar to Article 23(4) of the 2006 and 2016 U.S. Model Treaties,[172] dealing with residents of the Other Contracting State who are also citizens of the United States.[173] The purpose of such provisions is to prevent double tax attributable to the fact that the United States asserts taxing jurisdiction on the basis of citizenship, but under applicable domestic law, provides "double tax relief" only to the extent the taxpayer has foreign-source income.

Other treaties provide special rules for how double tax relief is applied to specific tax regimes of the Contracting States, usually related to taxes imposed in connection with the extraction or exploitation of natural resources.[174] Broadly speaking, these rules are intended to treat income and credits from the specified activities (e.g., extraction of minerals from oil and gas wells) separately from income derived from other activities.[175] Thus, under these rules, a taxpayer may be required to compute the U.S. tax that would be due with respect to income from such extraction activities under U.S. principles

and then compute the tax that would be due solely with respect to income from such extraction activities under the principles of the Other Contracting State in order to determine the credit, if any, one is entitled to claim.[176] These rules may even prescribe special carryforward rules so that "excess credits" in respect of extraction activities otherwise due may not offset income from nonextraction related activities.[177]

The U.S.-France Treaty has a re-sourcing rule[178] specifically targeted at the mismatch between the way the two countries tax partnership income.[179] By way of background, French domestic tax law would permit France to tax a French partner's distributive share of U.S.-source income earned by a U.S. services partnership. In general, however, such income would be exempt from French tax under the U.S.-France Treaty.[180] Article 14(4) of the U.S.-France Treaty provides, however, that "[i]n no event, however, shall [relevant Treaty] provisions . . . result in France exempting under Article 24 (Relief from Double Taxation) more than 50 percent of the earned income from a partnership accruing to a resident of France." Thus, to the extent the French partner's distributive share of U.S.-source income is in excess of this threshold, double tax would result. For example,

> if a partnership of two equal partners, one of whom is a resident of France, has $100,000 of earned income of which $20,000 is derived from the French office, each partner's share (absent any special allocation) would amount to $50,000, of which only $10,000 would be of French source. Under this rule, France is permitted to tax the resident partner on $25,000 (50 percent of $50,000).[181]

The United States would also tax the French partner on $40,000 (his share of U.S.-source income), meaning there would be double taxation with respect to $15,000 of partnership income. Article 24(2)(d), however, provides a re-sourcing rule specifically aimed at this issue:

> If, for any taxable period, a partnership of which an individual member is a resident of France so elects, for United States tax purposes, any income which solely by reason of paragraph 4 of Article 14 is not exempt from French tax under this Article shall be considered income from sources within France. The amount of such income shall reduce (but not below zero) the amount of partnership earned income from sources outside the United States that would otherwise be allocated to partners who are not residents of France. For this purpose, the reduction shall apply first to

---

[166] See § 865(h)(1)(B).

[167] See S. Rep. No. 100-445, at 239 (1988). In addition, taxpayers may elect to apply § 865(h) to treat certain distributions from corporations organized in a U.S. possession as foreign-source income. See § 865(h)(2)(B); S. Rep. No. 100-445, at 239–40.

[168] S. Rep. No. 100-445, at 239.

[169] S. Rep. No. 100-445, at 239.

[170] See III.A., above.

[171] See, e.g., U.S.-Netherlands Treaty, art. 25(2).

[172] See discussion of Article 23(4) of the 2006 U.S. Model Treaty and 2016 U.S. Model Treaty at III.D.6., above.

[173] See, e.g., U.S.-France Treaty, art. 24(2)(b) (as renumbered under the 2009 France Protocol); U.S.-Germany Treaty, art. 23(3); U.S.-Ireland Treaty, art. 24(3).

[174] See, e.g., U.S.-U.K. Treaty, art. 24(3).

[175] See U.S.-U.K. Treaty, Technical Explanation, art. 24(3).

[176] U.S.-U.K. Treaty, Technical Explanation, art. 24(3), noting that the U.K. petroleum tax is creditable only to the extent it is imposed on income from U.K. extraction activities, but that other, non-creditable, U.K. taxes are also imposed on income from such activities and that the tax itself is imposed on income from certain nonextraction activities.

[177] U.S.-U.K. Treaty, art. 24(3)(b), and accompanying Technical Explanation, art. 24(3).

[178] U.S.-France Treaty, art. 24(2)(d) (formerly contained in Article 24(1)(d) until paragraphs 1 and 2 were switched by Article 8(1) of the 2009 France Protocol).

[179] The following discussion is indebted to Kimberly S. Blanchard, *The Unresolved Tax Status of Multinational Service Partnerships and Their Partners*, 56 Tax Law. 779, 784–86 (2003).

[180] U.S.-France Treaty, art.7(4), applied by analogy under art. 14(4).

[181] U.S.-France Treaty, Technical Explanation to Article 14(4).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA

ISBN 978-1-63359-317-6

Add96

income from sources within France and then to other income from sources outside the United States.

In other words, if the partnership makes the election provided for in Article 24(2)(d), the United States would treat the $15,000 as French-source income, effectively giving up its right to tax such income. Query, however, whether this re-sourcing rule provides adequate relief, due to the final two sentences of the language quoted above. As Kimberly Blanchard explains,

> Where the election is made, the resourced income must be applied to reduce the non-U.S. source income of the U.S. partners. While this reduction will be neutral as long as the foreign source income being reduced is French source income that France has re-linquished taxing jurisdiction over, the reduction will also be applied to other foreign source income of the U.S. partners. The net effect may often be to disallow the U.S. partners' foreign tax credits for taxes paid to other countries in which the partnership carries on its activities. If this is the case, one would have to conclude that the tax treaty between France and the United States is simply unworkable in respect of partnerships having operations in third countries.[182]

---

[182] Kimberly S. Blanchard, *The Unresolved Tax Status of Multinational Service Partnerships and Their Partners*, 56 Tax Law. 779, 784–86 (2003).

© 2019 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-317-6

New York State Bar Association Tax Section

REPORT ON TREATY RE-SOURCING RULES

November 24, 2014

This report (this "Report")[1] provides a general overview of the various types of resourcing rules found in U.S. income tax treaties, conveys our support for the use of a blanket resourcing rule and recommends that the Internal Revenue Service (the "Service") and the United States Department of the Treasury (the "Treasury") issue guidance clarifying the application of the sourcing rules found in certain treaties.

In general, U.S. income tax treaties[2] provide that the United States will grant a U.S. taxpayer a credit against U.S tax for taxes paid or accrued to the treaty partner in accordance with the terms of the treaty. However, the grant of a credit against U.S. tax is generally made in accordance with and subject to the law of the United States, and U.S. law includes a variety of rules and limitations relating to foreign tax credits, including rules designed to limit the foreign tax credit to taxes paid on income that is treated as foreign source.[3] Where a U.S. income tax treaty allows the treaty partner to tax income that U.S. domestic law treats as U.S. source, a U.S. taxpayer that pays income tax to the treaty partner on such income may not be able to claim a foreign tax credit unless the income is treated as foreign source under the treaty.

As described in detail below, U.S. income tax treaties have over time taken various approaches to resourcing income that a treaty partner is permitted to tax. At one end of the spectrum

---

[1]    The principal author of this report is Elizabeth Kessenides. Substantial contributions were made by David Schnabel, Stephen Land, Mary Bennett, Kim Blanchard, Peter Connors, Fred Feingold, David Hardy, Robert Kantowitz, and Abraham Leitner. Helpful comments were received from Richard Anderson, Peter Blessing, Kevin Glenn, Alexey Manasuev, Ron Grabov-Nardini, James Reardon, Michael Schler, Len Schneidman, David Sicular and Willard Taylor. The substantial assistance of Ethan Blinder is gratefully acknowledged. This report reflects solely the views of the Tax Section of the New York State Bar Association ("NYSBA") and not those of the NYSBA Executive Committee or the House of Delegates.

[2]    The discussion in this Report is limited to sourcing provisions contained in income tax conventions. This Report does not review any gift and estate tax conventions.

[3]    U.S. domestic law authorizes a foreign tax credit for foreign taxes paid, regardless of what a treaty provides. However, the authorization of the credit under Section 901 of the Internal Revenue Code of 1986, as amended (the "Code") is made subject to the rules contained in Section 904 (unless otherwise indicated, all Section references herein are to the Code). The operative provisions of Section 904 limit the foreign tax credit to the U.S. tax imposed on "foreign source income". Thus, in many instances a U.S. resident taxpayer may be unable to effectively utilize a foreign tax credit in the absence of a treaty provision that clearly allows income to be treated as "foreign source". The general simplifying premise is that the relevant item of income taxed by the treaty partner is the only foreign source income of the U.S. person. The foreign tax credit computation is, of course, more complex; and where a U.S. person has other sources of foreign income, that foreign source income may affect the ultimate amount of the credit that can be claimed.

are U.S. income tax treaties that include a "blanket resourcing rule"[4] whereby any income that a treaty partner is permitted to tax is clearly and unambiguously treated as foreign source. A second group of U.S. income tax treaties[5] include limited resourcing rules that apply in some (but not all) of the circumstances where the treaty partner is permitted to tax a U.S. taxpayer under the terms of the treaty.

A third group of U.S. income tax treaties[6] include a general resourcing rule but provide that the rule is "subject to" the domestic source rules "as apply for purposes of limiting the foreign tax credit." As described in greater detail below, it is not entirely clear whether this language is meant to refer only to the limitations imposed by Section 904 (as many practitioners expect) or to include the basic domestic source rules as well (which apply more broadly but can also have the effect of limiting the availability of a foreign tax credit). We note, however, that even if the latter reading of the "subject to" language is appropriate, an election under Section 865(h) may be available in some cases to treat the underlying income as foreign source. We believe it would be helpful for the IRS and Treasury, in connection with the issuance of any guidance that relates to the recommendations set forth below, to consider as well the meaning of the "subject to" language and the application of Section 865(h) in this context.[7]

This Report is divided into six parts: Part I describes our recommendations. Part II provides general background. Part III summarizes various provisions of the Code relating to the source of income and foreign tax credits. Part IV discusses the evolution of the sourcing provisions included in the U.S. model income tax conventions, the saving clauses found in treaties entered into

---

[4] See, for example, the U.S. income tax treaties with China, United Kingdom, Canada, Germany, and Japan (discussed in Part V.A. below).

[5] See, for example, the U.S. income tax treaties with Denmark, Italy, France, Switzerland and South Africa (discussed in Part V.B. below).

[6] See, for example, the U.S. income tax treaties with Estonia, Latvia, Luxembourg, Sweden and Austria (discussed in Part V.C below) and the U.S. income tax treaties with India and Thailand (discussed in Part V.E. below).

[7] See discussion in note 76, *infra*.

by the United States and the OECD Model Convention.  Part V discusses the sources rules currently found in various United States treaties.  Part VI provides various examples where treaty sourcing issues and double tax concerns arise.

## I.    Recommendations

### A.    Endorsement of the Model Treaty Approach.

We strongly support the approach of the current U.S. Model Income Tax Convention, providing for a blanket re-sourcing of all income of a U.S. resident that a treaty partner is authorized to tax under a bilateral income tax treaty.  We support a blanket re-sourcing rule because (i) it is most consistent with the basic objective of tax treaties, that of avoiding double taxation, (ii) it is consistent with the agreed taxation of the income, (iii) it avoids traps for the unwary, and (iv) it is likely to demand a highly disciplined approach to decisions regarding the allocation of primary taxing authority during the treaty negotiation process.  We recognize, however, that there may be situations where a country is so unwilling to surrender its taxing authority over specific items of income that the Model Treaty approach may not be appropriate from the perspective of the United States.

### B.    Issuance of Interpretive Guidance Directed at Specific Treaties or Groups of Treaties

Many of the issues discussed in this Report could be solved through the publication of guidance (which could take the form of a revenue ruling, revenue procedure or notice) explaining how the United States will interpret certain treaties that are currently in force.[8]  Such guidance could be directed at the interpretation of specific, individual treaties (or groups of identified treaties with identical or similar language)[9] where the application of the source rules for purposes of claiming a foreign tax credit is unclear and it is determined that the intent of the treaty (when combined with the

---

[8] We considered whether some of the issues discussed in this Report could be solved by a mutual agreement process or through Competent Authority relief.  However, we expect that this may not be practical in light of the number of relevant treaties.

[9]  Variations among U.S. tax treaties generally fall into patterns, based upon the time the treaties were negotiated.  See Part V below.

application of the Code) is to allow the sourcing required for a foreign tax credit.  For example, this guidance could address whether the language "subject to such source rules in the domestic laws of the [Contracting States] as apply for the purpose of limiting the foreign tax credit" in various treaties (see Parts V.C and V.E) is meant to refer only to the special source rules contained in Section 904 of the Code.[10]

Alternatively, for some treaties broader guidance could be issued, providing that income which the treaty allows the foreign treaty partner to tax shall be treated for Section 904 purposes as "arising from sources outside the United States" (and therefore as sourced to the relevant treaty partner country, subject to the other limitations of Section 904).

As an alternative, guidance interpreting various treaties could be issued in the form of regulations under Section 894 ("Income Affected by Treaty") or possibly under Section 904(d)(6)(C).

### C.    Guidance under Section 865(j)

The Treasury and the IRS could also consider issuing guidance under Section 865(j) applicable to certain source rules for personal property sales. This guidance could address the disposition of shares in a foreign company where the shares represent primarily an interest in foreign real (or "immovable") property; if the gain is taxed by a treaty partner country in accordance with the typical treaty provision (for sales of real or immovable property interests situated in a contracting state), and if the tax is applied by the treaty partner in a manner that corresponds to the tax that would be imposed on a direct sale of real estate, the guidance could provide that the gain on the stock disposition will be sourced in the same manner as gain from a sale of the underlying property would have been sourced.

---

[10] If considered necessary, the guidance could be limited to certain types of income or to treaties that allow the treaty partner to tax a U.S. resident on only certain types of income in a manner consistent with the current Model treaty provisions.

## II.    Background

In general, the country with primary taxing authority under a treaty is often thought of as the country where the income arises -- in other words, as being the country of "source." However, this allocation of primary taxing jurisdiction to a country is not always consistent with the determination of "source" imposed by the general source rules contained in the Code. While some U.S. income tax treaties (including the current U.S. Model Treaty) remedy this mismatch with a clear and unambiguous blanket resourcing rule, other U.S. income tax treaties do not.[11] As described in Part IV, variations also exist in the Model Tax Treaties that the United States has adopted over time. While the modifications and variations in language that appear in current treaties have been noted in certain Technical Explanations, there has never been a full articulation of the meaning of these differences.[12]

For example, in some treaties, the re-sourcing rules are stated to be "subject to the source rules in the domestic laws of the Contracting States as apply for purposes of limiting the foreign tax credit."[13] In other treaties, the statement in Article 23 (or its corollary) regarding the tax credit offered by the United States is stated as being provided "[i]n accordance and subject to the limitations of the law of the United States", with no further explication.[14] It is not clear if both of these clauses are equivalent provisions or what exactly the language is intended to mean. While the language could fairly be understood to subordinate the treaty re-sourcing rules to the specific source rules contained in Section 904 that apply for purposes of calculating the foreign tax credit, the

---

[11] One could argue, that at least in some treaties, references in the Relief from Double Taxation article to the availability of a foreign tax credit by the residence country suggest that the residence country should grant relief from double taxation on income for which it has granted primary taxing rights to the "other country" even in the absence of a blanket re-sourcing rule. It would be helpful if this were clarified by the Treasury and the IRS if it were intended.

[12] We note that there are other mismatches, such as timing mismatches, that sometimes can give rise to double tax problems. Those types of mismatches are not discussed here. Furthermore, we concentrate below on the mismatch itself and ignore the possibility that the taxpayer may have other low-taxed foreign source income against which the credit arising from the mismatch can be absorbed.

[13] See discussion below in Section V of this Report on "Version C", reviewing treaties with the following countries: Estonia, Latvia, Luxembourg, Sweden and Austria.

