# No. 24-1284

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

**MATTHEW CHRISTENSEN AND KATHERINE KAESS CHRISTENSEN,**

**Plaintiffs-Appellees,**

**v.**

**UNITED STATES,**

**Defendant-Appellant**

---

**ON APPEAL FROM THE JUDGMENT OF THE
UNITED STATES COURT OF FEDERAL CLAIMS,
NO. 20-935; SENIOR JUDGE MARIAN BLANK HORN**

---

**RESPONSE BRIEF FOR APPELLEES**

---

**STUART E. HORWICH**
**Counsel for the Appellees**

**20 Old Bailey, 5th Floor**
**London  EC4M 7AN**
**United Kingdom**
**+44 20 8057 8013**

**June 24, 2024**

## CERTIFICATE OF INTEREST

(1)     The full name of all parties represented by counsel are:  Matthew Christensen and Katherine Kaess Christensen.

(2)     Each person named in Section (1) is a real party in interest.

(3)     There are no affiliated entities associated with the persons listed in section (1) above.

(4)     There are no other law firms, partners or associates who have not entered an appearance in the appeal who appeared in the Court of Federal Claims or are expected to appear in this Court.

(5)     There are no related or prior cases, other than the case at bar, that meet the criteria under Federal Circuit Rule 47.5.

(6)     No further disclosure is required under Federal Rules of Appellate Procedure 26.1(c) or (d).

# TABLE OF CONTENTS

**STATEMENT OF THE ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**I.** **The Standards of Treaty Interpretation Favor a Result That Avoids Double Taxation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    **A.** **The Shared Expectations of the Treaty Partners at the Time the Treaty is Signed Control the Interpretation of its Provisions.** . . . 6

    **B.** **The Defendant's Interpretation of the French Treaty Is Not Entitled to Deference.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**II.** **The Court of Federal Claims Erred in Denying a Treaty-Based Foreign Tax Credit Pursuant to Article 24(2)(a) of the French Treaty** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    **A.** **The Text of Article 24(2)(a) Supports Taxpayers' View That a Treaty-Based Foreign Tax Credit Should Be Allowed To Offset the NIIT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

        **1.** **The Plain Language of Article 24(2)(a) Allows for a Treaty-Based Foreign Tax Credit to Offset the NIIT.** . . . . . . . . . . .15

        **2.** **The Taxpayers' Interpretation Accords with The Shared Expectations of the Treaty Partners.** . . . . . . . .19

        **3.** **Other Federal Court Cases Interpreting the Provisions of Article 24(2)(a) Confirm that a Foreign Tax Credit is Allowed Under the Terms of the French Treaty.** . . . . . . . . .21

    **B.** **Many U.S. Treaties Provide that Foreign Levies Qualify as Creditable Taxes Notwithstanding U.S. Domestic Rules.** . . . . . . .24

C.    The Defendant's Convoluted Logic Renders Article 24(2)(a)
       Without Meaning or Effect within the French Treaty . . . . . . . . . 26

D.    The Court of Federal Claims' Opinion Does Not Properly
       Address the Function of Article 24(2)(a) in the French Treaty. . .28

III.   <u>The Court of Federal Claims Correctly Allowed Taxpayers a</u>
       <u>Treaty-Based Foreign Tax Credit Under Article 24(2)(b)</u>
       <u>Of the French Treaty</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

A.    Article 24(2)(b)'s Plain Terms Do Not Subject a Treaty-
       Based Foreign Tax Credit to the Provisions and Limitations of
       United States Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

B.    Article 24(2)(b)(ii) Does Not Import Code-Based Rules for
       Determining the Treaty-Based Foreign Tax Credit Allowed to U.S.
       Citizens Residing in France. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       1.    Article 24(2)(b)(ii) Limits the Scope of the Three-Bite Rule
             Contained in Article 24(2)(b)(i) Without Reference to the
             Code-Based Provisions and Limitations. . . . . . . . . . . . . . .34

       2.    The Technical Explanation Does Not Support
             The Defendant's Position that All Code-Based Rules
             Apply to Article 24(2)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . 38

       3.    The Court of Federal Claims' Interpretation
             Does Not Produce Other Anomalous Results. . . . . . . . . . . .40

C.    The Supreme Court's Decision in *O'Connor* Supports the
       Court of Federal Claims' Decision to Allow a Treaty-Based
       Foreign Tax Credit Pursuant to Article 24(2)(b). . . . . . . . . . . . . 42

D.    The Court of Federal Claims Correctly Determined That a
       Treaty-Based Foreign Tax Credit is Allowed Pursuant to Article
       24(2)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

iv

# TABLE OF AUTHORITIES

## Constitution of the United States

Article VI, Paragraph 2 (Supremacy Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

## Case Law

*Air France v. Saks*, 470 U.S. 392, 296-97 (1985 . . . . . . . . . . . . . . . . . . . . . 5, 6, 32

*Bacardi Corp of Am. v. Domenech*, 311 U.S. 150 (1940) . . . . . . . . . . . . . . . . . . . 7

*BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25 (2014) . . . . . . . . . . . . . . . . 6

*Bruyea v. United States*, Fed. Cl. Docket No. 23-766-T. . . . . . . . . . . . . . . . .10, 40

*El Al Israeli Airlines v. Tseng*, 525 U.S. 155 (1999) . . . . . . . . . . . . . . . . . . . . . . . 8

*Eshel v. Comm'r*, 831 F.3d 512 (D.C. Cir. 2016), *reversing* 142 T.C. 197 (2014). .9

*Filler v. Comm'r*, 74 T.C. 406 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20, 26

*Haver v. Comm'r*, 444 F.3d 656 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 21

*Iceland Steamship Co. Eimskip v. U.S. Dep't of the Army*, 201 F.3d 451
     (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jamieson v. Comm'r*, 584 F.3d 1074 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . .23

*Jordan v. Tashiro*, 278 U.S. 123 (1928). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Kappus v. Comm'r*, 337 F.3d 1053 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . .23

*Kim v. United States*, 2023 WL 2313547 (C.D. Cal. 2023) . . . . . . . . . . . . . . . . 13

*Kolovrat v. Oregon*, 366 U.S. 187 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 9

*Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Medellin v. Texas*, 552 U.S. 491 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*National Westminster Bank v. United States*, 512 F.3d 1347 (Fed. Cir. 2008). . . . . 9

*North West Life Insurance Co. of Canada v. Comm'r*, 107 T.C. 363 (1996) . . . . . .9

*O'Connor v. United States*, 479 U.S. 27 (1986) . . . . . . . . . . . . . . . . . .19, 31, 42, 44

*Olympic Airways v. Husain*, 540 U.S. 664 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rocca v. Thompson*, 223 U.S. 317 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Snap-On  Tools, Inc. v. United States*, 26 Cl. Ct. 1045 (Cl. Ct. 1992),
    *aff'd* 26 F.3d 137 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sullivan v. Kidd*, 254 U.S. 433 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sumitomo Shoji America Inc. v Avagliano*, 457 U.S. 176 (1982) . . . . . . . . . . . .7, 9

*Toulouse v. Comm'r*, 157 T.C. 49 (2021) . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 16, 24

*United States v. Butler*, 297 U.S. 1 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Choctaw Nation*, 179 U.S. 494 (1900) . . . . . . . . . . . . . . . . . . . .6

*United States v. Stuart*, 489 U.S. 353 (1989) . . . . . . . . . . . . . . . . . . . . . . 6, 7, 12

*Water Splash v. Menon*, 581 U.S. 271 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Wright v. Henkel*, 190 U.S. 40 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Xerox v. United States*, 41 F.3d 647 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# Treaties

*Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital*, Fr.-U.S., Aug 31, 1994, 1963 U.N.T.S. 67, as supplemented by Protocols dated Dec. 8, 2004 and Jan. 13, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*Convention Between the Government of the United States of America and the Government of the Republic of Croatia for the Avoidance of Double Taxation and the Prevention of Tax Evasion With Respect to Taxes on Income* . . . . . . . . . . . . .17

# Statutes

Internal Revenue Code (26 U.S.C.)

 Code Section 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

 Code Section 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18, 25

 Code Section 904 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33, 37, 38, 39

 Code Section. 1411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 2

Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, Sec. 1012(aa)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# Miscellaneous

Notice 2008-3, 2008-2 I.R.B. 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

The Department Technical Explanation of the Convention between the Government of the United States of American and the Government of the French Republic for the Avoidance of Double Taxation and the prevention of Fiscal Evasion with respect to taxes on Income and Capital signed at Paris on August 31, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . .passim

Department of the Treasury Technical Explanation of the Convention Between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income Signed at Washington, August 19, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Joint Committee Explanation of the Proposed Income Tax Treaty and Protocol Between the United States and the Italian Republic, JPRT 106-9-99 (Oct 13, 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Treasury Department Explanation of the Model Income Tax Convention – 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

## Other Materials

Blanchard, The Tax Court's Erroneous Decision in *Toulouse*, 50 *Tax Mgm't Int'l J.*, No. 10 (Oct 1, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Gould, "The Tax Court's Flawed Analysis in *Toulouse* Should Be Challenged", *Tax Notes International*, vol. 103, p. 1695-1696 (Sept 27, 2021). . . . . . . . . . . . . .13

Rosenbloom and Shaheen, "*Toulouse*: No Treaty-Based Credit?", *Tax Notes International*, vol. 104, pp. 417-422 (Oct. 25, 2021) . . . . . . . . . . . . . . . . . . . . . . 13

## STATEMENT OF THE ISSUES

1.　　Whether the Court of Federal Claims erred in ruling that Article 24(2)(a) of the income tax treaty between the United States and France (the "French Treaty")[1] does not allow a U.S. person to claim a treaty-based foreign tax credit against the net investment income tax (the "NIIT") imposed by Section 1411 of the Internal Revenue Code of 1986 (26 U.S.C. – the "Code").

2.　　Whether the Court of Federal Claims correctly determined that Article 24(2)(b) of the French Treaty allows a U.S. citizen residing in France to claim a treaty-based foreign tax credit against the NIIT.

---

[1]　　The 1994 Treaty (Convention between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, signed on August 31, 1994), 1963 U.N.T.S. 67.  As indicated in the Defendant's brief (Def. Br. at 10, n.4), the 2009 Protocol to the French Treaty amended Article 24 by reversing the original numbering of paragraphs 1 and 2.  We adopt the same numbering convention used by the Defendant, referring to the renumbered version and using brackets for that numbering when quoting original sources.

## SUMMARY OF ARGUMENT

A principal purpose of the French Treaty, as acknowledged by the Defendant (Br. at 47), is the avoidance of double taxation.  Article 24 of the French Treaty, entitled "Relief from Double Taxation," advances this purpose by providing that certain taxes imposed by each country are eligible for a foreign tax credit – a "treaty-based foreign tax credit" – even if otherwise not provided for by statute.

In 2010, Congress enacted the net investment income tax, the NIIT, which imposes a 3.8 percent tax on certain investment income generated by U.S. citizens and residents.  Code Sec. 1411.  The NIIT is imposed on U.S. citizens living in France, such as the Appellees in this case, Matthew and Katherine Kaess Christensen (the "Taxpayers").  In the case at bar, France imposed income tax on the Taxpayers' investment income at higher rates than the sum of the U.S. regular income tax and the NIIT.  As the Code does not provide a foreign tax credit –  a "Code-based foreign tax credit" – against the NIIT, [2] the IRS also imposed the NIIT on that same investment income, resulting in double taxation.  In the case at

---

[2]     The Code provides for a foreign tax credit for income taxes contained in Chapter 1.  As the NIIT was codified in its own Chapter 2A, the parties agree that the NIIT is not a U.S. tax that taxpayers who are not entitled to Treaty benefits can offset using foreign tax credits.  It follows that a taxpayer may pay French tax and the NIIT on the same income without being able to offset the NIIT, creating a double tax situation.

bar, the Taxpayers claim entitlement to a treaty-based foreign tax credit under Article 24(2) of the French Treaty.

Article 24(2) contains two separate paragraphs that by their plain terms allow for a treaty-based foreign tax credit that is separate from the credit available under the Code. The amount of the treaty-based foreign tax credit allowed under Article 24(2)(a) is determined "in accordance with the provisions and subject to the limitations" of U.S. law (*i.e.*, the Code) "as it may be amended from time to time without changing the general principle hereof". Article 24(2)(b) allows a treaty-based foreign tax credit for U.S. citizens resident in France, who are otherwise subject to two worldwide taxing regimes (the United States by virtue of citizenship and France by virtue of residence) without importing any Code-based rules.

The Court of Federal Claims held that the consequence of the language cited above is that because the Code itself does not provide a foreign tax credit against the NIIT, a treaty-based foreign tax credit is not available under Article 24(2)(a). In reaching that conclusion, the lower court misinterpreted key provisions within Article 24(2)(a) and failed to consider how its terms fit within the larger context of the Treaty, let alone the Treaty's terms and explicit purpose of avoiding double taxation. This holding was plain error and the Taxpayers should have received a treaty-based tax credit pursuant to Article 24(2)(a).

The Court of Federal Claims correctly ruled that Article 24(2)(b) allows for a treaty-based foreign tax credit to offset the NIIT.  The plain language of that Treaty article provides for a treaty-based foreign tax credit, which accords with a principal purpose of the Treaty:  the avoidance of double taxation.  The Defendant's argument that the provisions of Article 24(2)(b) should be read to import the "limitations" wording (as erroneously interpreted by the Defendant) in Article 24(2)(a) is not supported by the Treaty's text, its purpose or any of the caselaw cited by the Defendant.  Thus, even if this Court were to conclude that the Taxpayers could not claim a treaty-based foreign tax credit pursuant to Article 24(2)(a), the Taxpayers would still be entitled to the relief they requested pursuant to Article 24(2)(b) in accordance with the Court of Federal Claims' judgment.

**ARGUMENT**

## I.    The Standards of Treaty Interpretation Favor a Result That Avoids Double Taxation.

This is a treaty interpretation case.  The proper interpretation of Article 24(2)(a) and (b) of the French Treaty "must begin * * * with the text of the treaty and the context in which the written words are used."  *Air France v. Saks*, 470 U.S. 392, 296-97 (1985).  The goal is to achieve an outcome that accords with the *shared expectations* of the sovereign nations entering into the treaty.  Treaties should be liberally interpreted to establish their intended purpose, *Kolovrat v. Oregon*, 266 U.S. 187 (1961), which in the case of the French Treaty is the avoidance of double taxation.  Where there are two equally plausible interpretations, the more liberal interpretation is preferred.  As such, even if this Court finds the Defendant's interpretation plausible (it is not), the Taxpayers' interpretation, which achieves a principal purpose of the Treaty to avoid double taxation, should be preferred.

Although the views of the Executive Branch agency responsible for negotiating and administering a treaty are normally accorded significant deference, where the Government-advocated position does not reflect the shared expectations of the treaty partners, such deference withers.  Where the Government's position is directly contrary to an interpretation of the treaty that achieves its explicit purpose

– the avoidance of double taxation – under Supreme Court precedent, as well as

this Court and other court's precedents, its views are accorded no deference at all.

### A.     The Shared Expectations of the Treaty Partners at the Time the Treaty is Signed Control the Interpretation of its Provisions.

The principal rule governing the interpretation of treaties in the United

States is well established:  a treaty is a contract between nations such that its

interpretation is first and foremost "a matter of determining the parties' intent."