[14] See discussion below, Section V, Version B treaties.

language could also (at least arguably) be read to subordinate the treaty provision to all domestic source rules relevant to the foreign tax credit (*e.g.*, the basic rules in Sections 861, 862 and 865).[15]

It is difficult to discern what policy reason is at work if these provisions are to be read broadly.  Tax treaties are entered into in order to protect taxpayers from double taxation; *i.e.,* taxation in both countries on the same item of income.  Thus, treaties aim to "resolve competing national claims to the same tax revenue".[16]  A treaty determines a taxpayer's residence and, with respect to different categories of income, assigns primary taxing rights to one country.  In that same vein, treaties also typically include an obligation on the part of the residence country to offer a credit for taxes paid to the foreign treaty partner country.[17]

The treaty between the United States and India provides a good illustration.  In response to the highly publicized *Vodafone* case,[18] India adopted broad (and retroactive) legislation proposing to tax indirect transfers of interests in assets located in India.  As discussed in greater detail below, Article 13 of the U.S.-India treaty is unusual in that it broadly allows capital gains to be taxed by each contracting state in accordance with the provisions of its domestic law.  If a U.S. resident were required to pay tax in India by reason of the legislation and wanted to claim a foreign tax credit in the United States for such tax, the U.S. resident would need to apply the provisions in the treaty between the United States and India.  Article 25(3) of the U.S.-India Treaty provides that:

> "For the purposes of allowing relief from double taxation pursuant to this Article, income shall be deemed to arise as follows:

[15]   See Letter from Mary C. Bennett, Baker & McKenzie, to Patricia A. Brown, Deputy International Tax Counsel, Department of the Treasury, (6/2/2000), reprinted in 200 Worldwide Tax Daily 117-52 (6/16/2000). Ms. Bennett's letter stated, in reference to the "subject to" modifier clause:  "There is no clear indication that Treasury ever intended this modified source rule to yield to the general source rules (e.g., sections 861 and 862) that were not limited in their purpose to the foreign tax credit limitation."  See also Warren Crowdus, *The Interaction of Treaty and Code Source Rules*, Journal of International Taxation, Volume 13 (April 2002).

[16]   Philip R. West and Brian R. Symington, *The Korean Position on Royalty Sourcing*, 2012 TNT 80-5, April 25, 2012.

[17]   See Testimony of Barbara Angus, International Tax Counsel to the United States Department of the Treasury on Pending Tax Agreements, March 5, 2003, reprinted at:  http://www.treasury.gov/press-center/press-releases/Pages/js86.aspx.

[18]   *Vodafone International Holdings Ltd. v. Union of India*, Civil Appeal No. 733, see discussion, infra, pp.32-34.

(a) income derived by a resident of a Contracting State which may be taxed in other Contracting State in accordance with this Convention (other than solely by reason of citizenship in accordance with paragraph 3 of Article 1 (General Scope)) shall be deemed to arise in that other State;

(b) income derived by a resident of a Contracting State which may not be taxed in the other Contracting State in accordance with the Convention shall be deemed to arise in the first-mentioned State.

*Notwithstanding the preceding sentence, the determination of the source of income for purposes of this Article shall be subject to such source rules in the domestic laws of the Contracting States as apply for the purpose of limiting the foreign tax credit.* The preceding sentence shall not apply with respect to income dealt with in Article 12 (Royalties and Fees for Included Services)…."[19]

As noted above and discussed below in Part V, the intended scope and meaning of the italicized language is not entirely clear.

As discussed in Part VI, treaty sourcing (or resourcing) issues can also arise (i) upon a sale of an interest in a company holding foreign real estate, (ii) in relation to personal services income and (iii) potentially in relation to royalties.

For example, assume a U.S. resident taxpayer holds an interest in a real property holding corporation formed under the laws of  a foreign country jurisdiction ("FC") that has entered into an income tax treaty with the United States, whose assets consist primarily of real property (to use treaty terminology, "immovable property") located in the FC.  Virtually all U.S. treaties in force[20] (as well as the current U.S. Model Treaty) would allow the FC treaty partner to tax gains realized on the sale of such stock by a U.S. resident; in a sense, this is a corollary to the U.S. "FIRPTA" regime.  Yet, while the FC treaty partner can tax this type of gain, it is not always clear whether the operative treaty provisions properly allow the gain to be classified as "foreign source income".  Those treaties

---

[19]  Convention for the Avoidance of Double Taxation, Sept. 12, 1989, U.S.-India, Art. 25(3), CCH U.S. Tax Treaties Vol. 4 ¶ 4203.05 [hereinafter, U.S.-India Tax Treaty] (emphasis added).

[20]  With rare exceptions—*e.g., see* Convention for the Avoidance of Double Taxation, June 4, 1976, U.S.-Kor., CCH Tax Treaties Vol. 4 , ¶ 5403.05 [hereinafter, U.S.-Korea Tax Treaty], which does not specifically address the sale of stock of real property holding companies, although Announcement 2001-34, 2001-1 C.B. 1087 confirmed that the United States and Korea have agreed that gains derived from the disposition of shares of certain Korean real property corporations by U.S. persons will be sourced in the situs country of the real property.

with a blanket re-sourcing rule ensure effective relief by virtue of a foreign tax credit. Other treaties present uncertainties. Differences can be observed (for example) when comparing the treaties with China, France, Sweden, and Israel.[21] The treaties with China and Israel would appear to effectively re-source the income, whereas in the case of the treaties with Sweden, France, Italy and Denmark (to name a few) there are apparent limitations on the re-sourcing of income that would not necessarily allow a foreign tax credit to be effectively claimed.

The treaty negotiation process is a negotiation between two nations. As a result, uniform results can never be assured and treaties will always raise distinct considerations. However, our expectation is that there are relatively few cases where the United States intended to permit a treaty partner to tax income of a U.S. resident but to prevent the U.S. resident from claiming a credit for these taxes by reason of the general source rules applicable under the Code.

## III.    Statutory Background; Source of Income and Foreign Tax Credit Provisions of the Code

The United States taxes its citizens, residents, and domestic corporations on worldwide income, wherever derived. Nonresident alien individuals and foreign corporations are taxed on certain U.S.-source fixed or determinable, annual or periodical income (even if the income is not effectively connected with a U.S. trade or business) and on income that is effectively connected with a trade or business in the United States (including, in the case of real property, gains on sales of interests in U.S. real property holding companies). The source rules of the Code attempt, in some manner, to source income according to the location of the activities that generate the income (although there are exceptions). For example, interest income paid by a corporation is generally sourced by reference to the place of incorporation of the borrower (with certain exceptions for cases

---

[21]    In situations where there is a concern about the "source" of gain on the sale of stock, there may be cases where a taxpayer could undertake other planning, e.g., an F reorganization, followed by a sale of a "disregarded entity" predecessor of the foreign real property holding company, to mitigate this problem. Not all taxpayers, however, are in a position to obtain the advice that is needed to restructure their transactions in advance, or are in a position to control the ultimate structure of the transaction.

where a borrower does not have any U.S. trade or business or where a foreign entity derives effectively connected income).[22]  Dividend income is generally sourced by reference to the place of incorporation of the payor of the dividend (with certain special rules for cases where foreign corporations earn a significant amount of income that is effectively connected with a U.S. business).[23]  Rents are sourced based on the location of the relevant property,[24] and royalties are sourced based on the place where the intangible is used.[25]  Services income is sourced by reference to where services are performed.[26]

In the case of gains from the disposition of property, the source rules have changed over time. Different source rules apply for inventory[27] (a discussion of these rules is outside the scope of this report) and personal property.  The Section 865 source rules for personal property sales were altered by Congress in 1986.[28]  Today, in the case of a United States resident, income or gain from the sale of personal property is generally U.S. source.  In the case of a nonresident, such income or gain is generally non-U.S. source.  There are limited exceptions to this basic residence rule, including one that applies to a U.S. citizen residing outside the United States, if a foreign tax of ten percent or more is incurred on the income.[29]  In addition, Section 865(e)(2) contains special sourcing rules for sales through a fixed place of business.  For example, where a U.S. resident maintains an office or fixed place of business outside the United States, to which gain on the sale of personal property is

---

[22]  *See* §§861(a)(1), 862(a)(1).

[23]  *See* §§861(a)(2)(A) and (B), 862(a)(2).

[24]  *See* §§861(a)(4), 862(a)(4).

[25]  Id.

[26]  *See* §§861(a)(3), 862(a)(3).

[27]  *See* §§861(a)(6), 862(a)(6).

[28]  Until that time, gain on personal property sales was sourced by reference to the location of the sale, generally understood to be a "title passage" rule. This approach was susceptible to manipulation, and when tax rates were reduced in 1986, Congress decided it was appropriate to change the determination to a residence-based standard.

[29]  *See* §865(g)(2).

attributed, the gain can be treated as foreign source income if an income tax equal to at least ten percent is actually paid to the foreign country.[30]

Section 865(h) makes available a special election that was adopted in order to address the "later in time" rule.  (The "later in time" rule refers to Congress' ability to override the provisions of a double tax convention, particularly where it makes clear the intent to do so.  Where the provisions of U.S. law and a treaty are in conflict, courts have adopted a "later in time" approach to determine which will prevail.)  In relation to Section 865 and the source rules for personal property sales, Congress recognized that the change to the source rules in 1986 could create a conflict with certain existing treaties.  In order to address this, Section 865(h) allows a taxpayer to elect to apply treaty source rules in order to treat gain as foreign source income, in the case of sales of stock in a foreign corporation or sales of an intangible (as defined in Section 864(d)(2)) -- but only in cases where the treaty provides a source rule for the relevant income.[31]  The operative language of Section 865(h)(2) states that it applies to income "which, under a treaty obligation of the United States (applied without regard to this section) would be sourced outside the United States, and with respect to which the taxpayer chooses the benefits of this section."  Section 865(d)(2) defines an intangible as any patent, copyright, secret process or formula, goodwill, trademark, trade brand, franchise, or other like property.

Special rules also apply under the Code for investments in United States real property interests by non-U.S. persons.  Under the "FIRPTA" provisions of the Code, adopted by Congress in 1980, the source rules are, in a sense, modified:  gain on the sale of stock in a domestic U.S. real property holding company by non-U.S. persons is treated as income that is effectively connected with a U.S. trade or business, and therefore subject to U.S. tax.[32]

---

[30]  §865(e)(2).

[31]  See S. Rep. No. 100-445, at 239 (1988), *reprinted in* 1988 U.S.C.C.A.N., 4515, 4753.

[32]  See §897.

Because of the potential for double taxation that can arise whenever United States persons derive income abroad, double tax exposure has historically been addressed by allowing U.S. taxpayers to claim a credit for foreign income taxes paid. The foreign tax credit is, however, limited. The most basic and important limitation in its operation is that the foreign tax credit is allowed to reduce the imposition of U.S. tax only on foreign source income. A foreign tax credit is not effective in reducing United States tax where a person only has U.S.-source income.[33]

While an in-depth discussion of the foreign tax credit provisions of the Code is beyond the scope of this Report, a few general observations are important to bear in mind. Section 901 of the Code authorizes the allowance of a credit in lieu of a deduction for taxes paid (or deemed to have been paid under Sections 902 and 960)[34] to a foreign country. Section 904 currently limits the credit that can be taken to a cap, the cap being the U.S. tax liability on the person's foreign source taxable income.[35]

Section 904 also includes a set of additional rules that can limit the tax credit availability. Under Section 904(d), the foreign tax credit limitation rules are applied separately for "passive category income" and "general category income". "Passive category" income consists of income which is of a kind that would be foreign personal holding company income, and includes most dividends, interest, and capital gains.[36] Before 2004, there were nine baskets, but the American Jobs

---

[33] See §904(a). The system of allowing a foreign tax credit to be claimed for foreign taxes paid dates to 1918; ever since 1921, the foreign tax credit was limited to the U.S. tax that would have been imposed on foreign source income. See Graetz & Grinberg, *Taxing Int'l Portfolio Income,* 56 N.Y.U. Tax Law Rev. 537 (2003).

[34] §902 of the Code allows a "deemed paid" credit for taxes paid by a foreign corporation where a domestic corporation owns 10% or more of the voting stock of such foreign corporation, by reference to the ratio of dividends received during the relevant taxable year to the foreign corporations post-1986 undistributed earnings.

[35] The limitation is expressed as a fraction; U.S. taxes (before credits), multiplied by foreign-source taxable income over total taxable income. Thus, foreign-source income is taxed at the higher of the U.S. or foreign effective rate.

[36] §904(d)(2).

Creation Act of 2004 reduced the number of baskets from nine to two (effective for tax years beginning after December 31, 2006).[37]

Section 904(d)(6) provides a further limitation, requiring taxpayers to apply the limitation rules separately for each item of income re-sourced under a treaty. Section 904(d)(6) provides in general that (i) if, without regard to any treaty obligation of the United States, any item of income would be treated as derived from sources within the United States, (ii) under a treaty obligation of the United States, such item would be treated as arising from sources outside the United States, and (iii) a taxpayer chooses the benefits of such treaty obligation, the provisions of Section 904(a), (b) and (c) shall be applied separately with respect to such item. Furthermore, Section 904(d)(6)(C) authorizes regulations "or other guidance as is necessary or appropriate to carry out the purposes of this paragraph."

Section 904(h) also contains special source rules, for situations where U.S. source income is routed through a foreign corporation. Before these rules were enacted, U.S. source income could be routed through a foreign corporation in a low-tax jurisdiction in order to artificially increase the foreign tax credit limitation of a U.S. taxpayer. Section 904(h) prevents this result, reclassifying as U.S. source certain income that is routed in this fashion. Section 904(h)(10) also includes a treaty-specific provision, to the effect that the general rules of Section 904 will respect a specific treaty re-sourcing rule where the taxpayer so elects, and that such income will be included in a separate basket for 904 limitation purposes. In order for 904(h)(10) to apply, however, the relevant treaty must provide that the income in question would "be treated as arising from sources outside the United States."

The operation of Section 904 can provide a significant limitation: if an item of income taxed by a foreign country in accordance with the terms of an income tax treaty with the United States is

---

[37] *See* §404, American Jobs Creation Act of 2004, Pub. L. No. 108-357.

not characterized as foreign source income, no foreign tax credit can be claimed even if a meaningful foreign tax is incurred by the U.S. resident taxpayer (assuming the taxpayer does not have other low-taxed foreign source income, putting them in an excess limitation position).[38]

The operative source rules of the Code are affected by United States treaty policy and by the agreement that is reached (with a treaty partner) when the United States enters into double tax conventions.  As stated above, treaties usually contain provisions that limit the authority of the United States to impose tax.  In the case of nonresidents, treaties do this by reducing or eliminating the U.S. taxes imposed.  In the case of U.S. resident taxpayers, treaties generally limit the United States' taxing priority by virtue of a clause that provides (or aims to provide) foreign tax credit relief to U.S. resident taxpayers who incur a tax burden in the relevant foreign jurisdiction.

## IV.    Model Treaties

### A.    United States Model Income Tax Conventions, 1977-2006

Treaty provisions take into account the tax laws of a treaty partner, and modify the operation of United States tax law that would otherwise apply under operative provisions of the Code.  The treaty negotiation process thus typically involves the United States (as well as the treaty partner) ceding certain taxing priority over specific types of income.  The United States may surrender its right to tax some or all of certain income (if the income would otherwise be U.S. source under the Code), giving priority to the foreign treaty partner (for instance, the United States might agree not to impose a full 30% withholding tax on interest or dividends, but to apply a reduced or zero rate of withholding).

The American Law Institute ("ALI") undertook a study in 1991 on the International Aspects of United States Income Taxation, making certain proposals on U.S. Income Tax Treaties.  The

---

[38]   A deduction could still be claimed but the usefulness of a deduction is obviously not the same as a credit in terms of providing a full offset for foreign taxes paid. As noted above, taxpayers that are fortunate enough to have other foreign-source income in the same basket that has not borne a particularly high rate of foreign tax may be able to "cross-credit" and use the credit anyway, but that is not a reason to allow inequities and inefficiencies to persist.