*See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (citing *Air*

*France v. Saks*, 470 U.S. at 399; *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921); *Wright*

*v. Henkel*, 190 U.S. 40, 57 (1903)); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11

(2014) (citing *Medellin v. Texas*, 552 U.S. 491, 505 (2008); *United States v.*

*Choctaw Nation*, 179 U.S. 494, 535 (1900)).  It is therefore the Court's

"responsibility to read the treaty in a manner consistent with the shared

expectations of the contracting parties."  *Lozano v. Montoya Alvarez*, 572 U.S. at

12 (quoting *Olympic Airways v. Husain*, 540 U.S. 664, 650 (2004)).

In *United States v. Stuart*, 489 U.S. 353 (1989), the Supreme Court

specifically declined to look to U.S. internal law constraints in determining when

the Internal Revenue Service (the "IRS") could serve a document request for

documents to a third-party recordkeeper by Canadian officials made under certain

treaty provisions in the U.S./Canada tax treaty.  In refusing to allow Code-based

provisions to trump the plain language of the treaty, the Court held, "[t]he clear

import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *United States v. Stuart*, 489 U.S. at 365-66 (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982)).

The parties agree that a principal purpose of the French Treaty is to avoid double taxation, and a necessary corollary to achieving that goal is to interpret the Treaty's text to achieve that purpose. *Xerox v. United States*, 41 F.3d 647, 652 (Fed Cir. 1994) ("[i]n construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purpose of the treaty."). As the Supreme Court has ruled numerous times: "where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights that may be claimed under it, the more liberal interpretation is to be preferred." *United States v. Stuart*, 489 U.S. at 368, quoting *Bacardi Corp of American v. Domenech*, 311 U.S. 150, 163 (1940); *Jordan v. Tashiro*, 278 U.S. 123, 128 (1928); *Kolovrat v. Oregon*, 366 U.S. at 190 ("[t]his Court has many times set its face against treaty interpretations that unduly restrict rights a treaty is adopted to protect.").

The Defendant argues that its interpretation of the French Treaty "is consistent" with the Treaty's purpose (Def. Br. at 47), but then states that the avoidance of double taxation does not mean that the Treaty's purpose was to

"*eliminate* double taxation in every instance." (Emphasis in original.) This statement highlights the Defendant's error:  while there may remain some unavoidable instances of double taxation despite the intended purpose of the Treaty, that is not a reason to interpret the French Treaty in a way that gives rise to the very evil that the Treaty seeks to avoid.  By contrast, the Taxpayers' interpretation avoids double taxation; it is a more logical and purposeful reading of the Treaty's words and should be adopted.

      **B.**     **The Defendant's Interpretation of the French Treaty Is Not Entitled to Deference.**

As a general rule, the meaning attributed to a treaty by the Executive Branch agencies that negotiated and enforce the treaty terms is entitled to significant deference.  The deference shown to the responsible Executive Branch agency derives from the negotiating history, past practices or diplomatic communications showing the shared understanding of the treaty partners.  *See*, *e.g., El Al Israeli Airlines v. Tseng*, 525 U.S. 155, 168 (1999).  Here however, the Defendant's reliance on numerous Supreme Court precedents to this effect (Br. 40-41) is misplaced as in the cited cases, the counterparties to each of the treaties

affirmatively agreed or at least acquiesced to the views espoused by the responsible Executive Branch agency.[3]

The Executive Branch's interpretation of a treaty, however, is not accorded deference where the Executive Branch argues for an interpretation in isolation, without regard or contrary to, the views of its treaty partner. *National Westminster Bank v. United States*, 512 F.3d 1347 (Fed. Cir. 2008); *Iceland Steamship Co. Eimskip v. U.S. Dep't of the Army*, 201 F.3d 451 (D.C. Cir. 2000); *Eshel v. Comm'r*, 831 F.3d 521 (D.C. Cir. 2016) (where the IRS asserts a meaning of a treaty without analysis of the shared expectations of the two sovereigns, its position "is the legal equivalent of trying to clap with one hand"); *see also*, *North West Life Insurance Co. of Canada v. Comm'r*, 107 T.C. 363, 379 (1996) ("There is no authority for the

---

[3]    *See*, *Sumitomo Shoji*, *supra* (diplomatic notes between Japan and the United States both agreed with plaintiffs' position that the relevant treaty between the two nations did not bar certain claims against U.S. subsidiary of a Japanese corporation); *Kolovrat v. Oregon*, *supra* (1961) (diplomatic notes between Yugoslavia and the United States both agreed with plaintiff's position that the "most favored nation" treaty between the two countries overrode state law restrictions on property that could be inherited); *Abbott v. Abbott,* 560 U.S. 1 (2010) (shared interpretation among numerous signatories to child abduction treaty, including the United States, that a *ne exeat* right was a custody right); *United States v. Stuart*, *supra* (shared practice between the United States and Canada pursuant to the Canadian income tax treaty confirmed that the treaty gave the United States the right to turn over documents to Canadian tax officials); *Medellin v. Texas*, 552 U.S. 491 (2008) (International Court of Justice ("ICJ") rulings not self-executing pursuant to Vienna Convention as evidenced by ICJ opinions themselves).

proposition that a court construing a convention must follow the interpretation suggested by our Government when that interpretation runs contrary to what the Court concludes was the intent of the contracting parties.").[4]

At the time the French Treaty was ratified, the only United States income taxes against which a French (or other foreign) tax could be credited already benefited from a Code-based foreign tax credit. *Ipso facto*, no evidence at the time of signing or ratification, whether in the Technical Explanation[5] or elsewhere, provided any extrinsic guidance as to the Treaty partners' shared expectations regarding the availability of a treaty-based foreign tax credit for the NIIT, that is, a subsequently enacted U.S. tax that (i) was a "United States income tax" covered by the terms of the Treaty and (ii) did not fall within Chapter 1 of the Code. Thus, the

---

[4]    After the instant case was briefed and argued before the Court of Federal Claims, a Canadian resident U.S. citizen brought a case in the Court of Federal Claims arguing that the treaty between the Canada and the United States (the "Canadian Treaty") provides for a treaty-based foreign tax credit to offset the NIIT. *Bruyea v. United States*, Fed. Cl. Docket No. 23-766-T. Appx. 998. The applicable foreign tax credit article in the Canadian Treaty is substantially identical to that in the French Treaty. In *Bruyea*, the Canadian Government specifically confirmed its view that the applicable foreign tax credit article entitles the plaintiff to a treaty-based foreign tax credit. Addn. 1.

[5]    *See* The Department Technical Explanation of the Convention between the Government of the United States of American and the Government of the French Republic for the Avoidance of Double Taxation and the prevention of Fiscal Evasion with respect to taxes on Income and Capital signed at Paris on August 31, 1994 (the "Technical Explanation").

Defendant cannot fairly rely on the Technical Explanation or point to anything in the Technical Explanation that covers the situation before this Court.

Moreover, there were no discussions between the Department of Treasury and the French Government about the NIIT at the time that the NIIT was enacted, nor have there been at any time since.[6]  It is important to bear in mind that the Technical Explanation was drafted in 1994, at the time the French Treaty was adopted, and that this predates by nearly twenty years the legislation giving rise to the NIIT.  Unilateral assertions today about the meaning of the French Treaty in relation to the NIIT, relying on the Technical Explanation, cannot establish the shared expectations of the Treaty partners at the time of adoption.  *See*, *e.g.*, *Snap-On  Tools, Inc. v. United States*, 26 Cl. Ct. 1045 (Cl. Ct. 1992), *aff'd* 26 F.3d 137 (Fed. Cir. 1994) (unilaterally issued U.S. statements do not assist in ascertaining the treaty partners' shared expectations where no evidence shows that the treaty partner agreed to such U.S. statements).

In summary, and as the Court of Federal Claims correctly stated (Appx. 89), the *shared expectations* of the Treaty partners control and a liberal reading of Articles 24(2)(a) and 24(2)(b) should be adopted to fulfil the explicit aim of the

---

[6]      In response to a Freedom of Information Act request, the Internal Revenue Service stated that "no records were located in response to [counsel's] request" for "all communications between the competent authorities of the United States regarding any significant changes which have been made with respect to changes in U.S. tax laws relating to the Net Investment Income Tax."  Appx. 153.

Treaty – the avoidance of double taxation.  The Court of Federal Claims correctly gave no "deference to the defendant's interpretation" in analyzing Articles 24(2)(a) and 24(2)(b) and instead indicated that it would  "apply the liberal interpretation of treaties rule announced in *United States v. Stuart*" to establish "the shared expectation of the United States and French Governments with respect to [Articles 24(2)(a) and 2(b) * * *."  Appx. 83.  Application of these interpretive rules to Article 24 supports the conclusion that the Taxpayers are entitled to a treaty-based foreign tax credit to avoid double taxation.

## II.  The Court of Federal Claims Erred in Denying a Treaty-Based Foreign Tax Credit Pursuant to Article 24(2)(a) of the French Treaty.

Article 24(2)(a) of the French Treaty provides:

In accordance with the provisions and subject to the limitations of the law of the United States (*as it may be amended from time to time without changing the general principle hereof*), the United States shall allow to a citizen or a resident of the United States as a credit against the *United States income tax*:

(i) the French income tax paid by or on behalf of such citizen or resident * * *."

(Emphasis added.)  The Court of Federal Claims held that because a foreign tax credit to offset the NIIT is not allowed under the Code, the allowance of a treaty-based foreign tax credit would not be "[i]n accordance with the provisions and subject to the limitations" of U.S. law.  Appx. 86.  In support of its holding, the Court of Federal Claims cited the Tax Court's decision in *Toulouse v. Comm'r*, 157

T.C. 49 (2021), which held that a French resident taxpayer could not offset the

NIIT using a treaty-based foreign tax credits.[7] *See also*, *Kim v. United States*, 2023

WL 2313547 (C.D. Cal. 2023) (no South Korea treaty-based foreign tax credit to

offset the NIIT).

The Court of Federal Claims dismissed the italicized parenthetical phrase

"as it may be amended from time to time without changing the general principle

hereof", stating:

> The 'provisions' and 'limitations' language incorporates I.R.C. [Code] statutory restrictions on the availability of foreign tax credits, and the 'general principle' language, although modifying this incorporation, does not nullify the immediately preceding incorporation of the 'provisions' and 'limitations' of United States law.

Appx. 86. Although the Court of Federal Claims recognized that the "general

principle" is the "allowance of a credit", it failed to discuss how the allowance of

such a credit actually modifies the "provisions" and "limitations" language.

Instead, the lower court held that the allowance of a credit is conditioned "upon

compliance with the 'provisions' and 'limitations' of United States tax laws * * *."

---

[7]    Scholarly articles have criticized the decision in *Toulouse*.  *See, e.g.,* Rosenbloom & Shaheen, *Toulouse*: No Treaty-Based Credit?, 104 *Tax Notes Int'l* 417 (Oct. 25, 2021)); Kim Blanchard, The Tax Court's Erroneous Decision in Toulouse, *Tax Mgmt. Int'l J.* (Oct. 1, 2021); Jeffrey Gould, The Tax Court's Flawed Analysis in *Toulouse* Should Be Challenged, 103 *Tax Notes International* 1695 (Sept. 27, 2021).  Addn. 2-14.

*Id.* Simply put, the Court of Federal Claims erroneously nullified the general principle language of the Treaty despite its statement to the contrary quoted above.

In reaching this conclusion, the Court of Federal Claims, like the Tax Court in *Toulouse*, failed to engage in a textual analysis of the French Treaty and interpreted Article 24(2)(a) in a manner that renders it, and a number of other provisions, superfluous. Far from reading the provisions of Article 24(2)(a) liberally to effect a principal purpose of the Treaty, the lower court adopted a narrow interpretation, resulting in double taxation, the very evil the Treaty was designed to eliminate or at least to avoid. Such a result is inconsistent with other U.S. tax treaties that have substantially identical language and do allow for a treaty-based foreign tax credit where no credit would be allowed under the Code.

The Court of Federal Claims erred in denying the Taxpayers a treaty-based foreign tax credit under Article 24(2)(a). The lower court correctly found in favor of the Taxpayers based on Article 24(2)(b) and its judgment should be affirmed not only for that reason, but also because Article 24(2)(a) allows for a treaty-based foreign tax credit against the NIIT.

**A.      The Text of Article 24(2)(a) Supports Taxpayers' View
That a Treaty-Based Foreign Tax Credit Should Be Allowed
To Offset the NIIT.**

**1.      The Plain Language of Article 24(2)(a) Allows for a Treaty-
Based Foreign Tax Credit to Offset the NIIT.**

Article 24(2)(a) contains a number of key terms, including (1) "United

States income tax", (2) the "provisions" and "limitations" and (3) the "general

principle hereof."  The Court of Federal Claims held, and the parties agree, that the

NIIT qualifies as a "United States income tax" covered under Article 24(2) of the

French Treaty.  (Def. Br. at 13.)  The parties further agree that the provisions and

limitations of U.S. law generally refer to those found within the Code.  (Def. Br. at

37.)  Finally, the parties also agree that the "general principle hereof" referred to in

Article 24(2)(a) is the allowance of a credit.  (Def. Br. at 29.)

Despite agreeing to the basic understanding of the words in Article 24(2)(a),

the parties disagree as to their interpretation.  The Defendant argued, and the Court

of Federal Claims held, that a treaty-based foreign tax credit can only be allowed

under Article 24(2)(a) if it is allowed under the Code and that the "general

principle hereof" language is a treaty-based requirement that the United States

must only maintain a Code-based foreign tax credit system.  This is plain error:  the

Defendant cannot seriously suggest that by this language, the United States bound

itself to never eliminate the statutory provisions giving rise to a foreign tax credit

system and that this is the only meaning and effect of this language.  It is axiomatic

that Congress can at any time pass legislation to override any treaty provision including the foreign tax credit system. Article VI(2) of the United States Constitution. The Defendant's interpretation of the "general principle hereof" language gives the Treaty provision all the binding effect of a New Year's resolution.

The Tax Court, in *Toulouse*, realized that its reading of Article 24(2)(a), which the Court of Federal Claims adopted, rendered the provision irrelevant. The Tax Court nevertheless tried to justify this reading as follows:

> Petitioner questions the purpose of the Treaties if there is no independent, treaty-based credit and a credit is allowable only if it is provided in the Code. But we do not so hold. Other provisions of the Treaties may well provide for credits that are unavailable under the Code. Petitioner, however, relies on provisions that by their express terms do not.

157 T.C. at 61-62. The Tax Court erred: it is not that there may be a different article, such as Article 24(2)(b), that provides an independent treaty-based foreign tax credit. Article 24(2)(a) has no place or purpose in the French Treaty if its terms serve only to indicate the provision has no effect -- an untenable proposition. *See Water Splash v. Menon*, 581 U.S. 271, 277-278 (2017). Further, it begs the question why, if Article 24(2)(a) simply mirrors the rules for a Code-based foreign tax credit, the United States and France would have drafted this complex provision

seemingly intended to avoid double taxation.[8]  The Defendant's interpretation does not give effect to the Treaty's purpose and renders pointless the very existence of the provision itself.