ALI's study referred to the manner in which countries entering into treaties address their concerns over "source-based taxation" observing that "[i]*n practice, the bargain which emerges from the balancing of these interests invariably results in a relaxation of domestic law rules governing the source-based taxation of non-resident persons and entities*"[39] and characterizing the source rules of a treaty as a necessary measure "*…to insure that the allocation of primary taxing jurisdiction to the source country is respected by the residence country in giving double tax relief*."[40]

The ALI's in-depth study observed that, with reference to double tax problems "most of them arise because the two countries make inconsistent determinations with respect to the same taxpayer."[41]  The chapter on the "Purpose of Treaties" refers to problem cases as falling into three categories: "residence-residence" (where both countries consider the same person a resident); "residence-source" (where the two countries attribute different "source" to the same item of income); and "source-source" (where both countries assert source jurisdiction to tax the same income of a taxpayer that is not a resident of either country).  The issues we review below, which relate to the provisions of the "Relief of Double Taxation article", fall into the "residence-source" category of potential conflict.[42]

The discussion in Section VII below sets forth examples of "problem cases" where there is currently a gap—where the foreign country is allowed to tax income, but that same income is not 're-sourced' by virtue of the treaty as "foreign source income," leaving a taxpayer with a possible double tax burden.  The most recent 2006 U.S. Model treaty (the "2006 Model Treaty") avoids this result because it has an effective blanket re-sourcing rule.  However, many treaties currently in force do not

---

[39]   ALI, Federal Income Tax Project, International Aspects of U.S. Income Taxation II, "The Purpose of Income Tax Treaties and Their Legal Consequences", at 2 [hereinafter, "ALI at"].

[40]   Id., Chapter on "Residence Country Taxation", at 233.

[41]   ALI at 6.

[42]   ALI at 8.

reflect this approach. Furthermore, in some cases the saving clause (discussed below) can operate to allow U.S. statutory law to override a specific treaty benefit.

There have been various U.S. Model Income Tax Conventions ("U.S. Models") over time. In 1977, the Treasury Department released the first U.S. Model. As U.S. domestic law and tax treaty policy evolved over the years, the Treasury Department has released updated versions of the U.S. Model: to date, there have been four versions, released in 1977, 1981, 1996, and most recently in 2006. The different versions of the Model Treaties have adopted various versions of "Relief from Double Taxation" Articles. As noted above, the 2006 U.S. Model contains a blanket re-sourcing provision in Article 23(3).

### 1.    The 1977 U.S. Model

In the original 1977 U.S. Model, the Relief from Double Taxation provision in Article 23(3) contained special source rules covering particular types of income as well as a general "catch-all" re-sourcing provision in (d):

> "*For the purposes of the preceding paragraphs of this Article, the source of income or profits shall be determined in accordance with the following rules:*
>
> (a) *Dividends, as defined in paragraph 3 of Article 10 (Dividends), shall be deemed to arise in a Contracting State if paid by a company which is a resident of that State or if paragraph 5 (c) of Article 10 (Dividends) applies.*
>
> (b) *Interest, as defined in paragraph 2 of Article 11 (Interest), shall be deemed to arise in the State specified in paragraph 4 of Article 11.*
>
> (c) *Royalties, as defined in paragraph 2 of Article 12 (Royalties), shall be deemed to arise in a Contracting State to the extent that such royalties are with respect to the use of, or the right to use, rights or property within that State.*
>
> (d) *Except for income or profits referred to in subparagraphs a), b), or c), and except for income or profits taxed by the United States solely by reason of citizenship in accordance with paragraph 2 of Article 1 (Personal Scope): income or profits derived by a resident of a Contracting State which may be taxed in the other Contracting*

> *State in accordance with this Convention shall be deemed to arise*
> *in that other Contracting State."*[43]

Paragraphs (a) through (c) reflect the special source rules, while paragraph (d) is a general re-sourcing rule for all other types of income.[44]

## 2.    The 1981 U.S. Model

The 1981 U.S. Model took a more expansive approach to re-sourcing in the Relief from Double Taxation provision and is the most similar to the current method of re-sourcing income in the 2006 Model Treaty.  The following is the relevant language from Article 23(3) of the 1981 U.S. Model:

> *"For the purposes of allowing relief from double taxation pursuant to*
> *this Article, income shall be deemed to arise exclusively as follows*
>
> *(a) income derived by a resident of a Contracting State which may be*
> *taxed in the other Contracting State in accordance with this*
> *Convention (other than solely by reason of citizenship in*
> *accordance with paragraph 2 of Article 1 (General Scope)) shall be*
> *deemed to arise in that other State;*
>
> *(b) income derived by a resident of a Contracting State which may not*
> *be taxed in the other Contracting State in accordance with the*
> *Convention shall be deemed to arise in the first-mentioned State.*
>
> *The rules of this paragraph shall not apply in determining credits*
> *against United States tax for foreign taxes other than the taxes referred*
> *to in paragraphs 1(b) and 2 of Article 2 (Taxes Covered)."* [45]

## 3.    The 1996 U.S. Model

In the 1996 U.S. Model, the U.S. moved away from including re-sourcing of U.S. resident income in the Relief from Double Taxation provision.  Instead, the provision only discusses the re-

---

[43]   U.S. Model Income Tax Convention of May 17, 1977, Art. 23(3), CCH U.S. Tax Treaties, Vol.1, ¶ 212.

[44]   A similar Relief from Double Taxation provision incorporating both specific and general source provision can be found in the U.S.–Jamaica treaty. Not surprisingly, the U.S.–Jamaica treaty was entered into in 1980, not long before the release of the updated U.S. Model in 1981.

[45]   U.S. Model Income Tax Convention of June 16, 1981, Art. 23(3), CCH Tax Treaties Vol. 1, ¶ 211. This form of Relief from Double Taxation provision appears in a number of existing treaties, but with several variations and limitations that can present uncertainties. Similar provisions can be found in the U.S. treaties with: (i) Austria (1996), (ii) Barbados (1984), (iii) Canada (1980), (iv) Finland (1989, as amended in 2008), (v) Italy (1984), (vi) Mexico (1992, modified in 2002), (vii) New Zealand (1982, as amended in 2006), and (viii) the United Kingdom (2001, with modifications).

## Add114

sourcing of income of non-resident U.S. citizens.[46] Article 23(3) of the 1996 U.S. Model refers to "[w]here a U.S. citizen is a resident of [name of treaty partner country]", providing that in such cases income that would be exempt from U.S. tax under the treaty shall be sourced in the foreign country.

It is unclear why the Treasury moved away from the re-sourcing language in the 1981 U.S. Model and no real explanation is provided by the Treasury Technical Explanation. The Technical Explanation to the 1996 Model reads as follows:

> "*The United States agrees…to allow its citizens and residents a credit against U.S. tax for income taxes paid or accrued to the other Contracting State. …The credit…is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained….*
>
> *As indicated, the U.S. credit under the Convention is subject to the various limitations of U.S. law (see Code sections 901-908). For example, the credit against U.S. tax is generally limited to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code Section 904(a) and (d)), and the dollar amount of the credit is determined in accordance with U.S. currency translation rules (see, e.g., Code section 986). Similarly, U.S. law applies to determine carryover periods for excess credits and other inter-year adjustments. …Furthermore, nothing in the Convention prevents the limitation of the U.S. credit from being applied on a per-country basis (should internal law be changed), an overall basis, or to particular categories of income. (see, e.g., Code Section 856(h)).*"[47]

Thus, there is no indication, in the general discussion of Article 23, that there was a desire to override the allocation of taxing authority in a particular treaty, or that the omission of a re-sourcing provision could have an impact on a taxpayer's ability to claim a foreign tax credit. Indeed, the explicit references in the Technical Explanation to Sections 901-908, Section 904(a) and Section 986, and their related limitation rules, could be read as an indication that these were the only "*limitations of U.S. law*" that were contemplated by the general lead-in clause. While the Technical Explanation

---

[46] *See* U.S. Model Income Tax Convention of September 20, 1996, Art. 23, CCH Tax Treaties Vol 1, ¶ 210.

[47] Treasury Department Technical Explanation of 1996 U.S. Model Treaty, CCH Tax Treaties Vol.1,¶ 216.

does refer to the fact that the rules of paragraph (3) were not in the 1981 Model, it does not acknowledge that prior model treaties had a more effective and general re-sourcing rule. Some commentators have posited that the U.S.'s departure from providing re-sourcing in the Relief from Double Taxation provision was driven by confusion over how to properly interpret the modified source rules adopted after the enactment of Section 904(g).[48] As observed by Warren Crowdus,"[t]he question is, what exactly are the rules that apply for purposes of limiting the foreign tax credit? The most sensible reading and approach would be to subject the Code's generally applicable source rules to the resourcing provision, and to preserve the Code's special source rules that apply exclusively (or almost exclusively) for foreign tax credit limitation purposes."[49] While the 1996 treaty does not contain an explicit re-sourcing provision, it is arguable that the underlying assumption was that the general "treaty-based credit" language implicitly incorporates a re-sourcing; otherwise, the language stating that a citizen or resident would be allowed a credit for taxes "imposed by the other contracting state" could be unilaterally negated.

### 4.    2006 U.S. Model

The 2006 U.S. Model adopted a blanket re-sourcing rule for all income that the U.S. allows the treaty partner to tax under the convention. The Treasury Department Technical Explanation states that the provisions of paragraph 3 of Article 23 are "intended to ensure that a U.S. resident can obtain an appropriate amount of U.S. foreign tax credit for income taxes paid to the other Contracting State when the Convention assigns to the other Contracting State primary taxing rights over an item of gross income." Article 23, "Relief from Double Taxation" reads as follows:

> "*Article 23(2): In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow a resident or citizen of the United States as a credit*

---

[48]   See Letter from Mary C. Bennett, supra note 15. See also Crowdus, *The Interaction of Treaty and Code Source rules*, supra note 15.

[49]   See Crowdus, *The Interaction of Treaty and Code Source Rules*, supra note 15.

> *against the United States tax on income applicable to residents and citizens:*
>
> (a) *the income tax paid or accrued to [treaty partner country] by or on behalf of such resident or citizen; and*
>
> (b) *in the case of a United States company owning at least 10 percent of the voting stock of a company that is resident of [treaty partner country] and from which the United States company received dividends, the income tax paid or accrued to [treaty partner country] by or on behalf of the payer with respect to the profits out of which the dividends are paid."* [50]

The reference to "in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended from time to time," is intended to ensure that the credit against U.S. tax is limited to the net foreign source income within the relevant foreign tax credit limitation category and that the dollar amount of the credit is determined in accordance with applicable currency translation rules of the Code.[51] In addition, issues such as the determination of carryover periods are determined by reference to U.S. law.

The operative re-sourcing language is contained in paragraph (3):

> *Article 23(3): For purposes of applying paragraph 2 of this Article, an item of gross income, as determined under the laws of the United States, derived by a resident of the United States that, under this convention, may be taxed in [treaty partner country] shall be deemed to be income from sources in [treaty partner country]."* [52]

Accordingly, the Treasury Department Technical Explanation states, "if the Convention allows the other Contracting State to tax an item of gross income (as defined under U.S. law) derived by a resident of the United States, the United States will treat that item of gross income as gross income from sources within the other Contracting State for U.S. foreign tax credit purposes."[53]

---

[50]   U.S. Model Income Tax Convention of November 15, 2006, Art. 23, CCH Tax Treaties Vol. 1, ¶ 209 [hereinafter, the "2006 Model Treaty"].

[51]   See Technical Explanation of the 2006 U.S. Model Income Tax Convention, CCH Tax Treaties Vol. 2, ¶ 215, p. 10,677.

[52]   See 2006 Model Treaty, Art. 23.

[53]   Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, CCH Tax Treaties Vol. 2, ¶ 215, p. 10,678.  The same section continues, referring to the special rules that may apply to a U.S.-owned foreign

### B.    The Saving Clause

Every income tax treaty that the United States enters into contains a "saving clause," the purpose of which is to allow the government to tax citizens and residents under the Code as if the treaty had not come into effect. The language of the saving clause is nearly identical in each instance and is often found near the beginning of a treaty.[54]

Typically, immediately following the saving clause is a paragraph which allows certain enumerated treaty provisions to override the saving clause.[55] There is variance between treaties over the specific override provisions, and over time the number of override provisions has grown. Most importantly for purposes of this discussion, the Relief from Double Taxation provision of a treaty is almost always included as one of the override provisions. Therefore, the United States generally cannot use the saving clause to tax citizens or residents if it will create a double tax in violation of the treaty's Relief from Double Taxation provision. Here again, the relevant re-sourcing language of Article 23 is determinative of the result. If a treaty contains a blanket re-sourcing provision in conjunction with its Relief from Double Taxation provision, the saving clause of that treaty can never create a double tax by reason of a source mismatch.  However, if the Relief from Double Tax provision does not contain a blanket re-sourcing rule, then the saving clause allows the United States

corporation under Section 904(g)(10), and the fact that the re-sourcing rule applies to gross income, not net income; thus, the expense allocation and apportionment rules of the Code and regulations continue to apply. Treaties that contain language largely consistent with the 2006 Model Treaty include: China (1984), Tunisia (1985), the United Kingdom (2001) and Belgium (2006).

[54]   The saving clause is found in Article 1, paragraph 4 in the 2006 U.S. Model Treaty. It reads, "Except to the extent provided in paragraph 5, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article 4 (Resident)) and its citizens. Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of a Contracting State may, for the period of ten years following the loss of such status, be taxed in accordance with the laws of that Contracting State."

[55]   The override provisions to the saving clause are found in Article 1, paragraph 5 in the 2006 U.S. Model Treaty, which reads, "The provisions of paragraph 4 shall not affect:

(a) the benefits conferred by a Contracting State under paragraph 2 of Article 9 (Associated Enterprises), paragraphs 1 b), 2, and 5 of Article 17 (Pensions, Social Security, Annuities, Alimony, and Child Support), paragraphs 1 and 4 of Article 18 (Pension Funds), and Articles 23 (Relief From Double Taxation), 24 (Non-Discrimination), and 25 (Mutual Agreement Procedure); and

(b) the benefits conferred by a Contracting State under paragraph 2 of Article 18 (Pension Funds), Articles 19 (Government Service), 20 (Students and Trainees), and 27 (Members of Diplomatic Missions and Consular Posts), upon individuals who are neither citizens of, nor have been admitted for permanent residence in, that State."

to assert U.S. statutory law for purposes of determining the source of income, and where U.S. statutory law treats as U.S. source an item of income that the FC treaty partner is permitted to tax, a double tax risk will exist.[56]

### C.    OECD Model Tax Convention

The current OECD Model Treaty offers two versions of Article 23, one, an exemption method (wherein the state of residence agrees to exempt income taxable by the other contracting state from tax) and another, a credit method (whereby the state of residence commits to reduce the tax due for taxes paid to the other contracting state on income the "other state" is allowed to tax under the treaty).[57] Because the U.S. Model adopts the credit method of relief from double taxation, the following discussion focuses on the OECD Model's credit method approach.

The OECD Model treaty language itself appears intended to effectively provide relief from double taxation, even absent express resourcing language.  It states that a credit will be given to "a resident of a Contracting State [who] derives income or owns capital which, in accordance with the provisions of this Convention, may be taxed in the other Contracting State."[58] While the OECD Model does not make explicit reference to the source rules of the contracting countries in Article 23, the commentary to Article 23 does state that "[t]he …Articles are drafted in a general way and do not give detailed rules on how the exemption or credit is to be computed, this being left to the domestic laws and practice applicable." [59] Thus, the OECD Commentary gives great deference to domestic law rules on how the residence country computes its foreign tax credit limitation, raising the question of whether this deference includes giving precedence to the resident state's domestic source rules.

---

[56]   The U.S.-France Treaty is one such example; see discussion below.  See Part VI.B..

[57]   OECD (2012), *Model Tax Convention on Income and on Capital 2010: Full Version*, Art. 23A and 23B, OECD Publishing.doi: 10.1787/9789264175181-en [hereinafter, 2010 OECD Model].

[58]   2010 OECD Model, Art. 23B.

[59]   2010 OECD Model, C(23)-11 para.32.