The Technical Explanation, the central authority on which the Defendant relies, supports this conclusion, providing that "[t]he credits provided under the Convention are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, *i.e.* **the allowance of a credit**, is retained." (Emphasis added.)[9]  This Technical Explanation further provides that "the terms of

---

[8]     It is instructive that in the only treaty negotiated by the United States since enactment of the NIIT, the *Convention Between the Government of the United States of America and the Government of the Republic of Croatia for the Avoidance of Double Taxation and the Prevention of Tax Evasion With Respect to Taxes on Income* (the "Croatia Treaty"), the foreign tax credit article (Article 23(2)) provides that the United States shall allow a foreign tax credit "to the extent allowed under the law of the United States (as it may be amended from time to time)." This is significantly different from the wording in the French Treaty.  By limiting the foreign tax credit to that which is allowed under "the law of the United States," the Croatia Treaty demonstrates that if a treaty-based foreign tax credit is not intended by the treaty partners, the agreement would be drafted accordingly.  *See*, *Rocca v. Thompson*, 223 U.S. 317, 332 (1912) ("treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning, and to choose apt words in which to embody the purposes of the high contracting parties.").

[9]     This accords with the Treasury Department Explanation of the Model Income Tax Convention – 2006, which provides "[t]he credits allowed under paragraph 2 are allowed in accordance with the provisions and subject to the

the credit are determined by the provisions of the U.S. statutory credit at the time

the credit is given.  The limitation of law generally limits the credit against **U.S.**

**tax to the amount of U.S. tax due** with respect to net foreign source income

within the relevant foreign tax credit limitation category (see Code Section

904(a)).”  (Emphasis added.) ).  “Limitations” refers to principles contained in the

Code – chiefly Code Sec. 904 – regarding the amount of the foreign taxes that may

be credited against United States income tax and not something broader.[10]

The Article 24(2)(a)’s “provisions” and “limitations” language, interpreted in

accordance with the explicit purpose of the Treaty and the discussion in the

Technical Explanation,  invokes the Code to determine the quantum of the French

tax that can be used to offset “United States income taxes”.  The “general

principle” language ensures that once the amount of French tax has been

established pursuant to the Code-based rules, there is an allowance of a foreign tax

---

limitations of U.S. law as that law may be amended from time to time, as long as
the general principle of this Article, that is, the allowance of a credit is retained.
* * * [T]he U.S. credit under the Convention is subject to the various limitations of
U.S. law (see, *e.g.*, Code section 901-908).  For example, the credit against U.S.
tax generally is limited to the amount of U.S. tax due with respect to net foreign
source income within the relevant foreign tax credit limitation category (see Code
section 904(a) and (d) * * *.”

[10]     The limitations rules can be more complex when income arises in multiple
separate limitation categories, or baskets.  The Defendant has not argued, let alone
demonstrated, that basketing issues would have any role in this case.

credit to offset any "United States income tax" covered under the terms of the French Treaty. This textual interpretation achieves the purpose of avoiding double taxation by allowing a foreign tax credit, not just to offset taxes under the provisions of the Code, but more broadly to offset "United States income taxes" covered by the French Treaty, which the parties agree includes the NIIT.[11]

### 2. The Taxpayers' Interpretation Accords with The Shared Expectations of the Treaty Partners.

As discussed in more detail below with respect to the Defendant's flawed interpretation of the Supreme Court's decision in *O'Connor v. United States*, 479 U.S. 27 (1986), the Defendant's interpretation cannot accord with the *shared expectations* of the Treaty partners. The *O'Connor* case highlights a central tenet of the rationale for sovereigns to enter into tax treaties: each sovereign relinquishes sovereign taxing rights (typically over income arising in its country) in exchange for reciprocal concessions on the part of the other country. *See*, *e.g.*,

---

[11] The Defendant also argues (Br. 49-50) that the Taxpayers may rely on other provisions of the Code that might, in certain circumstances, allow them to offset other U.S. taxes in the future with foreign tax credits that would have offset the NIIT in the 2015 tax year before this Court. While theoretically, it is possible that this situation would arise, it is naïve to assume in a situation where French tax rates generally exceed those in the United States that any such relief would actually be realized. In any event, that speculative possibility is not a valid reason for denying the Taxpayers current Treaty benefits.

*Filler v. Comm'r*, 74 T.C. 406, 409-410 (1980).[12]  The *shared expectation* of each sovereign necessarily must be that whichever sovereign has primary taxing rights may impose its treaty-defined taxes and the other sovereign must allow an offset to its treaty-defined taxes.

For example, if the Taxpayers sell U.S.-situs real estate, the United States has primary taxing rights and levies capital gains tax plus NIIT on the sale. Pursuant to Article 24(1)(a)(iii), France must offset the full amount of United States income tax, *including the NIIT,* against any French tax, the obvious consequence of the NIIT being a "United States income tax" and a matter that is not disputed.  It follows then, as a matter of bargained for treaty-reciprocity, that if the Taxpayers sell French-situs real estate, France has primary taxing rights and pursuant to Article 24(2)(a), the United States must offset the French taxes arising on that gain against *all* United States income tax (both the capital gains tax and the NIIT).

The Defendant's proposition that France surrenders taxing rights by allowing a credit against French taxes for the NIIT when the United States has primary

---

[12]    Treaties are based upon reciprocity:  one country may relinquish the right to tax certain income on which it would ordinarily exercise taxing rights (*e.g.*, the United States relinquishes taxation rights over U.S.-source interest received by a French resident) in exchange for its counterparty's agreement not to tax identical income (*e.g.*, France relinquishes taxing rights over French source interest received by a U.S. resident).

taxing rights without a reciprocal obligation on the part of the United States when France has primary taxing rights does not represent an equilibrium that one would expect from a bargain between two sovereigns. Interpreting Article 24(2)(a) to provide for reciprocal allowances of foreign tax credits comports with the *shared expectations* of the Treaty partners that double taxation is avoided by each sovereign relinquishing taxation rights in exchange for a similar surrender of taxing rights by the other sovereign.

### 3.    Other Federal Court Cases Interpreting the Provisions of Article 24(2)(a) Confirm that a Foreign Tax Credit is Allowed Under the Terms of the French Treaty.

Federal courts have already had the opportunity to consider the meaning of the Article 24(2)(a) phrase "as it may be amended from time to time without changing the general principle thereof". In 1986, the Code was amended such that a taxpayer could only claim a foreign tax credit against 90 percent of his or her alternative minimum tax (AMT) obligation.[13] Congress specifically overrode all treaty obligations to justify this restriction, stating that it "shall apply notwithstanding any treaty obligation of the United States in effect on the date of enactment of the [1986 law change]." *See* Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, Sec. 1012(aa)(2). Thus, even if a

---

[13]    Code Sec. 59(a). This limitation was repealed in 2004. American Jobs Creation Act of 2004, Pub. L. 108-357, Sec. 421(a)(1).

taxpayer incurred foreign tax sufficient to offset 100 percent of his or her AMT liability, Code Section 59(a) expressly limited foreign tax credits such that a taxpayer would be required to pay no less than 10 percent of this U.S. tax liability.

In *Haver v. Comm'r*, 444 F.3d 656 (D.C. Cir. 2006), the taxpayer argued that the AMT limitation violated the terms of a tax treaty between the United States and Germany. The operative provision of the German treaty was substantially identical to Article 24(2)(a) in the French Treaty. The court held that as the AMT limitation was enacted in 1986 and the German Treaty was ratified in 1991, the Code Section 59(a) limitation on creditability of German tax was implicitly agreed by the two treaty partners. The court wrote:

> [The taxpayer] argues that the Government's position would allow the United States to deny the foreign tax credit to an unlimited extent, and thus effectively eviscerate the benefits of [the equivalent of Article 24(2)(a) of the French Treaty]. Whether or not a more substantial [AMT] would conflict with the Treaty is a question we need not answer here. As we have explained, [the AMT] was in place when the [German] Treaty was adopted, so the parties to the Treaty had reason to know that the United States surely would impose a 10% minimum tax. Therefore, it is unnecessary for us to decide what more might have been contemplated by the provision in [the equivalent of Article 24(1)] that conditions the tax credit limitations of U.S. law 'as it may be amended from time to time without changing the general principles' of the Treaty."

*Id.* at 660. In so holding, the court distinguished between limitations that existed at the time the treaty was ratified and after-enacted provisions that required consideration of the general principle that a foreign tax credit shall be allowed.

The Congressional override to allow the 90 percent AMT limitations notwithstanding treaty provisions to the contrary explicitly recognized that the "as it may be amended from time to time without changing the general principle thereof" language expands foreign tax credit relief beyond that contained in the Code. Courts have pointed to this Congressional override to explain why the "as may be amended from time to time without changing the general principle" language did not allow for a foreign tax credit without application of the 90 percent AMT limitation. *E.g.*, *Jamieson v. Comm'r*, 584 F.3d 1074, 1076 (D.C. Cir. 2009); *Kappus v. Comm'r*, 337 F.3d 1053, 1058 (D.C. Cir. 2003).

These cases stand for the proposition that where a Congressional override of a provision in multiple treaties is present, sovereigns entering into a treaty can expect that a comparable provision in a new treaty will be interpreted in accordance with the existing override because of the "provisions" and "limitations" language. The corollary to this is that the Treaty partners' shared expectations would naturally be that, short of a later treaty override (which is not present in the case of the NIIT), the "general principle hereof" language ensures a treaty-based foreign tax credit against a newly enacted United States income tax, such as the NIIT.

**B.     Many U.S. Treaties Provide that Foreign Levies Qualify as Creditable Taxes Notwithstanding U.S. Domestic Rules.**

The Court of Federal Claims, quoting from the unsound Tax Court decision in *Toulouse*, held that "any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's provision of a credit. *Toulouse*, 157 T.C. at 58; Appx. 85.  And yet, there are numerous instances where the terms of a bilateral treaty having substantially identical language give a different result than would be achieved exclusively under the Code.

For example, the income tax treaty between the United States and Denmark allows for a foreign tax credit for the Danish Hydrocarbon Tax.  *See* Section 23(c)(i) of the Danish treaty (Danish Hydrocarbon Tax Act a creditable tax); Technical Explanation to the Danish Treaty ("subparagraph (c) refers to taxes paid to Denmark by residents or nationals of the United States under the Danish Hydrocarbon Tax Act, **and may allow for greater foreign tax credits than allowed under U.S. statutory law**.") [14]  Emphasis added.

Similarly, the United States tax treaty with Italy is allows for a foreign tax credit for the *imposta regionale sulle attivita produttive* (the "IRAP").  *See* Article

---

[14]     Department of the Treasury Technical Explanation of the Convention Between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income Signed at Washington, August 19, 1999.

2(b)(iii) of the Italy Treaty; *see also* Joint Committee Explanation of the Italian Treaty[15] ("Because the IRAP tax base does not permit deductions for labor and, in certain cases, interest, it is not likely to be a creditable tax under U.S. internal law. The proposed treaty provides that a portion of the taxes imposed under the IRAP will be considered to be a creditable income tax under this article."). *See also* Notice 2008-3, 2008-2 I.R.B. 253 (Mexican *impuesto empresarial a tasa ūnica* creditable under the United States / Mexico tax treaty pending further study without regard to whether that tax meets the definition of an income tax under Code Section 901.)

In each of these cases, if the "provisions" and "limitations" language limited the allowance of a foreign tax credit to what the Code allows, a treaty-based foreign tax credit would not be available. Yet, in each of these treaties, where a specific definition in the treaty incorporates a tax that is otherwise not creditable, a treaty-based foreign tax credit is specifically allowed. This logic extends to the case at bar. The NIIT is a "United States income tax" covered under the French Treaty. That it would otherwise fall outside the foreign tax credit provisions of the Code is not dispositive, as treaty provisions may give results not otherwise obtainable under the Code.

---

[15]    Joint Committee Explanation of the Proposed Income Tax Treaty and Protocol Between the United States and the Italian Republic, JPRT 106-9-99 (Oct 13, 1999).

### C.     The Defendant's Convoluted Logic Renders Article 24(2)(a) Without Meaning or Effect within the French Treaty

The interpretation of any article in the French Treaty necessarily requires consideration of the Treaty as a whole.  Article 1 states that, except as otherwise provided, the French Treaty applies only to persons who are residents of the United States or France.  Article 4 defines the term "resident" and includes any fiscal resident of France (including U.S. citizens such as the Taxpayers).  Article 4(3)(a) and (b).  However, the so-called "saving clause" contained in Article 29(2) provides that "[n]otwithstanding any provision of the Convention, except the provisions of [Article 29(3)], the United States may tax * * * its citizens as if the Convention had not come into effect."  The effect of a tax treaty's saving clause is to nullify the application of the treaty by the United States for a U.S. citizen, other than for articles specifically excluded from the terms of the saving clause.  *See*, *e.g.*, *Filler v. Comm'r*, 74 T.C. at 409-410 (1980).

Article 29(3) of the French Treaty allows U.S. citizens and residents certain benefits notwithstanding the saving clause.  In particular, Article 29(3) states that the saving clause "shall not affect: (a) the benefits conferred * * * under Article 24 (Relief From Double Taxation) * * *."  As indicated in the Technical Explanation, the purpose of this carve out is to prevent the saving clause "from applying where it would contravene provisions of the Convention that are intended to extend U.S. benefits to U.S. citizens and residents."

26

As discussed above, it is the Defendant's position that only credits that are available to taxpayers are "Code-based foreign tax credits," *i.e.*, those credits that are provided for under the Code.  If it had indeed been the shared expectations of the Treaty partners that only the terms of the Code would determine entitlement to foreign tax credits, then there would have been no need for an elaborate set of provisions in the French Treaty entitling a U.S. citizen to claim a foreign tax credit, including Article 24(2)(a).  Not having that provision at all or having it be subject to, rather than excluded from, the saving clause would have achieved the result advanced by the Defendant.  To achieve this result for Article 24(2)(a) in its opinion, the Court of Federal Claims provides for an elaborate charade by which:

- The saving clause in Article 29(2) operates to deny a U.S. citizen any rights other than those provided in the Code;

- An exception to Article 29(2) applies under Article 29(3) offering the U.S. citizen the ability to claim a foreign tax credit under Article 24(2)(a); *but*

- The wording of Article 24(2)(a) would restrict foreign tax credit relief to that allowed under the Code.

This convoluted logic would have the effect of rendering these French Treaty provisions meaningless, without purpose or effect, which cannot be a serious proposition.  *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("words cannot be meaningless, else they would not have been used").

**D.  The Court of Federal Claims' Opinion Does Not Properly Address the Function of Article 24(2)(a) in the French Treaty.**

In the final analysis, the Court of Federal Claims failed to consider that its reading of Article 24(2)(a) made no sense in the overall context of the Treaty and raised more questions than it answered about the function of Article 24(2)(a). The Taxpayers' reading of this provision, which provides an independent treaty-based credit in this situation gives the Treaty language substance and fulfills a principal purpose of the French Treaty – to avoid double taxation.

The Taxpayers' interpretation of Article 24(2)(a) has a number of advantages compared to the Court of Federal Claims' erroneous alternative:

1. It fulfils a principal purpose of the French Treaty, to avoid double taxation.

2. It reflects a liberal interpretation of Article 24(2)(a) to achieve a principal purpose of the Treaty, rather than the narrow interpretation advocated by the Defendant that would result in double taxation – the evil the Treaty seeks to avoid.

3. It is in accordance with the plain language of the Treaty and does not nullify the parenthetical phrase "as amended from time to time without changing the general principle thereof".

4. It is consistent with decisions of other Courts of Appeals that have discussed the meaning of Article 24 in other U.S. income tax treaties.