**V.    Variations in U.S. Treaties in Force**

Despite the use of the U.S. Model Treaty as the starting point for treaty negotiations, many treaties in their final form do not precisely follow the U.S. Model in the Relief from Double Taxation article. The section below describes in detail variations in some relevant treaty re-sourcing provisions contained in a large sampling of treaties (25).

**A.    <u>Version A Treaties</u>: Treaties with a blanket re-sourcing approach (Examples: China, United Kingdom, Canada, Germany, Japan, and possibly Australia)[60]**

A few treaties adopt the blanket re-sourcing approach found in the 2006 U.S. Model. The Treaty with China, entered into force in 1984, includes a clear statement in Article 22 that "[i]income derived by a resident of a Contracting State which may be taxed in the other Contracting State in accordance with this Agreement shall be deemed to arise in that other Contracting State."[61]

The U.S.-U.K treaty also essentially allows for a complete re-sourcing of the income that the United Kingdom is allowed to tax in accordance with the terms of the treaty, with one exception. The U.S.-U.K. treaty provides that the U.K. generally will not tax capital gains of U.S. residents unless the gains are "real property related" or in the case of certain gains realized by persons who had been U.K residents in the six years immediately preceding the disposition of the relevant property. (This special rule was negotiated in order to allow the U.K. to apply its domestic law to these situations). The general re-sourcing rule applies to whatever income the U.K. can tax under the treaty, with the

---

[60]   See Convention for the Avoidance of Double Taxation, April 30, 1984, U.S.-China, Art. 22, CCH U.S. Tax Treaties Vol. 2 ¶ 2103.22 [hereinafter, U.S.-China Tax Treaty]; Convention for the Avoidance of Double Taxation, July 24, 2001, U.S.-U.K., Art. 24, CCH U.S. Tax Treaties Vol. 7 ¶ 10,901.24 [hereinafter, U.S. – U.K. Tax Treaty]; Convention for the Avoidance of Double Taxation, August 29, 1989, U.S.-Ger., Art. 23, CCH U.S. Tax Treaties Vol. 3 ¶ 3203 [hereinafter, U.S.-Ger. Tax Treaty]; Convention for the Avoidance of Double Taxation, November 6, 2003, U.S.-Japan, Art. 23, CCH U.S. Tax Treaties Vol. 4 ¶ 5201.23 [hereinafter, U.S.-Japan Tax Treaty]; Convention for the Avoidance of Double Taxation, September 26, 1980, U.S.-Can., Art. 24, CCH U.S. Tax Treaties Vol. 2 ¶ 1903.24 [hereinafter, U.S.-Can. Tax Treaty]; Convention for the Avoidance of Double Taxation, August 6, 1982, U.S.-Austl., Art. 22, CCH U.S. Tax Treaties Vol. 1 ¶ 503.45 [hereinafter, U.S.-Austl. Tax Treaty].

[61]   U.S.-China Tax Treaty, Art. 22.

exception of this 6-year look-back rule of Article 13.[62] The treaty with Canada applies similar source rules.[63]

The original treaty with Germany, which was signed in 1989, did not contain a blanket re-sourcing rule and was similar to the treaties described under "Version B" in the next section. However, the 2006 Protocol to the treaty with Germany (entered into force in December 2007) amended the Relief of Double Taxation Provision (Article 23) to include a blanket re-sourcing rule.[64]

The treaty with Japan similarly applies a general re-sourcing rule to all items of income that Japan may tax under the treaty when derived by a U.S. resident.[65] The U.S.-Japan Treaty was adopted before the revised 2006 U.S. Model Treaty had been adopted, and was inconsistent with the sourcing rule contained in the earlier 1996 U.S. Model Treaty. The Technical Explanation to the U.S.-Japan Treaty contains an interesting acknowledgement:

> "*The last sentence of paragraph 2 provides a re-sourcing rule for gross income covered by paragraph 2. This provision is intended to ensure that a U.S. resident can obtain a U.S. foreign tax credit for Japanese taxes paid when the Convention assigns to Japan primary taxing rights over an item of gross income. Although the U.S. Model does not contain a re-sourcing rule, the prior Convention does contain a similar rule, as do many other U.S. treaties.*"[66]

The United States-Australia tax treaty contains a modified version of the "blanket re-sourcing" approach. Unlike other treaties, which include the re-sourcing rule in the Relief from Double Taxation Article, the treaty with Australia addresses re-sourcing of income in the Miscellaneous Article, as follows:

---

[62]  U.S.-U.K. Tax Treaty, Arts. 6, 13, and 24.

[63]  U.S.-Can. Tax Treaty, Arts. 6, 13, and 24.

[64]  See Protocol to the 1989 United States- Germany Income Tax Treaty, Article XII, reprinted at CCH Tax Treaties Vol. 3, ¶ 3209.

[65]  U.S.-Japan Tax Treaty, Art. 23.

[66]  Treasury Department Technical Explanation to U.S.-Japan Tax Treaty, Art. 23, CCH U.S. Tax Treaties Vol.4, ¶ 5233.

*"Income derived by a resident of the United States which, under this Convention, may be taxed in Australia shall for purposes of the income tax law of Australia and of this Convention be deemed to be income from sources in Australia."*[67]

The language quoted above does not explicitly state that it applies for purposes of United States law. However, the Treasury Department Technical Explanation did consider this a blanket resourcing rule: "Paragraph 1 [of Article 27] provides source rules. Income derived by a resident of the United States which, under the Convention, may be taxed by Australia, is deemed to have its source in Australia."[68]

Notably, in a 1999 private letter ruling the Service addressed the "source" of income on an item of gain realized by a U.S. corporation that was potentially taxable in a "foreign country" (which we understand to be Australia) under Article 21 of the treaty, "Items of Income Not Expressly Mentioned". [69]  While one might question whether income that a treaty partner country is not *specifically* allocated primary taxing authority over should properly be considered to have been "re-sourced" under Article 27 (since the Article itself is oddly worded, and the technical explanation refers to income that under the Convention may be taxed by Australia), the Service concluded that where Australia's exercise of taxing authority was consistent with the terms of the treaty, the item of income would be re-sourced as "foreign source income."

---

[67]  U.S.-Austl. Tax Treaty, Art. 27.

[68]  Treasury Department Technical Explanation to U.S.-Austl. Tax Treaty, Art. 27, CCH U.S. Tax Treaties Vol.1, ¶ 520.

[69]  PLR 199918047 (Feb. 9, 1999).

Add122

**B.**     **Version B Treaties: Treaties that do not have any general re-sourcing language and only re-source income earned by a U.S. citizen who resides in the Treaty partner country (Examples: Denmark, Italy, France, Switzerland and South Africa)[70]**

A number of treaties do not contain a general re-sourcing provision and apply a re-sourcing rule only for U.S. citizens who reside in the relevant foreign treaty partner jurisdiction.  The 1994 U.S-France Treaty is one such example, providing as follows in Article 24, Relief from Double Taxation:

> "*Article 24 (1)(a): In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States as a credit against the U.S. income tax: (i) the French income tax paid by or on behalf of such citizen or resident, and (ii) in the case of a United States company owning at least 10 percent of the voting power of a company that is a resident of France and from which the United States company receives dividends, the French income tax paid by or on behalf of the distributing corporation with respect to the profits out of which the dividends are paid.*
>
> *Article 24(1)(b): In the case of an individual who is both a resident of France and a citizen of the United States, (i) the United States shall allow as a credit... the French income tax paid after the credit referred to in subparagraph(a)(iii) of paragraph(2) ... and (ii) income referred to in paragraph 2 and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary.*"[71]

If a U.S. individual does not reside in France (or the relevant treaty country) but resides in the United States, re-sourcing is not provided for in the treaty. Thus where an item of income can be taxed by France in accordance with the Treaty and that income is classified as U.S.-source income under the Code, no relief from double tax is provided. This is because the language of the Treaty

---

[70]   See Convention for the Avoidance of Double Taxation, August 19, 1999, U.S.-Den., Art. 23, CCH U.S. Tax Treaties Vol. 3 ¶ 2500 [hereinafter, U.S.-Den. Tax Treaty]; Convention for the Avoidance of Double Taxation, August 25, 1999, U.S.-Italy, Art. 23, CCH U.S. Tax Treaties Vol. 4 ¶ 4803.23 [hereinafter, U.S.-It. Tax Treaty]; Convention for the Avoidance of Double Taxation, August 31, 1995, U.S.-France, Art. 24, CCH U.S. Tax Treaties Vol. 3 ¶ 300.1[hereinafter, U.S.-Fr. Tax Treaty]; Convention for the Avoidance of Double Taxation, February 17, 1997, U.S.-S. Afr., Art. 23, CCH U.S. Tax Treaties Vol. 6 ¶ 8201.23; Convention for the Avoidance of Double Taxation, October 2, 1996, U.S.-Switz., Art. 23, CCH U.S. Tax Treaties Vol. 6 ¶ 9101.23.

[71]   U.S.-Fr. Tax Treaty, Art. 24.

qualifies the obligation of the United States to offer a tax credit; it is made available only "[i]n accordance with and subject to the limitations of the law of the United States". The Technical Explanation to the U.S.-France treaty notes that:

> *"Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions of the U.S. statutory credit at the time a credit is given. The limitations of U.S. law generally limit the credit against U.S. tax to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code section 904(a))."* [72]

Essentially the same language as that cited above can be found in the treaties with Denmark (signed in 1999 and entered into force on March 31, 2000); and Italy (signed in 1999 and entered into force on December 16, 2009). [73]

C.    <u>Version C Treaties</u>: Treaties that have a general re-sourcing rule, where the relevant rule is "subject to the source rules in the domestic law of a treaty party as apply for purposes of limiting the foreign tax credit" (Examples: Estonia, Latvia, Luxembourg, Sweden, and Austria) [74]

Another variation from the U.S. Model Treaty's re-sourcing language is a group of treaties that contain a general re-sourcing rule but provide that it is "subject to such source rules in the domestic law" of the treaty party "as apply for purposes of limiting the foreign tax credit…." By way of example, the U.S. - Estonia Tax Treaty provides that:

> *"23(1). In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income: (a) the Estonian tax paid by or on behalf of such resident or citizen; and (b) in the case of a United States company owning at least 10 percent of the voting stock of a company*

---

[72]    Treasury Department Technical Explanation to U.S.-France Tax Treaty, Art. 24, CCH U.S. Tax Treaties Vol.3, ¶ 3060.

[73]    U.S.-Den. Tax Treaty, Art. 23; U.S.-It. Tax Treaty, Art. 23.

[74]    Convention for the Avoidance of Double Taxation, January 15, 1998, U.S.-Est., Art. 23, CCH U.S. Tax Treaties Vol. 3 ¶ 2801.24 [hereinafter, U.S.-Est. Tax Treaty)]; Convention for the Avoidance of Double Taxation, January 15, 1998, U.S.-Lat., Art. 24, CCH U.S. Tax Treaties Vol. 5 ¶ 5551; Convention for the Avoidance of Double Taxation, April 3, 1996, U.S.-Lux., Art. 24, CCH U.S. Tax Treaties Vol. 5 ¶ 5701; Convention for the Avoidance of Double Taxation, September 1, 1994, U.S.-Swed., Art. 23, CCH U.S. Tax Treaties Vol. 6 ¶ 8801.24; Convention for the Avoidance of Double Taxation, May 30, 1996, U.S.-Austria, Art. 22, CCH U.S. Tax Treaties Vol. 1 ¶ 703.22.

*which is a resident of Estonia and from which the United States company receives dividends, the Estonian tax paid by or on behalf of the distributing company with respect to the profits out of which the dividends are paid.*

*(...)*

*23(3) For the purposes of allowing relief from double taxation pursuant to this Article, **and subject to such source rules in the domestic laws of the Contracting States as apply for purposes of limiting the foreign tax credit,** income derived by a resident of a Contracting State which may be taxed in the other Contracting State in accordance with this Convention (other than solely by reason of citizenship in accordance with paragraph 4 of Article 1 (General Scope)) shall be deemed to arise in that other State."* [75]

While the precise meaning of the "subject to" language is not entirely clear, a natural interpretation of the overall provision would be that income of a U.S. taxpayer which Estonia taxes in accordance with the treaty will generally be treated as a foreign source income for purposes of applying the U.S. foreign tax credit rules, but the limitations under Section 904 will continue to apply to any such taxes. [76]

The treaty with Estonia was signed in January 1998 and entered into force on December 30, 1999. In the Joint Committee Explanation of the Treaty, Article 23 is described by the Joint Committee on Taxation as follows:

*"Part of the double tax problem is dealt with in other articles of the proposed treaty that limit the right of a source country to tax income. This article [Article 23] provides further relief where both Estonia and the United States otherwise still tax the same item of income. This article is not subject to the saving clause, so that the country of*

---

[75]   U.S.-Est. Tax Treaty, Art. 23.

[76]   We note that Section 865(h) permits a taxpayer to make an election to treat certain gain as foreign source if (among other things) it would be sourced outside of the United States "under a treaty obligation of the United States (applied without regard to [Section 865])...."   As a result, even if the "subject to" language were interpreted broadly, an election may be available in some cases to treat gain as foreign source.  The application of Section 865(h) to the Version C treaties is somewhat confusing since (i) Section 865(h) requires that the underlying gain be treated as foreign source under the treaty and (ii) in the version C treaties, the source rules are (under a broad reading) "subject" to the domestic rules. However, Section 865(h) provides that the determination of whether a treaty treats the income as foreign source is made "without regard to" Section 865.  This could be read to turn off the "subject to" language for purposes of applying Section 865(h) even if the "subject to" language were given a broad interpretation.  Similar principles would apply in the Version E treaties.

*citizenship or residence will waive its overriding taxing jurisdiction to the extent that this article applies.*

*The proposed treaty generally provides that the United States will allow a U.S. citizen or resident a foreign tax credit for the income taxes imposed by Estonia. ... For purposes of allowing relief from double taxation under this article, the proposed treaty provides a source rule for determining the country in which an item of income is deemed to have arisen. Under this rule, income derived by a resident of one of the countries that may be taxed in the other country in accordance with the ... treaty (other than solely by reason of citizenship) is treated as arising in that other country. However, the preceding rule does not override the source rules of the domestic laws of the countries that are applicable for purposes of limiting the foreign tax credit.*" [77]

The Treasury Department Technical Explanation to the treaty with Estonia states: "As indicated, the U.S. credit under the Convention is subject to the various limitations of U.S. law (see Code sections 901 - 908)." [78]  While the Joint Committee and Treasury Department explanations reiterate the reference to "source rules... that are applicable for purposes of limiting the foreign tax credit", there is no indication in either of the two explanations that this language meant all general source rules contained in the Code would override the treaty allocation of taxing rights, or impede a foreign tax credit from being claimed.  A more logical reading would suggest that "subject to the source rules" was intended to refer only to the different baskets of income that apply under Section 904 of the Code. [79]

In the Technical Explanation that accompanied the 1996 Luxembourg treaty, however, a sentence appears, stating that if the treaty source rules and the Code source rules are inconsistent, an election under Section 904(g)(10) would be unavailable (thus, reading a general "source override"

[77]  Joint Committee on Taxation Explanation of Proposed Income Tax Treaty Between the United States and the Republic of Estonia,  October 8, 1999, CCH U.S. Tax Treaties Vol.3 ¶ 2811.

[78]  Treasury Department Technical Explanation of U.S.-Est. Tax Treaty, CCH U.S. Tax Treaties Vol.3, ¶ 2812.

[79]  The following treaties contain language such as this: Convention for the Avoidance of Double Taxation, January 15, 1998, U.S.-Lat., Art. 24, CCH U.S. Tax Treaties Vol. 5 ¶ 5501; Convention for the Avoidance of Double Taxation, January 15, 1998, U.S.-Lith., Art. 23, CCH U.S. Tax Treaties Vol. 5 ¶ 5551; Convention for the Avoidance of Double Taxation, April 3, 1996, U.S.-Lux., Art. 25, CCH U.S. Tax Treaties Vol. 5 ¶ 5701; Convention for the Avoidance of Double Taxation, September 1, 1994, U.S.-Swed., Art. 23, CCH U.S. Tax Treaties Vol. 6 ¶ 8801.24; Convention for the Avoidance of Double Taxation, May 30, 1996, U.S.-Austria, Art. 22, CCH U.S. Tax Treaties Vol. 1 ¶ 703.22.

into the clause)[80]; this statement could reflect a broad reading of the "subject to" clause. This particular Technical Explanation is an unusual example and is inconsistent with the technical explanations to other treaties in this category. As noted earlier in the Report,[81] however, commentators have articulated the position that the "subject to" clause included in these Version C treaties should not be interpreted as allowing all general source of income rules in the Code (which are of general application and are not primarily directed towards limiting the availability of a foreign tax credit) to override the treaty-specific determination of "source" (by reference to the allocation of primary taxing authority).