5. It is consistent with other U.S. income tax treaties including those that use the "provisions" and "limitations" language and allow a treaty-based foreign tax credit where a Code-based foreign tax credit would not be allowed (or, in the case of the Croatia Treaty, where the language of the treaty unequivocally denies a treaty-based foreign tax credit for the NIIT).

6. It does not depend upon an elaborate charade by which the saving clause, the exception to the saving clause, and the language of Article 24(2)(a) render each other nugatory.

For these reasons, Article 24(2)(a) provides the Taxpayers the relief they have requested, in addition to the treaty-based foreign tax credit the Court of Federal Claims correctly allowed for under Article 24(2)(b), and the lower court erred in not allowing the treaty-based credit under Article 24(2)(a) as well.

### III. The Court of Federal Claims Correctly Allowed Taxpayers a Treaty-Based Foreign Tax Credit Under Article 24(2)(b) Of the French Treaty.

Article 24(2)(b) of the French Treaty provides:

In the case of an individual who is both a resident of France and a citizen of the United States:

(i)  the United States shall allow as a credit against the United States income tax the French income tax paid after the credit referred to in subparagraph (a)(iii) of subparagraph [1].  * * *

(ii)  Income referred to in paragraph [1] and income that, but for the citizenship of the taxpayer, would be exempt from United States income tax under the Convention, shall be considered income from sources within France to the extent necessary to give effect to the provisions of subparagraph (b)(i). The provisions of this subparagraph (b)(ii) shall apply only to the extent that an item of income is included in gross income for purposes of determining French tax. * * *

Breaking down the constituent parts of the provisions shows that a credit is allowed:

- The Taxpayers are U.S. citizens resident in France;

29

- The parties agree that the NIIT is a "United States income tax" that is covered by the French Treaty;

- The Taxpayers' paid tax to France on the relevant sale of French shares in a French company.[16]

Recognizing the straightforward application of the plain text, the Court of Federal Claims found that Article 24(2)(b) provides for a treaty-based foreign tax credit and ruled in favor of the Taxpayers.

Despite the plain, unequivocal wording of Article 24(2)(b), the Defendant nonetheless challenges the Court of Federal Claims' ruling. First, the Defendant argues that language in Article 24(2)(b)(ii) that treats U.S.-source income as if it is French-source income (a mechanism known as "re-sourcing") implicitly imports Article 24(2)(a)'s "provisions" and "limitations" language (and the suspect meaning that the Defendant attributes to this language) into Article 24(2)(b). The Defendant further maintains that the Taxpayers' plain textual interpretation produces "anomalous results" that could not have been intended by the Treaty partners.

---

[16] Article 24(1)(a)(iii), which refers to certain types of income arising in the United States over which the United States retains primary taxing rights, does not apply in the present case. The parties agree that the sale of French shares giving rise to the NIIT are gains over which the French retain primary taxing rights.

Next, the Defendant cites *O'Connor v. United States*, *supra*, interpreting the income tax treaty between the United States and Panama (the "Panama Treaty"), for the proposition that it would be "implausible" to interpret Article 24(2)(b) without reference to the "provisions" and "limitations" language. (Def Br. at 32.)

Neither component of the Defendant's argument withstands scrutiny. For the reasons set forth below, this Court should affirm the Court of Federal Claims correct holding that Article 24(2)(b) provides for the treaty-based foreign tax credit claimed by the Taxpayers.

> **A.** **Article 24(2)(b)'s Plain Terms Does Not Subject a Treaty-Based Foreign Tax Credit to the Provisions and Limitations of United States Law.**

Article 24(2)(b) implements the so-called "three-bite" rule of the French Treaty, in which the priority of taxation is:

1. Source-based taxation (as assigned by the Treaty) is assigned primary taxing rights.

2. Residence-based taxation is assigned secondary taxing rights.

3. Citizenship-based taxation (only for U.S. citizens in France as France does not impose citizenship-based taxation) has residual taxing rights.

The parties agree that in the case at bar the United States does not have source-based taxing rights on the Taxpayers' sale of shares in a French company and that French residence-based taxation exceeds the entire amount of United States income tax, including the NIIT. As a result, the plain language of Article 24(2)(b)

31

provides that the French taxes offset all United States income tax (which by definition includes the NIIT), and the United States cannot collect any citizenship-based tax from the Taxpayers.

The Court of Federal Claims agreed, holding that the operation of the three-bite rule in this case provides the relief the Taxpayers' requested.  The lower court noted that this plain textual reading of the French Treaty avoids double taxation – a principal purpose of the Treaty.  This analysis should end the inquiry and a treaty-based foreign tax credit should be allowed in this case.  *Air France v. Saks*, *supra*.

The Defendant nonetheless argues that Article 24(2)(b)(i) implicitly imports the Article 24(2)(a) "provisions" and "limitations" language (and the meaning the Defendant attributes to this language) and that this is necessary to "avoid anomalous results" – such as allowing unlimited cross-crediting – that could never have been intended by the Treaty partners.[17]  The Defendant asserts that the re-sourcing rule contained in Article 24(2)(b)(ii) shows "unmistakenly" (Def. Br. at 28) that the Article 24(2)(a) language must have been intended to apply to Article 24(2)(b)(i) and further quotes from the Technical Explanation to support its

---

[17]    As the Defendant's brief explains in more detail, cross-crediting occurs when amounts of a foreign tax paid on one item of income are used to offset U.S. tax on a separate item of income.  The Code allows cross-crediting to a limited extent.  High foreign taxes on an item of income arising in the same "separate limitation category" (or basket) may offset U.S. taxes on lightly taxed foreign source income in the same basket.

position.  In fact, the Treaty prevents, by application of its own terms, the

unlimited cross-crediting that is the Defendant's contrived bugaboo.

### B.     Article 24(2)(b)(ii) Does Not Import Code-Based Rules for Determining the Tax Credit Allowed to U.S. Citizens Residing in France.

Recognizing that the plain text of Article 24(2)(b)(i) provides a treaty-based

foreign tax credit for the Taxpayers, the Defendant has no choice but to claim that

the re-sourcing provision of subparagraph (b)(ii) justify the importation of Code-

based rules to override Article 24(2)(b)(i)'s text.  The Defendant argues that the

only reason for the Article 24(2)(b)(ii) re-sourcing rule is that the Treaty partners

believed that any treaty-based credit "was in the first place subject to the Internal

Revenue Code's source-based limitation in § 904(a)" (Def. Br. at 27) to prevent

cross-crediting.  A close examination of the French Treaty and the Technical

Explanation of the re-sourcing rule, however, demonstrates the fallacy of the

Defendant's position.

1.    **Article 24(2)(b)(ii) Limits the Scope of the Three-Bite Rule Contained in Article 24(2)(b)(i) Without Reference to the Code-Based Provisions and Limitations.**

Article 24(2)(b)(i) describes the ordering rules for U.S. citizens resident in France pursuant to which the United States may impose tax on the certain types of U.S.-source income and France may impose tax on the basis of residence (the first two bites of the three-bite rule) before determining the U.S. citizenship-based taxation (the third bite).  France may impose a tax (the second bite) after crediting any U.S. source-based taxation (the first bite) and "the United States shall allow as a credit against the United States income tax" any French residence-based tax against the United States' residual citizenship-based tax (the third bite).

Article 24(2)(b)(i)'s text, read in isolation, might in theory allow a French resident U.S. citizen to offset without limitation the second bite French taxes against any third bite U.S. citizenship tax.  For example, Article 24(2)(b)(i) in isolation could potentially offer a French resident U.S. citizen the ability to offset the French income tax arising on French-source salary income against U.S.-source interest income – a broad ability to cross-credit to reduce or eliminate any U.S. citizenship-based taxation.

Article 24(2)(b)(ii) ensures that such broad-based cross-crediting does not occur by introducing a source-based limitation.  Article 24(2)(b)(ii) provides that income "shall be considered from sources within France *to the extent necessary to*

*give effect* to the provisions of subparagraph (b)(i)." (Emphasis added.) Pursuant to Article 24(2)(b)(ii)'s "to the extent necessary to give effect" language, it is not possible for a French resident U.S. citizen to credit any French taxes arising on one item of income (*e.g.*, French salary income) to offset United States income taxes arising on a different item of income (*e.g.*, U.S.-source interest income).

The Technical Explanation explains this result by an example in which a U.S. citizen resident in France receives a U.S.-source dividend of 100 over which the United States has source-based taxing rights of 15. The example assumes that France would impose 22 of residence-based tax before taking into account the provisions of the Treaty. Article 24(2)(b)(i) provides that the United States may impose tax of 15 and France may impose tax of 7 (its 22 statutory rate less a 15 credit for the U.S. taxes paid). Article 24(2)(b)(ii) re-sourcing is not necessary for this computation.

Article 24(2)(b)(ii) becomes relevant for the residual citizenship-based taxing rights retained by the United States (the third bite) – in other words, it may limit the French tax (in the example, 7) that can offset any United States income taxes. As the Technical Explanation explains, this re-sourcing results in a U.S. citizen resident in France incurring a total tax burden on that dividend to the "higher of the two taxes." It does so by re-sourcing income "to the extent necessary to give effect" to the three-bite rule. In the example, the Technical

Explanation assumes the United States would impose 28 of tax on that income (*i.e.* higher than the 22 of French taxes). To achieve a result in which the taxpayer incurs the higher of the two taxes, a credit must be allowed for the 7 of French tax actually imposed. Re-sourcing is limited to a fixed amount of the (otherwise U.S.-source) dividend as French-source (in the example 25 of the 100 is re-sourced from U.S. source to French source).[18]

Crucially, any re-sourcing is limited "to the extent necessary to give effect" to the three-bite rule and therefore only 25 of the dividend is re-sourced. If the taxpayer in the Technical Example received a second dividend subject to a tax rate of 20, the following results would obtain:

- The United States would collect the first 15 of source based tax

- France would collect 7 of residence-based tax (the "higher of the two taxes")

- The excess by which the French taxes (22) exceeded the United States income taxes (20) could not be used to cross-credit the citizenship-based taxes with respect to the first dividend (as the dividend income giving rise to 6 of citizenship-based tax in the

---

[18]    The Technical Explanation example concludes that 25 of the 100 dividend is re-sourced (25 of income multiplied by the 28 percent U.S. tax rate allows the 7 of French tax to offset the U.S. citizenship-base tax).

Technical Example remains U.S.-source over which no treaty-based credit is provided).

Article 24(2)(b)(ii)'s "to the extent necessary to give effect" text therefore mandates that each item of income that is subject to re-sourcing will be taxed at the higher of the two tax rates, and excess credits that may result (where French-based residency taxation exceeds any residual U.S. citizenship-based taxation) cannot be applied to other items of income.  This is an "item-by-item" re-sourcing rule pursuant to which cross-crediting can *never* occur.[19]

The Defendant's argument that sourced-based limitations must have been imported into Article 24(2)(b) therefore confuses cause and effect.  It is not, as the Defendant argues, that "the drafters believed that the credit against U.S. income tax referenced in subparagraph (b)(i) * * * was in the first place subject to the Internal Revenue Code's source-based limitations in § 904(a)."  Def. Br. at 27.  To the contrary, Article 24(2)(b)(ii) instead applies a source-based limitation, like that contained Code Sec. 904(a), to prevent unlimited cross-crediting.  The source-based rule contained in Article 24(2)(b) applies on an item-by-item basis.

---

[19]    At the time the French Treaty was ratified, the Code did not limit cross-crediting when a treaty re-sourced income.  Code Sec. 904(d)(6), which now provides the same item-by-item restrictions, was enacted in 2010.  Plainly, the Treaty partners did not adopt Code provisions and limitations in 1994, including those permitting cross-crediting when the French Treaty was ratified.

**2.    The Technical Explanation Does Not Support
The Defendant's Position that All Code-Based Rules
Apply to Article 24(2)(b).**

The Defendant quotes the Technical Explanation in support of its proposition

that all Code-based foreign tax credit limitations apply to Article 24(2)(b):

> The credits provided under the Convention are allowed in accordance with
> the provisions and subject to the limitations of U.S. law . . . . Thus, although
> the Convention provides for a foreign tax credit, the terms of the credit are
> *determined by* the provisions of the U.S. statutory credit at the time a credit
> is given. The limitations of U.S. law generally limit the credit against U.S.
> tax to the amount of U.S. tax due with respect to net foreign-source income
> within the relevant foreign tax credit limitation category (see Code section
> 904(a)).
>
> \*    \*    \*
>
> Subparagraph 1(b) [now 2(b)] also provides that certain U.S.-source
> income will be treated as French Source income to permit the additional
> credit to *fit within* the foreign tax credit limitation of Code Section 904.

(Def Br. at 39 –Emphasis added.)  Again, the Defendant confuses the method by

which Article 24(2)(b)(ii) operates.

The first paragraph above quoted by the Defendant refers only to Article

24(2)(a) and indicates that the amount of French tax eligible for a treaty-based

foreign tax credit in Article 24(2)(a) is "**determined by**" the "provisions" and

"limitations" in the Code.[20]   This set of rules, as discussed above, determines the

amount of French tax that can be used to offset any United States income tax and

---

[20]    As indicated in Section II, *supra*, these provisions and limitations do not
change the general principle that a treaty-based credit is allowed against any
"United States income tax."  The *amount* of French tax that can be applied to offset
the United States tax is "determined by" rules in the Code.

involves various concepts including allowing for cross-crediting in certain situations.

The second paragraph quoted by the Defendant refers to Article 24(2)(b) and states that re-sourcing rules are designed to "**fit within**" the Code Section 904 limitation. "Fits within" is not synonymous with "determined by." Article 24(2)(b)(ii) applies an item-by-item approach whereby French taxes may only offset income that is re-sourced to give effect to subparagraph (b)(i) – this "fits within" the Code Sec. 904 limitation as income not re-sourced remains U.S.-source against which no cross-crediting may occur. It does not, however, mean that there is a wholesale adoption of Code Sec. 904 rules.

The Technical Explanation does not support the Defendant's assertion that "Article 24(2)(b)(ii) would not have been necessary had the drafters believed the credit referenced in subparagraph (b)(i) was free of the restrictions of the Internal Revenue Code, as the [Court of Federal Claims] held." To the contrary, the Technical Explanation shows that subparagraph (b)(ii) applies a standalone item-by-item approach to re-sourcing. Denying a treaty-based foreign tax credit against U.S.-source income "fits within" the Code Sec. 904 limitation; the "item-by-item" approach, however, conclusively demonstrates that Code-based rules, including the ability to cross-credit taxes, do not apply.