**D.    Version D Treaties: Treaties that pre-date the 1977 Model Treaty and contain an outdated situs-based test for sourcing sales of personal property (Examples: Korea, Israel, Norway, Cyprus, Indonesia, Morocco, and Egypt)[82]**

A number of treaties do not conform to any of the U.S. Models because they were entered into before any U.S. Model had been adopted. These treaties consistently approach the question of source on an item-by-item basis, in a separate article entitled "source" (generally, Article 6). The approach seems to reflect an intent to source income in a manner consistent with the way in which it would be taxed under the treaty, but the treaties themselves do not specifically so state.

These treaties generally contain a separate article with source rules of general applicability (relevant for purposes of determining which country has primary taxing jurisdiction). With respect to personal property sales, these treaties provide that such property will be sourced by reference to

---

[80]    *See Bennett*, supra note 15. Ms. Bennett states that this "ignores the fact that, for purposes of determining whether there is a potential conflict between the Code source rule and the modified treaty source rule, section 904(g)(10)(A)(i) requires reference to the U.S. source treatment that results from section 904(g)(1), and section 904(g)(10)(A)(ii) requires the modified treaty source rule to be applied as if section 904(g)(1) did not exist."

[81]    *See* note 15 *supra*.

[82]    See U.S.-Kor., Art. 6; Convention for the Avoidance of Double Taxation, November 20, 1975, U.S.-Isr, Art. 4, CCH U.S. Tax Treaties Vol. 4 ¶ 4603.09; Convention for the Avoidance of Double Taxation, December 3, 1971, U.S.-Nor., Art. 24, CCH U.S. Tax Treaties Vol. 5 ¶ 7003.51; Convention for the Avoidance of Double Taxation, March 19, 1984, U.S.-Cyprus, Art. 6, CCH U.S. Tax Treaties Vol. 2 ¶ 2303.07; Convention for the Avoidance of Double Taxation, July 11, 1988, U.S.-Indon., Art. 7, CCH U.S. Tax Treaties Vol. 4 ¶ 4303.15; Convention for the Avoidance of Double Taxation, August 1, 1977, U.S.-Morocco, Art. 5, CCH U.S. Tax Treaties Vol. 5 ¶ 6050.43; Convention for the Avoidance of Double Taxation, August 24, 1980, U.S.-Egypt, Art. 4, CCH U.S. Tax Treaties Vol. 3 ¶ 2703.

where the sale occurs (an approach consistent with the title-passage rule that applied under U.S. statutory law at the time).

### E.    <u>Version E Treaties</u>: Treaties with India and Thailand[83]

As discussed above, India now taxes non-residents, under its domestic law, on income which "accrues or arises or is deemed to accrue or arise in India."[84]  With regard to capital assets, a non-resident's income is deemed to accrue or arise in India upon the transfer of a capital asset "situated in India".[85]

The treaty with India was signed in 1989 and entered into force in 1990. The treaty in some respects follows the style of the general resourcing rule found in 1981 U.S. Model, but contains a limitation (similar to the one found in the Version C treaties) that the provision is subject to the domestic source rules of each contracting state for purposes of limiting the foreign tax credit.  Article 25 of the U.S.-India treaty refers to the United States allowing a citizen or resident a credit in accordance with and subject to the limitations of U.S. law. Article 25, paragraph 3, reads as follows:

> *"For the purposes of allowing relief from double taxation pursuant to this Article, income shall be deemed to arise as follows:*
>
> (a) *income derived by a resident of a Contracting State which may be taxed in the other Contracting State in accordance with this convention (other than solely by reason of citizenship in accordance with paragraph 3 of Article 1 (General Scope)) shall be deemed to arise in that other state;*
>
> (b) *income derived by a resident of a Contracting State which may not be taxed in the other Contracting State in accordance with the Convention shall be deemed to arise in the first-mentioned State.*
>
> ***Notwithstanding the preceding sentence****, the determination of the **source of income for purposes of this Article shall be subject to such source rules in the domestic laws of the Contracting States as apply for the purpose of limiting the foreign tax credit.**  The preceding*

---

[83]    U.S.-India Tax Treaty, Art. 25; Convention for the Avoidance of Double Taxation, November 26, 1996, U.S.-Thailand, Art. 25, Tax Treaties (CCH) Vol. 6 ¶ 9403.25.

[84]    Sec. 9(1), Income-Tax Act, 1961 as amended by Finance Act 2012.

[85]    Id.

*sentence shall not apply with respect to income dealt with in Article 12 (Royalties and Fees for Included Services).*"[86]

The Treasury Department's Technical Explanation to the treaty refers to Article 25(3) and acknowledges the limitation of the treaty in terms of re-sourcing income as follows:

"*Paragraph 3 provides rules for determining the source of income for purposes of the treaty foreign tax credit. The general rule is (1) that income of a resident of a Contracting State is deemed to arise in the other Contracting State, if that other State is given the right to tax that income by the Convention, so long as that taxing right is not solely on the basis of citizenship...*

*If, however, the rules in the laws of a Contracting State for the determination of source of income for foreign tax credit purposes differ from the general rule stated above, the statutory rule will apply. This granting of precedence of statutory source rules over the treaty source rule, however, does not apply to determining the source for credit purposes of royalties and fees for included services dealt with in Article 12.*"[87]

The U.S.-Thailand Tax Treaty is consistent with the India treaty provisions described above.

Like the Version C Treaties discussed above, a natural interpretation of the "[n]otwithstanding" qualification is that it applies only to the specific source rules contained in Section 904 of the Code but not to the more general source rules of the Code. However, the fact that this qualification is followed by a statement that "[t]he preceding sentence shall not apply with respect to income dealt with in Article 12" could make this conclusion more difficult to reach than in the case of the Version C treaties. Moreover, the ALI study on International Aspects of U.S. Income Tax, in its chapter on Residence Country Taxation states that:

"*Article 23, paragraph 3 of the treaty with India contains the usual language but then goes on to provide that Code source rules nonetheless apply for treaty credit purposes, except for special treaty rules relating to royalties. While the purpose of this language is not clear, it appears to mean that the United States will not give double tax relief for Indian taxes which are based on the application of the treaty. This is somewhat inconsistent with the principles stated in the text; it may simply be a case where the source country was unwilling*

---

[86]  U.S.-India Tax Treaty, Art. 25(3).

[87]  Treasury Dept. Technical Explanation of the U.S.-India Treaty, reprinted at CCH U.S. Tax Treaties Vol.5, ¶ 4250.

*to give up taxing jurisdiction and the residence country unwilling to give double tax relief, leaving a resulting area of unrelieved double taxation."*[88]

However, we question this interpretation as it would (like a broad reading of the subject to language in the case of the Version C treaties) completely negate the re-sourcing contemplated by Article 25(3)(a) of the India Treaty.[89]

## VI.    Examples of Treaty Sourcing Issues

### A.    Capital gains on sales of shares in companies, or interests in partnerships, whose assets consist mainly of real property located in the relevant foreign country.

Most treaties in force (and all of the treaties we discussed above)[90] allow the U.S. treaty partner to impose tax on gains attributable to sales or dispositions of "shares or similar rights in a company the assets of which consist of at least 50 percent of real property situated in" the relevant foreign country or derive at least 50 percent of their value, directly or indirectly, from real property situated in such country.[91] When this gain is not clearly re-sourced under the treaty, a question arises regarding the source of the gain for U.S. tax purposes. If, in the hands of a U.S. resident, the gain remains U.S. source income by virtue of the provisions of Section 865 of the Code (as would appear to be the case), the U.S. resident would not be able to claim a foreign tax credit and double taxation of the income could result.

Application of the U.S. sourcing rules may be impacted where the relevant treaty contains a definition of the term "real property" that cross-references relevant local law. For example, Article 6 of the treaty with Italy refers to the fact that "the term 'immovable property' shall have the meaning

---

[88]   ALI, "Residence Country Taxation", at 233.

[89]   See also a discussion of Section 865(h) in note 76, supra.

[90]   The treaty with Korea did not originally allow Korea to impose such a tax but a later announcement was made that the U.S. government had entered into an agreement with Korea to this effect. See Announcement 2001-34, 2001, CB 1087, April 3, 2001.

[91]   See, e.g., U.S.-Fr. Tax Treaty, Art. 13 (2)(b).

that it has under the law of the Contracting State in which the property in question is situated."[92]  If a treaty reads in this manner, and if the gain on the sale of the foreign company's shares in the case of a relevant jurisdiction is taxed by the foreign country because the shares are, under local law, treated as "real property," one might consider whether a U.S. resident could attempt to apply the treaty in a manner that requires the United States to similarly treat this gain as arising from a sale of real property, and possibly treat the gain as income from sources outside the United States under Section 862(a)(5).  This might appear to be a reasonable approach theoretically, but it is by no means assured.  And, if this is not the case under local law (in other words, if the law of the foreign country would not characterize the gain on a sale of such shares as real property gain), then the gain would be U.S. source income in the hands of a U.S. resident and the U.S. resident may not have relief from double taxation.[93]

## B.    Income from Personal Services

Issues can also arise under treaties that do not have a blanket re-sourcing rule where a U.S. citizen resides overseas and performs occasional dependent personal services for a non-U.S. employer within the United States. Treaties generally allow the United States to tax U.S. citizens by virtue of the operation of the saving clause in this type of situation, even if the primary taxing authority is granted to the country of residence under the treaty.  Thus, (a) a U.S. citizen residing overseas may be subject to worldwide taxation by the foreign country of residence on his or her income for dependent personal services in that foreign country, and may also come into the United States to perform occasional services here; (b) the United States can similarly exercise its taxing

---

[92]   See U.S.-Italy Tax Treaty, Art. 6(2); see also, e.g., U.S.-Fr. Tax Treaty, Art. 6(2).

[93]   Moreover, some treaty partners are permitted to tax certain capital gains of a U.S. resident even where the gain is not attributable to "immovable property" (see, e.g. the U.S-Spain treaty, article 13, which allows Spain to impose a tax on capital gains where a U.S. resident owns or used to own at least 25% of the stock of the company).  However, the special provision in the treaty with Spain incorporates its own special source rule (under the U.S.-Spain treaty, such gain is deemed to arise in the other state to the extent necessary to avoid double taxation).   See Convention for the Avoidance of Double Taxation, February 22, 1990, U.S.-Spain, Art. 13, CCH U.S. Tax Treaties Vol. 6 ¶ 8403.27 [hereinafter, U.S.-Spain Tax Treaty].  We mention this example because it demonstrates the principle the Report is supporting; i.e., where a treaty partner is given priority taxing authority over an item of income, a credit should be available, particularly if the tax was contemplated at the time the treaty was negotiated.

authority on the U.S. citizen's worldwide income, as confirmed by the saving clause of the treaty; (c) the saving clause of the treaty does not override the Relief from Double Taxation article; however, it does override other provisions of the treaty dealing with the taxing authority of a country in the case of income for personal services. This precise fact pattern was addressed by the Tax Court in *Filler v. Commissioner*.[94]

In *Filler*, a U.S. citizen resided in France. The individual, who was employed by IBM-Europe, made business trips to the United States for a few days at a time during 1972 and 1973. As a French resident, Filler paid income tax to France on his total amount of compensation earned during 1972 and 1973, including the portion attributable to his services in the United States. The United States also taxed Filler (since he was a U.S. citizen) and disallowed his claim for a foreign tax credit on the income attributable to the days worked in the United States, because this income was U.S.-source income under the Code.

The substantive provisions of the treaty with France provide in Article 15 that in the case of personal services income, only the county of residence shall tax the income if: (a) the recipient is present in the other state for periods not exceeding in the aggregate 183 days in any 12-month period; (b) the employer is not a resident of the United States; and (c) the wages/salary are not borne by a permanent establishment or fixed place of business in the United States.[95]

Therefore, under Article 15 of the treaty, only France could tax Filler on the income earned because Filler was in the United States for fewer than 183 days that year. However, the Tax Court stated that Article 15 does not stand alone, drawing attention to the fact that there is also the saving clause of the treaty to be considered. The savings clause (currently in Article 29(2) of the U.S.-France Tax Treaty) allows the U.S. to tax its citizens and residents as if the treaty had not come into effect. While the saving clause cannot override the Relief from Double Taxation provision, it can

---

[94]  *Filler v. Commissioner*, 74 T.C. 406 (1980).

[95]  U.S.-Fr. Tax Treaty, Art. 15.

override Article 15.  The Tax Court concluded that a fair reading of the treaty is that France should offer the credit, not the United States. The U.S. is required to provide a credit only for "the appropriate amount" of French tax and it is understood that the related Code sections on "source of income" would be applicable.[96]

Yet another case of double taxation  on personal services income can arise when multinational partnerships, including service partnerships, earn income that is taxed by both the United States (when received or allocated to the partners) and by a treaty partner.  Coincidentally, one example of this situation appears in Article 14 of the U.S.-France treaty.  Specifically, Article 14(4) of the U.S.-France treaty provides that the exemption from French tax granted under Article 24 of the treaty shall not exceed more than 50 percent of the earned income from a partnership accruing to a U.S. citizen residing in France. Thus, any U.S. income in excess of this 50 percent cap can be taxed by both France and the U.S.  While France is allowed to impose this tax under the treaty, nothing in the treaty requires the United States to re-source the income and treat it as foreign source.[97]

### C.    Royalties Earned by U.S. Residents from Persons in Treaty Partner Countries

Commentators have identified the difficulty with identifying the "source" of royalty income, as well as the proper character of that income (especially when there is a group of rights in the relevant contractual provisions covered by the license).[98]  While many treaties avoid the issue of source and double taxation because they exempt royalty payments made to residents of the other contracting state from withholding altogether, some treaties do currently allow withholding taxes to be imposed upon payments of royalties to U.S. residents. For example, treaties with Australia,

---

[96]   In this case the taxpayer had actually sought relief from the French tax authorities by way of a credit and it had been denied. The Tax court stated that he could re-present his case to the French taxing authorities, and, if denied, then he could go to the French competent authority to "initiate international administrative procedures under article 25."

[97]   See Blanchard, Multinational Service Partnerships, 56 Tax Lawyer No. 4, at 785

[98]   West & Symington, supra note 16. See also Andersen, 11.02(1)(b)(iii).

Bulgaria, Italy, Korea and Spain all currently allow for withholding tax to be imposed. These treaties generally refer to royalties that "arise" in a contracting state, and describe royalties as "arising" in a particular place by reference to the payor.[99]

Where the treaty does not effectively re-source the royalty income in question as foreign source income, double tax exposure can arise if the royalties are being paid by a foreign person for use of licensed property in the United States because, in such a case, the United States would treat the income as U.S. source even though primary taxing right is ceded to the treaty partner.

---

[99] U.S.-Austl. Tax Treaty, Art. 12; Convention for the Avoidance of Double Taxation, February 23, 2007, U.S.-Bulg., Art. 12, CCH U.S. Tax Treaties Vol. 2 ¶ 1803.25; U.S.-Kor. Tax Treaty, Art. 14; U.S.-Spain Tax Treaty, Art.12; U.S.-It. Tax Treaty, Art. 12.