### 3. The Court of Federal Claims' Interpretation Does Not Produce Other Anomalous Results.

The Defendant also argues that a plain reading of Article 24(2)(b), "unmoored" from the Code provisions, would produce "anomalous results". (Def. Br. 34-37.) The Defendant points to an "egregious example" where a U.S. citizen residing in France could claim the benefit of the "foreign earned income exclusion" contained in Code Sec. 911 yet "get a treaty-based credit for taxes on that excluded income – a credit the taxpayer can then use to offset U.S. tax on other income, including unrelated U.S. source income." (Def. Br. at 34.) The Defendant would have this Court believe this result, is "unprecedented in any other U.S. income tax treaty and was not intended by the contracting parties." *Id*.[21]

The Defendant confuses the purpose and scope of Article 24(2)(b)(ii)'s re-sourcing provisions. The "unrelated U.S. source income" to which the Defendant refers would either be exempt from French tax, in which case it falls completely outside the scope of Article 24(2)(b)(ii), or it is subject to limited re-sourcing "to

---

[21] As a preliminary matter, this statement is not true. The result is precisely what is intended with respect to the Canada/U.S. tax treaty, a point made to the Court of Federal Claims in the *Bruyea* case. For this Court's reference, the relevant portion of the taxpayer's brief in *Bruyea* is attached to this brief as part of the addendum. Addn. 15-19.

the extent necessary give effect to" limited U.S. citizenship-based taxation.[22]  The

Treaty does not allow for anomalous results; it is the Defendant's analysis that is

flawed.[23]

In summary, Article 24(2)(b) provides relief for U.S. citizens living in

France by creating specific rules, including re-sourcing of income, to avoid double

taxation.  These rules are self-contained and do not import Code-based rules to

achieve their explicit purpose of avoiding double taxation of U.S. citizens who are

resident in France.  The re-sourcing rules apply an "item-by-item" approach and, as

a result, do not produce the anomalous results that the Defendant erroneously

claims could arise.  As the Court of Federal Claims correctly determined, the plain

language of Article 24(2)(b) provides the Taxpayers the treaty-based foreign tax

credit they have claimed to offset the NIIT, and that court correctly applied this

provision to avoid double taxation, a principal purpose of the French Treaty.

---

[22]    As discussed above, pp. 34-37, *supra*, by its plain terms, Article 24(2)(b)(ii)
does not apply if the unrelated income is not subject to French tax – "this
subparagraph (b)(ii) shall apply only to the extent that an item of income is
included in gross income for purposes of determining French tax."   Equally true,
U.S.-source income that was not re-sourced "to give effect to" Article 24(2)(b)(i)
remains U.S.-source against which no treaty-based credit is allowed.

[23]    Other concerns raised by the Defendant, such as the proper translation into
U.S. dollars of foreign tax payments made in a foreign currency are equally
unfounded.  Currency translation issues have existed from the time the first foreign
tax credit rules were implemented over a century ago and do not require treaty-
based language to resolve.

**C.    The Supreme Court's Decision in *O'Connor* Supports the Court of Federal Claims' Decision to Allow a Treaty-Based Foreign Tax Credit Pursuant to Article 24(2)(b).**

The Defendant argues that the Supreme Court's decision in *O'Connor* supports its position that "express limiting language in the first paragraph of a treaty article addressing taxation [is] applied to the entire article." (Def Br. at 30.) The Defendant's argument is wrong. The issue in *O'Connor* was the interpretation of the Panama Treaty with respect to U.S. tax on income of U.S. citizens working for the Panama Canal Commission, even where unrelated to their employment. The operative Panama Treaty language was:

> 1. By virtue of this Agreement, the Commission, its contractors and subcontractors are exempt from payment in the Republic of Panama of all taxes, fees or other charges on their activities or property.

> 2. United States citizen employees and dependents shall be exempt from any taxes, fees or other charges on income received as a result of their work for the Commission. Similarly, they shall be exempt from payment of taxes, fees or other charges on income derived from sources outside the Republic of Panama.

The taxpayers in *O'Connor* argued the text of the Panama Treaty exempted them from U.S. income tax (including on U.S.-source income wholly unrelated to their work for the Commission). Paragraph 1, the taxpayers noted, specifically provided an exemption from "the payment in the Republic of Panama of all taxes" while paragraph 2 did not limit the exemption to such Panamanian taxes. The taxpayers reasoned that such an omission meant that a U.S. citizen employed by the Panama

Canal Commission must therefore be exempt from all worldwide taxes, including U.S. taxes arising on U.S.-source investment income wholly unrelated to their work for the Commission.

The Supreme Court noted that the taxpayer's literal reading of the text of paragraph 2 could support a claim that a U.S. citizen working for the Panama Canal Commission would be exempt from all worldwide taxes.  Nevertheless, the overall context of the Panama Treaty would be "implausible" if paragraph 2 were also not limited to an exemption from taxes imposed by the Panamanian Government.

> While, as the petitioners assert, there might have been some reason why Panama would insist that its inability to tax United States citizen Commission employees upon their earnings in Panama be matched by a detraction from the United States' sovereign power to tax those same earnings, there is no conceivable reason why this hypothetical "your-sovereignty-for-mine" negotiating strategy would escalate into a demand that the United States yield more sovereign prerogatives than it was asking Panama to forgo -- and no imaginable reason why the United States would accept such an escalation, producing tax immunity of unprecedented scope.

479 U.S. at 31.

Thus, while it might be plausible that pursuant to the first sentence of paragraph 2, the United States would surrender residual citizenship-based taxing rights over income a U.S. citizen resident in Panama received from the Panama Canal Commission, it was wholly implausible that the United States would agree to surrender taxing rights over all other income, including for example, U.S.-source

investment income.  Accordingly, the Supreme Court read paragraph 2 as limited to exempting the taxpayer from taxes payable to Panama, effectively importing into paragraph 2 the "payment to the Republic of Panama" language in paragraph 1.

The issue arising in the Panama Treaty is in stark contrast to the issue arising in the case at bar.  In *O'Connor*, the taxpayers were arguing for an interpretation of treaty language that could not be reconciled with a bargain between sovereign nations in which each surrenders sovereign taxing rights for an equivalent concession by the other nation.  It was "implausible" that, in the bargaining between the two countries, the United States would agree to surrender taxing rights on wholly unrelated income ("more sovereign prerogatives than it was asking Panama to forgo") in a situation where such income was not subject to tax elsewhere.

This reasoning, however, cannot be assimilated to the Taxpayers' interpretation of Article 24(2)(b).  In the Taxpayers' interpretation, the United States is not surrendering "more sovereign prerogatives" than it asks France to forgo (nor does it involve France surrendering more sovereign prerogatives than it asks the United States to forgo, which is inherent in the Defendant's flawed interpretation).  Instead, the Taxpayers' interpretation corresponds exactly to a "your-sovereignty-for-mine" negotiation, providing for precisely the treaty-based tax credit result adopted by the Court of Federal Claims in this case, and reflects

44

the proper hierarchy of the three-bite rule.  Pursuant to the French Treaty, when the United States has primary sourced-based taxing rights (the first bite of the three-bite rule), France surrenders taxing rights on United States income by providing a credit for such United States taxes, including the NIIT, to offset a corresponding amount of French residence-based tax (*i.e.*, France reduces the "second bite" tax to account for the United States' "first bite" tax, including the NIIT).  When, however, France exercises residence-based taxing rights, the bargained for *quid pro quo* is for the United States to surrender its residual citizenship-based taxing rights and to do so, it must allow for such taxes, including the NIIT, to be offset by foreign tax credits (*i.e.*, the United States reduces the "third bite" tax to account for France's "second bite" of tax).

In summary, *O'Connor* was a case of drafting omission, and no such drafting omission has occurred in the French Treaty.  It is a perfectly logical bargain that (a) France will offset all United States income taxes, including the NIIT, against French taxes when the United States has superior taxing rights and (b) the United States will offset French tax against all United States income taxes, including the NIIT, when France has superior taxing rights.  The Court of Federal Claims' decision, following Article 24(2)(b)'s plain text, is correct and guarantees a treaty-based foreign tax credit to the Taxpayers in this case, consistent with the French Treaty's purpose to avoid double taxation.

**D.    The Court of Federal Claims Correctly Determined That a Treaty-Based Foreign Tax Credit is Allowed Pursuant to Article 24(2)(b).**

The Court of Appeals entered judgment on behalf of the Taxpayers based on its conclusion that the text of Article 24(2)(b) allows for a treaty-based foreign tax credit against the NIIT. This provision does not import the "provisions and limitations" language of Article 24(2)(a) and, therefore, its erroneous interpretation of Article 24(2)(a) has no effect on its judgment.

The Defendant asserts that Article 24(2)(b)(ii) shows "unmistakably" that the Article 24(2)(b) three-bite rule does not operate independently of the Code. However, a careful reading of Article 24(2)(b)(ii) shows that the Treaty and the Code operate in different unrelated ways, including the Treaty's application of an "item-by-item" approach which, at the time of the Treaty's ratification, had no Code-based equivalent.

The Defendant's argument that the Technical Explanation supports its interpretation is equally flawed. The example in the Technical Explanation shows that cross-crediting is not permitted under Article 24(2)(b) and the use of the term "fit within" rather than the "determined by" description used in the case of Article 24(2)(a) confirms that Article 24(2)(b) did not import Code-based rules limiting the availability of a treaty-based foreign tax credit. Moreover, such re-sourcing rules do not give rise to anomalous results; rather, it is the Defendant's implausible

interpretation that would give rise to double taxation, contrary to a principal purpose of the French Treaty.

The Taxpayers' interpretation, in accordance with the plain language of the Treaty to achieve its principal purpose should control. The French Treaty should be interpreted liberally to achieve its goals rather than in a contrived, narrow way to thwart its purpose.

## CONCLUSION

For the reasons set forth above, the Court of Federal Claims judgment should be affirmed as Articles 24(2)(a) and 24(2)(b) each independently allow the Taxpayers a treaty-based foreign tax credit to offset the NIIT.

Respectfully submitted,

/s/ Stuart E. Horwich
Horwich Law LLP
20 Old Bailey, 5th Floor
London  EC4M 7AD
011 44 20 8057 8013
seh@horwichlaw.co.uk
Counsel for Plaintiffs

June 24, 2024



Canada Revenue     Agence du revenu
Agency             du Canada

July 10, 2023

Mr. Max Reed                                                    *Our file*
Polaris Tax Counsel                                            ILBD-AMT-56731
1788 West Broadway, Suite 900
Vancouver, BC V6J 1Y1

Dear Mr. Reed:

**Subject:      Competent Authority Request
                Taxpayer: Paul Bruya
                <u>Tax Years:  2013 through 2020</u>**

We are writing in response to your request for an update on the status of negotiations between the Canadian Competent Authority and the United States (US) Competent Authority in relation to the Taxpayer's case, which was submitted under Article XXVI of the Canada-US Tax Convention (Convention).

The Taxpayer, a Canadian resident and US citizen, has been subject to double taxation on capital gains he earned from the disposition of Canadian real estate. As a fiscal resident of Canada, the Taxpayer is subject to tax on his worldwide income in Canada. As a citizen of the US, he is also subject to tax on his worldwide income in the US. Relief from double taxation is granted in accordance with domestic laws and the Convention. In the vast majority of cases, double taxation is relieved without any difficulties. However, with the introduction of the US Net Investment Income Tax (NIIT), such relief has proven difficult.

The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention. Discussions with the US competent authority under the Mutual Agreement Procedure to obtain relief from double taxation are ongoing and our respective positions remain far apart.

We will continue to keep you informed of any developments in this case. Please do not hesitate to contact us should you have further question about this case.

Your sincerely,

Digitally signed by
JENNINGS MICHAEL
Date: 2023.07.10
17:36:56 -04'00'

Michael Jennings
Director
Competent Authority Services Division
International and Large Business Directorate
Canada Revenue Agency



"Addn. 1"

# International Journal™

October 01, 2021

•

## The Tax Court's Erroneous Decision in Toulouse



Kim Blanchard[*]

Weil, Gotshal & Manges LLP

New York

[*] Kim Blanchard is a Tax partner in Weil, Gotshal & Manges LLP's Tax, Executive Compensation & Benefits Department and is based in New York. Her practice encompasses a variety of largely international transactions involving corporate acquisitions and mergers, internal restructurings, business formations, and joint ventures. She also advises domestic, foreign, and multinational clients in connection with venture capital investment and fund formation, partnerships, real estate, executive compensation, and exempt organization issues.

This article may be cited as Kim Blanchard, *The Tax Court's Erroneous Decision in Toulouse*, 50 Tax Mgmt. Int'l J. No. 10 (Oct. 1, 2021).

In the recent case *Toulouse v. Commissioner*,[1] the Tax Court held that a U.S. citizen resident abroad was not entitled to claim a foreign tax credit to offset U.S. tax paid under §1411 [2] on net investment income (NII). Because the Tax Court framed the issue incorrectly, it reached the wrong decision. This note will reframe the issue in the hope that the decision will be revisited, if not by the Tax Court then by some other court.

---

[1] 157 T.C. No. 4 (Aug. 16, 2021).

[2] All section references are to the Internal Revenue Code, as amended ("the Code"), or the Treasury regulations thereunder, unless otherwise indicated.

---

The taxpayer in this case was a U.S. citizen resident in a foreign country who paid creditable income taxes to France and Italy. She applied foreign tax credit (FTC) carryovers to zero out her liability for U.S. tax on NII imposed by §1411. The IRS reassessed the NII tax without benefit of the FTC, and the taxpayer ultimately sought relief in the Tax Court. The taxpayer conceded that the Code does not provide an FTC against the NII tax, as the relevant provisions apply the credit only against taxes imposed by Chapter 1 of the Code, whereas the NII tax, enacted in 2010, appears in a new Chapter 2A.[3] The taxpayer argued that the "Relief from Double Taxation" articles of the U.S. tax treaties with France and Italy[4] provided "a foreign tax credit independent of the Code." The Tax Court held that these articles "do not provide an independent basis for a foreign tax credit against the net investment income tax" and thus that the taxpayer was not entitled to claim the FTC against her NII tax.

---

[3] Pub. L. No. 111-152, §1402(a)(1), added Code §1411, effective for taxable years beginning after December 31, 2012.

[4] Article 24(2)(a) of the U.S.-France treaty and Article 23(2)(a) of the U.S.-Italy treaty (hereafter, the "RFDT articles").

---

**Bloomberg Law**®

"Addn. 2"

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**// PAGE 1**

The proper question in *Toulouse* was not whether a treaty may provide an "independent basis" for the FTC. Rather, the proper question was whether the treaty **requires** the United States to grant the FTC on the facts of this case, regardless of U.S. domestic law. Once the issue is properly characterized, the answer is clear: The tax treaties in question require the United States to provide the taxpayer with the FTC.

All U.S. tax treaties contain a "Taxes Covered" article that describes the types of taxes the treaty addresses. The language of that article is virtually identical in all U.S. treaties, including the French and Italian treaties. It provides that the taxes that are the subject of the treaty include, in the case of the United States, **the Federal income taxes imposed by the Internal Revenue Code** . The Taxes Covered article also states that the treaty shall equally apply to "any identical or substantially similar taxes that are imposed after the date or signature" of the treaty that are in addition to, or in place of, taxes in existence at the time the treaty was signed.[5]

---

[5]*See, e.g.*, Article 2(2) of the France-U.S. tax treaty.

---

There is no question that the NII is an income tax imposed by the Code, and the Tax Court did not suggest otherwise. A tax on "net" investment income is a tax on income. Under Reg. §1.1411-1(a), provisions of the Code that apply for purposes of computing taxable income under Chapter 1 generally also apply for purposes of computing NII.[6] Interestingly, the deductions taken into account in computing NII include the §164 deduction for foreign taxes paid.[7] The regulation that affirms this result states that the deduction is not allowable if the taxpayer claims an FTC in the same year. The purpose of this rule was almost certainly to address a comment that the IRS received with respect to prior proposed regulations, to the effect that although the §164 deduction and the FTC are mutually exclusive under the Code, a taxpayer might take the position that the tax on NII is a separate tax from that in Chapter 1, and claim the §164 deduction for the NII tax while claiming an FTC for the Chapter 1 tax.[8] Such an approach would treat taxpayers whose NII is foreign source more favorably than those whose NII is domestic source. To preclude such a result, the Treasury regulations do not treat the NII as a separate tax.