## Northwestern Journal of International Law & Business

Volume 2
Issue 2 *Fall*

Fall 1980

# Newly Revised Income Tax Treaty with France: A Breakthrough in U.S. Tax Treaty Law

Stephanie H. Simonard

Follow this and additional works at: http://scholarlycommons.law.northwestern.edu/njilb

Part of the International Law Commons, and the Taxation-Transnational Commons

Recommended Citation

Stephanie H. Simonard, Newly Revised Income Tax Treaty with France: A Breakthrough in U.S. Tax Treaty Law, 2 Nw. J. Int'l L. & Bus. 455 (1980)

This Article is brought to you for free and open access by Northwestern University School of Law Scholarly Commons. It has been accepted for inclusion in Northwestern Journal of International Law & Business by an authorized administrator of Northwestern University School of Law Scholarly Commons.

# The Newly Revised Income Tax Treaty With France: A Breakthrough In U.S. Tax Treaty Law

## *Stephanie H. Simonard**

*In 1979, the United States and France revised their 1967 Income Tax Treaty. Developed along the lines of the Organization of Economic Co-Operation and Development Model Convention, the revised Treaty adopts a unique method of calculating the U.S. foreign tax credit limitation. The revised Treaty changed the definition of "source" of income to permit the foreign tax credit against what would otherwise be termed "U.S. source income." In this article, Mrs. Simonard examines the revised Treaty and its effects on U.S. citizens residing in France.*

A major change in French tax law[1] in 1976 caused many Americans to leave France and pushed the United States Treasury Department to renegotiate the 1967 Income Tax Treaty between France and the United States.[2] The result of the negotiations is a revised treaty that is unique in that it approximates the spirit of the Organization for Economic Co-Operation and Development (OECD) Model Convention[3] more than any other U.S. tax treaty with respect to the taxation of individuals. It is also the only U.S. treaty that provides a major deviation from the Internal Revenue Code (I.R.C.) for U.S. citizens.[4]

---

* Manager, Tax Department, Peat, Marwick, Mitchell & Co., Paris, France; A.B., 1972, Sweet Briar College; *Certificat à titre étranger* from l'Institut d'Études Politiques, Paris, France.

[1] *See* notes 4-6 and accompanying text *infra*.

[2] Convention Between the United States of America and the French Republic With Respect to Taxes on Income and Property, July 28, 1967, 19 U.S.T. 5280, T.I.A.S. No. 6518.

[3] Organization for Economic Co-Operation and Development Model Convention for the Avoidance of Double Taxation With Respect to Taxes on Income and Capital, [1980] 1 Tax Treaties (CCH) ¶ 151 [hereinafter cited as OECD Model].

[4] U.S. treaties with Belgium and Japan do provide limited sourcing rules with respect to compensation. The Belgian Treaty provides that "[i]ncome which has been taxed by Belgium in

While the I.R.C. taxes U.S. citizens on their worldwide income regardless of their residence, the revised Treaty equates U.S. citizens residing in France with French citizens who are not U.S. residents. Thus, the Treaty recognizes France's right to tax worldwide income, including most types of U.S. source investment income. To achieve this treatment, however, the individual U.S. taxpayer residing in France faces a complex tax situation. This article will focus on the changes, the unique aspects of the revised Treaty, the differing U.S. and French interpretations of the Treaty, and the practical problems that have arisen in its application from the perspective of an American citizen residing in France.

## TAX REVERSAL FOR U.S. CITIZENS RESIDING IN FRANCE

Following World War II and up through 1978, France was a tax haven for numerous American citizens. France taxed its residents on a worldwide income basis; American citizens were exempt from French tax on U.S. source investment income (and in some cases on part of their compensation income) because of Article 164-1, which provided an exemption to individuals subjected to tax on worldwide income by their country of origin.[5]

At the end of 1976, in a major revision of the definitions of "domicile" and "residence," and of the taxation of French citizens sent overseas on business assignments, the French National Assembly repealed Article 164-1.[6] There was no publicity about this aspect of an other-

---

accordance with Articles 6 through 21 shall, for the purpose of applying the United States credit in relation to Belgian tax, be treated as income from Belgian sources." Convention Between the United States and Belg. for the Avoidance of Double Taxation, July 9, 1970, art. 23(2), 23 U.S.T. 2689, 2706, T.I.A.S. No. 7463. In practice, however, this provision has not had wide application. *See also* Convention Between the United States of America and Japan for the Avoidance of Double Taxation, Mar. 8, 1971, 23 U.S.T. 967, T.I.A.S. No. 7365. Also, most treaties have foreign tax credit provisions applicable to U.S. citizens despite a "savings clause." Even these provisions, however, can be rendered inapplicable. *See* Rev. Rul. 79-152, 1979-1 C.B. 237; Rev. Rul. 80-201, 1980-30 I.R.B. 15; Rev. Rul. 80-223, 1980-33 I.R.B. 12.

[5] [1969] CODE GÉNÉRAL DES IMPÔTS, art. 164-1 (France). Article 164-1 specifically stated: "Taxpayers of foreign citizenship who are domiciled in France are taxable. . . . However an exemption from this taxable income will apply to foreign source income to the extent that the taxpayers can show that they were subjected to tax in their country of origin on their worldwide income." Since the United States is the only major Western country which taxes its citizens who are resident abroad on their worldwide income, this provision was utilized in fact by Americans.

[6] Law No 76-1234 of December 29, 1976, [1979] CODE GÉNÉRAL DES IMPÔTS, art. 164. In fact, under this law, a person may be either a "domiciliary" or a "non-resident" but not a "resident" of France, for tax purposes. To be considered domiciled, it is sufficient to live or work in France, have major economic or family ties with France, or spend over six months there. Under this broad French definition, the term "domiciliary" in fact corresponds to the U.S. tax definitions of both "resident" and "domiciliary." In this article, the treaty term "resident" is used through-

Add137

wise highly-touted bill and Americans were able, *in extremis*, to postpone the applicable provisions until 1979, and to promote the renegotiation of the Income Tax Treaty between France and the United States.[7]

Indeed, an amendment to the Treaty was necessary. Double taxation of U.S. source income would result from the new French law for Americans residing in France; the foreign tax credit provisions of the U.S. Internal Revenue Code[8] would not provide effective relief. Almost three years later, the Protocol of November 24, 1978 (date of signature) was ratified on September 27, 1979, retroactively effective from January 1, 1979.[9]

The Treaty, as amended by the Protocol,[10] has been criticized as inequitable, but the result did meet the objective of avoiding double taxation. In the negotiations leading up to the final Protocol, the French were in a position of strength: there was no particular justification for maintaining the Article 164-1 exemption, and principles of international law clearly recognize the right of a host country to tax the worldwide income of its residents. This is a basic premise of both the OECD Model Convention,[11] as well as the U.S. Treasury Department's own Model Convention.[12]

UNIQUE PROVISIONS COMBINE TO PROVIDE MODEL RESULT

The originality of the Protocol is the relief from double taxation under Article 23,[13] and specifically the calculation of the U.S. foreign tax credit, which is a dollar-for-dollar reduction in U.S. income tax for

---

out, to denote that the U.S. citizen is a resident of France under French Code Général des Impôts Article 4B, and under Article 3(1) of the 1967 Income Tax Treaty between France and the United States, note 2 *supra*.

[7] Law N⁰ 76-1234 of December 29, 1976, was effective beginning January 1, 1977, except as applicable to persons taxed in their country of origin on a global basis—ie, U.S. citizens—the effective date being January 1, 1979. *Id.* art. 164-1.

[8] I.R.C. §§ 901-905.

[9] Protocol to the Convention Between the United States of America and the French Republic With Respect to Taxes on Income and Property of July 28, 1967, as amended by the Protocol of Oct. 12, 1970, Nov. 24, 1978, __ U.S.T. __, T.I.A.S. No. 9500, [1980] 1 TAX TREATIES (CCH) ¶ 2836A [hereinafter cited as Protocol]. The Protocol "entered into force" one month after ratification, on October 27, 1979. Hereafter, the term "Protocol" refers to the Protocol of November 24, 1978.

[10] All further textual citations to the Treaty refer to the Convention Between the United States and France With Respect to Taxes of July 28, 1967, as amended by the Protocol of Nov. 24, 1978, [1980] 1 TAX TREATIES (CCH) ¶¶ 2803-2835 [hereinafter cited as French Treaty].

[11] OECD Model, note 3 *supra*.

[12] Treasury Department's Model Income Tax Treaty of May 17, 1977, [1980] 1 TAX TREATIES (CCH) ¶153 [hereinafter cited as Treasury Model].

[13] Protocol, *supra* note 9, at art. 23.

the *allowable amount* of foreign income tax incurred.[14]  The key concept here is not the total amount of foreign tax, but rather the calculation of the "allowable amount," known as the foreign tax credit limitation.

### The Foreign Tax Credit and Source Rules

Essentially, American citizens are taxed on their worldwide income, regardless of their place of residence.  They utilize the same tax forms, define their income the same way, and are audited by the Internal Revenue Service, which has offices overseas.  The principal difference in the calculation of the U.S. taxable income applicable to nonresident Americans, is certain deductions designed to offset part of the higher expenses incurred by salaried or self-employed individuals living abroad.[15]  Recognizing that foreign countries also will attempt to tax Americans residing abroad on at least a portion of their earnings, U.S. law provides a foreign tax credit.[16]  This credit is a direct reduction of tax, similar to the investment tax credit.

The foreign tax credit has been in existence since 1918, and has been a useful tool in avoiding international double taxation of U.S. citizens.  It only permits, however, a credit of foreign taxes paid or accrued against the U.S. tax on foreign source taxable income.[17]  For example, if an individual has $1000 of U.S. tax liability, and 75% of his income is from foreign sources, a limitation of $750 (75% of the U.S. tax) is imposed on the amount of actual foreign tax which will be permitted as a reduction of the U.S. tax.  If the individual has paid $500 in French taxes, his U.S. credit would be $500; but if he paid $800, his credit would be $750.[18]

A treaty negotiator can hardly tamper with a provision of the I.R.C. that has been in existence for sixty years, and expect approval by the U.S. Senate.  Instead, the language of the Treaty changed the definition of "source of income," to permit the foreign tax credit against what would otherwise be termed "U.S. source income."  To fully un-

---

[14] *Id.* at art. 23(1).

[15] I.R.C. §§ 911 (exclusions from income), 913 (deductions from income).

[16] *Id.* at §§ 901-905.

[17] *Id.* at § 904.

[18] *Id.* at §§ 901-905. Under § 904(c), the U.S. tax can be reduced to zero. Any excess foreign tax can be carried back for use two years prior to the year in question, or carried forward for use five years afterward. *Id.*

The author has provided only the general concept of the foreign tax credit. The intricacies of its computation plus the definitional aspects are admirably discussed in E. OWENS, THE FOREIGN TAX CREDIT (1961).

**Add139**

derstand the importance of this innovation, a review of the concept of "source" is necessary.

The OECD Model Convention does not use the word "source," and although the official commentary concerning the Model uses the word frequently, "source" is not specifically defined. Nor is the term "source" defined in the U.S.-French treaty, but Article 2(2) states that "any term not otherwise defined shall, unless the context otherwise requires, have the meaning which it has under the laws of the contracting state relating to the taxes which are the subject of the convention."[19] The I.R.C. provides sourcing definitions or rules in sections 643, 861-864, 956 and 2104.[20]

Voluminous Treasury regulations also are devoted to the definition of "source," but for the typical American citizen residing overseas, U.S. source income includes: dividends and interest from U.S. corporate securities; interest from a U.S. bank or other U.S. debt obligations; compensation received for services rendered in the U.S. (including an allocation of earnings to business trips to the United States); income from property or royalties located in the United States; capital gains on security sales (unless the securities were sold in the country of foreign residence or a minimum foreign tax of 10% was paid in the country of sale); and capital gains on the sale of real property located in the U.S.[21] Trust income is treated according to the source of its elements, and the source of business income is defined as the country in which the business effectively operates.[22] Income may be categorized as U.S. source, foreign source, or both.[23]

French internal law is less detailed in this respect because it allows a foreign tax credit only within the context of a treaty provision, with no internal tax equivalent. But for the purposes of taxing U.S. citizens residing in France, the U.S. approach is generally acceptable to France.

### *New Source Rules Under Treaty*

Under the revised Treaty, the U.S. source rules are vastly altered

---

[19] French Treaty, *supra* note 10, at art. 2(2). In Herbert A. Filler, 74 T.C. __ (1980), No. 28, [1980] TAX CT. REP. DEC. (P-H) ¶74.28, this article was used—or in the writer's view, abused—by not properly discussing the context of the Treaty in defining the "source" of earnings resulting from a business trip to the U.S. by an American living in France. This particular definitional problem has been resolved by the new Protocol.

[20] I.R.C. §§ 643, 861-864, 956 and 2104.

[21] *Id* at § 861.

[22] I.R.C. § 652(b) ("conduit rule"). *See also* I.R.C. §§ 661(b), 662(b).

[23] *Id* at §§ 862-863.

with respect to income derived from the U.S. that is taxable in both countries. Hence, generally:

1. If a U.S. dividend is taxable in France, enough of that dividend will be treated as U.S. source to ensure a U.S. tax of 15% on it; the remainder will be treated as French source;[24]
2. Similarly for U.S. interest and royalties, except that the U.S. tax will amount to 10%, and zero or 5% respectively;[25]
3. U.S. capital gains taxed in France become fully French source;[26]
4. Up to 50% of U.S. earned income from partnerships could become French source if an election provided in the Treaty is made by the partnership.[27]

Items 1-3 equate the U.S. citizen with a French citizen (except where the overall tax before foreign tax credit exceeds that in France, as explained below).[28] Item 4 was a compromise between France and the United States.

## ANALYSIS OF THE PROTOCOL PROVISIONS

The provisions (or absence thereof) of the Protocol relevant to the U.S. citizen residing in France concern income from the performance of services, pensions, earned partnership income, alimony and those provisions dealing with passive investment income including dividends, interest, royalties and capital gains. It is important to remember that the relief from double taxation in this Treaty lies in the definition of *source* in the context of the calculation of the foreign tax credit in the U.S. return.

### Compensation for Services Rendered

The U.S. upheld one traditional U.S. source item by providing that income allocable to business trips to the United States be treated as U.S. source income. This conforms to U.S. tax law and ends a long-standing de facto item of double taxation,[29] but differs from the recent Belgian-U.S. tax treaty where income related to such trips is converted to Belgian source, if subject to tax in Belgium.[30] Under both U.S. and French tax laws, the individual's total compensation should now be

---

[24] French Treaty, *supra* note 10, at art. 9.
[25] *Id.* at arts. 10-11.
[26] *Id.* at art. 12.
[27] *Id.* at art. 23(3)(c)(i).
[28] *See* notes 76-91 and accompanying text *infra*.
[29] *See* Filler, 74 T.C. __ (1980).
[30] Belgian Treaty, note 4 *supra*.

# Add141

partially allocated to days spent in the U.S. on business.[31] As a practical matter this is usually accomplished by multiplying total compensation by a ratio of days worked in the United States, to total days worked during the year.[32] Since "total compensation" may be defined differently under U.S. and French tax rules, the resulting figure may not be identical on the U.S. and French tax returns of the same individual.

This allocation of income to U.S. business trips applies only to U.S. citizens residing in France and cannot be applied to French citizens.[33] This is different from the treatment of U.S. and French citizens under the Treaty: Article 15 provides that a French resident (other than a U.S. citizen) may spend up to 183 days per year in the U.S. on business without incurring income tax there, to the extent that the payment for services is not made or borne by an employer or permanent establishment in the U.S.[34] Thus, a business trip to the U.S. may be taxable only in the U.S. for a U.S. citizen, but taxable only in France for a French citizen.

An Exchange of Letters between the U.S. and France accompanied the Protocol to discuss various additional items not specifically covered in the Protocol itself.[35] Among the items included are the French tax treatment of employee stock options and contribution to qualified pension, profit-sharing and other retirement plans by employers and self-employed taxpayers.[36] These letters basically concluded that the French treatment would conform to the U.S. treatment of these items. Thus, for example, the ordinary income element from stock options would be treated as taxable compensation in France.[37]

---

[31] French Treaty, *supra* note 10, at art. 23(2)(a)(ii).

[32] French Instruction of February 19, 1980, para. II(3)(a), BULLETIN OFFICIEL DE LA DIRECTION GÉNÉRALE DES IMPÔTS No. 37 (Feb. 26, 1980) [hereinafter cited as Instruction].