---

[6] Because the NII tax is an income tax, the IRS had to devise complex rules and elections to deal with the fact that NII overlaps with the Code's rules for controlled foreign corporations and passive foreign investment companies. *See* Reg. §1.1411-10.

[7] Reg. §1.1411-4(f)(3)(iii).

[8]*See* New York State Bar Association Tax Section Report No. 1284, "Report on the Proposed Regulations Under Section 1411," at pages 33–34 (May 15, 2013) ("NYSBA Report").

---

Because it is an income tax, the NII tax is subject to the treaty. It is irrelevant whether the tax is set out in Chapter 1 or Chapter 2A of the Code. So why is that significant?

A treaty is a contract. The question in *Toulouse* was whether that contract required the United States to grant a taxpayer a credit for the French and Italian taxes imposed. This is not semantics, but fundamental to the purpose and operation of tax treaties. A tax treaty sets out detailed rules prescribing which country may tax which income of persons who would otherwise be subject to tax in both countries (either because of dual residence or, more commonly, because one country taxes based on source and another based on residence). Each treaty country has a compelling sovereign


© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 2

interest in ensuring that income of a taxpayer that the treaty allows it to tax is not subject to taxation a second time in the other country. France's right to tax income it regards as having a French source, or as belonging to a French resident, would be undermined if the United States were permitted to tax that same taxpayer on the same income, and vice versa.

The RFDT article is contained in all treaties. It is the mechanism through which double taxation of the same income is avoided and is central to the manner in which a tax treaty functions. In the RFDT article, the United States had promised its treaty partner that it will provide an FTC for that country's taxes on income, subject to the limitations of the Code described below. Since the NII is an income tax covered by the tax treaties, the United States is required to grant a credit for any foreign tax paid on NII. Although the language and coverage of the RFDT article varies from treaty to treaty, as applied to a simple case such as *Toulouse* it is virtually identical in all U.S. tax treaties. The article begins by stating "It is agreed that double taxation **shall** be avoided in accordance with the following paragraphs of this Article." The RFDT article appearing in the U.S.-Italy treaty is typical and provides in relevant part:

> In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States **shall** allow to a resident or citizen of the United States as a credit against the United States tax on income the appropriate amount of income tax paid to Italy. . . . Such appropriate amount shall be based upon the amount of tax paid to Italy, but shall not exceed the limitations of the law of the United States (for the purpose of limiting the credit to the United States tax on income from sources without the United States). (Emphasis added)

The foregoing analysis leads in a straightforward way to the conclusion that the United States must grant an FTC in respect of an otherwise creditable foreign tax imposed on NII. This short piece should end here. But the Tax Court, pointing to the qualifying phrase "[i]n accordance with the provisions and subject to the limitations of the law of the United States," concluded that "the plain text of the treaty provisions on which petitioner relies subject the terms of the Treaties, and thus any allowable credit to the provisions and limitations of the Code."[9] The court interpreted that qualifying phrase to mean **that the FTC must be allowed by U.S. domestic law**. Since U.S. tax law allows an FTC only for taxes imposed by Chapter 1, and the NII was enacted as a new Chapter 2A, the Tax Court concluded that the RFDT article did not apply to the NII tax.

---

[9] 157 T.C. No. 4 at p. 15.

---

If this were correct, then the United States could avoid its treaty obligations by the simple expedient of enacting new income taxes in new Chapters of the Code, in direct violation of the provisions of U.S. tax treaties that make them applicable to identical or substantially similar taxes imposed after the date or signature of the treaty that are in addition to, or in place of, taxes in existence at the time the treaty was signed. Fortunately, such a ludicrous result is not mandated by the qualifying phrase cited in the court's decision. If the qualifying language is instead interpreted, as it must be, in the context of the overall purpose of a tax treaty and with an understanding of how the U.S. FTC rules operate, a very different meaning is evident.

Here we must digress to the subject of how the U.S. FTC rules operate. As all countries that negotiate tax treaties with the United States become aware (if they were not already), the United States relieves double taxation only by granting an FTC. The United States does not grant a full dollar-for-dollar FTC



"Addn. 4"

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

in respect of any creditable foreign tax paid. Instead, §904 limits the credit to the proportion of the U.S. tax against which the credit is taken that the taxpayer's foreign-source income (as computed using U.S. tax principles) bears to his or her worldwide income. Even then, this limitation is applied separately as among four different "baskets" of income. And even then, foreign-source income is reduced by allocating deductions in a manner that can cause the amount of the credit to be far less than the amount of income subject to foreign tax, even where the foreign tax is imposed at a low rate. [10]

---

[10] Because the Tax Court did not consider the manner in which the Code's FTC rules operate, it overlooked that fact that nothing in §1411 precludes the tax on NII from being considered a U.S. income tax for purpose of computing the §904 limitation. For a discussion of the result of treating it as such, see NYSBA Report at 35.

---

The §904 limitations are what the treaty is referring to in the clause "subject to the limitations of the law of the United States." *What that clause does not and logically cannot refer to is a provision of U.S. law that purports to treat an income tax covered by the treaty as not being subject to the RFDT article of the treaty*. Moreover, no provision of the Code purports to do any such thing. It is irrelevant that U.S. domestic law would not provide an FTC against the NII tax in non-treaty cases. There is no inconsistency in the fact that when a treaty applies, the treaty governs. No one would maintain that when a treaty reduces the U.S. withholding tax rate on dividends from 30% to 15%, there is an inconsistency with U.S. domestic law. The present case is no different.

The Tax Court cited the preamble to the final §1411 regulations[11] for the proposition that any FTC benefit provided by a tax treaty would need to be addressed on a treaty-by-treaty basis, saying that is exactly what the court attempted to do. Putting aside the problem that the Tax Court's decision did not correctly frame the treaty analysis, a reliance on language in a preamble that conflicts with the clear mandate of a treaty is unwarranted.

---

[11] T.D. 9644.

---

The preamble first stated that "The Treasury Department and the IRS do not believe that these regulations are an appropriate vehicle for guidance with respect to specific treaties." It should have stopped there. The preamble stated that an analysis of each U.S. treaty would be required

> to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country. If, however, a United States income tax treaty contains language similar to that in paragraph 2 of Article 23 (Relief from Double Taxation) of the 2006 United States Model Income Tax Convention, which refers to the limitations of United States law (which include sections 27(a) and 901), then such treaty would not provide an independent basis for a credit against the section 1411 tax.

The statement that the limitations of U.S. law include §27(a) and §901 — with its implicit inference that no tax would ever be creditable against a tax imposed by Chapter 2A — is clearly wrong as a matter of treaty interpretation. The claim that a treaty-specific analysis would be required should be interpreted as referring only to the question whether the foreign tax was in fact imposed on the same NII subject to U.S. tax and is considered to have a foreign source. These issues are relevant to application of the limitations imposed by §904. Some treaties do have specific "resourcing" rules that might be relevant in a particular case. But the *Toulouse* case did not present any such special issues.



© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

"Addn. 5"

The Tax Court appears to have sensed that its holding would conflict with the clear requirement of the treaties in question. The court approached this problem as whether legislation — in this case the addition of the NII tax — could "override" or "abrogate" a treaty. But properly understood, this case had nothing to do with a treaty override at all; certainly a preamble to Treasury regulations cannot abrogate a treaty. The treaty is not inconsistent with the Code; all the Tax Court was required to do in order to arrive at the correct answer in *Toulouse* was to apply the treaty.

That the Tax Court lost sight of this simple analysis is evident from its failure to even mention whether the French and Italian taxes paid by the taxpayer were imposed on her NII. Presumably they were, since the government did not claim otherwise, and if they had not been, the case would have been unnecessary. Similarly, the court failed to ask whether the NII in question had a foreign source under U.S. rules, which is a question required to be answered in order to determine what portion of the underlying taxes are creditable. The Tax Court did not analyze the manner in which the FTC rules operate and how those rules relate to the requirements of the treaties in question.[12]

---

[12] It did not help matters that in this case, the taxpayer claimed the FTC in the wrong way. Rather than simply claiming the FTC on the line provided for that purpose on her tax form, she netted out the credit against her NII tax only. Apparently she believed that because the Code does not permit an FTC for taxes not contained in Chapter 1, this roundabout approach, coupled with a claim for treaty relief, was required. In doing so, she made the same mistake that the Tax Court made, treating the treaty as being inconsistent with the Code in this respect.

---

One cannot help thinking that the taxpayer would have been better off seeking "competent authority" relief under the treaties.[13] There is no question that if Italy and France had been asked whether the United States was required to grant an FTC, both countries would have vociferously maintained that it was — and would have prevailed. Granted, competent authority cases can take years and are ill-suited to individual taxpayers — and this case, involving two foreign countries, would have required two separate proceedings. But the next taxpayer in Ms. Toulouse's situation might consider this worth the trouble.

---

[13] All U.S. tax treaties provide an avenue for taxpayers to appeal to the "competent authorities" of the contracting states where a violation of the treaty is alleged. *See, e.g.,* Article 26.1 of the France-U.S. tax treaty.

---


"Addn. 6"

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

# LETTERS TO THE EDITOR

## tax notes international®

# The Tax Court's Flawed Analysis In *Toulouse* Should Be Challenged

To the Editor:

There has been a fair amount of commentary in your pages[1] about the recent *Toulouse* decision[2] disallowing a taxpayer's treaty claim to a foreign tax credit offset against her net investment income tax liability (imposed under chapter 2A of the Internal Revenue Code of 1986).

In my opinion, the Tax Court's analysis of the issue was defective and as a result it probably reached the wrong decision.

The taxpayer, a U.S. citizen and apparently a French resident, sought to offset French taxes on her income against the NII tax under article 24(2)(a) of the France-U.S. tax treaty.[3] It provides as follows:

> In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen . . . of the United States as a credit against the United States income tax . . . the French income tax paid by or on behalf of such citizen.

Identical language is found in all U.S. treaties. Because it allows the United States to give credits in accordance with the provisions of its domestic law, initially it affords U.S. citizens nothing in the way of FTC relief for French tax.

Any relief provided under the treaty language must be found in the language of the parenthetical concerning post-treaty modifications to the "provisions and limitations" of U.S. law on FTCs. The treaty allows the United States to apply these changes if they "do not change the general principle hereof." "Hereof" is a reference to article 24(2)(a) itself, the "general principle" of which is the allowance of credits that are in accordance with the provisions and limitations of U.S. law as they existed at the time the treaty was entered into, or, more broadly, the elimination of double tax.

Because the United States and its treaty partner have specifically agreed when post-treaty amendments to the provisions and limitations of U.S. tax credit rules are to apply, it seems that the normal "later in time" principle for determining the primacy of domestic legislation and inconsistent treaty provisions must take a back seat. Any post-treaty modification in the U.S. FTC rules can be assumed to be incorporated into the earlier treaty only if the modification doesn't change the general principle of the preexisting rules.

That doesn't mean that the United States can't override this and enforce a change in its FTC rules that is inconsistent with the "general principle" of the prior rules if it wishes, but it seems to require that the new statutory rule be expressly stated to be applicable notwithstanding treaty provisions to the contrary. Thus, in 1986, when Congress amended the alternative minimum tax rules to cap FTCs at 90 percent of the AMT liability, the legislation expressly stated that this change override existing treaties (1988 Technical and Miscellaneous Revenue Act, section 1012(aa)(2)(B)). No similar provision was enacted in connection with the introduction of the NII tax. Indeed, there is no evidence any consideration was given by Congress to the FTC issue, which

---

[1] *See, e.g.,* Robert Goulder, "*Toulouse v. Commissioner*: The Treaty Made Me Do It," *Tax Notes Int'l*, Aug. 30, 2021, p. 1293; and Michael Smith, "U.S. Tax Court Clarifies Tension Between NIIT and Foreign Tax Credits," *Tax Notes Int'l*, Aug. 23, 2021, p. 1091.

[2] *Catherine S. Toulouse v. Commissioner*, 157 T.C. No. 4 (2021).

[3] There was a similar claim concerning Italian tax under the Italy-U.S. tax treaty. Because the taxpayer did not seek relief under article 24(2)(b) of the France-U.S. tax treaty (the "resourcing" provision), I presume this provision was inapplicable.

"Addn. 7"

For more *Tax Notes*® *International* content, please visit www.taxnotes.com.

would have affected comparatively few taxpayers.

There seems to be no dispute that the NII tax is an income tax and therefore within the ambit of U.S. income tax treaties. It was added to the IRC as a new chapter 2A, rather than as an amendment to the general income tax rules of chapter 1, which no doubt suited the convenience of the lawmakers. But it could just as readily have been incorporated into chapter 1. Because, unlike chapter 1, chapter 2A does not provide for an FTC, no FTC is allowable against NII tax as a matter of domestic law.

Can this be said to be a change in U.S. domestic law that is inconsistent with the "provisions and limitations" of the prior FTC rules? In my submission the answer is yes, because the failure to provide for an FTC offset against the NII tax (resulting in double tax) is a new and inconsistent "limitation" on the general principle of those rules as they existed prior to enactment of the NII tax. This would be more obvious if the NII tax had been incorporated within chapter 1, in which case an express provision would have been needed disapplying the FTC rules (similar to the AMT limitation in 1986), but the effect is the same.

The Tax Court didn't address this issue because it misread the crucial treaty language:

> The Treaties recognize that U.S. tax laws may be subsequently amended "without changing the general principle hereof." U.S.-France Treaty, art. 24(2)(a); U.S.-Italy Treaty, art. 23(2)(a). Section 1411 was enacted after both Treaties. Imposition of the net investment income tax is not a change to the general principles of U.S. tax laws.

As already noted, the "general principles hereof" are the general principles of the relevant treaty provision on FTCs, and not, as the Tax Court states, the "general principles of U.S. tax laws." Such a woolly reading does indeed eliminate any potential for relief to be allowed under the parenthetical language in treaty FTC articles. However, fundamental principles of statutory interpretation require such provisions to be interpreted in a manner that makes them meaningful.

Given the above, I trust other taxpayers will not be deterred from challenging this position again. ∎

Yours faithfully,
Jeffrey L. Gould
Youngstein & Gould
London
Sept. 22, 2021

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

"Addn. 8"

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

# VIEWPOINT

## tax notes international®

# *Toulouse*: No Treaty-Based Credit?

by H. David Rosenbloom and Fadi Shaheen






H. David Rosenbloom        Fadi Shaheen

H. David Rosenbloom is a member with Caplin & Drysdale Chtd. in Washington, the James S. Eustice Visiting Professor of Taxation and the director of the international tax program at New York University School of Law, and a member of Tax Analysts' board of directors. Fadi Shaheen is a professor of law and a Professor Charles Davenport Scholar at Rutgers Law School in Newark, New Jersey.

In this article, Rosenbloom and Shaheen maintain that the U.S. Tax Court's decision in *Toulouse* — that U.S. tax treaties with France and Italy do not provide a treaty-based foreign tax credit against the net investment income tax — is mistaken.

Copyright 2021 H. David Rosenbloom and Fadi Shaheen.
All rights reserved.

The 13th chime of a clock is what is referred to in current parlance as a "tell": The errant chime is probably wrong, suggesting something may be amiss in the mechanism. A close inspection is in order.