[33] French Treaty, *supra* note 10, at art. 23(2)(a)(ii)(a).

[34] *Id.* at art. 15(2).

[35] Letters Attached to the Protocol of Nov. 24, 1978, [1980] 1 TAX TREATIES (CCH) ¶ 2836A (signed by Francois de Laboulaye, Ambassador of France, and George S. Vest, Assistant Secretary for European Affairs).

[36] *Id.* at paras. 3(a), 3(c). Additionally, para. 3(d) permits a deduction from French income which has been taxed for U.S. state and local income taxes on personal service and business income.

[37] *Id.* at para. 3(c). A practical question arises with respect to how much of the ordinary income is taxable in France if it could be argued that the ordinary income portion was earned over several years, most of which were not spent in France. For example, if an individual has a U.S. non-qualified stock option which he received while working in the United States and which he exercised in his first year of residence in France after having held the stock option for several years, does France have the right to tax the entire amount of ordinary income arising therefrom? If it does, would the United States treat the entire ordinary income portion as foreign source income? This matter is yet to be resolved, but it would appear that a reasonable solution would be

*Pensions*

Exemption from French taxation continues for U.S. social security or U.S. government pensions under Articles 16 and 20.[38] Important changes have occurred in the U.S. taxation of French social security and the joint taxation of private pensions.

*Social Security.* The Treaty Protocol removes an inequity in the treaty which permitted exemption of French social security pensions received by U.S. citizens if they resided in the United States, but no exemption if they resided in France. Article 20 now permits exemption from U.S. tax of French social security pensions no matter where the recipient resides. The application of this article is not affected by the "savings clause."[39]

It should be noted, however, that no specific definition of "social security" is provided in any of the documents accompanying the Protocol. A reasonable assumption is that the definition includes pensions received from regular or executive pension plans where contributions were obligatory under French tax law.[40]

*Private Pensions.* Private pensions received as a result of past employment (described in Article 19), are taxable in France except to the extent that the services rendered for such pensions occurred "when the principal place of employment was in the United States."[41] Problems may arise in calculating the amount of exempt pension income. It appears, however, that the I.R.S. will accept the "source" definition provided in the French Administrative Instruction of February 19, 1980,[42] which calculates the excludable amount as follows: if the activity was performed in the U.S. for more than half the year, the pension relating to the entire year is exempt in France; if the activity was engaged in for less than half the year in the U.S., the pension relating to the entire year would be taxable in France. The fraction of the total number of years worked in the U.S., over the total number of years worked to earn the pension, would be applied to the annual pension to determine the

---

a split between countries, similar to the treatment of pension income, as discussed at the text accompanying notes 40-44 *infra*.

[38] French Treaty, *supra* note 10, at arts. 16, 20.

[39] *Id* at art. 22(4)(a)(i).

[40] A private letter ruling to the American Chamber of Commerce of France, Inc., from J.F. Ryals of the Internal Revenue Service, dated April 30, 1974, includes contributions to these plans as creditable foreign income taxes under a general definition of social security contributions.

[41] French Treaty, *supra* note 10, at art. 23(2)(a)(ii)(c).

[42] View expressed by Carolyn Christiansen of the I.R.S. in an oral presentation given at a meeting sponsored by the Assn. of Americans Resident Overseas (Mar. 7, 1980) Paris, France.

**Add143**

amount excludable from French taxable income.[43] This appears to conflict with the sourcing rules set forth in a recently published I.R.S. Revenue Ruling where, in a non-treaty situation, all of the capital appreciation element of the pension was treated as U.S. source income.[44]

Finally, it should be noted in this respect that work must have been performed in the U.S. for the exemption to be applicable. Hence, if an individual performed work in other foreign countries, the pension relating thereto will be taxable in France; but the retired businessman who spent his entire working life in the United States may still retire to France and pay no tax there if his only income is from a private pension, U.S. social security and/or a U.S. government pension.

### *Professional Partnerships*

Both during and after the negotiations, there was considerable debate over how the countries should share the tax imposed on the partnership income of a U.S. citizen residing in France, when the partnership's main activities are located in the United States. The partnership provisions in the Protocol are subject to various interpretations.[45]

The compromise between France and the U.S. on the taxation of personal service income from partnerships resulted in another unique provision which changes the source of income in the U.S. return and concedes France's right to tax partially U.S. source income. A treaty provision was necessary because of a conflict in the two countries' tax rules for determining the source of partnership income related to personal services. Generally, a partner's share of partnership earnings is considered under U.S. law to retain the source and character which that income has within the partnership.[46] In other words, the source is determined at the partnership level. The major exception to this rule, covering guaranteed payments, is explained in detail below.[47] The French position apparently is that a French resident partner who receives his partnership share for the performance of services in France is considered to have received entirely French source income.[48] Thus

---

[43] Instruction, *supra* note 32, at para. II(2)(e).

[44] Rev. Rul. 79-389, 1979-2 C.B. 281.

[45] French Treaty, *supra* note 9, at arts. 6(4), 14(4), 23(3)(c).

[46] *See* I.R.C. § 702(b).

[47] *See* notes 58-63 and accompanying text *infra*.

[48] *See* Senate Foreign Relations Comm., S. Exec. Rep. No. 96-4, 96th Cong., 1st Sess., Report on the Protocol to the Convention with France on Income Taxes Signed November 24, 1979, Part VII, art. 1, para. 10 (1979); [1979] Code Général des Impôts, art. 164 B-I(d).

## Add144

France argued that the entire amount of a U.S. resident partner's income was French source to him even though it conceded that the partnership may have had no French source income. The compromise confirms the U.S. rule in Article 6(4) whereby France agrees that source is determined at the partnership level;[49] but the U.S. then conceded in Article 14(4) the right of France in any event to limit the excluded income to 50% of the total.[50] A possible anomaly is that a French citizen partner may, under the new Treaty, exclude his entire share of U.S. source income from the partnership because Article 14(4) only refers to U.S. citizens. This results in a conflict with Article 24, Nondiscrimination.

If no guaranteed payment exists,[51] and more than half of the partnership income is from U.S. sources, then the "50% minimum" provision would result in double taxation since France would be taxing U.S. source income. Accordingly, the Treaty provides relief through an election which may be made by the partnership to treat as foreign source income any income taxed in France because of the 50% provision.[52] A condition of making the election is that the partner benefiting from it may not claim deductions under I.R.C. section 913.[53] The election also requires that in the partnership's U.S. return, the global foreign source income be reduced by the amount that is attributed to the partners residing in France under the election.[54] Procedures for making the election are provided in Revenue Procedure 80-16.[55] Any income taxed in France under the "50% provision" will reduce income taxable in France for non-resident partners.[56]

Another potential area for concern is that many American partners residing overseas have been paid part of their partnership earnings in the form of "guaranteed payments" for services rendered overseas. Under U.S. law, these are considered to be foreign source on a similar basis as salary, and in the past have enabled partners to claim both foreign earned income deductions/exclusions and the foreign tax credit even if the partnership did not have net foreign source profits.[57]

The published U.S. and French interpretations on the treatment to

---

49 French Treaty, *supra* note 10, at art. 6(4).

50 *Id.* at art. 14(4).

51 *See* notes 57-62 and accompanying text *infra*.

52 French Treaty, *supra* note 10, at art. 23(3)(c)(i).

53 *Id.* at art. 23(3)(c)(ii).

54 *Id.*

55 Rev. Proc. 80-16, 1980-17 I.R.B. 29; I.R.C.§§ 911, 913. Section 911 does not currently apply to France, however, since it is not listed as a hardship area.

56 French Treaty, *supra* note 10, at art. 14(4).

57 Andrew O. Miller, Jr. v. Comm'r, 52 T.C. 752 (1969).

**Add145**

be accorded a guaranteed payment (although not discussed in the Protocol itself) are markedly different. The French Instruction of February 19, 1980, together with subsequent oral clarification, specifically make reference to these payments; the French seem inclined to consider them as though the payments were salary to the partner from the partnership, taxable in France under Article 15. The French ruling did *not* permit the exclusion provided in Article 14 on such payments.[58] Hence, in a case where a partner receives a guaranteed payment plus other partnership earnings from U.S. sources, the implication was that he would be taxed in France on 100% of the guaranteed payment plus 50% of the additional partnership earnings.

A literal reading of the Treaty would, however, lead to the conclusion that the 50% limitation applies to total income from the partnership, including the guaranteed payment. Article 14(4) states that the amount of income exempt from French tax under Article 6(4) will be limited to 50% of "total earned income from the partnership."[59] This wording is intended to ensure that France is allowed to tax at least one-half of a partner's income; there seems to be no reason why this should be changed if a partner receives a guaranteed payment.[60] For example, if a partner receives a guaranteed payment of $75,000, and a distributive share of U.S. source income of $125,000, his income taxable in France should be $100,000, applying the 50% to the total partnership income of $200,000. Apparently, the French may not agree with this interpretation.

If the foregoing analysis is correct, guaranteed payments could be used to obtain foreign source income in the U.S. return and avoid the need for an election under Article 23 (discussed below).[61] In such a case, the partner would be able to claim on his U.S. tax return the foreign earned income deductions provided under I.R.C. section 913.

Finally, it should be noted that the stated French position on guaranteed payments, set forth above, is understood to be under review by

---

[58] Instruction, *supra* note 32, at paras. I(6), II(2)(c).

[59] French Treaty, *supra* note 10, at art. 14(4).

[60] SENATE FOREIGN RELATIONS COMM., ON THE PROTOCOL TO THE CONVENTION WITH FRANCE ON INCOME TAXES, S. EXEC. REP. No. 96-4, 96th Cong., 1st Sess. (1979). Part VII, art. 1, para. 10 specifically states:

For purposes of this limitation, the partner's "earned income" includes any guaranteed payments which he receives from the partnership for his services; so if, for example, he receives a $20,000 guaranteed payment and a $100,000 distributive share of profits, application of the proposed protocol's partnership source rules could not result in French exemption of more than $60,000 (50 percent of $120,000) of the distributive share of partnership income.

*Id.* at 14.

[61] *See* notes 73-75 and accompanying text *infra.*

the French Administration. Indications are that France may ultimately accept that only 50% of total income (including guarantees) will be taxed in France as long as at least 50% of total partnership income is from U.S. sources.[62]

### Alimony and Annuities

It appears that a drafting omission occurred in the Treaty, resulting in the potential double taxation of alimony and annuity income. France is given the right to tax these items received by a resident of France.[63] If the taxpayer is residing in the United States, however, U.S. law considers them to be U.S. source.[64] Since no special provisions are provided in the Treaty, double taxation could result. It appears that the tax on the alimony or annuity income should be given to France, with the United States granting a credit for that tax. To obtain this, however, the competent authority procedures would have to be invoked.[65] Curiously, the same problem would appear to arise from the Treasury's Model Convention.[66]

### Passive Investment Income

The taxation by France of passive U.S. investment income comes as the hardest blow to many Americans residing in France. Specifically, as stated above, dividends, interest, royalties and capital gains from U.S. sources were previously not taxed in France if they were taxed in the U.S.[67] Although many Americans remain unscathed, whole segments of the American community have been compelled by higher taxes either to leave France or to restructure their investment portfolios. Retired Americans or American spouses of foreigners who previously may have had no income taxable by France, were particularly hard hit. In many individual cases, although double taxation has been avoided under the terms of the Protocol, the worldwide tax is nevertheless doubled due to the effect of progressive tax rates.

---

[62] This indication was derived from a meeting held by Mr. Baconnier of the Legislation Department of the Budget Ministry with various representatives of the public, including Mr. James Shaw of Peat, Marwick, Mitchell & Co. on November 25, 1980.

[63] French Treaty, *supra* note 10, at art. 19(2).

[64] Walter A. Howkins v. Comm'r, 49 T.C. 689 (1968).

[65] French Treaty, *supra* note 10, at art. 25(2).

[66] Treasury Model, note 9 *supra*. Treasury Model Article 18(3) grants exemption from U.S. tax in a similar situation. Yet Article 1(3), the savings clause, negates this. Furthermore, Article 23(3)(d) does not permit the alimony to be treated as foreign source (it should be noted that, at least as reproduced in CCH, Tax Treaties, Article 23(3)(d) erroneously refers to the savings clause as Article 1(2) when in fact it is Article 1(3)).

[67] *See* note 5 and accompanying text *supra*.

Add147

For example, a wife of a French citizen may have previously paid little or no tax on U.S. source investment income because it was taxed only in her separate U.S. return at the beginning marginal rates. Now, French law requires her income to be included in her husband's French return at much higher marginal tax rates of up to 60%, while as explained below,[68] only a relatively small credit is given for the U.S. tax which is deemed to equal the withholding tax rate provided in the Treaty or less if less U.S. tax is actually paid.[69] In fact, even if income is exempt from French tax under the Treaty, it may be used to push up the tax rate on income that is taxable in France.[70] The result is that while income subject to French taxes has increased, the number of Americans paying French tax has probably decreased.

As stated earlier, France had for years been a relative tax haven for these individuals. In all fairness, if one regards the OECD Model as the standard to be imitated, this writer believes that the U.S.-French treaty approaches the standard more than any other treaty the U.S. has concluded, in the context of the taxation of American citizens residing overseas.

The specific method of avoiding double taxation of U.S. dividends, interest, royalties and capital gains is unique to U.S. tax treaties. But while simple in concept, the method is difficult to apply. The general rule is that the U.S. will obtain its share of the worldwide tax as defined in Articles 9, 10, 11, 12 (without application of the savings clause, Article 22(4)(a)), and France will get any additional tax. Unfortunately, the Treaty does not express itself in such terms. It uses the complicated jargon of the foreign tax credit to do this.[71] The advantage to the U.S. of the Treaty's system is that the savings clause does remain operative, providing a possible second opportunity for the U.S. to tax the U.S. income.

This can be illustrated where the amount of taxable passive investment income is such that it falls within the highest tax brackets in the U.S. and France, respectively 70% and 60%. On U.S. interest in the amount of $1000 paid to a resident of France, the U.S. has a first right to 10%, or $100. France has the right to $600 less $100 tax credit, or $500. The U.S., having the higher tax rate then can claim an additional $100, the difference between 70% and 60% of $1000. Thus the world-

---

[68] *See* notes 109-111 and accompanying text *infra.*

[69] French Treaty, *supra* note 10, at arts. 23(2)(b), 23(3)(b).

[70] *Id.* at art. 23(2)(c). Although a similar provision existed in the Treaty before the new Protocol, it was rarely, if ever applied because relief was sought under internal French law Article 164-1, note 5 *supra*, not the Treaty.

[71] French Treaty, *supra* note 10, at arts. 23(1), 23(3).

wide tax is at the higher of the two countries' rates and equals $700, with $200 going to the U.S. and $500 going to France. It should be noted, however, that even in this type of case, the extra $100 due to the U.S. will be considered as tax on foreign source income.

The U.S. will have the right to 10% of U.S. source interest, 15% of U.S. source dividends, no percentage of U.S. capital gains (except on real estate as discussed below), and zero or 5% of U.S. royalties.[72] The sacred savings clause of the Convention in effect necessitates a formula for backing into this result: its method is to change the definition of the source income. Article 23(3)(b) states:

> The United States, in determining the amount of credit allowable for foreign taxes, shall consider as income from sources within the United States only that portion of each item of income referred to in subparagraph (b) of paragraph (2) [dividends, interest, royalties and capital gains] which is equal to the ratio of $\frac{X}{Y}$ where:
>
> (i) X is the rate of tax which the United States would be entitled to levy if the individual deriving the income were not a citizen of the United States, and
>
> (ii) Y is the effective rate of tax (before reduction by investment tax credit or foreign tax credit) which the United States levies for the year on the individual's gross income.
>
> *The proportion of each item of income which is not considered as from sources within the United States under this subparagraph shall be considered as from sources within France.* The provision of this subparagraph shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax.[73]

The effect of this formula can best be illustrated by using a simple example:

## EXAMPLE

Retired U.S. citizen resident in France (married, no children)

|                                                                         | Dollars |
| ----------------------------------------------------------------------- | ------: |
| U.S. Private Pension (for services performed in the U.S.)               | 10,000  |
| U.S. Dividend Income                                                    | 20,000  |
| Gross Income                                                            | 30,000  |
| U.S. tax before credit                                                  | 5,593   |
| French tax before credit (pension is exempt from French tax but used for rate calculation) | 5,317 |

---

[72] *See* notes 76-98 and accompanying text *infra.*

[73] French Treaty, *supra* note 10, at art. 23(3)(b). Items of income listed within brackets refer to Articles 9, 10, 11 and 12 as listed in Article 23 (emphasis added).