The analogy came to mind in reading the Tax Court's opinion in *Toulouse*,[1] involving a claim by a U.S. citizen residing in France of a treaty-based foreign tax credit for income taxes paid to France and Italy against the net investment income tax (NIIT) imposed by section 1411 of the Internal Revenue Code. In holding there was no credit, the Tax Court said the provisions for relief from double taxation in the U.S. tax treaties with France and Italy "expressly state that *any* allowable foreign tax credit is subject to the limitations of U.S. tax laws and must be in accordance with the Code" (emphasis added). "Accordingly, for petitioner to prevail on the basis of the provisions she cites, the Code must provide the credit if one exists," the court concluded. "It is immaterial that the Code does not affirmatively state that a foreign tax credit against the net investment income tax is disallowed," it added.

Reader, that does not sound right.

As the taxpayer conceded, the code does not provide an FTC against the NIIT.[2] It also does not prohibit an FTC against the NIIT. The taxpayer's point was that the treaties with France and Italy create an independent basis for a credit, and in the absence of a code prohibition, she should be entitled to rely on the treaties.

The taxpayer's position was clear. So was the court's response. Pointing to the language of both treaties that the United States shall allow an FTC "in accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)," the court

---

[1] *Toulouse v. Commissioner*, 157 T.C. No. 4 (2021).

[2] Section 901 provides for an FTC against the tax imposed by chapter 1 of subtitle A of the code. The NIIT is imposed by section 1411, which is in chapter 2A of subtitle A of the code. No code provision provides for an FTC against the NIIT.

"Addn. 9"    For more *Tax Notes® International* content, please visit www.taxnotes.com.

**VIEWPOINT**

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

held that the treaties "do not provide an independent basis" for an FTC against the NIIT.

### I. Independent Treaty-Based Credit?

The structure of a tax treaty certainly suggests that it provides an independent basis for an FTC. Take, for example, the 2016 U.S. model income tax convention. Article 2 (taxes covered) identifies the counterparties' taxes that are the subject of the document and provides that the treaty also applies to "any identical or substantially similar taxes that are imposed after the date of signature of the [treaty] in addition to, or in place of, the existing taxes." Article 23 (relief from double taxation) contains measures to alleviate double taxation and cross-references article 2 to indicate the taxes that are the focus of the relief. For the United States, the method of relief is the FTC, which is provided "in accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)." Most U.S. tax treaties in force, including those with France and Italy, follow that pattern. It would appear the cited provisions amount to an independent treaty-based FTC.

The code envisions treaty-based FTCs as well. Section 6511(d)(3) addresses overpayments attributable to foreign taxes "for which credit is allowed against the tax imposed by subtitle A in accordance with the provisions of section 901 or the provisions of any treaty to which the United States is a party."

The very purpose of treaty provisions for relief from double taxation would be in question if the Tax Court's logic in *Toulouse* were correct. To see that, an examination of the court's opinion and relevant statutory and treaty provisions is necessary.

### II. Analysis

#### A. Covered Taxes

The place to begin is article 2. The Italy-U.S. treaty includes in its article 2 the Italian Imposta Regionale Sulle Attività Produttive (IRAP), but only "that portion of such tax that is considered to be an income tax" under paragraph 2(c) of article 23. Under those rules, the amount of IRAP qualifying for the U.S. credit is computed with some deductions not allowed under Italian law.

Under the prior Italy-U.S. treaty, the IRAP was declared creditable to a similar extent.[3]

The IRAP is similar to a VAT and does not generally allow deductions for interest or labor costs. It is almost certainly not a creditable income tax under the code,[4] which allows a credit for foreign "income, war profits, and excess profits taxes."[5] Statutory and regulatory rules addressing creditability do not contemplate that a portion of a non-creditable tax may be extracted and considered an income tax.[6] Thus, the treaties with Italy have long provided an FTC that is not provided by the code.

The IRAP is cited as an example, but it is not unique. There are other U.S. treaties that grant credits for otherwise non-creditable or possibly non-creditable foreign taxes.[7] Various foreign levies on extraction income have been covered in treaties when their status under statutory rules was dubious.[8] It is hard to see how those foreign taxes can be made creditable by treaties if *Toulouse* is correct.

Given that treaties have been used to allow U.S. FTCs independent of the statutory rules, the issue in *Toulouse* is more subtle than the Tax Court recognized. There is more to say about article 2

---

[3] In a March 1998 release on the prior treaty (IR-INT-98-6), the IRS said "the United States does not believe it is required to provide a tax credit for IRAP under the Current Treaty," but added that "in accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended), the United States shall allow as a credit against the United States tax on income a portion of the amount of IRAP paid or accrued, and this portion shall be considered income tax for purposes of determining creditability." It said the United States "does not consider IRAP to be an income tax or an 'in lieu' tax within the meaning of section 901 or 903 of the Internal Revenue Code and the Income Tax Regulations thereunder."

[4] See Joint Committee on Taxation, "Explanation of Proposed Income Tax Treaty and Proposed Protocol Between the United States and the Italian Republic" (JCS-9-99), at article 23 ("Because the IRAP tax base does not permit deductions for labor and, in certain cases interest, it is not likely to be a creditable tax under U.S. internal law.").

[5] Section 901 and reg. section 1.901-2(a).

[6] Reg. section 1.901-2(a)(1) (with some exceptions not relevant here, "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax").

[7] See, e.g., Notice 2008-3, 2008-2 IRB 253 (regarding the Mexican Impuesto Empresarial a Tasa Única).

[8] See, e.g., the Netherlands-U.S. tax treaty (covering "de vennootschapsbelasting (company tax), including the government share in the net profits of the exploitation of natural resources levied pursuant to the Mining Act (Mijnbouwwet)"); and the Norway-U.S. tax treaty (covering "the national and municipal taxes on income (including contributions to the tax equalization fund), and the special tax administered under section 5 of the Act of 13 June 1975, No. 35, relating to the taxation of submarine petroleum resources").

"Addn. 10"

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

than the court's two brief sentences.[9] Because the issue is whether the treaties accord an FTC against the liability for NIIT, the threshold question is whether the NIIT, enacted after both the French and Italian treaties were signed, is a covered tax under article 2. The answer depends on whether the NIIT is identical or substantially similar to the U.S. taxes enumerated in article 2 of the French and Italian treaties. The federal income taxes imposed by the IRC are named in article 2 of all U.S. treaties, including the French and Italian treaties.

On the question of being identical or substantially similar, the United States has been generous in appraising foreign taxes enacted after a treaty was signed.[10] It seems to approach the question by asking whether a new foreign tax is similar to specified income taxes in that it functions as a tax on income.[11] There are no authorities explicitly determining whether U.S. taxes enacted after a treaty was signed were identical to or substantially similar to U.S. taxes specified in a treaty. There is, however, no reason to believe the interpretive standard should be any different when the question involves a U.S., rather than foreign, tax enacted after a treaty was signed. In a string of decisions addressing the alternative minimum tax, it was assumed without discussion that the AMT qualifies.[12]

The NIIT, a tax on investment income, would appear to meet the test for both Italian and French treaties. After all, reg. section 1.1411-1(a) provides that except as otherwise provided, all IRC provisions that "apply for chapter 1 purposes in determining taxable income (as defined in section 63(a)) of a taxpayer also apply in determining the tax imposed by section 1411." Substantial similarity to the federal income tax is clear.

If the NIIT were not covered by the French and Italian treaties, the court's conclusion that

creditability turns on what the code provides would surely be correct. If, however, the NIIT is a covered tax, analysis must turn to the articles on relief from double taxation (article 23 in the Italian treaty and article 24 in the French treaty).

## B. Relief From Double Taxation

### 1. 'Shared Expectations'

Article 23 of the Italian treaty and 24 of the French treaty apply to income taxes. Italian article 23 explicitly cross-references article 2, and French article 24 has a clear, if not explicit, cross-reference, and the structure of both treaties strongly suggests the link. That means Italy and France have agreed to give credits for the NIIT against their covered income taxes.[13]

Tax treaties are contracts, painstakingly negotiated by sovereign countries and interpreted in accordance with the "genuine shared expectations of the contracting parties."[14] The views of the United States, one of those contracting parties, are relevant and important in interpreting a U.S. treaty, but they are not controlling.[15] It would be odd for a document interpreted in accordance with the shared expectations of the contracting parties to provide that France and Italy must give a credit for the NIIT against their income taxes, but the United States need not give credits for French and Italian income taxes against the NIIT.

### 2. The Treaty Obligation

What, then, is to be made of the fact that the United States' treaty obligation to credit French and Italian taxes is cabined "in accordance with the provisions and subject to the limitations" of U.S. law? That is the language the Tax Court relied on to reach its broad conclusion that "the Code must provide the credit if one exists." As noted,

---

[9] *See Toulouse*, 157 T.C. No. 4, at 16-17.

[10] *E.g.*, Rev. Rul. 2002-16, 2002-15 C.B. 740 (Dutch schedular taxes).

[11] If the new tax is similar to a specified foreign tax that is not an income tax, the inquiry would presumably be somewhat different.

[12] *Lindsey v. Commissioner*, 98 T.C. 672 (1992), *aff'd*, 15 F.3d 1160 (D.C. Cir. 1994); *Jamieson v. Commissioner*, T.C. Memo. 1995-550, *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) (unpublished); *Pekar v. Commissioner*, 113 T.C. 158 (1999); *Kappus v. Commissioner*, T.C. Memo. 2002-36 (2002), *aff'd*, 337 F.3d 1053 (D.C. Cir. 2003); *Jamieson v. Commissioner*, T.C. Memo. 2008-118, *aff'd*, 584 F.3d 1074 (2009).

[13] France can exempt U.S.-source income, but if and to the extent it does not, it must provide a credit for covered U.S. taxes against its income tax. *See* article 24(1).

[14] *See, e.g., Maximov v. United States*, 299 F.2d 565, 568 (2d Cir. 1962), *aff'd* 373 U.S. 49 (1963); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 12 (2014) ("It is our 'responsibility to read the treaty in a manner "consistent with the *shared* expectations of the contracting parties."'" (emphasis in original)); *National Westminster Bank PLC v. United States*, 512 F.3d 1347, 1353 (Fed. Cir. 2008); and *Eshel v. Commissioner*, 831 F.3d 512 (2016).

[15] *North West Life Assurance Co. of Canada v. Commissioner*, 107 T.C. 363, 379 (1996) ("The Supreme Court has consistently held that we must consider the expectations and intentions of *both* signatories." (emphasis in original)).

For more *Tax Notes® International* content, please visit www.taxnotes.com.

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

that statement cannot be correct as a general proposition. Consider, once again, the IRAP.

IRC section 901(a) provides in pertinent part that the tax imposed by chapter 1 of subtitle A of the code "shall, subject to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b)." Section 901(b) provides that for U.S. citizens (such as the taxpayer in *Toulouse*), the amount referred to in subsection (a) is "the amount of any [foreign] income, war profits, and excess profits taxes." As noted, the IRAP is not that kind of tax. Therefore, the IRAP is not a creditable foreign tax for section 901 purposes. In the absence of another code provision providing a credit for the IRAP, it must be concluded that the code does not provide a credit for the IRAP at all. It is a fact, however, that a credit for a portion of the IRAP does exist. How so?

Article 23(2)(a) of the Italy-U.S. tax treaty provides in pertinent part:

> In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income the appropriate amount of *income tax* paid to Italy. [Emphasis added.]

Article 23(2)(b) then provides that a portion of the IRAP is considered an income tax for article 23 purposes.

As the U.S. Supreme Court has explained, when statute and treaty "relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either,"[16] and "no domestic legislation is required to give [a self-executing treaty] the force of law in the United States."[17] Article 23 of the Italian treaty provides a treaty-based credit for the IRAP. The code denies a section 901 credit for the IRAP, but it does not preclude any credit for the IRAP, and certainly does not preclude a treaty-based credit

for the IRAP. Allowing a credit for the IRAP against U.S. income tax gives full effect to both code and treaty provisions without violating the language of either, and harmony is achieved. The same logic applies to article 24 of the French treaty and double taxation relief provisions of other treaties.

What might the "in accordance with" and "subject to the limitations" references mean? The U.S. Treasury Department's official technical explanations of treaties carry considerable weight.[18] That should be especially true when the treaty language interpreted in a technical explanation is devised by the Treasury for a commitment of the United States. The model technical explanation of the 2006 U.S. model convention — Treasury's most recent model technical explanation — suggests that the reference is:

> to the various limitations of U.S. law (see, *e.g.*, Code sections 901-908). For example, the credit against U.S. tax generally is limited to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code section 904(a) and (d), and the dollar amount of the credit is determined in accordance with U.S. currency translation rules (see, *e.g.*, Code section 986).[19]

Treasury has also taken the position that statutory rules reducing the credit amount from 100 percent of the foreign tax paid to a lower percentage fall within the cited language.[20]

What, then, are the various limitations of U.S. law and of IRC sections 901 to 908? They are limitations on the amount of taxes that are eligible for the credit. The treatment of the IRAP makes clear that not all elements of the code that define the scope of the statutory FTC are limitations for that purpose. Under section 901(b), only foreign

---

[16]*Whitney v. Robertson*, 124 U.S. 190, 194 (1888).

[17]*Trans World Airlines Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984).

[18]*See, e.g., North West Life*, 107 T.C. 363.

[19]Similar language is in the technical explanations of the treaties with Italy and France.

[20]See, e.g., Treasury's technical explanation of the Italy-U.S. 1999 income tax convention, article 23(2), referring to the quoted language and saying, "The alternative minimum foreign tax credit generally is limited in accordance with U.S. law to 90 percent of alternative minimum tax liability."

"Addn. 12"    For more *Tax Notes® International* content, please visit www.taxnotes.com.

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

income, war profits, and excess profits taxes are creditable taxes for the section 901 credit. If the definition of what is creditable were a limitation of U.S. law, the U.S. obligation under article 23(2)(a) of the Italian treaty would have been subject to it, and the IRAP would not be creditable.

It seems the phrase "in accordance with the provisions and subject to the limitations of the law of the United States" does not refer to domestic rules pertaining to the kind of taxes eligible for the credit. That is presumably what the model technical explanation means by the statement that although the treaty provides for an FTC, "the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit." It is hard to see how a treaty could provide for an FTC if the kind — as opposed to the amount — of tax is subject to domestic law limitations.

Regarding the distinction between the phrases "in accordance with" and "subject to the limitations of," the first cannot be superfluous and is probably intended to expand, rather than limit, the treaty-based credit. The model technical explanation states that "U.S. law applies to determine carryover periods for excess credits and other inter-year adjustments."[21] The U.S. model and U.S. treaties in force say nothing specific about carryovers. Without the "in accordance with" language, treaties could be interpreted as not contemplating carryovers.

*Toulouse* involved a claim of credits for Italian and French taxes paid by the taxpayer in years before 2013 and carried forward and claimed for 2013, the year at issue. Consistent with the technical explanation, the IRS did not argue that the taxpayer could not prevail because the claimed treaty-based credit involved carryovers. That may have been based on the realization that treaty credit obligations incorporate the statutory carryover benefit under the "in accordance with" language.

The question of an independent treaty-based FTC against the NIIT is similar to that of the independent treaty-based credit for the IRAP.