CREDITS

FRENCH credit for U.S. tax
  15 % of dividends                                                      (3,000)

U.S. credit for French tax
  dividends ×  ___15%___  = U.S. Source
                effective U.S.
                tax rate

$$20,000 \times \dfrac{.15}{\dfrac{5.593}{30,000}} = 16,092$$

20,000 − 16,092 = 3,908 foreign source

$$\dfrac{3.908}{30,000} \times 5,593 = 729$$

Lesser of 729 or 5,317 − 3,000 = 2,317                                   (729)

| | |
|---|---:|
| Total tax worldwide | 7,181 |
| Total U.S. tax after credits 5,593 − 729 | 4,864 |
| Total French tax:  5,317 − 3,000 | 2,317 |
| Total worldwide tax | 7,181 |

The U.S. tax on dividends is $3,000, or 15 % of the dividends.  The U.S. tax on pension is 10,000 × .1864 (effective U.S. tax rate) = $1,864.  Total U.S. tax: $3,000 + $1,864 = $4,864.

The French tax is purely on dividends: $5,317 less the U.S. tax on dividends of $3,000 = $2,317.

The worldwide tax is the higher of the two countries' taxes before credits on dividends, or the French tax of $5,317 plus the higher of the two countries' taxes on the pension, or the U.S. tax of $1,864:  $5,317 + $1,864 = $7,181.

In preparing U.S. tax returns for Americans residing in France, this formula should be applied whenever the relevant income has been taxed by France.  There are a myriad of questions evoked in practical applications; little guidance can be found in the Internal Revenue Code or in other published U.S. reports.  Most of the questions are definitional in nature.  However, a key phrase in Article 23(3)(a), and repeated in paragraph (b)(i) of the same article (both deal with U.S. tax relief), is the amount or rate, respectively, of "tax which the United States would be entitled to levy in respect of the item of income *if the individual deriving the income were not a citizen of the United States.*"[74]

---

[74] *Id.* at art. 23(3)(a) (emphasis added).

Additionally, the French tax relief provided in Article 23(2)(b) states that:

> As regards income taxable in the United States under Articles 9, 10, 11, or 12 and income to which paragraph (4)(b) of Article 22 applies, France shall allow to a resident of France a tax credit corresponding to the amount of tax levied by the *United States under this Convention other than by reason of citizenship*. Such tax credit, not to exceed the amount of French tax levied on such income, shall be allowed against taxes mentioned in subparagraph (1)(b)(i) of Article 1 of the Convention in the bases of which sued income is included.[75]

Thus, when studying the U.S.-French treaty for avoidance of double taxation on passive investment income, it would appear that one must ignore momentarily that the French resident, taxable on worldwide income, is also a U.S. citizen. In actuality, however, that is easier said than done, as seen below by a description of specific areas covered or not covered by the Treaty. These questions are raised in order to encourage attempts to resolve them.

*Interest.* All interest income from the U.S. is taxable in France.[76] The kinds of U.S. interest, however, which clearly qualify for the 10% credit against French tax is uncertain. For example, interest on municipal bonds are taxable in France; under U.S. law, such interest is tax-exempt and would not be subject to a 10% income tax for either a French or U.S. citizen. Thus, although the wording of the Treaty can be read to permit a 10% credit to be applied against municipal bond interest, the French authorities have interpreted the revised Treaty to deny the credit.[77]

Interest earned on U.S. savings accounts presents a slightly different case in that such interest is taxable to the U.S. citizens or residents but *not to French citizens* residing in France under *internal* U.S. tax law.[78] Here again, the wording of the Treaty permits the 10% credit to be applied, and given the lack of French or U.S. official clarification, a reasonable interpretation is that the credit will be allowed because the U.S. citizen would normally be taxed in the U.S. on this interest in-

---

[75] *Id.* at art. 23(2)(b) (emphasis added).

[76] *Id.* at art. 10(1).

[77] Instruction, *supra* note 32, at para. II(5).

[78] This distinction results from the interaction of I.R.C. sections 872 and 861(c). Section 872 includes for nonresident alien individuals gross income from sources within the United States, while section 861(c) states that interest from deposits in U.S. banks are not considered to be U.S. source income. It should be noted, however, that this applies to nonresident alien individuals only.

**Add151**

come.[79]

*Dividends*.  U.S. source dividends are fully taxable in France, subject to a 15% credit.[80]  It is not obvious, however, how certain types of U.S. dividends will be treated by the French tax authorities.  These include U.S. corporate capital gains distributions (where capital gains are distributed to shareholders), "dividends" from essentially interest-yielding liquid asset funds, and U.S. corporate "return of capital" distributions (reduction in basis in the U.S. since they are not distributed out of earnings and profits).

*Royalties*.  All U.S. royalties must be fully reported on French residents' French tax returns, whether they benefit from favorable treaty provisions or not.[81]  Royalties from U.S. mineral rights are exempt, however, from French tax in France under the Treaty,[82] which conforms to the OECD Model that real property income is taxed at the sites of the realty.[83]  Royalties from U.S. know-how or patents are entitled to a tax credit of 5% against the French tax,[84] but royalties from literary, artistic or scientific works are fully taxable in France to the U.S. resident recipient.[85]

*Capital gains*.  Capital gains on securities sold on a stock exchange in any country by French residents are subject to tax in France without credit for any U.S. tax paid.[86]  It happens that 1979 was also the first year for application of the new domestic French capital gains law.[87]  Prior to 1979, capital gains on securities transactions were generally not taxed to individuals.[88]

Under the new law, when securities sales exceed 100,000 French francs during a year, such gains *may* be taxable in France.  In addition, all "speculative" transactions are considered taxable regardless of amount.  Capital losses are allowed only against capital gains and may

---

[79] The French Tax Declaration, form No. 2047, used for reporting such income and calculating the credit does not provide, however, a space for a foreign tax credit on savings account interest.

[80] French Treaty, *supra* note 10, at art. 9.

[81] Instruction, *supra* note 32, at para. II(5).

[82] French Treaty, *supra* note 10, at art. 5.

[83] OECD Model, *supra* note 3, at art. 6.

[84] French Treaty, *supra* note 10, at art. 11.

[85] *Id.* at art. 11(3).

[86] *Id.* at art. 12.

[87] *See* note 89 and accompanying text *infra*.

[88] [1979] CODE GÉNÉRAL DES IMPÔTS, art. 160.

be carried forward.[89]

One of the complications of the French law is a transitional meas-
ure providing for a stepped-up cost basis which may be elected for
shares held in 1978 to the highest value of 1978.[90] This can result in the
computation of a low gain or even a loss for French tax purposes com-
pared to a sizeable gain in the U.S. Although this is obviously advanta-
geous to the taxpayer in France, it is unclear as to how the difference in
taxable amount will be treated for U.S. purposes. The wording of the
Protocol merely allows that an otherwise U.S. source capital gain
which is taxed in France will become foreign source, allowing a credit
for French taxes. The U.S. authorities must also tackle the question of
how to treat U.S. capital losses that are not "taxed" in France but are
reported there.[91]

*U.S. Real Property Income.* The discussion in the French In-
struction of February 19, 1980, on capital gains on the sale of U.S. real
estate may be termed "opportunist."[92] Article 5 of the Treaty, un-
changed by the Protocol, clearly permits the U.S. to tax income from
U.S. real estate, including capital gains, while France has seemingly
given up the power to do so. Under the Treaty, before amendment by
the new Protocol, France interpreted Article 5 to mean that it would
not tax such gains.[93] Unpublished assurances of continued non-taxa-
tion were made before publication of the February ruling.[94]

Now, however, the Instruction relies on new Article 23, in which
no distinction is made between capital gains on securities and on real
property, to conclude that France has the right to tax capital gains on
U.S. real property, subject to a credit for the U.S. tax on the gain. The
exact method of determining the amount of U.S. credit is not provided.
Under U.S. law, at the time of this writing, generally a zero tax would
apply to a French citizen having a capital gain on U.S. realty.[95] This
position represents a departure from the French tax treaty tradition of

---

[89] *Id.* art. 92 (in which "speculative" transactions are specifically defined).

[90] *Id.*

[91] *See* DEP'T OF THE TREASURY, INTERNAL REVENUE SERVICE, PUB. NO. 514, *Foreign Tax
Credit for U.S. Citizens and Resident Aliens* (Rev. Nov. 79), in which the I.R.S. states that for such
"U.S. capital gains, the entire gain is treated as French source. For example, you had a gain from
the sale of U.S. securities in a year when you were not in the United States more than 183 days."
*Id.* at 5.

[92] Instruction, *supra* note 32, at para. I(7).

[93] *Id.*

[94] Telephone conversation between Direction Général des Impôts and the author (Nov. 6,
1979).

[95] I.R.C. § 871(a)(2).

**Add153**

relinquishing taxation of foreign real property income and is probably contrary to the understanding of the U.S. negotiating team.[96] Yet, under the Treaty, rental income from real property in the U.S., whether held outright or in a partnership, is not taxable in France.[97]

*Trust and Estate Income.* Neither trust nor estate income is referred to specifically in the revised Treaty or official U.S. or French publications. Their absence, however, would imply that the income from a trust or an estate must be regarded on a transparent basis, as to nature and source. This view conforms to U.S. law, but is contrary to the French viewpoint. Specifically, the French law provides that "trust" income will be taxed as income from movable property.[98] If this rule were applied in the context of the Treaty, which treaty tax credit rate would apply? This important question was in fact raised in the French Senate ratification debate. The authorities claimed they would view trusts as transparent, implying they would look to the actual trust assets to determine type and source of income.[99] The authorities might also be implying that the terms of the trust regarding beneficiaries, accumulations, etc., might be disregarded for French tax purposes as they often are for U.S. tax purposes.[100] Unofficial opinions from the authorities confirm this view.[101] Nevertheless, there are many types of trusts in the U.S., taxable in different ways. Trusts do not exist in France. The French are currently reviewing how, to whom and when trusts will be taxed in France.

### U.S. Effective Tax Rate Used in Sourcing Ratio

A mathematical calculation is required, as seen above,[102] in con-

---

[96] The argument against the French interpretation is that it is Article 5 which governs the taxation of the U.S. real property income and Article 23(2)(a)(1) which exempts such income from tax in France. Artice 12(2)(a) excludes real property capital gains from the scope of Article 12 and, thus, from the scope of Article 23(2)(b). Additionally, the French interpretation makes application of Article 23(3)(b) absurd: a U.S. capital gain on real property would be converted to French source in direct contradiction to the spirit of Article 5 and to the French Instruction itself. Finally, Article 23(3)(a), which covers the case of the U.S. citizen resident in France provides that the tax credit to be granted by France shall be zero, not the U.S. tax, with respect to capital gains.

[97] French Treaty, *supra* note 10, at art. 5.

[98] [1979] CODE GÉNÉRAL DES IMPÔTS, art. 120-9.

[99] The French Tax Authorities went on record in the French Senate debate on ratification of the Protocol as expecting transparent tax treatment on trusts. *See* [1979] JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANCAISE [J.O.] 2396-2400.

[100] *Id.* Debates on the adoption of the Protocol in the French Senate (June 27, 1979).

[101] This tendency has been unofficially confirmed at various meetings between tax consultants and the French Tax Authorities.

[102] *See* text accompanying note 73 *supra*.

# Add154

verting U.S. income to French source. The ratio printed above uses the term "gross income" in defining the denominator:

> Y is the effective rate of tax (before reduction by investment tax credit or foreign tax credit) which the United States levies for the year on the individual's *gross income*.[103]

"Gross income" is a defined term under U.S. tax law.[104] If the U.S. internal tax definition of gross income is used, however, the desired results of the ratio will frequently not be obtained, resulting in *de facto* double taxation: the U.S. tax of 10% on interest, 15% on dividends, none on capital gains, and zero or 5% on royalties, may in fact be increased.

In reflecting on this, one must realize that "gross income," under section 61:

— includes gross business income before off-setting of relevant expenses,

— includes gross capital gains, before reduction by capital losses or the long-term capital gains deduction of 60%,

— includes gross rental receipts before reduction for depreciation and expenses,

— includes employer-paid reimbursements for moving expenses before a deduction for conceivably the same amount,

— includes salaries, before reduction by the foreign earned income deductions or employee business expenses.[105]

To fulfill the aim of the Protocol, "taxable income" or at least "adjusted gross income" would be a better measure of the effective tax rate than gross income. "Adjusted gross income" reduces gross income by business-related expenses and other adjustments to income mentioned above, while "taxable income" further reduces it by itemized deductions allowable.[106]

The difficulty in using "gross income" can be easily illustrated by using the example presented earlier,[107] but assuming that there was rental income (either U.S. or foreign) of $10,000 and rental expense and depreciation of $10,000. The net rental income being zero, there is no difference in U.S. tax before credits. Since an additional $10,000 is added to gross income, however, the effective tax rate becomes 14%, and no income at all is converted to foreign source. No U.S. foreign

---

[103] French Treaty, *supra* note 10, at art. 23(3)(b)(ii) (emphasis added).
[104] I.R.C. § 61.
[105] *Id.*
[106] I.R.C. §§ 62, 63.
[107] *See* pp. 468-69 *supra*.

**Add155**

tax credit being permitted, the worldwide tax is increased by $729 to $7910, because no consideration was given to the rental expenses in the effective tax rate calculation. The use of "adjusted gross income" rather than gross income would, in this example, revive the $729 foreign tax credit. The one I.R.S. example published to date, simplistic in the extreme, avoids this definitional issue by not identifying $23,700 out of $25,000 of "gross income."[108]

*French Higher Tax Rate.* The U.S. citizen residing in France must report his worldwide income in the French return, specifying any amounts exempt from French tax under the Treaty.[109] The French authorities may calculate the French tax at the higher average tax rate which would have applied had the income not been exempt.[110] The Exchange of Letters released with the Protocol, and the February 19, 1980 French Instruction both specify that the income taxable in France under the Treaty is multiplied by a rate obtained by dividing the tax on income as if no income were exempt, by that same amount of worldwide income.[111] Any foreign tax credits will then reduce the tax so obtained.

## CONCLUSION

American citizens residing in France have found themselves, in many cases, with not only higher overall tax burdens, but also confronting a substantial task in applying the provisions for relief from double taxation. Their various reactions have been to relocate, to seek costly professional assistance, or to regard the new compliance and tax burden as simply another cost of residing in France.

The revised Treaty, however, provides the theoretical means for an equitable division of tax revenues with a result approaching the OECD Model as regards U.S. citizens residing abroad. The Report of the Department of State modestly affirms that the "Protocol is the first agreement in which the residence and citizenship bases of taxation have been divided up in a comprehensive manner."[112] More importantly, the right of the residence country truly to tax U.S. income has been recognized. Unfortunately, achievement of this principle has resulted in an increased tax burden for many Americans residing in France.

---

[108] *Foreign Tax Credit for U.S. Citizens and Resident Aliens, supra* note 91, at 5.

[109] French Treaty, *supra* note 10, at art. 23(2)(c); Instruction, *supra* note 32, at para. III.

[110] French Treaty, *supra* note 10, at art. 23(2)(c).

[111] Letters Attached to the Protocol of Nov. 24, 1978, *supra* note 35, at para. 3(f); Instruction, *supra* note 32, at para. III.

[112] Report of the Dept. of State, [1980] 1 TAX TREATIES (CCH) ¶2836B, 2819-7E.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1284

**Short Case Caption:** Christensen v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 10,630 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/22/2024

Signature: /s/ Kathleen E. Lyon

Name: Kathleen E. Lyon

Save for Filing