Section 901(a) provides an FTC against the tax imposed by chapter 1 of subtitle A of the code. The NIIT is imposed by chapter 2A. Therefore, section 901(a) does not allow a section 901 credit against the NIIT, just as section 901(b) does not allow a section 901 credit for the IRAP. There is no code provision allowing an FTC against the NIIT, nor is there one allowing an FTC for the IRAP. There is, however, no code provision that denies a treaty-based credit against the NIIT, just as there is none denying a treaty-based credit for the IRAP.

The preamble to the section 1411 regulations suggests that section 27 constitutes a limitation on the FTC that the treaty-based credit obligation is subject to. Section 27, however, says nothing beyond what section 901 says. In its entirety, it provides that the "amount of taxes imposed by foreign counties and possessions of the United States shall be allowed as a credit against the tax imposed by [chapter 1 of subtitle A of the code] to the extent provided in section 901." The current purpose of section 27 seems to be a mere reference to section 901.

### 3. 'Without Changing the General Principle'

There is another reason the treaty language that credits under U.S. treaties are allowed "in accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)" does not preclude a treaty-based credit against the NIIT. Importantly, the model technical explanation interprets those words to mean that credits under U.S. treaties are allowed "in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, *so long as the general principle of the Article, that is, the allowance of a credit, is retained*" (emphasis added).

The parenthetical treaty language above prevents the "in accordance with . . . and subject to the limitations of" wording from impugning the allowance of a credit. Imposition of the NIIT without allowing a treaty-based credit against it would not retain the principle of allowing a credit for the NIIT.

The Tax Court dismissed that argument, saying that imposing the NIIT "is not a change to the general principles of U.S. tax laws." That, however, is the wrong reference. The question is not whether imposing the NIIT without a credit

---

[21]The same language is found in the technical explanation of the Italian treaty.

For more *Tax Notes® International* content, please visit www.taxnotes.com.

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

would change the general principles of U.S. tax laws but whether imposing the NIIT without a credit would retain the general principle of the allowance of a credit. The answer appears to be no.

### III. Final Remarks

There is considerably more to *Toulouse* than appears in the Tax Court's opinion. It is true that creditability of a foreign tax against a nonspecified U.S. tax presents a different question than creditability of a nonspecified foreign tax against the U.S. income tax. The first question raises issues regarding how the intricate U.S. rules for limiting the credit and allowing for carryovers apply when the statutory mechanisms are lacking. The second question presents less difficulty because the familiar statutory rules limiting creditable foreign taxes can easily apply to nonspecified foreign taxes. The distinction does not, however, present a convincing rationale for denying a treaty-based FTC in the first case. It certainly does not answer the question why the United States may refuse to credit specified French and Italian taxes against a nonspecified U.S. tax when France and Italy agree to give credit for that same nonspecified U.S. tax against their income taxes.

In concluding, it is worth identifying two pink herrings that swim into the analytical picture. The Tax Court professes not to be saying that "there is no independent, treaty-based credit and a credit is allowable only if it is provided in the Code."[22] It said, "Other provisions of the Treaties may well provide for credits that are unavailable under the Code." Really? One may fairly wonder what those other provisions might be. If they are not found in the treaty article on relief from double taxation, where would one look? Those articles have been essentially stable in content at least since the first U.S. model income tax convention in 1976.

The Tax Court said the taxpayer in *Toulouse* "relies on provisions that by their express terms do not" provide tax credits. However, no other articles could possibly provide credits. If the court's holding is correct, it is reasonable for the taxpayer to question the purpose of articles 24(2)

and 23(2) of the French and Italian treaties, respectively. In fact, the court's approach renders those articles meaningless regardless of whether other provisions exist, and that cannot be right. It is an established maxim of law that "words cannot be meaningless, else they would not have been used."[23] At any rate, the court's reference to other provisions does not count for much in the absence of any indication of what those provisions are.

The court noted that the preamble to the section 1411 regulations "explains that an analysis of each U.S. income tax treaty would be required to determine whether the United States has an obligation under the treaty to provide a foreign tax credit against the section 1411 tax." That statement certainly suggests acceptance of the concept of a treaty-based FTC. But what does the statement mean? If it means only that a future treaty might explicitly allow an FTC against the NIIT, it is hard to take exception. Anything is possible in the future. On the other hand, if the statement is intended to suggest that examining existing treaties might yield results different from the one the court reached for the French and Italian treaties, the preamble is misleading. Virtually all U.S. treaties are similar to the ones the Tax Court examined and for which it held there is no treaty FTC against the NIIT.

There is, of course, no question that in enacting a new tax after a treaty has been signed, Congress can provide that there is no FTC allowed against the new tax by the code or any treaty. The supremacy clause of the U.S. Constitution, which gives the same legal status to treaties and statutes, so provides. However, Congress did not do that in enacting the NIIT, which can easily be harmonized with the allowance of a treaty-based FTC.[24] The core problem with the Tax Court's decision in *Toulouse* is that it did not mention, or apparently consider, that kind of harmonization as an option. ∎

---

[22] *Toulouse*, 157 T.C. No. 4, at 21.

[23] *United States v. Butler*, 297 U.S. 1, 65 (1936).

[24] One commentator has argued that enacting the NIIT without allowing a statutory FTC is a treaty override. Reuven S. Avi-Yonah, "Is the Net Investment Income Tax a Treaty Override? Reflections on *Toulouse*," *Tax Notes Int'l*, Oct. 4, 2021, p. 41. The IRS dismissed that argument in its briefs in *Toulouse*, and we consider it foreclosed. The law is clear: The question of override does not arise if harmonization is possible. *See* H. David Rosenbloom and Fadi Shaheen, "Treaty Override: The False Conflict Between *Whitney* and *Cook*," 24 *Fla. Tax Rev.* 375 (2021).

"Addn. 14"

For more *Tax Notes® International* content, please visit www.taxnotes.com.

**B.      Articles XXIV(4) through (6) are Standalone Provisions that Allow for
A Treaty-Based Foreign Tax Credit
Irrespective of Any Other Treaty Limitations.**

In his Opening Brief, Plaintiff argued, in accordance with this Court's ruling in
*Christensen*, that Article XXIV(4) is independent from the provisions contained in Article
XXIV(1).  Plaintiff's position, like the decision in *Christensen*, finds support in the Court of
Appeals decisions in *Haver v. Comm'r*, 444 F.3d 656 (D.C. Cir 2006) and *Kappus v. Comm'r*, 337
F.3d 1053 (D.C. Cir. 2003), which recognized that Article XXIV(4) could be interpreted to provide
a credit independent of Article XXIV(1), although not deciding the case on that issue.  Applying
the plain language of Article XXIV(4)(b), Plaintiff, a U.S. citizen resident in Canada, is entitled to
offset the NIIT using treaty-based foreign tax credits corresponding to Canadian taxes of an
"appropriate amount".

Article XXIV(4)(b) states that "[f]or the purposes of computing the United States tax, the
United States shall allow as a credit against the United States tax the income tax paid or accrued
to Canada * * *."  Plaintiff paid Canadian tax in excess of the U.S. capital gains tax and the NIIT
arising on the sale of Canadian real property and the Defendant agrees that the plain text of Article
XXIV(4)(b) would provide the relief Plaintiff seeks in this case.  The Defendant contends,
however, that reading Article XXIV(4)(b) "in isolation completely ignores paragraph (6)."  (Def.
Br. at 28.)  The Defendant argues that "the drafters' inclusion of a special re-sourcing provision in
paragraph (6) shows that they understood that the paragraph (1) language restricting the foreign
tax credit ('in accordance with the provisions and subject to the limitation of the law of the United
States') applied to the credits referenced in paragraph 4(b) as well."[13]  *Id.*

---

[13]      Although the Defendant does not, and cannot, point to any textual language in the Canada
Treaty for this assertion, the Defendant argues that "[t]he failure of the Treaty to repeat [the Article

"Addn. 15"

Article XXIV(6) states that re-sourcing shall occur "to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or paragraph 5(c)." The Defendant maintains that "the only reason this re-sourcing rule would be necessary is if the drafters believed that the credit against U.S. tax referenced in subparagraph 4(b) was subject to the Code's § 904 limitation in the first place." (Def. Br. at 29.) The Defendant asserts that "[h]ad the drafters believed, as plaintiff contends, that paragraph 4(b) provides an independent credit unrestricted by the limitations of the Code, there would have been no reason to include paragraph (6) in the Treaty." (Def. Br. at 30.) The Defendant concludes that any other interpretation would produce "anomalous results" that are "unprecedented" and "could not have been intended by the contracting parties," including results such as a U.S. citizen resident in Canada being able to:

- Claim foreign tax credits against U.S. tax on U.S.-sourced income, despite the clear and longstanding policy behind the foreign-tax-credit limitation under § 904;

- Evade the § 904 limitation by cross-crediting foreign tax on general basket income against U.S. tax on passive basket income; and

- Obtain a double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, a windfall that would normally be precluded by § 911(d)(6).

*See*, Def. Br. at 33-34.

---

XXIV(1) limiting language] is inconsequential when the full text of Article XXIV is considered", citing *O'Connor v. United States*, 479 U.S. 27 (1986). (Def. Br. at 30.) The Defendant, however, does not apply the logic of the *O'Connor* decision, where the Supreme Court held that it would be inconceivable for the United States to surrender taxing rights on a U.S. citizen living in Panama when reciprocal taxing rights are not surrendered by the Panama authorities. Here, the Defendant argues that although the Canadian Government must permit the NIIT as a credit when the United States has primary taxing rights, the United States will not provide a reciprocal credit to offset the NIIT when Canada has primary taxing rights. Rather than the usual "your sovereignty for mine" bargain where the United States and Canada agree to relinquish reciprocal taxing rights, the Defendant urges that this treaty provides a unilateral taxing right for the United States Government (a position with which the Canada competent authority unsurprisingly disagrees). The logic of *O'Connor* does not support the Defendant's position that it is inconsequential that Article XXIV(4) did not include the Article XXIV(1) limiting language.

The Defendant points to no authority for this conjecture, and none exists. In fact, the examples contained in the Technical Explanation discussing the operation of Articles XXIV(4) through (6) unequivocally reach precisely the opposite conclusion, namely, that Article XXIV(1) does not apply. Simply put, as this Court found in *Christensen*, Articles XXXIV(4) through (6) are standalone provisions that operate without regard to Article XXIV(1) and the "anomalous" or "unprecedented" results that the Defendant argues "could not have been intended by the contracting parties" do in fact result from the proper application of these provisions. Moreover, these results accord with the shared expectations of the Treaty partners as set forth in the Technical Explanation.

The Technical Explanation (Doc. 18-3 at pp. 44-45, Exs. C and D) analyzes the case of a Canadian resident U.S. citizen receiving $100 of U.S. source royalty income and $200 of Canadian (*i.e.* foreign source) personal service income, and further assumes:

i.  <u>The United States Tax on the Royalty Income</u>. The U.S. source royalty income incurs $41.82 of U.S. tax before taking into account any treaty-based foreign tax credit based on the U.S. citizen's worldwide income. Applying the first bite rule, Article XXIV(4)(a) reduces the United States' primary taxing rights to $15.00 (*i.e.* 15 percent of $100), the amount of tax that a Canadian resident who is not a U.S. citizen would have incurred. Thus, the United States has the first bite of tax of $15.00. Applying the second bite rule, the remaining $26.82 of U.S. tax may be offset by Canadian taxes.

ii. <u>The Canadian Tax on the Royalty Income</u>. The example computes the amount of Canadian tax attributable to the royalty income to be $30.80. Because the Canadian tax exceeds the remaining amount of U.S. tax ($26.82), the excess Canadian tax

"Addn. 17"

($3.98), while giving rise to a credit, is not currently applied and instead "is a foreign tax credit carryover for U.S. purposes, *subject to the limitations of* [Treaty Article XXIV] *paragraph 5*."  (Emphasis added)

Under the terms of paragraph 5, the $3.98 could be used against future lower taxed royalties (whether active or passive) arising in a later year, even though Code Secs. 904(d)(1) and (6) would preclude the use of these credits in the future.[14]   Quite simply, as shown in this Technical Explanation example, the provisions of the Canada Treaty override the Code.

That the Technical Explanation contemplates the Canada Treaty overriding the Code is even more apparent in the treatment of the $200 of foreign source personal services income.  The example assumes:

  i.   The United States Tax on Canada Personal Services Income.  The $200 of Canada source personal service income is subject to the foreign earned income exclusion of Code Sec. 911, pursuant to which the U.S. citizen may exclude $80 from U.S. tax.  The U.S. tax on the remaining $120 of income is $50.18.  Because the relevant income is Canadian source, the United States does not have a "first bite" of tax.  As a result, the entire $50.18 may be offset by foreign tax credits.

  ii.   The Canadian Tax on the Personal Services Income.  The Canadian tax on the same $200 of personal services income is $84.20.[15]  Because the Canadian tax exceeds the remaining amount of U.S. tax ($50.18), the Canadian tax over the remaining United

---

[14]    Code Sec. 904(d)(1) would require a determination of whether the royalty arose in the active conduct of the taxpayer's business or as a passive investment.  Code Sec. 904(d)(6) provides that if a treaty provides for a foreign tax credit against U.S. source income, the foreign taxes cannot be used as a credit against other items of income arising in later years.

[15]    The Canadian tax is significantly higher since, although the U.S. citizen may deduct $80 from the $200 of personal services income under the U.S. "foreign earned income exclusion", the Canadian rules do not allow for the deduction and the full $200 is taxable in Canada.

"Addn. 18"

States tax ($34.02) while giving rise to a credit, is not currently applied and instead "is a foreign tax credit carryover for U.S. purposes, *subject to the limitations of* [Treaty Article XXIV] *paragraph 5*." (Emphasis added)

Under the Code's foreign earned income exclusion rules, because the taxpayer excluded the $80 of Canadian income, the taxpayer may not claim a credit for Canadian taxes that arise on such $80 of excluded income. Code Sec. 911(d)(6).[16] Significantly, the example provides for no reduction of Canadian taxes (the $34.02 carryover), even though $80 of income (on which the taxpayer incurred Canadian tax) was subject to the foreign earned income exclusion – a result directly contrary to the statutory mandate contained in Code Sec. 911(d)(6).

The Technical Explanation examples and their results are substantially different from what would result by applying the Code. These are, in fact, the very results the Defendant has characterized as "anomalous" and "unprecedented", specifically allowing the "double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, a windfall that would normally be precluded by § 911(d)(6)." (Def Br. at 34.) No doubt to the Defendant's dismay, the Technical Explanation examples provide analysis and results that are expressly and unequivocally *not* "in accordance with the provisions and subject to the limitations of the laws of the United States."

It follows from the Technical Explanation examples differing materially from what would have occurred under the Code, that the Defendant is mistaken in asserting that the drafters must have intended to incorporate Article XXIV(1) into the operation of Article XXIV(4) through (6). Consistent with this Court's holding in *Christensen* with respect to a parallel provision in the

---

[16] A reduction of the ratio of excluded income to total foreign earned income (80/200) multiplied by the Canadian tax on the foreign earned income ($84.20), or $33.68, would be required.

"Addn. 19"

FORM 19. Certificate of Compliance with Type-Volume Limitations

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1284

**Short Case Caption:** CHRISTENSEN v. UNITED STATES

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 11,431 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/24/2024

Signature: /s/ Stuart E Horwich

Name: Stuart E. Horwich

Save for Filing